UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RICHARD H. LIVINGSTON,

                                        Plaintiff,

            v.                                                      7:15-cv-0631 (TWD)

SCOTT HENDERSON; SEAN RYAN;
JEFFREY BALLAGH, CITY OF SYRACUSE,

                                        Defendants.
_____

APPEARANCES:                                        OF COUNSEL:

RICHARD H. LIVINGSTON
Plaintiff, *pro se*
14-B-3634
Great Meadow Correctional Facility
Comstock, New York 12821

CITY OF SYRACUSE CORPORATION COUNSEL          KHALID BASHJAWISH, ESQ.
*Attorneys for Defendants*                                      Assistant Corporation Counsel
233 East Washington Street
Syracuse, New York 13202

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**DECISION AND ORDER**[1]

I.      **INTRODUCTION**

            *Pro se* Plaintiff Richard H. Livingston, an inmate in custody of the New York State

Department of Corrections and Community Supervision, brings this action, pursuant to 42

U.S.C. § 1983, against Defendants Scott Henderson, Sean Ryan, Jeffrey Ballagh, and the City of

Syracuse alleging numerous violations of his rights secured by the United States Constitution

_____
            [1] This matter has been referred to the Court for all proceedings and the entry of judgment
in accordance with 28 U.S.C. § 636(c), and consent of the parties.  (Dkt. No. 33.)

and New York State law.  (Dkt. No. 67.)  His claims, which arise in connection with his arrest on

October 22, 2014, sound in conspiracy, illegal search and seizure, false arrest, malicious

prosecution, malicious abuse of process, denial of due process, intentional and negligent

infliction of emotional distress, excessive force, assault and battery, and municipality liability.

(*See generally* Dkt. No. 67.)  Presently before the Court is Defendants' motion for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 115.)  Plaintiff

opposes the motion.  (Dkt. No. 124.)  For the following reasons, Defendants' motion is granted

as set forth below; the amended complaint is dismissed in its entirety; and the Court declines to

exercise supplemental jurisdiction.

## II.    BACKGROUND

The following facts are undisputed unless otherwise noted.[2]  At the time of the events

giving rise to this action, Plaintiff was enrolled in the Syracuse Community Treatment Court

("SCTC") Judicial Diversion Program pursuant to a guilty plea made as part of a plea agreement

in Onondaga County Court on April 22, 2013, in connection with his possession of cocaine five

months earlier.  (Dkt. 115-2 at ¶¶ 1-6.[3])  While enrolled in the SCTC, Plaintiff violated his

contract repeatedly and produced two to three positive urine screens.  *Id*. at ¶ 6.  On July 17,

---

[2]  In response to Defendants' Statement of Material Facts, Plaintiff indicates whether he admits or denies the alleged fact in each numbered paragraph.  (Dkt. Nos. 115-2; 124-1.)  However, Plaintiff fails to cite to specific evidence in the record supporting his denials, as required by Local Rule 7.1(a)(3).  *See id*.  In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.  *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001).  Therefore, his version of the factual allegations has been gleaned from his assertions elsewhere in the record.

[3]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.  Unless indicated, all text quoted from Plaintiff's amended complaint, depositions, and motion papers is unaltered.

2014, Plaintiff missed a court appearance, prompting the Honorable James H. Cecile, Acting Onondaga County Court Judge, to issue a bench warrant for Plaintiff's arrest.  *Id*. at ¶¶ 9-11.

On October 21, 2014, the Honorable Rory A. McMahon, Syracuse City Court Judge, signed search warrants authorizing the search of Plaintiff, his associations, vehicles, and residences for evidence related to the illegal sale of cocaine, including, *inter alia*, John Land, Tarnyonoh Karpeh, 1619 West Genesee Street, and 152 West Lynhurst Avenue.  (Dkt. No. 115-2 at ¶ 17; *see also* Dkt. No. 115-14.)  On October 22, 2014, Judge McMahon signed a search warrant for another property associated with Plaintiff, 1034 State Fair Boulevard.  (Dkt. No. 115-7 at ¶¶ 15, 16.)  These search warrants were based, in part, on Plaintiff's sale of cocaine to confidential informants working with Ballagh and the Syracuse Police Department.  *Id*. at ¶¶ 1-16.[4]

On October 22, 2014, members of the Syracuse Police Department searched: (1) 1619 West Genesee Street; (2) 152 West Lynhurst Avenue; and (3) 1034 State Fair Boulevard pursuant to the search warrants issued by Judge McMahon.  (Dkt. No. 115-2 at ¶ 21.)  On that date, Plaintiff was renting 1034 State Fair Boulevard and resided there with his girlfriend, Tarnyonoh Karpeh.  (Dkt. No. 115-12 at 30.)  Plaintiff also rented 1619 West Genesee Street, with his girlfriend, and 152 West Lyndhurst Avenue.  *Id*. at 31.  In turn, Plaintiff sublet 152 West Lynhurst Avenue to John Land.  *Id*.

On October 22, 2012, at approximately 7:30 a.m., officers searched 152 West Lynhurst Avenue.  (Dkt. No. 124-3 at 43.)  John Land was arrested during the search and the following

---

[4]  Plaintiff "denies that an investigation even existed because after an alleged 18-month investigation, Ballagh has failed to offer evidence to corroborate his findings.  Moreover, this investigation entailed zero indictments.  This investigation is only alleged."  (Dkt. No. 124-1 at ¶ 12.)  Plaintiff also denies selling crack cocaine.  *Id*. at ¶ 13.

property was seized: (1) green brown plant like material; (2) two silver scales; (3) beige chunky substance; (4) small bag of white powder; (5) wallet; (6) cell phone; and (7) mail. (Dkt. No. 115-14 at 31.)

At approximately 11:50 a.m., officers searched 1034 State Fair Boulevard. (Dkt. No. 124-3 at 50.) Plaintiff and his girlfriend were present during the search and the following properly was seized: (1) glassine envelopes; (2) dagger, (3) U.S. Currency; (4) 5 white pills; (6) sandwich bags; (7) cell phones; and (8) a digital scale. *Id*. at 29.

Plaintiff was arrested on the bench warrant and for items recovered during the execution of the search warrant at 152 West Lynhurst Avenue, documented under DR # 14-503815. (Dkt. No. 124-3 at 45.) Plaintiff's girlfriend was arrested for the items recovered during the execution of the search warrant at 1034 State Fair Boulevard. *Id*. As discussed below, there are conflicting accounts at to what transpired during the search of 1034 State Fair Boulevard.

During Plaintiff's July 22, 2016, deposition, he testified that on the morning of October 22, 2014, he received multiple telephone calls from various neighbors informing him that police raided 152 West Lynhurst Avenue and 1619 West Genesee Street. (Dkt. No. 115-12 at 33-34.) By the time he put the phone down, "they was pulling up." *Id*. at 34-35.[5] At approximately 11:50 a.m., Defendants Ryan and Henderson, and over fifteen other members of the Syracuse Police Department, busted down the doors of 1034 State Fair Boulevard and Plaintiff

---

[5] Plaintiff testified, "I saw them pulling up. . . . I saw them actually getting ready. They didn't know I saw them, so I saw them. They opened the vehicle, they had a bus, vehicles pulling up, they were getting ready again, I actually saw it, and I saw my girlfriend and I opened my door I won't -- she was walking to the front and I was running to the back there and before I could even get there or before my girl could even open the door it was too late, they had busted the door -- they busted the door. (Dkt. No. 115-12 at 36.) Plaintiff testified that he was in the kitchen, by the back door, "to welcome them in" because he "didn't do nothing wrong." *Id*. at 37.

immediately put his hands up and complied with the officers' instructions. *Id*. at 36-37. Plaintiff

was handcuffed without incident. *Id*. at 37. After he was restrained, Henderson began to strike

Plaintiff in the face with an open palm, demanding to know the location of the drugs and guns.

*Id*. Henderson then punched Plaintiff in the stomach. *Id*. When another officer commanded

Henderson to "fall back," Henderson walked away and searched the residence. *Id*.; *see also* Dkt.

No. 67 at ¶ 24. When questioned about the use of force, Plaintiff testified:

> Q: And exactly what force are you claiming that he used on you?
>
> A: That he smacked the shit out of me two times and he punched me in the stomach and he was demanding drugs and guns.
>
> Q: How did he smack the shit out of you?
>
> A: He smacked me once and I don't know -- he smacked me once and then I was just like, whoa, ain't no -- what are you talking about? I was -- I was basically -- because I didn't know what was going on, like how are you going to smack a man when he's restrained, you know? I was furious at him because like why did you wait until I'm restrained to do that?
>
> Q: Which part of your body did he strike?
>
> A: My face, my cheek -- my right cheek and my left cheek.
>
> Q: What did he use to strike you?
>
> A: His hand, open-hand style.
>
> Q: And he punched you in the stomach?
>
> A: He punched me in the mid-section, yes.

*Id*. at 44-46.

In his affidavit submitted in support of Defendants' motion, Henderson states that when

they entered 1034 State Fair Boulevard to execute the search warrant, he observed Plaintiff in the

rear of the kitchen. (Dkt. No. 115-6 at ¶ 4.) Henderson and other officers gave Plaintiff repeated

commands to "get on the ground and to show his hands." *Id*. at ¶ 5. Instead, Plaintiff "turned

and moved toward the rear of the kitchen as if he was fleeing the residence." *Id*. at ¶ 6.

Henderson next explains:

> I forced [Plaintiff] to the ground, but he was actively resisting by
> holding his hands underneath his body and was refusing
> commands to stop resisting and to put his hands behind his back.
> After seeing that he was actively resisting, I struck him twice with
> an open palm to shock him into releasing his hands. After the two
> open palm strikes, Plaintiff released his hands from underneath his
> body, and I was able to secure him in handcuffs.

*Id*. at ¶¶ 7-9. Henderson also completed a "Narrative Supplement" shortly after the incident,

under DR # 14-504226, in which he states that upon entering the residence, he observed a male,

identified as Plaintiff, standing in the back of the kitchen:

> Livingston refused repeated commands to "show his hands" and
> "get on the ground" instead remaining to stand then turning away
> from us. I took hold of Livingston's right arm/shoulder and forced
> him [to] the ground where he was instructed to place his hands
> behind his back and not to resist his arrest. Livingston failed to
> comply and held his hands beneath his chest. I delivered two open
> hand strikes to the right side of Livingston's face which proved
> successful as he then placed his hands behind his back where they
> were handcuffed. Livingston stated he was not injured as a result
> of the incident and no obvious injuries were observed. Livingston
> was later lodged at the Justice Center on multiple charges.

(Dkt. No. 124-3 at 50.)

Ryan also completed a "Narrative" documenting the execution of the search of 1034

State Fair Boulevard under DR # 14-504226. (Dkt. No. 124-3 at 45.) According to Ryan, at

approximately 11:50 a.m., fifteen members of the Syracuse Police Department Special

Investigations Division, Gang Task Force, and Crime Reduction Team executed search warrants

on Plaintiff, and the residence of 1034 State Fair Boulevard. (Dkt. No. 124-3 at 45.) Two

detectives from the Onondaga County Sheriff's Office ("OSCO") were also present. *Id*. Upon

arrival, the front door of the residence was forced opened and Plaintiff was taken into custody in

the kitchen area and Tarnyonoh Karpeh in the living room.  *Id*.  After a systematic search of the

parties and the property, the following items were recovered and seized: (1) glassine envelopes;

(2) dagger, (3) $367.00; (4) 5 white pills; (5) $29.00; (6) box of sandwich baggies; (7) $280.00;

(8) cell phones; and (9) digital scale.  *Id*.; *see also* (Dkt. No. 115-14 at 31.)  Ryan described the

dagger as a "double sided knife, thereby constituting it to be a dangerous knife."  *Id*.  He further

stated:

> With Livingston's extensive background in dealing narcotics he
> has no legitimate reason for possessing that knife in the residence
> other than to use it unlawfully against another to protect his drug
> business.

*Id*.  Ryan's narrative indicated Plaintiff had an "outstanding warrant for CPCS 3rd and he was

booked by the OSCO detectives on this charge."  *Id*.  He further explains:

> After a consultation with the DA's office no charges were filed
> against Livingston on today's date for the items that were located
> in the residence.  However, he was charged with CPCS 3rd, 4th,
> and 7th for cocaine that was recovered at 152 Lynhurst Ave. that
> was documented under DR # 14-503815.

*Id*.

On October 22, 2014, Ballagh filed a felony complaint accusing Plaintiff of knowingly

and unlawfully possessing cocaine inside his home, located at 152 West Lynhurst Avenue, which

was the subject of lawful search warrant signed by Judge McMahon on October 21, 2014.  (Dkt.

No. 124-3 at 46.)  On October 23, 2014, Plaintiff was arraigned on the new felony charges.  (Dkt.

No. 67 at ¶ 25.)  By letter dated October 23, 2014, Plaintiff was advised that the following

charges were pending and would be submitted to the Grand Jury pursuant to CPL 190.50(5) in

connection with the search of 152 West Lynhurst Avenue under DR # 14-503815: criminal

possession of controlled substance in the third, fourth, and seventh (two counts) degrees, and

criminal use of drug paraphernalia in the second degree.  (Dkt. No. 124-3 at 44.)  According to

Plaintiff's criminal attorney, the October 22, 2012, charges were not presented for indictment. (Dkt. No. 115-8 at 8; *see also* Dkt. No. 67 at ¶ 26.)

On November 25, 2014, Plaintiff appeared before Judge Cecile in SCTC for sentencing based on his 2013 plea regarding Indictment 2013-0091-1. (Dkt. No. 115-8.) During the sentencing, Judge Cecile acknowledged that Plaintiff had asked for another chance to complete the judicial diversion program and requested an adjournment on the sentencing because "he's going to be able to beat the new charge – the new charges that he has been arrested on." *Id.* at 2-3. Judge Cecile continued:

> However, the reason I -- one of the reasons I'm sentencing Mr.
> Livingston is not only because of the new charges; but also, I gave
> him the last chance warning on June 17th and -- of this year -- and
> not only did he get rearrested on new charges, but he tested
> positive on the screenings in September after that. So, that's why I
> intend to sentence him today.

*Id.* at 3. Regarding the 2013 plea on Indictment 2013-0091-1, the Assistant District Attorney recommended a sentence between six and eight years and agreed that the sentence would satisfy also the new charges arising out of the October 22, 2014, search of 152 West Lynhurst Avenue stating:

> And I did speak with Senior ADA Mike Ferrante this morning,
> whose case this was originally, and who has the new felony case.
> He's asking for a sentence of between six and eight years in state
> prison. And if Mr. Livingston does receive a sentence of six to
> eight years, he will satisfy the new felony charge.
>
> And he wanted the Court to know as well that Mr. Livingston was
> the target of that search warrant and investigation for the selling of
> cocaine. They found cocaine, scales, and packaging all at the
> residence.

*Id.* at 7. Thereafter, with regard to Plaintiff's plea of guilty entered April 22, 2013, to criminal possession of a controlled substance in the third degree, Plaintiff was sentenced, as a second

felony offender, to a determinate term of imprisonment for six years followed by three years of post-release supervision. *Id*. at 18-19; *see also* Dkt. No. 115-16 at 2-3. Judge Cecile indicated Plaintiff' guilty plea would also satisfy the charges stemming from a June 3, 2014, arrest. (Dkt. No. 115-8 at 18.)

It is undisputed that although Plaintiff was arrested on October 22, 2014, for, *inter alia*, criminal possession of a controlled substance in the third and seventh degree as well as possession of drug paraphernalia, these charges were dismissed in satisfaction of Plaintiff receiving six years as a predicate felon. (Dkt. No. 115-2 at ¶ 30; Dkt. No. 124-1 at ¶ 30; *see also* Dkt No. 115-12 at 46-47.[6])

The Court takes judicial notice of the Certificate of Conviction/Disposition, that on April 30, 2015, the charges stemming from Plaintiff's October 22, 2014, arrest in connection with the search of 152 West Lynhurst Avenue (DR # 14-503815) were deemed "COVO"[7] by 2013-0091-1. (Dkt. No. 42-8.[8])

Plaintiff claims Defendants violated his constitutional rights and challenges the length of his current sentence, contending, *inter alia*, that his October 22, 2014, arrest and the charges

---

[6] Indeed, Plaintiff testified: "Q: So he asked the judge to sentence you to six to eight years and that would cover the charges incurred as a result of your October arrest? A: Absolutely. Q: Is that what happened? A: Sentenced me six years, three years post-release." (Dkt. No. 115-12 at 46-47. ) Plaintiff claims a detainer remained active and the charges were not formally dismissed on April 30, 2015. (Dkt. No. 67 at ¶ 31.) *See also* Dkt. No. 124-3 at 63 ("In response to your recent note, attached is the "Certificate of Disposition" received from Syracuse City Court. Your charges were covered and dismissed in satisfaction of your plea on another case (COVO) on 4/30/15.").

[7] According to the publicly available website maintained by the New York State Unified Court System, "COVO" is defined as "covered by disposition in another case." *See* https://iapps.courts.state.ny.us/webcrim_attorney/WebcriminalGlossary#CC (last visited Mar. 27, 2019).

[8] The state prosecution of an individual is a matter of public record, of which a court may take judicial notice. *Shmueli v. City of New York,* 424 F.3d 231, 233 (2d Cir. 2005).

were used to "enhance" his sentence on his conviction for criminal possession of a controlled substance in the third degree, based on his 2013 guilty plea. (*See generally* Dkt. No. 67.) Plaintiff explained:

> Q: So why are you incarcerated today? Why are you here?
>
> A: Drug court.
>
> Q: And that was because you violated the provisions of the drug court?
>
> A: New charges. . . . I don't dispute being convicted in drug court. What I'm disputing is the enhanced sentence that they gave me based on these charges.
>
> Q: What was the enhanced sentence?
>
> A: Six years.
>
> Q: They gave you six years because you violated the drug court provisions?
>
> A: Not because I violated the drug court, just because the new charges.
>
> Q: What new charges?
>
> A: June 3rd and October 22nd.

(Dkt. No. 115-13 at 53.)

The Court takes judicial notice of the fact that Plaintiff is presently incarcerated at Great Meadow Correctional Facility in Comstock, New York, serving a term of six years for the crime of criminal possession of a controlled substance in the third degree, of which he was convicted.[9]

---

[9] *See* http://nysdoccslookup.doccs.ny.gov (DIN # 14-B-3634) (last visited Mar. 28, 2019).

## III.    APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[10] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93

---

[10] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    THE PARTIES' CONTENTIONS

Generally, Plaintiff claims that: (1) Ryan, Henderson, and Ballagh conspired to violate Plaintiff's constitutional rights by attempting to "cover up" defective search warrants and exaggerating evidence in order to "impact" Plaintiff's sentence at the SCTC and to avoid civil liability; (2) Ryan, Henderson, and Ballagh violated state and federal constitutional laws against unreasonable searches and seizures; (3) Ballagh is liable for false arrest; (4) Henderson engaged in extreme and outrageous conduct in executing the search warrant and subjected Plaintiff to excessive force, assault and battery, and an unlawful interrogation; (5) Ryan violated state and federal due process of law by exaggerating evidence in police reports and filed a false report to impact Plaintiff's drug court status and cover up Defendants' wrongdoings to avoid civil liability; (6) Ryan, Henderson, and Ballagh engaged in malicious abuse of process; (7) Ballagh participated in a malicious prosecution, offered false and exaggerated evidence in the search warrant applications, and offered a false instrument for filing; (8) Ryan is liable for negligent and intentional infliction of emotional distress; (9) Henderson and Ballagh are liable for intentional infliction of emotional distress; and (10) the City of Syracuse failed to adequately train, supervise, and discipline Ballagh, Ryan, and Henderson.  (Dkt. No. 67 at ¶¶ 37-64.[11])

Generally, Defendants seek summary judgment and dismissal of the amended complaint in its entirety on the following grounds: (1) Plaintiff's § 1983 claims for false arrest, illegal search and seizure, malicious prosecution, and fabrication of evidence are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994); (2) Plaintiff's §§ 1983 and 1985(3) and state law claims for

---

[11]  For a complete statement, reference is made to the amended complaint.  (Dkt. No. 67.)

conspiracy, malicious abuse of process, intentional and negligent infliction of emotional distress, excessive force, and assault and battery fail as a matter of law; and (3) Plaintiff's municipal liability claims fail as a matter of law. (Dkt. No. 115-3.) In his response, Plaintiff claims, *inter alia*, that (1) his constitutional rights were violated; (2) Defendants' misconstrue the nature of his § 1983 claims; and (3) a genuine issue of material fact precludes summary judgment. (Dkt. No. 124.) Plaintiff does, however, admit the following claims should be dismissed: (1) conspiracy claims against Ryan and Henderson; (2) illegal search and seizure claims against Ryan and Henderson; and (3) negligent infliction of emotion distress claim against Ryan. (Dkt. No. 124 at 6, 9, 24.)

## V.    ANALYSIS

To prevail on a claim under § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws (2) by a person acting under the color of state law. *See* 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Duamutef v. Morris*, 956 F. Supp. 1112, 1115 (S.D.N.Y. 1997) (citing *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993)).

As detailed above, the gravamen of Plaintiff's amended complaint deals with the investigation, search warrants, search and seizure of property, false arrest, filing of false documents, malicious prosecution, malicious abuse of process, and conspiracy. The thrust of Plaintiff's allegation is that the "unfounded" charges stemming from his arrest on October 22, 2014, were used to "enhance" his sentence in the SCTC for criminal conviction of a controlled substance in the third degree. Although Plaintiff's only seeks monetary damages in this action,

distilled to their core, and with exception of the excessive force claim, Plaintiff's § 1983 claims challenge his current prison sentence.

###   A.   *Heck v. Humphrey*

A civil lawsuit may not be used to collaterally attack a criminal conviction. *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id*. at 486-87 (internal footnote omitted). This rule has come to be known as the "favorable termination" requirement. *See McKithen* v. Brown, 481 F.3d 89, 101 n.13 (2d Cir. 2007).

Under *Heck* and its progeny, a "§ 1983 action is barred (absent prior invalidation) no matter the relief sought (damages or equitable relief) . . . *if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) (emphasis in original). If a plaintiff whose success would necessarily demonstrate the invalidity of the confinement or its duration does not satisfy *Heck's* "favorable termination rule," he must seek relief through the federal habeas corpus statute rather than through § 1983. *Peralta v. Vasquez*, 467 F.3d 98, 104 (2d Cir. 2006) ("[T]he purpose of the *Heck* favorable termination requirement is to prevent prisoners from using § 1983 to vitiate collaterally a judicial or administrative decision that affected the overall length of confinement, and that punishments related to their term of imprisonment, or the procedures that led to them . . . must be attacked through a habeas petition."); *see Preiser v. Rodriguez*, 411 U.S. 475, 500

(1973) (habeas corpus relief is the "sole federal remedy" available to a state prisoner seeking to attack the fact or duration of his confinement).[12]

The dispositive factor in the *Heck* inquiry is whether judgment in favor of the prisoner would "necessarily imply" the validity of the conviction or the sentence. *Gastelu v. Breslin*, No. 3-CV-1339, 2005 WL 2271933, at *2 (E.D.N.Y. Sept. 12, 2005) (citing *Heck*, 512 U.S. at 487). If so, the prisoner cannot bring a § 1983 action unless the conviction or sentence has already been invalidated. *Id.*; *see also Praileau v. Fischer*, 930 F. Supp. 2d 383, 396 (N.D.N.Y. 2013) (stating "[u]nless, and until, the conviction is challenged and adjudicated" in the plaintiff's favor, the plaintiff's § 1983 claims are barred under *Heck*). For purposes of *Heck*, a termination is not favorable to an accused if the charge is withdrawn or the prosecution abandoned the charge pursuant to a compromise with the accused. *Rothstein v. Carriere*, 373 F.3d 275, 286-87 (2d Cir. 2004). Conversely, where the § 1983 action "even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment . . . the action should be allowed to proceed." *Heck*, 512 U.S. at 487 (emphasis in original).[13]

Accordingly, courts routinely dismiss § 1983 claims that implicate the validity of the prisoner's conviction or sentence when he has failed to demonstrate that his conviction was favorably terminated. *See Duamutef v. Morris*, 956 F. Supp. 1112, 1115-18 (S.D.N.Y. 1997)

---

[12] The Court takes judicial notice of Plaintiff's petition for habeas corpus pursuant to 28 U.S.C. § 2254, filed July 9, 2018, in the Northern District of New York, entitled *Richard Livingston v. Christopher Miller*, 9:18-cv-0803. Plaintiff's habeas petition before the Honorable Brenda K. Sannes, U.S. District Judge, is the proper avenue by which Plaintiff may seek relief from his conviction or sentence.

[13] As pertinent here, it is "well established that an excessive force claim does not usually bear the requisite relationship under *Heck* to mandate its dismissal." *McGrew v. Holt*, No. 6:13-cv-792 (GLS/TWD), 2015 WL 736614, at *4 (N.D.N.Y. Feb. 20, 2015) (quoting *Smith v. Fields*, No. 95 CIV. 8374, 2002 WL 342620, at *4 (S.D.N.Y. Mar. 4, 2002)). Defendants' motion for summary judgment on the excessive force claim is addressed in Section V.B., *infra*.

(dismissing § 1983 claims of malicious prosecution, false arrest, perjury, retaliation, and civil rights conspiracy under *Heck* where the plaintiff's underlying conviction had not been overturned); *Peay v. Ajello*, 470 F.3d 65, 68 (2d Cir. 2006) ("Inasmuch as plaintiff has not shown that his conviction has been reversed or declared invalid, the District Court properly dismissed the claims against [defendant]."); *Gibson v. City of New York*, 182 F.3d 899, 899 (2d Cir. 1999) (affirming a *Heck*-based dismissal where the plaintiff had failed to establish that his conviction had been reversed); *Houston v. City of New* York, No. 06 CV 2094 (RJD)(LB), 2013 WL 1310554, at *4-5 (E.D.N.Y. Mar. 28, 2013) (applying *Heck* to bar § 1983 claims for malicious prosecution and malicious about of process); *Younger v. City of New York*, 480 F. Supp. 2d 723, 730 (S.D.N.Y. 2007) (holding that plaintiff's § 1983 claims for false arrest and malicious prosecution would, if successful, render plaintiff's conviction invalid, and, were therefore barred by the favorable termination doctrine articulated in *Heck*); *Rivera v. City of Yonkers*, 470 F .Supp. 2d 402, 408 (S.D.N.Y. 2007) (dismissing plaintiff's false imprisonment/arrest and malicious prosecution claims pursuant to § 1983 because under *Heck*, "a conviction for a crime cannot be considered a termination in favor of the accused"); *McFadden v. New York*, No. 10-CV-141 (RRM)(CLP), 2011 WL 6813194, at *4 (E.D.N.Y. Dec. 28, 2011) ("Claims for both false arrest and malicious prosecution both call into question the validity of a conviction, because false arrest requires a lack of probable cause and malicious prosecution requires probable cause and a termination of the proceedings in the defendant's favor."); *see also Lane v. Papadimitrious*, No. 6:10-CV-647, 2010 WL 2803468, at *1 (N.D.N.Y. July 14, 2010) ("Thus, plaintiff's claims in the nature of perjury, slander, evidence-tampering, conspiracy to bring unfounded criminal charges against him, and false imprisonment necessarily implicate the validity of his conviction and are thus barred under *Heck v. Humphrey*, [] until such time as the

conviction may be vacated or otherwise invalidated."); *Wallace v. Speiget*, No. 04-CV-2821 (DGT), 2005 WL 1544811, at *1-2 (E.D.N.Y. July 1, 2005) (holding that *Heck* precluded plaintiff's § 1983 claims for malicious prosecution and slander).

Further, conspiracy claims are routinely dismissed under *Heck* when such claims bear on the validity of the underlying conviction or sentence. *Cruz v. Reilly*, No. 08-CV-1245 (JFB)(AKT), 2009 WL 2567990, at *3 (E.D.N.Y. Aug. 18, 2009) (collecting cases); *see also Amaker v. Weiner*, 179 F.3d 48, 52 (2d Cir. 1999) (holding that "*Heck* . . . applies with respect not only to [the] plaintiff's § 1983 claim but also to his §§ 1981, 1985(3) and 1986 claims" because the existence of a conspiracy would necessarily question the validity of plaintiff's conviction).

Here, excluding the excessive force claim, Plaintiff's §§ 1983 and 1985(3) claims fall squarely within the ambit of *Heck* because a decision in his favor would necessarily call into question the validity of his conviction or sentence.[14] Plaintiff apparently concedes as much. Notably, after Defendants' motion for summary judgment was fully briefed, Plaintiff filed a motion to consolidate this action with his petition for a writ of habeas corpus. (Dkt. No. 126.) In support of his motion to consolidate, Plaintiff stated:

> The two actions are solely based on common questions of law and fact. In addition both actions are related and coincide with each other. The section 1983 in pertinent part and the events leading up the Federal Habeas Corpus Petition filed.
>
> As a threshold matter the Habeas Corpus Petition must be heard and decided first and foremost as to not bar the [§] 1983 claims for the purpose of *Heck v. Humphrey*.

---

[14] In so holding, the Court expresses no opinion as to the merits of Plaintiff's §§ 1983 and 1985(3) claims at this juncture nor the validity of his underlying conviction or sentence, which is before Judge Sannes.

*Id*. at 1.  There, Plaintiff detailed the many ways in which he was "still held accountable" by the SCTC because the investigation, warrants, search and seizure, and arrest "were used at sentencing to negatively influence SCTC in imposing a lengthy prison term on Plaintiff."  *Id*. at 2.  Plaintiff further claimed that the District Attorney in attempt to cover up Defendants' errors, "fraudulently introduced elements" of the investigation to the SCTC "creating a strong presumption of Plaintiff being guilty."  *Id*.  Plaintiff explained that "the ploy" was "obvious" because Defendants used:

> SCTC as a vehicle to cover up the Detective's constitutional errors in order to help the Detective avoid civil and criminal liability. Attempting to merge the new charges (felonies) and drug court plea together by satisfying (dismissing).  As a result of six-eight years imposed.  [T]his is a crafty cover up.

*Id*. at 3.[15]

Clearly, were Plaintiff to succeed on any theory espoused above, he would necessarily call into question the validity of his current conviction or sentence.  Thus, Plaintiff's §§ 1983 and 1985(3) claims for conspiracy, illegal search and seizure, false arrest, malicious prosecution, malicious abuse of process, and denial of due process, all of which would necessarily imply the invalidity of his current conviction or sentence are barred under *Heck* unless and until such time as Plaintiff's conviction is overturned or his sentenced invalidated.  Therefore, these §§ 1983 and 1985(3) claims are not cognizable at this time.

"Disposition of the case on *Heck* grounds, however, warrants only dismissal without prejudice, because the suit may be reinstituted should plaintiff's conviction be 'expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or

---

[15]  By Decision & Order filed October 31, 2018, Plaintiff's motion to consolidate was denied. (Dkt. No. 128.)  The Court takes judicial notice that Plaintiff filed the same motion in his habeas petition pending before Judge Sannes, which was also denied by Order filed October 31, 2018.

called into question by a federal court's issuance of a writ of habeas corpus.'" *Amaker*, 179 F.3d at 52 (quoting, *inter alia*, *Heck*, 512 U.S. at 487).

**B.  Fourth Amendment Excessive Force**

Claims that law enforcement officers used excessive force in the course of an arrest are analyzed under the Fourth Amendment's reasonable standard. *Graham v. Connor*, 490 U.S. 386, 396 (1980).  Application of this test is case specific and requires a balancing of the "nature and quality of the intrusion on the plaintiff's Fourth Amendment interest against countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).  When performing a Fourth Amendment excessive force analysis, a court must consider (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *See id.*; *see also Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015); *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).

In making the excessive force inquiry, a court must evaluate the circumstances from the perspective of a reasonable officer at the time of the incident, rather than through the 20/20 lens of hindsight, taking into consideration that law enforcement officials are often forced to make split second judgments during the course of events that are rapidly evolving. *Tracy*, 623 F.3d at 96; *Brown*, 798 F.3d at 100.  Since physical force is often necessary to take somebody into custody, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. *Graham*, 490 U.S. at 396 (internal citation omitted).  Indeed, a "*de minimus* use of force will rarely suffice to state a Constitutional claim." *Romano v. Howarth*, 998 F.2d 101 105 (2d Cir. 2005).

"Further, a plaintiff must allege that he sustained an injury to maintain an excessive force claim." *Acosta v. City of New York*, No. 11 Civ. 856(KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012) (dismissing excessive force claim where plaintiff alleged that he was punched in the chest and thrown to the ground but did not allege any injury). Such injury need not be severe, however. *Robison v. Vi*a, 821 F.2d 913, 924 (2d Cir. 1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe."). Still it is clear that some type of injury is required to prevail on a § 1983 excessive force claim. *Castro v. Cty. Nassau*, 739 F. Supp. 2d 153, 177 n.16 (E.D.N.Y. 2010).

"[T]he Second Circuit and district courts in the Circuit recognize the concept of *de minimis* injury and, when the injury resulting from alleged excessive force falls into that category, the excessive force claim is dismissed." *Jackson v. City of N.Y.*, 939 F. Supp 2d 219, 231 (E.D.N.Y. 2013) (quotation marks and citation omitted). "[S]hort-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches from a cut inside the mouth" have been held to be *de minimis* and, thus, unactionable. *Id.* (quoting *Lemmo v. McKoy*, No. 08–CV4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011)). However, "the fact that [the p]laintiff may not have sustained serious long lasting harm is not dispositive." *Graham v. City of New York*, 928 F. Supp. 2d 610, 618 (E.D.N.Y. 2013); *see also Jennings v. Decker*, 17-CV-0054, 2019 WL 251781, at *8 (N.D.N.Y. Jan. 17, 2019) (observing that at the summary judgment stage even minor injuries, including scrapes and bruises, can support an excessive force claim).

Defendants argue Plaintiff's excessive force claim should be dismissed because Henderson used reasonable force to arrest Plaintiff and the alleged injury, if any, was *di minims*. (Dkt. No. 115-3 at 15-16.) As detailed above, Defendants contend that upon entering 1034 State

Fair Boulevard, Henderson observed Plaintiff moving towards the rear of the residence, as if he were trying to flee. (Dkt. No. 115-6 at ¶¶ 4, 5.) Plaintiff refused repeated commands and was actively resisting arrest. *Id*. at ¶¶ 5, 7. As a result, Henderson used two open palm strikes to shock Plaintiff into releasing his hands and was successful in securing Plaintiff's hands without further incident. *Id*. at ¶¶ 8, 9. Thus, according to Defendants, Henderson acted reasonably under the circumstances and the *de minimis* nature of Plaintiff's injury provides conclusive prove that the force used was *de minimis*. (Dkt. No. 115-3 at 16-17.)

In contrast, Plaintiff claims that he immediately put his hands up, complied with the officers' instructions, and was handcuffed without incident. *Id*. at 36-37. After he was restrained, however, Henderson struck Plaintiff in the face with an open palm, demanding to know the location of the drugs and guns, and punched him in the stomach. *Id*. at 37. Plaintiff also points out that he was not charged with resisting arrest on October 22, 2014, and suggests Henderson's statement that Plaintiff was "resisting arrest" was alleged after the fact "to justify the unreasonable force." (Dkt. No. 124-1 at 26.)

To be sure, resolution of such conflicting versions of the relevant events, including the severity of the plaintiff's resulting injuries, are generally a matter for the jury and not for the court on summary judgment. *McGrew v. Holt*, 2015 WL 736614, at *4. In this case, however, Plaintiff has alleged no injuries:

> Q: Did you complain of any injuries after your arrest?
>
> A: No, I wasn't injured.
>
> Q: Did you talk to any supervisor about the force that was used on you?
>
> A: No.

(Dkt. No. 115-13 at 39.)

Q:  Did you tell any officers you were injured?

A:  I didn't tell nobody I was injured.  I wasn't injured off a smack
in the face and a punch to the stomach.

*Id.* at 41.  Thus, Plaintiff's reliance on *Maxwell v. City of New York*, 380 F.3d 106 (2d Cir. 2004),

is misplaced.  (*See* Dkt. No. 124 at 25.[16])  Moreover, it is undisputed that Plaintiff's medical

records from the Onondaga County Justice Center and Great Meadow Correctional Facility show

that Plaintiff  did not receive treatment for his head or any other alleged area where Henderson

struck Plaintiff.  (Dkt. Nos. 115-2 at ¶¶ 31, 32; 124-1 at ¶¶ 31, 21.)

At summary judgment, Plaintiff now contends that his "injuries are mental, emotional

and psychological.  Henderson humiliated Plaintiff in the presence of his girlfriend Karpeh."

(Dkt. No. 124 at 25.)  However, a conclusory assertion of "emotional injuries" of the "garden

variety—namely mental pain, suffering, humiliation, damage to reputation, and emotional

anguish . . . [w]ithout more . . . is insufficient to sustain a claim for excessive force."  *Sullivan v.*

*City of New York*, No. 17 Civ. 3779 (KPF), 2018 WL 3368706, at *11 (S.D.N.Y. July 10, 2018)

(citing *Guerreror v. City of New York*, No. 12 Civ. 2916 (RWS), 2013 WL 673872, at *5

(S.D.N.Y. Feb. 25, 2013) (holding that an allegation that plaintiff "suffered mental and

emotional harm" unaccompanied by allegations of a specific or identifiable mental injury, is an

insufficient basis for an excessive force claim)).

---

[16]  In *Maxwell*, the plaintiff claimed she was unnecessarily swung and jerked around by the
handcuffs while she was cuffed from behind, and alleged she was shoved head first into the
police car, causing her to strike the metal partition between the front and back seats.  380 F.3d at
108.  She alleged immediate pain was treated for pain in her lower back and left arm and for
headache. *Id.*  During the following weeks, she suffered from headaches, dizziness, nausea, and
lethargy. *Id.*  She obtained further medical treatment and was diagnosed with post-concussive
syndrome. *Id.*

Simply put, even crediting Plaintiff's version of the use of force and viewing the evidence in the light most favorable to Plaintiff as the non-moving party, Plaintiff has not attributed any specific physical injury to the alleged use of force and Plaintiff's conclusory assertion of mental and emotional injury is insufficient to sustain a claim for excessive force. *See Kaid v. Rudnikc*, No. 15-CV-548-A, 2018 WL 3850828, at *6 (W.D.N.Y. June 26, 2018) (granting summary judgment on excessive force claim where, *inter alia*, despite the plaintiff alleging that after he was handcuffed, he was "punched several times in the stomach, side and back area," and then thrown to the ground and "kicked numerous times in the stomach and finally in the groin area" where his only claimed injury was "soreness"); *Brown v. City of New York*, No. 14 Civ. 2700 (BMC), 2015 WL 427942, at *5 (E.D.N.Y. Feb. 2, 2015) (granting summary judgment dismissing excessive force claims after the plaintiffs conceded that they suffered no physical injuries); *Acosta*, 2012 WL 1506954, at *11 (dismissing complaint where plaintiff claimed to have been punched, thrown to the ground, and forcibly handcuffed, but alleged no specific or identifiable physical harm beyond conclusory assertions); *Lyman v. City of Albany*, 536 F. Supp. 2d 242, 249 (N.D.N.Y. 2008) (dismissing excessive force claim where plaintiff alleged that he was "injured and subjected to physical and mental pain and suffering, emotional distress, embarrassment, humiliation and fear").

For these reasons, the Court finds Plaintiff's claim of excessive force fails as a matter of law.

## C. Municipality Liability

Plaintiff claims the City of Syracuse failed to adequately train and supervise Ballagh, Ryan, and Henderson. (Dkt. No. 67 at ¶¶ 60, 61,62.) By way of example, he argues the City of Syracuse "should have trained" Ballagh "not to commit to perjury," "how to appropriate apply

for search warrants," and "to not maliciously prosecute without probable cause." *Id*. at 60.

Similarly, Plaintiff contends the City of Syracuse failed to adequately train Ryan "not to

exaggerate police reports in order to obtain a collateral objective." *Id*. He claims Ryan and

Henderson should have been trained not to execute a warrant "that was not appropriately applied

for" and was "facially insufficient" or "deficient." *Id*. at. ¶¶ 61, 62. Lastly, Plaintiff argues the

City of Syracuse failed to adequately train Henderson how to execute a search warrant and arrest

without using excessive force and "unlawful interrogation" tactics. *Id*. at ¶¶ 62, 63.

In order to sustain a § 1983 claim for municipal liability, a plaintiff must show he

suffered a constitutional violation, and that the violation resulted from an identified municipal

policy or custom. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694-95 (1978). It

is well established that a *Monell* claim cannot lie in the absence of an underlying constitutional

violation. *See Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide

a separate cause of action . . . it *extends* liability to a municipal organization where that

organization's failure to train, or the policies or customs that it has sanctioned, led to an

independent constitutional violation.") (emphasis in original); *Thomas v. Westchester Cty.*, No.

12-CV-6718, 2013 WL 3357171, at *6 (S.D.N.Y. July 3, 2013) ("Absent an underlying

constitutional violation, a *Monell* claim cannot lie.").

Here, for the reasons set forth above, inasmuch as the Court finds Plaintiff's underlying

constitutional claims are barred by *Heck* and fail as a matter of law, there is no basis for

extending liability to the City of Syracuse. *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir.

2006) ("Because the district court properly found no underlying constitutional violation, its

decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

Therefore, the *Monell* claims are dismissed consistent with the foregoing.

### D. Supplemental Jurisdiction

Defendants seek summary judgment on Plaintiff's state law claims. (Dkt. No. 115-3 at 13-14, 17.) However, where a district court has dismissed all claims over which it has original jurisdiction, the court may decline to exercise supplemental jurisdiction over remaining state law claims. 28 U.S.C. § 1367(c)(3). The decision is a discretionary one, and its justification "lies in considerations of judicial economy, convenience and fairness to litigants[.]" *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction.") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

The Second Circuit has instructed "if [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Castellano v. Bd. of Tr.*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)); *see also Carnegie-Mellon*, 484 U.S.at 350 & n.7 ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."). "The Court notes that it may *sua sponte* render this determination." *Terrill v. Windham-Ashland-Jewett Central School Dist.*, 176 F. Supp. 3d 101, 112 (N.D.N.Y. 2016) (collecting cases).

Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and these claims are dismissed without prejudice to refiling in state court.

**ACCORDINGLY**, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 115) is **GRANTED** as follows:

(1) Plaintiff's § 1983 claims excessive force claims against Defendants Henderson and the City of Syracuse are **DISMISSED** as a matter of law for failure to state a claim upon which relief may be granted;

(2) Plaintiff's remaining §§ 1983 and 1985(3) claims against Defendants Henderson, Ryan, Ballagh, and the City of Syracuse are **DISMISSED WITHOUT PREJUDICE** as barred by *Heck v. Humphrey*; 512 U.S. 477 (1994); and

(3) the Court declines to exercise supplemental jurisdiction and Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE** and subject to refiling in state court; and it is further

**ORDERED** that Plaintiff's amended complaint (Dkt. No. 67) is **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that the Clerk shall provide Plaintiff with a copy of this Decision and Order, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam); and it is further

**ORDERED** that the Clerk of the Court shall entered judgment in Defendants' favor and close this case.

**SO ORDERED.**

Dated: March 29, 2019
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

KeyC te Ye ow F ag  Negat ve Treatment
D st ngu shed by Sm th v. Co  ns, S.D.N.Y., October  , 20 5

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

 *1 Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that
1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].)

1    Given my duty to liberally construe a *pro se*
     plaintiff's civil rights complaint, I construe Plaintiff's
     Amended Complaint as including a claim that
     various Defendants violated Plaintiff's rights under
     the Fourth Amendment to be free from unreasonable
     searches and seizures. See *Phillips v. Girdich,* 408
     F.3d 124, 130 (2d Cir.2005) ("We leave it for the
     district court to determine what other claims, if any,
     the plaintiff] has raised. In so doing, the court's
     imagination should be limited only by the plaintiff's]
     factual allegations, not by the legal claims set out
     in his pleadings. ) citations omitted]. *(See also*
     Dkt. No. 5, ¶ 44 Plf.'s Am. Compl., alleging that
     Defendants Woods and Holt "violat ed] plaintiff's

4th ... Amendment ] rights ], ¶ 15 alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt ]; Dkt. No. 37, Part 23, Ex. A at 26 28 Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

### I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]    A fact is "material only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a pro se plaintiff's pleadings. "[I]n actions in which one of the parties appears pro se, this Court is faced with the ... responsibility of granting significant liberality in

how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]    *See Vermont Teddy Bear Co., Inc. v. 1 800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]    *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.* ).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) (" W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true. ); *Lee v. Alfonso,* 97 CV 1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted. ); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered. ); *Mehlenbacher v. Slafrad,* 99 CV 2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true. ); *Adams v. N.Y. State Thruway Auth.,* 97 CV 1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) (" T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff. ); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) (" A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record. ).

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit

or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

[6]    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) (" A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment. ); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on  his verified amended complaint] in opposing summary judgment ), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes. ) citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact.... ).

[7]    Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein. ); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995)  citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

[8]    *See Patterson,* 375 F.3d at 219 (" Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief. ... Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial. ); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) (" Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of  Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment. ); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay ); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made

on "secondhand information and hearsay ), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [0] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.    Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

[9]    *See* Fed.R.Civ.P. 56(e) (requiring that non movant "set forth specific facts showing that there is a genuine issue for trial ); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions  in an affidavit] that are conclusory. ) citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56 e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings ).

[10]    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements  for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment. ) citations omitted]; *West Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us  was conclusory and thus insufficient to satisfy the requirements of Rule 56 e] ), *cert. denied,* 474 U.S. 829 (1985);

*Applegate,* 425 F.2d at 97 (" Plaintiff] has provided the court through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial. ).

11   *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554 555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint ) citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary ); *Allah v. Greiner,* 03 CV 3789, 2006 WL 357824, at *3 4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign ), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No.

42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [2] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [3]

12   (Dkt. No. 42, Part 1, ¶ 7 Plf.'s Response to Woods Aff.].)

13   *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates ], 31 32 admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 admitting that he took the documents to "honor Inmate Alcivar's "wishes ], 33 admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate

was deceased ]; Dkt. No. 37, Part 18, Ex. B at 6 9 Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10 12, 14 Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to **hold a copy of the complaint"** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents **being in my possession ...** you and the administration cannot take any action against the inmate's family nor myself ] emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [4] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [5] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [6]

[14]    (Dkt. No. 42, Part 1, ¶ 5.B. Plf.'s Response to Antonelli Aff.].)

[15]    (Dkt. No. 37, Part 18 at 6 8, 10 12 Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube ].)

[16]    (Dkt. No. 5, ¶ 12 Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [7]

[17]    (Dkt. No. 37, Part 2, ¶ 2 Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 Am. Compl.].)

 **\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [8]

[18]    (Dkt. No. 37, Part 2, ¶¶ 4 8 Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4 8 Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [9]

[19]    (Dkt. No. 42, Part 1, ¶ 12 Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident, ¶¶ 1 3 Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18 37 Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [2]

[20]    (Dkt. No. 37, Part 2, ¶ 12 Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer

were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident, ¶ 2 Am. Compl.]; Dkt. No. 37, Part 18 Ex. B. to Antonelli Aff.].)

[21]     (Dkt. No. 37, Part 2, ¶ 13 Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 Plf.'s Rule 7.1 Response.)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer.[22]

[22]     (Dkt. No. 1, "Facts of the Incident, ¶ 1 Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question about] an affidavit and its contents ].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action.[23] In pertinent part, the letter stated,

[23]     (Dkt. No. 37, Part 18, Ex. B at 6 9 Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79 80 Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already tied both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him.[24]

[24]     (Dkt. No. 37, Part 18, Ex. B at 6 9 Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center.[25]

[25]     (Dkt. No. 37, Part 2, ¶ 11 Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident, ¶ 3 Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters.[26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on."[27] In addition, the last page of the letter states:

[26]     (Dkt. No. 37, Part 2, ¶ 18 Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10 12, 14 Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From memorandum]; Dkt. No. 37, Part 23, Ex. A at 81 82 Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

[27]

    (Dkt. No. 37, Part 18, Ex. B at 10 Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*
It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. [28]

[28]

    (Dkt. No. 37, Part 18, Ex. B at 10 12, 14 Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. [29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

[29]

    (Dkt. No. 37, Part 16, ¶ 9 Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81 82 Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

     Plaintiff's Communications with Defendant Woods
     and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. [30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." [3]

[30]

    (Dkt. No. 37, Part 3, ¶ 3 Woods Aff.]; Dkt. No. 37, Part 4, Ex A Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 Plf.'s Rule 7.1 Response, admitting fact].)

[31]

    (Dkt. No. 37, Part 4, Ex A Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. [32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." [33]

[32]

    (Dkt. No. 37, Part 3, ¶ 3 Woods Aff.]; Dkt. No. 37, Part 5 Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 Plf.'s Rule 7.1 Response, admitting fact].)

[33]

    (Dkt. No. 37, Part 5 Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [34]

[34]

    (Dkt. No. 37, Part 3, ¶¶ 4 5 Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

[35]

    (Dkt. No. 37, Part 3, ¶ 6 Woods Aff.]; Dkt. No. 37, Part 7, Ex. C Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration

cannot take any action against the inmate's family nor myself. [36]

[36]    (Dkt. No. 37, Part 7 Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37]    (Dkt. No. 37, Part 3, ¶ 6 Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38]    (Dkt. No. 37, Part 7, Ex. D Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39]    (Dkt. No. 5, "Facts of the Incident, ¶ 11 Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [4]

[40]    (Dkt. No. 37, Part2, ¶ 24 Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1,¶ 24 Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 Holt Aff.]; Dkt. No. 5, "Facts of the Incident, ¶ 10 Plf.'s Am. Compl.].)

[41]    (Dkt. No. 37, Part2, ¶ 24 Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1,¶ 24 Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]    (Dkt. No. 37, Part 3, ¶¶ 8, 9 Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1,¶ 24 Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]    (Dkt. No. 37, Part 8, ¶ 4 Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25 26 Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25 26 Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident, ¶¶ 13 14 Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]    (Dkt. No. 37, Part 2, ¶ 26 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody Record indicating that Defendant O'Donnell was the one who

found the documents]; Dkt. No. 38, Part 4 at 90 exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31 33 Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10 12, 14 Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself ]; *see also* Dkt. No. 37, Part 19, ¶ 3 Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4 5 Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods. [45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F. [46]

[45] (Dkt. No. 37, Part 2, ¶ 28 Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny ]; Dkt. No. 37, Part 8, ¶ 5 Belarge Aff.]; Dkt. No. 5, "Facts of the Incident, ¶¶ 13 15 Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46] (Dkt. No. 37, Part 18, Ex. B Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002. [47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

[47] (Dkt. No. 37, Part 8, ¶ 6 Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48] (Dkt. No. 37, Part 17, Ex. A Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate

family member without the consent or approval of the Superintendent or his designee. [5]

[49]     (Dkt. No. 37, Part 16, ¶ 7 Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02 B] 26] vii].

[50]     (Dkt. No. 37, Part 3, ¶ 7 Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02 B] 14] v].

[51]     (Dkt. No. 37, Part 16, ¶ 9 Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services from Inmate Alcivar's daughters"].) *See also* 7 N.Y.C.R.R. § 270.02 B] 4] ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

[52]     (Dkt. No. 37, Part 2, ¶ 30 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 Plf.'s Response, admitting this fact].)

[53]     (Dkt. No. 37, Part 2, ¶ 31 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 Plf.'s Response, admitting this fact].)

[54]     (Dkt. No. 37, Part 16, ¶¶ 4 6, 11 Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4 6, 11

    Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43 44 exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

[55]     (Dkt. No. 37, Part 2, ¶ 32 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46 48 Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

[56]     (Dkt. No. 42, Part 23 at 46 48 Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

[57]     (Dkt. No. 37, Part 2, ¶ 31 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any

denial of this fact]; Dkt. No. 37, Part 8, ¶ 8  Belarge Aff.].)

58      *(Id.)*

59      *(Id.)*


Meetings Between Defendants
Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [6]

60      (Dkt. No. 37, Part 2, ¶ 37  Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37  Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13  Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9  Belarge Aff.]; Dkt. No. 42, Part 23 at 35 37  Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61      (Dkt. No. 37, Part 2, ¶ 3 8  Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8  Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9  Belarge Aff.]; Dkt. No. 42, Part 22 at 35 37  Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62      (Dkt. No. 37, Part 2, ¶ 39  Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39  Plf.'s Response, not specifically controverting that the pre misbehavior report meeting between Defendants Woods and Belarge, and the pre misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible

evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13  Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9  Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2  Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63      (Dkt. No. 37, Part 2, ¶¶ 37 39  Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37 39  Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13  Wood Aff.]; Dkt. No. 37, Part 8, ¶ 3, 9  Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2  Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)


Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

64      (Dkt. No. 5, ¶¶ 26, 37  Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57 58  Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43  Plf.'s Rule 7.1 Response, stating, "Plaintiff left S Block November 21, 2002.... ].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

65      (Dkt. No. 37, Part 2, ¶ 41  Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41  Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58 62  Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6  Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the

record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

[66]  (Dkt. No. 37, Part 2, ¶ 42 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11 12 Belarge Aff.]; Dkt. No. 37, Parts 9 12 Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8 17 Defs.' reply affidavits and exhibits, attaching photographs].)

[67]  (Dkt. No. 37, Part 8, ¶¶ 11 12 Belarge Aff.]; Dkt. No. 37, Parts 9 12 Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8 17 Defs.' reply affidavits and exhibits, attaching photographs].)

[68]  (Dkt. No. 37, Part 2, ¶ 43 Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13 14 Belarge Aff.]; Dkt. No. 37, Parts 13 15, Ex. B Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4 5 Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9**  In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Gill, 389 F.3d at 380* (citing *Dawes v. Walker, 239 F.3d 489, 492* [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)* (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]  *See Malik El v. N.Y. State DOCS,* 96 CV 0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin. ) (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy

Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [7]  In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]     (Dkt. No. 48, Parts 6 7, ¶ 6  Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24  Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines ]; Dkt. No. 37, Part 23, Ex. A at 86 90  Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]     (Dkt. No. 37, Part 24  Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86 90  Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]     (Dkt. No. 37, Part 17, ¶ 13  Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me ]; Dkt. No. 42, Part 1, ¶ 12  Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that " the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week

prior to holding said hearing, without providing any specifics about the alleged "encounter, without providing any assertion that it was Antonelli who was motivated by the alleged "encounter, and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1¶ 12  Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter  with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89  Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met  with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera  in the mess hall].)

74    (See, supra, Statement of Fact Nos. 22 23  stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as suggesting that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

75    (Dkt. No. 37, Part 25 at 8 9  Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy  against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14  Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the F]ourth  A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me,  and Plaintiff stated, " T]he F]ourth  A]mendment does not apply to the specific

paragraph that you are referring to,  i.e., Paragraph 43 of the Amended Complaint], 22  in which defense counsel asked, "Is there anything else in your second cause of action ...  other than a due process claim, and Plaintiff answered, "Not at this point, ma'am  even though that cause of action cites the Fourth Amendment], 26  in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?  and Plaintiff answered, "As an inmate, no, ma'am  ].) See Clissuras v. CUNY, 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion  to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12 h] 3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. [76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole factual basis for Plaintiff's Fourth Amendment claim. [77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

76    (See Dkt. No. 5, ¶ 44  Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat ed] plaintiff's 4th ... Amendment   ] rights ], ¶ 15 alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt ]; Dkt. No. 37, Part 23, Ex. A at 14 22,  26 28  Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77    (Dkt. No. 37, Part 22, Ex. A at 14  Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, " T]he F]ourth  A]mendment does not apply to  Plaintiff's first cause of action], 22  in which defense counsel asked, "Is there anything else in your second cause of action ...  other than a due

process claim, and Plaintiff answered, "Not at this point, ma'am  even though the cause of action cites the Fourth Amendment], 28  in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?  and Plaintiff answered, "Yes, ma'am  ].)

78    (Dkt. No. 5, ¶ 14  Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79]  Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80]  Indeed, Plaintiff appears to recognize this point of law. [8]

79    *See also Tinsley v. Greene,* 95 CV 1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights.  ); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights.  ), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80    *See Freeman v. Goord,* 02 CV 9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube ); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell  as his "cubicle ).

81    (Dkt. No. 37, Part 22, Ex. A at 26  Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate? and Plaintiff answered, "As an inmate, no, ma'am  ].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82]  Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83]  I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

82    (Dkt. No. 5, ¶ 12  Am. Compl.].)

83    I note that the alleged "interception  by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents belonging to Inmate Alcivar] being in  Plaintiff's] possession  and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84    *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods. ), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.  ) (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established

a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) in his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from

available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

[85]     "Spondylolisthesis  is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. *Rowland v. Hildreth,* 92 CV 6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman s Medical Dictionary* at 1456  25th ed.1990] ).

[86]     (Dkt. No. 5, ¶ 27  Am. Compl.]; Dkt. No. 38, Part 4 at 58 62  Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis ]; Dkt. No. 37, Part 23 at 54 58  Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

[87]     *See Villante v. N .Y. State DOCS,* 96 CV 1484, 2002 U.S. Dist. LEXIS 26279, at \*4, 8 9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report recommendation,* 2002 U.S. Dist. LEXIS, at \*11 12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at \*13 16, 30; *Smith v. Umar,* 89 CV 6988, 1989 U.S. Dist. LEXIS 14170, at \*4 6, 8 10 (E.D.Pa. Nov. 28, 1989).

[88]     (Dkt. No. 5, ¶¶ 35, 37, 38, 43  Am. Compl., alleging that Defendants who are non medical personnel violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

[89]     (Dkt. No. 37, Part 23 at 42 43, 53, 58  Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective.[90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question.[9]

[90]    (Dkt. No. 37, Part 25 at 14  Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged  in any manner,  citing record evidence in an attempt to support that argument].)

[91]    (See, supra, Statement of Fact No. 29.)

**\*13** More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed,[92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002.[93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002.[94]

[92]    (Dkt. No. 37, Part 25 at 11, 13 14  Defs.' Mem. of Law].)

[93]    (Compare Dkt. No. 42, Part 1, ¶¶ 10(a), 11  Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated  bunk in question Bunk Number "OS A1 20(b)  on **9/23/02,** after having been assigned to two different SHU cells, i.e., first in Cell "SH 0013  and then in Cell "B1 18  ]*with* Dkt. No. 5, ¶¶ 26 27  Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02]** *and* Dkt. No. 42, Part 1, ¶ 15  Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02]** *and* Dkt. No. 37, Part 23 at 58  Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first

requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94]    (Dkt. No. 38, Part 4 at 58 62  Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks   and noting that Plaintiff was 51 years old at the time]  emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds.[95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]    See Faunce v. Gomez, No. 97 16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92 CV 2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any

evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 35, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antonelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]  (Dkt. No. 5, ¶ 38 Am. Compl.].)

[97]  (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently moved to a different bunk. [99]

[98]  (Dkt. No. 37, Part 8, ¶ 11 Belarge Aff., identifying second bunk Plaintiff was assigned while in "S Block as Bunk Number "OS A1 20(b) ]; Dkt. No. 42, Part 1, ¶ 11 Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) swearing that he was assigned to the

allegedly "dilapidated  bunk in question on 9/23/02], ¶ 10(b) swearing that, at 9:45 p.m. on or about 10/7/02 fourteen days after 9/23/02 he was purposely moved to a cell "with a better bunk,  i.e., Cell "B2 40 ].) Any assertions by Plaintiff to the contrary are purely conclusory, self contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28  Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved ]; *compare* Dkt. No. 37, Part 23 at 58  Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU *with* Dkt. No. 42, Part 1, ¶ 11 Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) swearing that he was not assigned to the allegedly "dilapidated bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) swearing that, at 9:45 p.m. on or about 10/7/02 fourteen days after 9/23/02 he was purposely moved to a cell "with a better bunk,  i.e., Cell "B2 40 ].)

[99]  (*Compare* Dkt. No. 42, Part 1, ¶ 14 Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c)  Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [00]

[100]  (Dkt. No. 5, ¶¶ 26 33  Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [0]  Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

101    (*See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution,

then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

#### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [02] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [03] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

102    (Dkt. No. 37, Part 23 at 58, 61, 63, 65 Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

103    (*See, e.g.,* Dkt. No. 42, Part 2 at 13 15 Plf.'s Response Mem. of Law, in which Plaintiff appears to argue without any citation to evidence that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d

Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [04] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [05]

104    (*See, e.g.,* Dkt. No. 42, Part 2 at 13 15 Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

105    (Dkt. No. 48, Part 6, ¶¶ 4 5, 8 11 Berlin Aff.].)

2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* exists to estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities

in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [06] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [07] Indeed, he had filed grievances immediately before and during this very time period. [08] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]     (Dkt. No. 37, Part 23 at 6 11 Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]     (Dkt. No. 37, Part 23 at 59 Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]     (Dkt. No. 38, Part 4 at 50 Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-

time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [09] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [0] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.

[109]     *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 324 (1986); *Ciaprazi v. Goord,* 02 CV 0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report Recommendation by Peebles, M.J.) (" D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims. ) citations omitted].

[110]     *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01 CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7 8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91 CV 0479, 1997 WL 376043, at \*7 8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

111   *(See, e.g.,* Dkt. No. 5, ¶ 18 Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good time credits]; Dkt. No. 42, Part 1 Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good time credits]; Dkt. No. 38, Part 4 at 32 Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable .... ].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,*

340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [2]

Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [3] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]    *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17 18 (2d Cir.1994).

[113]    *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( " W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.  ) (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights  ).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to

Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains

arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C. Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17 25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33 35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048 49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249 50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *\*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *\*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347 48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 2271933
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Fernando GASTELU, Plaintiff,

v.

Dennis BRESLIN, Superintendent, Arthur
Kill Correctional Facility, Defendant.

No. 03 CV 1339 JG.
|
Sept. 12, 2005.

**Attorneys and Law Firms**

Kenneth Polite, Skadden, Arps, Slate, Meagher & Flom
LLP, New York, NY, for Plaintiff.

[1]   Gastelu filed his complaint *pro se* on February 28,
      2003. On March 25, 2005, pro bono counsel appeared
      upon Gastelu's behalf.

Eliot Spitzer, Attorney General of the State of New York,
New York, New York, By: Steven N. Schulman, Assistant
Attorney General, for Defendant.

*MEMORANDUM AND ORDER*

GLEESON, J.

**\*1**  Fernando Gastelu brings this action pursuant to 42
U.S.C. § 1983 against the Superintendent of Arthur Kill
Correctional Facility. On November 1, 2004, I denied
defendant's motion to dismiss pursuant to Rule 12(b)
(6) of the Federal Rules of Civil Procedure. Familiarity
with the November 1, 2004 order is assumed. Defendant
now moves for reconsideration. For the reasons set
forth below, the motion to reconsider is granted and,
upon reconsideration, the motion to dismiss the action is
granted.

BACKGROUND

Gastelu was arrested in Rockland County on February
8, 2001. He was convicted on his plea of guilty to a sex
offense and on June 6, 2001, he was sentenced to a term of

incarceration of two years. He was ultimately assigned to
serve his term at Arthur Kill.

Gastelu's two-year term expired on February 5, 2003, and
he expected to be released on that day. [2] Gastelu alleges
that instead, he was unlawfully detained by the defendant
until September 2, 2003, almost seven months after the
expiration of his term. Gastelu's detention continued past
the expiration date of his two-year sentence because he
was subjected to a special condition of release, namely,
that he find "acceptable" housing. *See* Schulman Ex. D at
8, Memo from Warden Breslin to Gastelu dated April 21,
2003 ("You are being held past your Maximum Expiration
date because you have failed to provide a verifiable
(acceptable) address for release. You will continue to be
held until you provide this residence."). [3]

[2]   Indeed, Gastelu expected to be released earlier. He
      alleges that he was awarded 3 months and 14 days
      of "good time credit under New York law, and
      accordingly should have been released on October 21,
      2002. To the extent that Gastelu is seeking money
      damages for the deprivation of good time credits
      without due process, such a claim is barred by *Heck*
      s favorable termination rule. *See Edwards v. Balisok,*
      520 U.S. 641, 648 (1997).

[3]   The April 21, 2003 memo was attached to Gastelu's
      letter request to the New York State Court of
      Appeals dated July 24, 2003 seeking leave to appeal
      the denial of his petition for a writ of habeas corpus.
      *See* Schulman Ex. D at 1 2.

From August 2002 until September 2003, Gastelu tried
to find housing that would be acceptable to his parole
officer. Gastelu was released on September 2, 2003, over
two-hundred days after his sentence expired.

*A. Procedural History*

*1. State Court Proceedings*
On February 27, 2003, Gastelu filed a petition for a writ of
habeas corpus in New York State court seeking his release
from custody. On May 6, 2003, the Appellate Division
dismissed the habeas petition without comment. By letter-
motion dated July 24, 2003, Gastelu requested leave to
appeal to the Court of Appeals. On December 2, 2003,
the Court of Appeals dismissed Gastelu's motion as moot
because Gastelu had been released on September 2, 2003.

2. *Federal Proceedings*

On February 28, 2003, Gastelu filed this action seeking money damages "in the amount of $500.00 per day for every day of illegal detention." Although not discernable from his complaint, Gastelu's later submissions make clear that he also seeks revocation of a term of post-release supervision because the state court did not inform him of that term during his plea or sentencing hearings.

On November 1, 2004, I denied defendant's motion to dismiss. On November 16, 2004, defendant moved for reconsideration of that denial.

DISCUSSION

A. *The Standard for a Motion for Reconsideration*

A. *Standard of Review*

A motion for reconsideration under [Federal Rule of Civil Procedure 59](#) and Local Rule 6.3 must be grounded on matters that were put before the Court on the underlying motion but overlooked. *See [Range Road Music, Inc. v. Music Sales Corp.,](#) [90 F.Supp.2d 390, 391](#) [(S.D.N.Y.2000)](#)* (the motion shall "set[ ] forth concisely the matters or controlling decisions which counsel believes the court has overlooked."). The requirements of Local Rule 6.3 are strictly construed in order to keep the court's docket free of unnecessary relitigation. *See [Bell Sports, Inc. v. System Software Assocs., Inc.,](#) [71 F.Supp.2d 121, 125-26 (E.D.N.Y .1999)](#)* (noting that a party seeking reconsideration bears a "difficult burden ... 'in order to dissuade repetitive arguments.' ") (quoting *[Ruiz v. Commissioner of the Dep't of Transp.,](#) [687 F.Supp. 888, 890 (S.D.N.Y.1988)](#)*); *see also [Quartararo v. Catterson,](#) [73 F.Supp.2d 270, 273 (E.D.N.Y.1999)](#)* (noting Rule 6.3's "design to prevent relitigation").

B. *Application of the* Heck *rule*

**\*2** In *[Heck v. Humphrey,](#) [512 U.S. 477 (1994)](#)*, the Supreme Court held that

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness

would render a conviction or sentence invalid, a [§ 1983](#) plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486-87 (internal footnote omitted). The dispositive factor in the *Heck* inquiry is whether judgment in favor of the prisoner would "necessarily imply" the invalidity of the conviction or sentence. *Id.* at 487. If so, the prisoner cannot bring a [§ 1983](#) action unless the conviction or sentence has already been invalidated. *Id.* On the other hand, where the [§ 1983](#) action "even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment ..., the action should be allowed to proceed." *Id.* (emphasis in original).

In the November 1, 2004 order, I found that *Heck*'s favorable termination rule did not apply because a judgment in Gastelu's favor would not necessarily imply the invalidity of his conviction or sentence. Gastelu was not challenging either his conviction or the sentence imposed; instead, he challenged his continued detention after the expiration of his sentence.

Upon reconsideration, however, I note that the Supreme Court has not limited *Heck* in the manner suggested by the November 1, 2004 order. In subsequent cases interpreting *Heck* in conjunction with *[Preiser v. Rodriguez,](#) [411 U.S. 475 (1973)](#)*, the Supreme Court has made clear that a prisoner is barred from bringing a [§ 1983](#) action challenging the duration of his confinement where success would necessarily imply the invalidity of that confinement (even if he is not challenging the original judgment of conviction or sentence imposed). [4] *See [Wilkinson v. Dotson,](#) [125 S.Ct. 1242, 1247-48 (2005)](#); [Edwards v. Balisok,](#) [520 U.S. 641, 648 (1997)](#)*. The prisoner with such a claim must seek federal habeas relief (or appropriate state relief) instead. *See [Wilkinson,](#) [125 S.Ct. at 1247](#)*.

[4]    In *Preiser,* the Court held that prisoners in state custody cannot use a [§ 1983](#) action to challenge "the fact or duration of his confinement. *[Preiser,](#)*

411 U.S. at 489. There, prisoners challenged the deprivation of good time credits as a result of disciplinary proceedings, and sought injunctive relief to compel restoration of the credits, which in turn would result in their release from confinement. *Id.* 476 77. The Court held that such a challenge is "just as close to the core of habeas corpus as an attack on the prisoner's conviction, for it goes directly to the constitutionality of his physical confinement itself and seeks either immediate release from that confinement or the shortening of its duration. *Id.* at 489; *see also Wilkinson,* 125 S.Ct. at 1250 (Scalia, J. concurring) (" *Preiser* ] and the cases that follow it hold that Congress, in enacting § 1983, preserved the habeas corpus statute as the sole authorization for challenges to allegedly unlawful confinement. ).

As a threshold matter, I address Gastelu's implicit claim that the imposition of a term of post-release supervision violates his due process rights. This claim, which was not clearly set forth in his complaint and not addressed in the November 1, 2004 order, is barred by *Heck*' s favorable termination rule. [5]

[5] While Gastelu did not clearly set forth a claim concerning post release supervision in his complaint, his affidavit in opposition to the motion to dismiss (as well as his opposition to this motion for reconsideration) makes clear that he is asserting such a claim. *See* Gastelu Aff. ¶ 30 (stating that his two claims are (1) damages for continued detention after his sentence expired; and (2) "the revocation of the Parol sic] Supervision to be completely free. I treat Gastelu's affidavit, submitted while he was pro se, as an amendment to his complaint. *See Washington v. James,* 782 F.2d 1134, 1138 39 (2d Cir.1986) (when pro se party responds to Rule 12 motion with an affidavit containing additional facts, the affidavit may be regarded as an amendment to the complaint).

### 1. *Post-Release Supervision*

Gastelu contends that the imposition of a term of post-release supervision is unconstitutional because the state court never informed him of such a term during his plea or sentencing hearings. *See* Polite Decl. Exs. A & B, Transcripts of plea and sentencing hearings (respectively), *People v. Gastelu,* No. 100-01 (Rockland County) (April 4 and June 6, 2001). At Gastelu's sentencing hearing, the state court indicated that he was sentencing Gastelu to a determinate sentence of two years, a penalty assessment, and a ten-year order of protection. *See* Polite Decl. Ex. B at 17-18. The court stated that these three components

"constitute[d] the sentence of the Court," and it did not indicate that Gastelu would also be subjected to a term of post-release supervision. *Id.* at 18.

**\*3** Under New York law, a term of post-release supervision is imposed automatically. *See People v. Lindsey,* 302 A.D.2d 128, 129 (3d Dep't 2003) ("Pursuant to Penal Law § 70.45 ... a period of postrelease supervision is automatically included in every determinate sentence 'as a part therof.' " (quoting N.Y. Penal Law. § 70.45(1)). New York State courts have upheld the imposition of post-release supervision regardless of whether a defendant was informed of the term. *See, e.g., Deal v. Goord,* 8 A.D.3d 769, 769 (3d Dep't 2004).

Here, I need not address the constitutionality of the "automatic" imposition of such a term in order to determine, as I do, that such a challenge falls squarely within the ambit of *Heck.* The term of post-release supervision is part of Gastelu's sentence, and a judgment in his favor would necessarily imply its invalidity. *Cf. Hill v. Goord,* 63 F.Supp.2d 254, 260-61 (E.D.N .Y.1999) (*Heck* applies to actions challenging fact or duration of parole) (collecting cases).

Accordingly, Gastelu is precluded from challenging the imposition of post-release supervision under § 1983. Absent prior invalidation, a petition for a writ of habeas corpus provides the exclusive federal remedy. [6]

[6] To the extent Gastelu is arguing that habeas relief is not available because he has been released from custody, a prisoner on parole is considered to be "in custody for habeas purposes. *See Jones v. Cunningham,* 371 U.S. 236, 243 (1963); *Scanio v. United States,* 37 F.3d 858, 860 (2d Cir.1994).

### 2. *Conditional Release*

In the November 1, 2004 order, I found that *Heck* did not bar Gastelu's claim because he was challenging neither his conviction nor his sentence. The Supreme Court, however, has interpreted *Heck* more broadly than the language of *Heck* might suggest. While *Heck* states that its favorable-termination rule is triggered when a prisoner's success would "necessarily demonstrate the invalidity of his conviction or sentence," 512 U.S. at 479, the Court has interpreted "sentence" to mean "confinement" in general. *See Wilkinson,* 125 S.Ct. at 1249 ("*Heck* uses the

word 'sentence' interchangeably with such other terms as 'continuing confinement' and 'imprisonment.').

Any challenge to the duration of confinement that would necessarily imply the invalidity of that confinement (even those that do not implicate the underlying conviction or sentence) falls within the ambit of *Heck*'s favorable-termination rule. *Wilkinson,* 125 S.Ct. at 1247-48; *see also Edwards,* 520 U.S. at 648 (prisoner's claim for money damages alleging that he was deprived of good-time credits without due process necessarily implies the invalidity of the "punishment imposed" (i.e., the deprivation of credits).

The Court has recently summarized the *Heck* rule as follows:

> a state prisoner's § 1983 action is barred (absent prior invalidation)-no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)-*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration.

*Id.* at 1248 (emphasis in original). Thus, a prisoner may bring a § 1983 action challenging disciplinary sanctions that have no effect on the duration of the prisoner's overall confinement, *see Muhammad v. Close,* 540 U.S. 749, 754-55 (2004); *Jenkins v. Haubert,* 179 F.3d 19, 21 (2d Cir.1999); or a procedural challenge that would not "necessarily imply" the invalidity of confinement. *See Wilkinson,* 125 S.Ct. 1248 (§ 1983 available to challenge constitutionality of parole procedures because a favorable judgment means at most new eligibility review, and not "necessarily" a shorter stay in prison). A prisoner must bring a habeas petition, however, where he seeks to invalidate the duration of confinement "either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody." *Id.* at 1247 (emphasis in original).

**\*4** Here, a judgment in Gastelu's favor, that is, a finding that his due process rights were violated by either the imposition of the approved-housing condition or the procedures used to determine whether he satisfied that condition, would necessarily imply the invalidity of his continued confinement after the expiration of his sentence. He is thus barred from bringing such a challenge under § 1983.

Gastelu argues that his § 1983 claim is not barred because he is no longer in prison, and thus habeas relief is not available to cure the allegedly unlawful confinement. *See Huang v. Johnson,* 251 F.3d 65, 74 (2d Cir.2001). In *Huang,* the plaintiff alleged that her son was confined in a juvenile facility for 83 more days than his sentence contemplated because defendants' improperly credited the time he served on Riker's Island. *Id.* at 66-68. After her son was released, the plaintiff brought a § 1983 action alleging, among other things, false imprisonment. *Id.* at 66. The Second Circuit held that *Heck* did not bar this claim because habeas relief was no longer available to address the alleged constitutional wrongs. *Id.* at 74-75 (citing *Spencer v. Kenna,* 523 U.S. 1, 20-21 (1998) (Souter J., concurring) (where prisoner no longer "in custody," he may bring a § 1983 action "without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy.").

Gastelu, however, unlike the ex-prisoner in *Huang,* was still in prison when he initiated this § 1983 action. Because his challenge would necessarily imply the invalidity of his confinement, he is precluded from bringing an action under § 1983. The fact that he was released while his § 1983 action was pending does not alter the result.

CONCLUSION

For the foregoing reasons, the motion for reconsideration is granted, and, upon reconsideration, the motion to dismiss is granted.
So Ordered.

All Citations

Not Reported in F.Supp.2d, 2005 WL 2271933

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 6813194
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Brandon McFADDEN, Plaintiff,

v.

State of NEW YORK; Officer Jorge
Puga; Detective Griffin; Sergeant Patrick
Abdul; ADA Jacqueline Rizk, Defendants.

No. 10–CV–141 (RRM)(CLP).
|
Dec. 28, 2011.

**Attorneys and Law Firms**

Brandon McFadden, Far Rockaway, NY, pro se.

Matthew Modafferi, New York City Law Department,
New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

ROSLYNN R. MAUSKOPF, District Judge.

**\*1** Plaintiff *pro se* brings this action for monetary
relief against defendants New York Police Department
("NYPD") employees Officer Jorge Puga, Detective
Richard Griffin, and Patrick Abdul ("defendants"), the
State of New York, and Assistant District Attorney for
Queens County Jacqueline Rizk, alleging violations of
the Civil Rights Act, 42 U.S.C. § 1983. On February
19, 2010 this Court dismissed *sua sponte* pursuant to 28
U.S.C. § 1915 plaintiff's claims against the State of New
York on Eleventh Amendment grounds, and against Rizk
on grounds of prosecutorial immunity. (Mem. and Order
(Doc. No. 7) at 5.) Presently before the Court is the motion
to dismiss of the remaining defendants Puga, Griffin and
Abdul. (Doc. No. 19.) For the reasons below, their motion
is GRANTED.

1  Plaintiff's application to proceed *in forma pauperis*
was granted on January 21, 2010. (Doc. No. 5.)

**BACKGROUND**

The following facts, liberally construed, are taken from
Plaintiff's complaint and his response to defendants'
motion to dismiss, assumed to be true for purposes
of deciding the instant motion. *See, e.g., Arnold
v. Westchester Cnty.,* No. 09 CV 3727 (JSR)(GWG),
2010 WL 3397375, at \*1 (S.D.N.Y. Apr. 16, 2010)
(considering factual allegations contained in the various
materials submitted by plaintiff *pro se* in connection with
defendants' motion to dismiss). Where applicable, the
Court takes judicial notice of state court and other filings,
as matters of public record. *See Pani v. Empire Blue Cross
Blue Shield,* 152 F.3d 67, 75 (2d Cir.1998); *Liberty Mut.
Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388
(2d Cir.1992).

On July 22, 2008, plaintiff alleges he and others were
fishing in Far Rockaway, Queens, when defendants
NYPD Officer Puga, NYPD Sergeant Abdul, and NYPD
Detective Griffin confronted plaintiff. (Compl.(Doc. No.
4 4) ¶ II(D).) After questioning and searching plaintiff,
defendants arrested plaintiff for sale of a controlled
substance offense. [2]  (Am.Compl.(Doc.Nos.18, 23) ¶ IV;
*see* Compl. ¶ IV(F).) Plaintiff alleges that, at some point
after his arrest, "once the arresting officer became aware
that [plaintiff] had prior sale convictions, he change[d]
[plaintiff's] charge to a sale of illegal drugs." (Am.Compl.¶
IV.) Plaintiff also alleges that at some point after the
arrest, he was "attacked at the law library at AMKC C
95 while trying to prove [his] inorcents [sic]." (Compl.¶
III.) Plaintiff makes no allegation as to the identity of his
attacker, or who may have caused the attack.

2  Plaintiff's submissions are somewhat unclear as to
whether the offense for which he was arrested
involved the sale or possession of a controlled
substance. (*Compare* Compl. ¶ IV (alleging that
defendants falsely "cause d] Plaintiff's arrest and
prosecution, for violation of New York Penal Law
220.39, criminal sale of a controlled substance in
the third degree), *with* Am. Compl. ¶ 3 (alleging
that defendants arrested plaintiff for possession of
" i]llegal drugs ).)

Plaintiff was convicted in October 2009, after a jury trial in
New York Supreme Court, Queens County. (Am.Compl.¶
IV.) Although there is some confusion as to plaintiff's
crime of conviction, it is clear, even by plaintiff's own
complaint, that he currently stands convicted under state
law of a controlled substance offense arising out of
the arrest made by these defendants.[3] *Id.* In essence,

plaintiff's false arrest and malicious prosecution claims are grounded in plaintiff's belief that he was maliciously charged with more serious crimes than he committed, and for which a jury found him guilty.

3    Plaintiff alleges that he was convicted of possession in the seventh degree, while defendants contend that he was convicted of third degree possession, submitting records of conviction in support of their contention. (*Compare* Am. Compl. ¶ IV *with* Aff. of Matthew Modafferi Ex. C (Doc. No. 20 4), at 1 (Certificate of Disposition); Defs.' Mem. in Supp. (Doc. No. 22) at 4.) The degree of possession is irrelevant, however, because the plaintiff's conviction of possession, in either degree, operates to bar plaintiff's claims under the rule in *Heck v. Humphrey,* as described below.

**\*2** Plaintiff originally filed his complaint in the United States District Court for the Southern District of New York. (Am.Compl.¶ II.) On December 21, 2009, the action was transferred to this Court pursuant to 28 U.S.C. § 1391(b). (Transfer Order (Doc. No. 3).) Defendants filed their motion to dismiss on March 4, 2011. (Doc. No. 19.) In response, plaintiff submitted an amended complaint. (Doc. Nos.18, 23.) Defendants' replied, alleging plaintiff's amended complaint should be dismissed as futile. (Doc. No. 24.)

### STANDARD OF REVIEW

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) requires the court to examine the legal, rather than factual, sufficiency of a complaint. As required by Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

A court considering a motion to dismiss must "take[ ] factual allegations [in the complaint] to be true and draw[ ] all reasonable inferences in the plaintiff's favor." *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009) (citation omitted). A complaint need not contain " 'detailed factual allegations,' " but it must contain "more than an unadorned, the-

defendantunlawfully-harmed-me accusation." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Rather, the plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 570). The determination of whether "a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citing *Iqbal v. Hasty,* 490 F.3d 143, 157 158 (2d Cir.2007)).

While *pro se* plaintiffs must satisfy these pleading requirements, federal courts are "obligated to construe a *pro se* complaint liberally." *See Harris,* 572 F.3d at 71 72 (2d Cir.2009) (citations omitted). In other words, trial courts hold *pro se* complaints to a less exacting standard than they apply to complaints drafted by attorneys. *Haines v. Kerner,* 404 U.S. 519, 520 21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Boykin v. KeyCorp,* 521 F.3d 202, 213 14. Since *pro se* litigants "are entitled to a liberal construction of their pleadings, [their complaints] should be read to raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (citation and internal quotation marks omitted). When a *pro se* plaintiff has altogether failed to satisfy a pleading requirement, however, the court should not hesitate to dismiss his claim. *See Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997); *see also Johnson v. City of N.Y.,* 669 F.Supp.2d 444, 448 (S.D.N.Y.2009) ("[T]o survive a motion to dismiss, even a *pro se* plaintiff must plead enough facts to state a claim to relief that is plausible on its face." (citation and internal quotation marks omitted)).

**\*3** As noted above, plaintiff submitted an amended complaint in response to defendants' motion to dismiss. Although the general rule is that "a complaint cannot be modified by a party's affidavit or by papers filed in response to a dispositive motion to dismiss," *Brownstone Inv. Group, LLC. v. Levey,* 468 F.Supp.2d 654, 660 (S.D.N.Y.2007), the Court will consider the factual allegations contained in plaintiff's amended complaint. *See Arnold,* 2010 WL 3397375, at \*1 (considering "the

relevant factual allegations contained in" *pro se* plaintiff's opposition to defendants' motion to dismiss); *Woods v. Goord,* No. 01 CV 3255 (SAS), 2002 WL 731691, at *1 n. 2 (S.D.N.Y. Apr.23, 2002) (considering *pro se* prisoner's factual allegations in briefs as supplementing the complaint); *Burgess v. Goord,* No. 98 CV 2077 (SAS), 1999 WL 33458, at *1 n. 1 (S.D.N.Y. Jan.26, 1999) ("In general, 'a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.' " (quoting *Gadson v. Goord,* No. 96 CV 7544 (SS), 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov.17, 1997) (Sotomayor, J.))).

The Court notes that in adjudicating this motion, it is entitled to consider: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's submissions if plaintiff has knowledge or possession of the material and relied on it in framing the complaint ... and ( [4] ) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co.,* 273 F.Supp.2d 351, 356 57 (S.D.N.Y.2003) (internal citations omitted); *see Liberty Mut.,* 969 F.2d at 1388 ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("[T]he district court ... could have viewed [documents submitted by defendant] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim"); *Pani,* 152 F.3d at 75 ("[A] district court may rely on matters of public record in deciding a motion to dismiss.").

## DISCUSSION

### I. False arrest and malicious prosecution

Read liberally, the gravamen of Plaintiff's complaint is that plaintiff was falsely arrested and maliciously charged with more serious crimes than he committed, and for

which a jury found him in violation of 42 U.S.C. § 1983. Section 1983 provides:

> **\*4** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

"Section 1983 itself creates no substantive rights, [but] ... provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citing *Okla. City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). To state a claim under § 1983, a plaintiff "must allege (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Dwyer v. Regan,* 777 F.2d 825, 828 (2d Cir.1985), modified, 793 F.2d 457 (2d Cir.1986) (citation omitted).

Plaintiff's § 1983 claims, however, are barred by the Supreme Court's ruling in *Heck v. Humphrey* and its progeny. 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383. In *Heck,* the Supreme Court held that:

> [I]n order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called

into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Id.* at 486 87. "Disposition of the case on *Heck* grounds ... warrants only dismissal without prejudice, because the suit may be reinstituted should plaintiff's conviction be 'expunged by executive order, declared invalid ... or called into question by a federal court's issuance of a writ of habeas corpus.' " *Amaker v. Weiner,* 179 F.3d 48, 52 (2d Cir.1999) (quoting *Heck,* 512 U .S. at 487).

Claims for both false arrest and malicious prosecution both call into question the validity of a conviction, because false arrest requires a lack of probable cause and malicious prosecution requires probable cause and a termination of the proceedings in the defendant's favor. *See, e.g., Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) (Sotomayor, J.) (false arrest); *Savino v. City of N.Y.,* 331 F.3d 63, 72 75 (2d Cir.2003) (malicious prosecution and false arrest); *Smart v. City of N.Y.,* No. 08 CV 2203 (HB), 2009 WL 862281, at *4 5. Courts in this Circuit routinely dismiss these claims where the plaintiff's conviction has not been overturned or otherwise invalidated. *See, e.g., Lynch v. Suffolk Cnty. Police Dep't., Inc.,* 348 F. App'x. 672, 674 (2d Cir.2009); *Fallen v. Connelly,* 36 F. App'x. 29, 31 (2d Cir.2002) ("To be sure, if a person were validly convicted of the crime for which he was arrested, he would be barred from bringing a claim for false arrest because one element of such a claim is the absence of probable cause ... and a valid conviction establishes the existence of probable cause."); *Younger v. City of N.Y.,* 480 F.Supp.2d 723, 730 (S.D.N.Y.2007) (dismissing false arrest and

malicious prosecution claims on summary judgment on *Heck* grounds).

**\*5** Here, plaintiff, by his own admission, currently stands convicted following a jury trial of a controlled substance offense, and has not shown that the conviction was disturbed. *See Gastelu v. Breslin,* No. 03 CV 1339 (JG), 2005 WL 2271933, at *3 (E.D.N.Y. Sept.12, 2005). Plaintiff has not alleged that his conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck,* 512 U.S. at 486 87. Thus, his conviction "stands as a complete bar to any claims of false arrest ... and malicious prosecution under Section 1983." *Smith v. P.O. Canine Dog Chas,* 2004 WL 2202564, at *6 (S.D.N.Y. Sept.28, 2004). Moreover, that plaintiff was ultimately convicted of a lesser charge than that for which he was arrested has been uniformly rejected by courts in this Circuit as the basis for claims of false arrest and malicious prosecution. *See, e.g., Allison v. Farrell,* No. 97 CV 2247 (DAB), 2002 WL 88380, at *4 (S.D.N.Y. Jan.22, 2002) ("[I]t is of no moment that [plaintiff] pled guilty to a lesser charge arising out of the events that took place on the day of his arrest and that the Criminal Trespass charge, temporally the first charge in the chain of charges was allegedly dismissed"); *Papeskov v. Brown,* No. 97 CV 5351 (SS), 1998 WL 299892, at *5 (S.D.N.Y. June 8, 1998) (Sotomayor, J.) (collecting cases) ("[A] plea of guilty, even to a charge lesser than that for which the plaintiff was arrested, bars a § 1983 action [for malicious prosecution and false arrest].") (citations omitted), *aff'd,* 173 F.3d 845 (2d Cir.1999).

For these reasons, plaintiff's claims of malicious prosecution and false arrest are DISMISSED.

### II. Post-arrest attack

"Section 1983 imposes liability for 'conduct which subjects, or causes to be subjected[,] the complainant to a deprivation of a right secured by the Constitution and laws.' Accordingly, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (quoting *Rizzo v. Goode,* 423 U.S. 362, 370 71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) and *McKinnon v. Patterson,* 568 F.2d 930, 936 (2d Cir.1977)) (internal citations and some internal

quotation marks omitted). As noted, plaintiff has failed to allege the involvement, if any, of defendants in the law library attack. Moreover, as plaintiff acknowledges in his complaint, the alleged attack here is identical to that alleged in plaintiff's action filed in the United States District Court for the Southern District of New York. *See McFadden v. State of NYC,* No. 08 CV 10035 (LTS) (JLC), Stipulation of Settlement and Order of Dismissal (Doc. No. 29) (S.D.N.Y. June 7, 2010). [4] Plaintiff settled that claim and dismissed his complaint with prejudice. *Id.* ¶ 1  2. Plaintiff, therefore, is barred from relitigating the same assault here. *See, e.g., Monahan v. N.Y.C. Dept. of Corr. .,* 214 F.3d 275, 291  93 (2d Cir.2000); *Sweeper v. Tavera,* No. 08 CV 6372 (HB), 2009 WL 2999702, at *2 (S.D.N.Y. Sept.21, 2009). For these reasons, plaintiff's claims arising out of an alleged attack on his person following his arrest are DISMISSED.

---

[4]   Indeed, plaintiff has filed numerous *pro se* actions in this and other courts alleging civil rights violations against various police, corrections and other law enforcement agencies. *See, e.g., McFadden v. City of N.Y.,* No. 10 CV1176 (RRM)(VVP) (E.D.N.Y. Mar. 10, 2010); *McFadden v. State of N.Y.,* No. 10 CV 1175 (RRM) (VVP) (E.D.N.Y. Mar. 10, 2010); *McFadden v. State of N.Y.,* No. 09 CV 10332 (LAP) (S.D.N.Y. Dec. 21, 2009); *McFadden v. C.O. Herman et al.,* No. 09 CV 1415 (TJM)(ATB) (N.D.N.Y. Dec. 21, 2009); *McFadden v. Dep t of Corr.,* No.07  CV  5326 (RRM)(LB) (E.D.N.Y. Nov. 13, 2007); *McFadden v. Dep t of Corr.  (N.Y.C.),* No. 07 CV11570 (WHP) (S.D.N.Y. Dec. 26, 2007); *McFadden v. Masley et al.,* No. 06 CV 1826 (LAK) (S.D.N.Y. Mar. 8, 2006); *McFadden v. Marcus,* No. 05 CV 4342 (TLM)(LB) (E.D.N.Y. Sept. 15, 2005); *McFadden v. City of N.Y.,* No. 02 CV 4298 (ARR) (LB) (E.D.N.Y. July 29, 2002).

### III. Leave to amend

**\*6**  A district court should provide a *pro se* plaintiff "every reasonable opportunity to demonstrate that he has a valid claim," particularly where he alleges a civil rights violation. *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir.1984). However, "[w]here it appears that granting leave to amend is unlikely to be productive ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *Cortec Indus.,* 949 F.2d at 48 ("[W]here a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice." (citation omitted)). Here, plaintiff's false arrest and malicious prosecution claims are substantively inadequate to state a claim for relief under *Heck.* His claims arising from the alleged law library incident are barred by prior settlement. Leave to amend, therefore, would be futile.

### CONCLUSION

Defendants' motion to dismiss all remaining claims against them is GRANTED. Accordingly, plaintiff's complaint is DISMISSED in its entirety as to defendants Puga, Griffin and Abdul. The Clerk of Court is directed to enter Judgment accordingly and to close the case.

The Clerk is further directed to transmit a copy of this Order to plaintiff *pro se* via U.S. Mail.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States,* 369 U.S. 438, 444  45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 6813194

---

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2803468
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rondula LANE, Plaintiff,

v.

Claire PAPADIMITRIOUS, Complainant; Kevin
Beach, Chief of Rome Police Department; Jeffrey
A. Race, Detective; James P. Boyer, Detective;
Albert J. Ciccone, Patrolman; Patrick J. Marthage,
Esq., First Assistant Public Defender; Barry M.
Donalty, Acting Supreme Court Justice; and Laurie
Lisi, Esq., Assistant District Attorney, Defendants.

No. 6:10–CV–647 (NAM/ATB).
|
July 14, 2010.

**Attorneys and Law Firms**

Rondula I. Lane, Rome, NY, pro se.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

 *1 In this *pro se* action under 42 U.S.C. § 1983, filed
June 2, 2010, plaintiff claims his rights were violated
in connection with a criminal prosecution against him.
United States Magistrate Judge Andrew T. Baxter has
prepared a Report and Recommendation (Dkt. No. 6)
granting plaintiff's motion (Dkt. No. 2) for leave to
proceed *in forma pauperis* only for the purpose of filing the
complaint, and recommending that this Court dismiss the
complaint (Dkt. No. 1) pursuant to 28 U.S.C. § 1915(e)(2)
(B)(ii), (iii). ("[T]he court shall dismiss the case at any time
if the court determines that ... (B) the action ... (ii) fails to
state a claim on which relief may be granted; or (iii) seeks
monetary relief against a defendant who is immune from
such relief.").

Plaintiff has submitted an objection to the Report and
Recommendation (Dkt. No. 10). He does not appear to
object to dismissal of the claims against defendants Barry
M. Donalty, Acting Supreme Court Justice, and Laurie
Lisi, Esq., Assistant District Attorney; in any event, they
must be dismissed on grounds of judicial and prosecutorial

immunity. *See* 28 U.S.C. § 1915(e) (2)(B)(iii). Plaintiff
objects to the recommended dismissal of the claims against
the other defendants, and the Court reviews these matters
*de novo. See* 28 U.S.C. § 636(b)(1)(C). Upon *de novo*
review, the Court agrees with Magistrate Judge Baxter's
conclusion that the claims against the other defendants fail
to state a claim upon which relief may be granted and must
be dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

In objecting to dismissal of his claims, plaintiff alleges that
the state criminal trial underlying the instant section 1983
action "is now over" and that he was "found guilty of all
the charges brought up against [him.]" Thus, plaintiff's
claims in the nature of perjury, slander, evidence-
tampering, conspiracy to bring unfounded criminal
charges against him, and false imprisonment necessarily
implicate the validity of his conviction and are thus barred
under *Heck v. Humphrey,* 512 U.S. 477, 486 87 (1994),
until such time as the conviction may be vacated or
otherwise invalidated. *See Channer v. Mitchell,* 43 F.3d
786, 787 88 (2d Cir.1994); *Jackson v. County of Nassau,*
2010 WL 335581, *8 (E.D .N.Y.2010). Likewise, plaintiff's
claim of ineffective assistance of his assigned trial counsel
implicates the validity of his conviction and is barred by
*Heck. See Evans v. Nassau County,* 184 F.Supp.2d 238, 243
(E.D.N.Y.2002). For these reasons as well, the complaint
is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

1       An internet search for plaintiff's name discloses
        that on June 17, 2010, an Oneida County jury
        found Rondula Lane guilty of all charges against
        him, including sexual abuse, burglary, and several
        counts of criminal sexual act. Sentencing is
        August 9, 2010. *See* http:// www.wktv.com/news/
        local/96570104.html.

It is therefore

ORDERED that the Report and Recommendation is
accepted; and it is further

ORDERED that for the reasons set forth in the
Report and Recommendation and in this Memorandum
Decision and Order, the complaint is dismissed.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2803468

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 1544811
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Troy WALLACE, Plaintiff,
v.
Probation Officer Felicia SPEIGET;
Probation Officer Supervisor Kaplan;
Justice Marraro, Defendants.

No. 04-CV-2821 (DGT).
|
July 1, 2005.

**Attorneys and Law Firms**

Troy Wallace, East Elmhurst, NY, pro se.

MEMORANDUM AND ORDER

TRAGER, J.

 **\*1** Plaintiff brings this *pro se* action pursuant to 42 U.S.C. § 1983 alleging "malicious prosecution and slander" because his probation officer provided "false information about the status of [his] probation." Complaint at IV, V. Plaintiff also alleges he was denied counsel at his arraignment, denied the right to speak on his own behalf, and remanded "without knowing the charges" against him. *Id.* at IV. It is unclear what plaintiff is requesting when he states the relief he seeks: "the space on the receipt received from reporting to the automated response management system (ARMS) marked messages be utilized by probation officers." *Id.* at ¶ V. The complaint was transferred to this Court from the United States District Court, Southern District of New York. The Court grants plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915 and grants plaintiff thirty days to amend his complaint as directed below.

1   Plaintiff filed this instant action while he was incarcerated at Rikers Island. According to the New York State Department of Corrections inmate locator service, plaintiff is incarcerated at Franklin Correctional Facility, P.O. Box 10, Malone, New York 12953. *http:// nysdocslookup.docs.state.ny.us.* It

is the plaintiff's responsibility to keep the Court apprised of his current address. The Clerk of Court shall note plaintiff's change of address on the docket. However, if plaintiff is moved in the future, he must notify the Court.

*Standard of Review*

Under 28 U.S.C. § 1915A, a district court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or employee of a governmental entity." 28 U.S.C. § 1915A. Upon review, a district court shall dismiss a prisoner's complaint *sua sponte* if the complaint is "frivolous, malicious, or fails to state a claim upon which relief may be granted; or seeks monetary relief from a defendant who is immune from such relief." *Id.; Liner v. Goord,* 196 F.3d 132, 134 & n. 1 (2d Cir.1999) (noting that under PLRA, *sua sponte* dismissal of frivolous prisoner complaints is not only permitted but mandatory); *see also Tapia-Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999). The Court construes plaintiff's pleadings liberally, particularly because they allege civil rights violations. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam); *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004).

*Discussion*

Plaintiff's claim states in its entirety:
I was unjustly incar[cer]ated due to my probation officer giving false information about the status of my probation, then I was denied counsel at arraignment, denied the right to remain free pending the outcome of my hearing, denied the right to speak on my behalf and remanded without knowing the charges against me. When I asked probation officer Kaplan "why am I here," his response was, "if you don't know that's to[o] damn bad."

Complaint at IV. Plaintiff was apparently arrested while on probation and arraigned on those charges in state court. That is as much as the Court can discern from plaintiff's complaint. Plaintiff does not provide any dates for his arrest, arraignment or whether he pursued his right to appeal the revocation of his probation in state court.

Plaintiff's complaint seeks damages and "that the space on the receipt received from reporting to the automated response management system (ARMS) marked message

be ut[i]lized by probation officers. Since I was never told by my p[robation] o[fficer] about a court date and there was no messages in the slot there was no way of know[ing] this fact." Complaint at V.

**\*2** Unless the charges against plaintiff have terminated in his favor, plaintiff's claim for damages under 42 U.S.C. § 1983 is barred by the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In *Heck,* the Supreme Court ruled that a § 1983 claim for damages arising from an arrest which implicates the validity of the plaintiff's underlying conviction or sentence is barred unless the underlying conviction is invalidated. Before bringing an action for damages, a plaintiff must first succeed in overturning his conviction or having it declared invalid, whether by an administrative board, state court, or in a federal habeas corpus proceeding. *See id.* at 486-87; *see also Amaker v. Weiner,* 179 F.3d 48 (2d Cir.1999) (dismissal under *Heck* is without prejudice; if plaintiff's conviction is declared invalid or called into question by a federal court's issuance of a writ of habeas corpus, the suit may be reinstated). The Supreme Court recently affirmed this determination in *Wilkinson v. Dotson,* ---U.S. ----, ----, 125 S.Ct. 1242, 1248, 161 L.Ed.2d 253 (2005) (discussing *Heck,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383).

Finally, plaintiff names Justice Marraro as a defendant. Judges are immune from a suit for damages for their judicial acts performed in their judicial capacities. *Mireles v. Waco,* 502 U.S. 9, 11, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991). The absolute judicial immunity of the court and its members "is not overcome by allegations of bad faith or malice," and a judge cannot be "deprived of immunity because the action he took was in error ... or was in excess of his authority." *Id.* at 11, 13 (quotation omitted). The Supreme Court has specifically applied the doctrine of judicial immunity to § 1983 cases. *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Thus, the claim against Justice Marraro is dismissed. 28 U.S.C. § 1915A.

*Leave to Amend*

In light of plaintiff's *pro se* status, the Court grants plaintiff thirty days to amend his complaint. *See Cruz v. Gomez,* 202 F.3d 593 (2d Cir.2000) (*pro se* plaintiff should be afforded opportunity to amend complaint prior to dismissal). Plaintiff must allege all the facts giving rise to his claim that defendants violated his constitutional rights. Plaintiff should provide the dates of all relevant events, the location(s) the events took place and a description of what actually occurred.

*Conclusion*

The complaint against defendant Marraro is dismissed. 28 U.S.C. § 1915A. If plaintiff chooses to replead his claims against the two remaining defendants, he is hereby directed to file an amended complaint clearly stating his claim and the facts underlying his claim against the defendants. The amended complaint must be signed and submitted to the Court within thirty days of the date of this Order, be captioned as an "AMENDED COMPLAINT," and bear the docket number 04-CV-2821.

No summons shall issue at this time and all further proceedings shall be stayed for thirty days for plaintiff to comply with this Order. If plaintiff fails to comply with this order within the time allowed, the complaint shall be dismissed for failure to state a claim upon which relief can be granted. 28 U.S.C. § 1915A. Once submitted, the amended complaint shall be reviewed for compliance with this order and for sufficiency under 28 U.S.C. § 1915A. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444-45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**\*3** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1544811

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2567990
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Geraldo CRUZ, Plaintiff,

v.

Det. Thomas E. REILLY, Charles L. Ross,
and 2 Unnamed Officers, Defendants.

No. 08–CV–1245 (JFB)(AKT).
|
Aug. 18, 2009.

**Attorneys and Law Firms**

Geraldo Cruz, pro se.

Arlene S. Zwilling, Esq., Office of the Suffolk County
Attorney, Hauppauge, NY, for Defendants.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

 **\*1** Plaintiff Geraldo Cruz ("plaintiff" or "Cruz")
brought the instant action *pro se,* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), against defendants Detective
Thomas E. Reilly, Police Officer Charles L. Ross, and
two unnamed officers, all members of the Suffolk County
Police Department (collectively, "defendants"), seeking
damages for the alleged violation of his civil rights by
defendants. Specifically, plaintiff claims that defendants
conspired, tampered with evidence, and committed
perjury during a criminal trial in Suffolk County Court
in February 2008. At the close of that trial, plaintiff was
convicted of the crime of burglary in the second degree, in
violation of New York Penal Law § 140.25.

The defendants now move to dismiss the complaint
pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure. For the reasons set forth below, the Court
grants defendants' motion in its entirety and dismisses the
complaint without prejudice.

**I. FACTS**

The following facts are taken from the complaint
("Compl."), as well as several pages of state court records
printed from the New York State Unified Court System
website and attached to the defendants' moving papers.
These facts are not findings of fact by the Court, but rather
are assumed to be true for the purpose of deciding this
motion and are construed in a light most favorable to
plaintiff, the non-moving party.

1      The Court takes judicial notice of the state court
documentation submitted by defendants. *See, e.g.,*
*Century 21 Real Estate LLC v. Raritan Bay Realty,*
*Ltd.,* No. 07 Civ. 1455(CPS), 2008 WL 4190955, at
*10 n. 6 (E.D.N.Y. Sept.3, 2008) (taking judicial
notice of the records of the New York State Unified
Court System that are available to the public on its
Internet website); *Trustees of Plumbers Local Union*
*No. 1 Welfare Fund, Additional Sec. Ben. Fund,*
*Vacation & Holiday Fund, Trade Educ. Fund and*
*401(K) Savings Plan v. Dan Yant, Inc.,* No. 06 Civ.
173(SJ)(JO), 2007 WL 3036759, at *9 (E.D.N.Y. Oct.
16, 2007) (same).

On February 22, 2008, plaintiff was convicted of the crime
of burglary in the second degree, a violation of New York
Penal Law § 140.25 and a class C felony, following a trial
in Supreme Court, State of New York, County of Suffolk.
(*See* Pl.'s Exh. B.)

In his complaint, plaintiff alleges that during the trial on
February 19 22, 2008, the defendants engaged in perjury,
evidence tampering, and conspiracy. (Compl., Pt. IV.) As
a result of defendants' alleged actions, plaintiff further
claims that he suffered from "mental and emotional
duress, false incarceration, due to pejured [sic] testimony.
Slande [sic] and defemation [sic] of character." (Compl.,
Pt. IV.A.)

**II. PROCEDURAL HISTORY**

Cruz filed this action on March 25, 2008. On March 5,
2009, defendants filed a letter motion to dismiss, and on
March 20, 2009, the Court ordered formal briefing of
the motion during a telephone conference call held with
the parties. On April 16, 2009, defendants filed a formal
motion to dismiss. On May 19, 2009, the Court received
a letter written in Spanish from plaintiff, presumably
as his opposition to defendants' pending motion, which
defendants then requested that the Court disregard. On

May 26, 2009, the Court ordered that plaintiff re-submit his opposition letter in English, in light of his having made prior submissions to the Court in English, including the complaint. Plaintiff's opposition was filed, in English, on June 17, 2009.

### III. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005). The plaintiff must satisfy "a flexible 'plausibility standard.' " *Iqbal v. Hasty,* 490 F.3d 143, 157 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

**\*2** The Supreme Court recently clarified the appropriate pleading standard in *Ashcroft v. Iqbal,* setting forth a two-pronged approach for courts deciding a motion to dismiss. *See* 129 S.Ct. at 1937. The Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations[,] a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (quoting and citing *Twombly,* 550 U.S. at 556 57) (internal citations omitted).

Moreover, as the Second Circuit recently emphasized in *Sealed Plaintiff v. Sealed Defendant,* "[o]n occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally .... This obligation entails, at the very least, a permissive application of the rules governing the form of pleadings .... This is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated. Accordingly, the dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases." 537 F.3d 185, 191 (2d Cir.2008) (citations and quotation marks omitted); *see Sharpe v. Conole,* 386 F.3d 483, 484 (2d Cir.2004); *see also Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145 46 (2d Cir.2002) (holding that when a plaintiff is appearing *pro se,* the Court shall " 'construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.' ") (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (alterations in original)).

### IV. DISCUSSION

As noted *supra,* plaintiff asserts claims pursuant to Section 1983. Under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges or immunities secured by the Constitution and federal law, (2) by a person acting under the color of state law. 42 U.S.C. § 1983. Section 1983 does not itself provide substantive rights, but in fact offers "a method for vindicating federal rights elsewhere conferred." *Patterson,* 375 F.3d at 225 (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)); *see also Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere.") (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

**\*3** Because plaintiff does not specify any specific causes of action, the Court liberally construes the complaint to assert claims under Section 1983 for malicious prosecution, conspiracy, and a violation of his right to a fair trial. [2] As the Court sets forth below, after carefully reviewing the complaint and liberally construing it in Cruz's favor, the Court agrees with defendants that plaintiff's claims fail as a matter of law, by virtue of his conviction. Specifically, the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129

L.Ed.2d 383 (1994), entitles defendants to a decision in their favor as a matter of law with respect to these claims. [3]

[2] Because plaintiff's allegations are confined to actions taken by defendants *during trial,* the Court does not construe the complaint to assert a claim for false arrest/imprisonment. Indeed, a cause of action for false arrest accrues at the time of detention and any damages attributable to actions thereafter are based on the tort of malicious prosecution. *See Wallace v. Kato,* 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (holding that claim for false arrest or false imprisonment ends once victim becomes held pursuant to process, and thereafter unlawful detention forms part of the damages for the entirely distinct tort of malicious prosecution); *accord Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006). In any event, to the extent that plaintiff is attempting to assert a false arrest/imprisonment claim, such claim would be barred by his conviction under *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). *See, e .g., Cameron v. Fogarty,* 806 F.2d 380, 388 (2d Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987). The Court further notes that any claim for conspiracy is more properly brought pursuant to 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003) ("The plaintiffs' claim under 42 U.S.C. § 1983, which is styled "Conspiracy to Violate Civil Rights, should actually be stated as a claim under Section 1985, which applies specifically to conspiracies. ). As discussed *infra,* however, the conspiracy claims are subject to *Heck* in this case, regardless of whether they are brought pursuant to 42 U.S.C. §§ 1983, 1985, or 1986. Finally, it is an open question whether plaintiff could assert a separate fair trial violation for the alleged actions of evidence tampering, as distinct from the malicious prosecution claim. *See generally Schiller v. City of N.Y.,* 2008 WL 200021, at *9 (S.D.N.Y. Jan.23, 2008) (discussing the doctrinal ambiguity in current Second Circuit law); *Richardson v. City of N.Y.,* No. 02 CV 3651, 2006 WL 2792768, at *6 7 (E.D.N.Y. Sept.27, 2006) (same). Because the Second Circuit has permitted parallel claims for malicious prosecution and denial of a fair trial to proceed based on the same alleged fabrication of evidence by police officers, and because the existence of probable cause may be a complete defense to one constitutional tort but not the other, the Court liberally construes the complaint here to allege both as well. *See Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 30 (2d Cir.1997); *see also Perez v. Cuomo,*

No. 09 Civ. 1109(SLT), 2009 WL 1046137, at *7 (E.D.N.Y. Apr.17, 2009) (analyzing both a malicious prosecution claim and fair trial claim based on alleged fabrication of evidence); *Douglas v. City of N.Y.,* 595 F.Supp.2d 333, 341 47 (S.D.N.Y.2009) (same); *Schiller,* 2008 WL 200021, at *9 (permitting plaintiff to bring both claims); *Jovanovic v. City of N.Y.,* No. 04 Civ. 8437, 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006) (" Claims have been permitted by the Second Circuit for] malicious prosecution and denial of a fair trial based on the same fabrication of evidence .... As these causes of action seem to coexist, p]laintiff may legitimately bring both. ) (citing *Ricciuti,* 124 F.3d at 130 31); *Taylor v. City of N.Y.,* No. 03 Civ. 6477(RLC), 2006 WL 1699606, at *4 5 (S.D.N.Y. June 21, 2006) (permitting both malicious prosecution claim and right to fair trial claim to survive summary judgment based on alleged false information provided by officers); *cf. Henry v. City of N.Y.,* No. 02 Civ. 4824(JSM), 2003 WL 22077469, at *4 (S.D.N.Y. Sept.8, 2003) (" W]hile there is no constitutional right to be free from having evidence fabricated against an individual, the offense rises to a constitutional violation if one is deprived of his liberty because of the fabrication. ) (citing *Zahrey v. Coffey,* 221 F.3d 342, 348 (2d Cir.2000)).

[3] In addition, the Court finds plaintiff's pleadings insufficient to withstand dismissal pursuant to Rule 8 of the Federal Rules of Civil Procedure. Pursuant to Rule 8, pleadings are to give "fair notice of what the plaintiff's claim is and the grounds upon which it rests  in order to enable the opposing party to answer and prepare for trial, and to identify the nature of the case. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957), *overruled in part on other grounds by Bell Atl. Corp.,* 550 U.S. at 547). When a complaint fails to comply with the Rule 8 pleading standard, the district court may dismiss it upon a motion or *sua sponte. Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995). Here, plaintiff's complaint falls far short of giving fair notice of his claim as required under Rule 8. There are no factual allegations whatsoever contained in the complaint to support the conclusory allegations of perjury, tampering with evidence, and conspiracy, and thus defendants do not have adequate notice of plaintiff's claims. Regardless of the omitted substance of plaintiff's allegations, however, it is apparent that his Section 1983 claims are subject to the limitations in *Heck,* as discussed *infra.* Thus, plaintiff's complaint is dismissed without prejudice to being re filed (1)

after plaintiff has successfully challenged his state court conviction, as required by *Heck,* and (2) in accordance with the pleading requirements of Rule 8.

### A. The *Heck* Rule

In *Heck v. Humphrey,* the Supreme Court "confronted the question of whether, given the overlap between § 1983 and the federal habeas corpus statute, a prisoner seeking civil damages may proceed with a § 1983 claim where success on the claim necessarily would implicate the unconstitutionality of the prisoner's conviction or sentence." *Amaker v. Weiner,* 179 F.3d 48, 51 (2d Cir.1999) (citing *Heck,* 512 U.S. at 477). The Supreme Court in that case explained:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. at 486–87 (footnote omitted); *see also Wilkinson v. Dotson,* 544 U.S. 74, 81, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005) ("*Heck* specifies that a prisoner cannot use § 1983 to obtain damages where success would necessarily imply the unlawfulness of a (not previously invalidated) conviction or sentence.").

Thus, pursuant to *Heck,* courts routinely dismiss claims of, *inter alia,* malicious prosecution, conspiracy, and deprivation of the right to a fair trial brought under Section 1983 when such claims bear on the validity of an underlying conviction or sentence. *See, e.g., Guerrero v. Gates,* 442 F.3d 697, 704 (9th Cir.2006) (holding that *Heck* bars plaintiff's § 1983 claims of wrongful arrest, malicious prosecution, and conspiracy); *Amaker,* 179 F.3d at 51–52 (holding that *Heck* applies to Section 1983 conspiracy); *Perez v. Cuomo,* No. 09 Civ. 1109(SLT), 2009 WL 1046137, at *7 (E.D.N.Y. Apr.17, 2009) ("A § 1983 claim for the violation of the due process right to a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction .... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[.]") (internal quotation marks and citations omitted); *Younger v. City of N.Y.,* 480 F.Supp.2d 723, 730 (S.D.N.Y.2007) (holding that plaintiff's claims for false arrest/imprisonment and malicious prosecution were barred by his plea of guilty pursuant to *Heck* ); *cf. Jovanovic v. City of N.Y.,* No. 04 Civ. 8437, 2006 WL 2411541, at *12 (S.D.N.Y. Aug. 17, 2006) (applying *Heck* to a Section 1983 claim for denial of the right to a fair trial in the context of a statute of limitations issue).

### B. Application

**\*4** Here, at stated *supra,* Cruz was convicted after a trial in state court of one count of burglary in the second degree on February 22, 2008. It is apparent from the state court documentation regarding plaintiff's conviction and confinement, however, that Cruz has been unsuccessful in challenging his conviction or has not even attempted to do so. Under these circumstances, the Supreme Court's holding in *Heck* precludes plaintiff from bringing claims in this Court under Section 1983 for malicious prosecution, conspiracy, and the denial of his right to a fair trial in connection with that conviction, since a successful result

in this case on any one of those claims would bear on the validity of that underlying conviction.

Indeed, *Heck* 's application to the instant matter is straightforward. The entirety of plaintiff's bare-bones complaint states the following:

> Tampering with evidence, perjury, during trial, conspiracy at trial, Feb. 19, 20, 21 and 22 of 2008 at 9:30 a.m. in Suffolk County Court in from [sic] of Honorable Judge Gazillo. Charles L Ros, and the 2 officer, Reilly & Thomas E. Det. It is to my belief that the three defendants listed above are guilty of my complaints listed.

(Compl., Pt. IV.) Although it is true that not all claims brought under Section 1983 necessarily implicate the validity of the underlying conviction, in this case, plaintiff's bald assertions of evidence tampering, perjury, and conspiracy during trial by the defendant police officers do necessarily implicate the validity of his burglary conviction and are thus barred by the *Heck* rule. *See, e.g., Channer v. Mitchell,* 43 F.3d 786, 787 88 (2d Cir.1994) (per curiam) (affirming *Heck*-based dismissal of claim that police officers committed perjury and coerced witnesses to identify plaintiff wrongfully); *Smithart v. Towery,* 79 F.3d 951, 952 53 (9th Cir.1996) (per curiam) (affirming *Heck*-based dismissal of § 1983 claim of conspiracy to "bring unfounded criminal charges" against plaintiff); *Williams v. Schario,* 93 F.3d 527, 529 (8th Cir.1996) ("[A] judgment in Williams's favor on his damages claim that defendants engaged in malicious prosecution and presented perjured testimony would 'necessarily imply the invalidity of his conviction or sentence' ") (quoting *Heck,* 512 U.S. at 487); *Jasper v. Fourth Court of Appeals,* No. 08 Civ. 7472(LAP), 2009 WL 1383529, at *1 (S.D.N.Y. May 18, 2009) ("The Court liberally construes this complaint as asserting that plaintiff was denied his constitutional right to a fair trial. However ... [s]ince plaintiff's conviction remains valid, plaintiff's fair trial claim is not cognizable under § 1983, and it must be dismissed as to all defendants[.]"); *Perez v. Cuomo,* No. 09 Civ. 1109(SLT), 2009 WL 1046137, at *7 (E.D.N.Y. Apr.17, 2009) ("A § 1983 claim for the violation of the due process right to a fair trial

is, in essence, a claim for damages attributable to an unconstitutional conviction .... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[.]") (internal quotation marks and citations omitted); *Fernandez v. Holzbach,* No. 3:04 Civ. 1664(RNC), 2007 WL 1467182, at *1 (D.Conn. May 15, 2007) (holding that plaintiff's allegations that his convictions were based on perjury and fabricated evidence pursuant to a conspiracy to violate his federal rights "necessarily impl[ied] that he was wrongly convicted" and could not be litigated "until he shows that the convictions have been invalidated"); *Duamutef v. Morris,* 956 F.Supp. 1112, 1115 16 (S.D.N.Y.1997) (dismissing § 1983 claims for, *inter alia,* malicious prosecution, false arrest, and perjury during trial due to a failure to state a claim under *Heck* because of the valid underlying criminal conviction). Thus, in order to bring a cognizable Section 1983 claim in this Court for the harms alleged, plaintiff must first establish the invalidity of his state court conviction.

**\*5** This result, as required by *Heck,* is consistent with the common law principles underlying plaintiff's claim for malicious prosecution. Indeed, the Supreme Court in *Heck* applied the favorable termination doctrine required to prevail in a lawsuit for malicious prosecution to all § 1983 damages actions that would implicate the legality of the challenged conviction, if successful. *See* 577 U.S. at 486 ("We think the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution."); *Dill v. Vill. of Gowanda,* 952 F.Supp. 989, 994 (W.D.N.Y.1997) ("The holding in *Heck* dovetails with established law in the Second Circuit, which also incorporates common law rules into Section 1983 analysis to hold that a valid conviction will bar a Section 1983 plaintiff from asserting federal claims for false arrest, false imprisonment, or malicious prosecution.") (internal citations and quotation marks omitted). Because an element of a claim for malicious prosecution is the termination of the proceeding in plaintiff's favor, *see, e.g., Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995), plaintiff's Section 1983 claim for malicious prosecution is necessarily barred because the subject prosecution was not terminated in a manner favorable to him. *See, e.g., Hygh v. Jacobs,* 961 F.2d 359, 367 (2d

Cir.1992) ("A plaintiff alleging the constitutional tort of malicious prosecution in an action pursuant to § 1983 must establish termination of the prosecution in his favor," which is accomplished "only when their final disposition is such as to indicate the accused is not guilty."); *Rivera v. City of Yonkers,* 470 F.Supp.2d 402, 408 (S.D.N.Y.2007) (dismissing plaintiff's false imprisonment/ arrest and malicious prosecution claims pursuant to § 1983 because under *Heck,* "a conviction for a crime cannot be considered a termination in favor of the accused"); *Smith v. P.O. Canine Dog Chas,* No. 02 6240(KMW)(DF), 2004 WL 2202564, at *6 (S.D.N.Y. Sept. 28, 2004) (stating that plaintiff's conviction bars any claim under Section 1983 for false arrest, false imprisonment, and malicious prosecution, and collecting cases).

With respect to plaintiff's claims for conspiracy, those claims also fail under the rule announced in *Heck* even if they were brought pursuant to 42 U.S.C. §§ 1985 and/ or 1986. *See Amaker,* 179 F.3d at 52 (holding that *"Heck ... applies with respect not only to plaintiff's* § 1983 claim but also to his §§ 1981, 1985(3) and 1986 claims" because the existence of a conspiracy would necessarily question the validity of plaintiff's conviction); *see also McNeill v. N.Y.,* 06 Civ. 4843, 2006 U.S. Dist. LEXIS 77085, at *9, (E.D.N.Y. Oct. 19, 2006), *aff'd,* 2007 U.S.App. LEXIS 22717, 2007 WL 2781910 (2d Cir. Sept. 25, 2007) (*"Heck* applies to plaintiff's conspiracy claims under § 1985(3) as well."); *Smith v. Fields,* No. 95 Civ. 8374(DAB), 1998 WL 709815, at *4 (S.D.N.Y. Oct.9, 1998) ("Plaintiff's allegations of unlawful collection and presentation of evidence go to the heart of the constitutionality of his criminal conviction .... To allow Plaintiff to go forward with his § 1985(3) and § 1986 actions would, therefore, necessarily imply the invalidity of Plaintiff's conviction.") (internal citation omitted); *Candelaria v. Greifinger,* No. 96 Civ. 0017(RSP), 1997 WL 642464, at *2 (N.D.N.Y. Oct.14, 1997) (holding that *Heck* applies to claims under Section 1985); *Duamutef v. Morris,* 956 F.Supp. 1112, 1117 18 (S.D.N.Y.1997) (same).

*6 Furthermore, any Section 1985 conspiracy claims against these particular defendants are also barred by the intracorporate conspiracy doctrine, which posits that officers, agents and employees of a single corporate or municipal entity, each acting within the scope of his employment, are legally incapable of conspiring together. *See, e.g., Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978) ("[T]here is no conspiracy [under Section 1985]

if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... officers[ ] and employees, each acting within the scope of his employment."). In this case, the individual defendants are employees of a single municipal entity, the Suffolk County Police Department, and the intracorporate conspiracy doctrine is therefore applicable. Here, plaintiff also does not allege that the individual defendants were acting outside of the scope of their employment. In order to show that defendants acted outside the scope of their employment, plaintiff must show that defendants were "acting in their personal interests, wholly and separately from the corporation" or municipal entity. *Bhatia v. Yhale Univ.,* No. 06 Civ. 1769, 2007 U.S. Dist. LEXIS 73849, at *4 5,2007 WL 2904205 (D.Conn. Sept. 30, 2007) (citing *Tardd v. Brookhaven Nat'l Lab,* 407 F.Supp.2d 404, 414 (E.D.N.Y.2006)); *see also Little v. City of N.Y.,* 487 F.Supp.2d 426, 442 (S.D.N.Y.2007) (dismissing conspiracy claims under Sections 1983 and 1985 under intracorporate conspiracy doctrine where plaintiff "does not provide any evidence to suggest that [defendants] were motivated by an independent personal stake in his arrest and prosecution"). The Court has carefully reviewed the complaint and finds that plaintiff has failed to allege that defendants were acting solely in their personal interests, separate and apart from their duties as police officers. Thus, the Court dismisses the potential Section 1985 claims of conspiracy on the additional grounds of the intracorporate conspiracy doctrine. Moreover, if no actionable conspiracy exists with respect to the defendants in this case, plaintiff's potential Section 1986 claims also fail as a matter of law. *See Dwares v. N.Y.,* 985 F.2d 94, 101 (2d Cir.1993) ("Liability under § 1986 ... is dependent on the validity of a claim under § 1985.") (citing *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.1978)); *see also Posr v. Court Officer Shield # 207,* 180 F.3d 409, 419 (2d Cir.1999) (affirming dismissal of Section 1986 claim where district court also dismissed Section 1985 claim).

Finally, vague and conclusory allegations that defendants have engaged in a conspiracy to violate plaintiff's constitutional rights must be dismissed. *See Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (dismissing conspiracy allegations where they were found "strictly conclusory"); *see also Walker v. Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983.") (citing *Ciambriello* ); *Sommer*

*v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Green v. Bartek,* No. 3:05 Civ. 1851, 2007 WL 4322780, at *3 (D.Conn. Dec.7, 2007) ("The Second Circuit has consistently held that a claim of conspiracy to violate civil rights requires more than general allegations."). In this case, plaintiff makes only the conclusory allegation that defendants conspired during the trial, and the complaint is void of any factual assertions to support this claim. Thus, the conspiracy claim is also dismissed on this ground. For all of these aforementioned reasons, plaintiff's conspiracy claims under Sections 1983, 1985, and/or 1986 do not survive dismissal.

**\*7** Moreover, even assuming that certain pleading defects could be remedied in an amended complaint, the *Heck* rule bars plaintiff's claims until the underlying conviction is invalidated, and thus providing the plaintiff with an opportunity to amend the complaint is futile until such time that the state court conviction is reversed, invalidated by a federal writ of *habeas corpus,* or otherwise expunged or declared invalid. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [plaintiff's] cause[ ] of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."); *see also Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999) (holding that if a plaintiff cannot demonstrate he is able to amend his complaint "in a manner which would survive dismissal, opportunity to replead is rightfully denied").

However, under these circumstances, the dismissal is without prejudice.

In sum, even accepting plaintiff's allegations as true and drawing all reasonable inferences in plaintiff's favor, the Court finds that plaintiff fails to state a claim upon which relief can be granted. Specifically, the Court concludes that the *Heck* rule, as a matter of law, prevents plaintiff from bringing claims for malicious prosecution, conspiracy, and violations of his right to a fair trial pursuant to Section 1983, or any potential claims under Sections 1985 and/or 1986.

## V. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss the complaint without prejudice pursuant to 12(b)(6) of the Federal Rules of Civil Procedure.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444 45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2009 WL 2567990

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1506954
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anthony ACOSTA, Plaintiff,

v.

CITY OF NEW YORK, Inspector Michael
Harrington, in his individual and professional
capacity, Police Officers Michael Mazzilli and
Police Officers "John Does" in their individual
and professional capacities, Defendants.

No. 11 Civ. 856(KBF).
|
April 26, 2012.

*MEMORANDUM & ORDER*

KATHERINE B. FORREST, District Judge.

**\*1** Plaintiff Anthony Acosta, a self-described Hispanic male and former police officer with the New York City Police Department ("NYPD"), brings this action against defendants the City of New York (the "City"), Inspector Michael Harrington (in his individual and professional capacities), Police Officer Michael Mazzilli (in his individual and professional capacities), and an unspecified number of John Doe police officers. Plaintiff alleges that as part of, and subsequent to, a 2008 altercation that occurred while plaintiff was off-duty, defendants engaged in discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 1981 and 1983, the New York State Human Rights Law ("NYSHRL"), New York State Exec. Law § 296 *et seq.,* and the New York City Human Rights Law ("NYCHRL"), New York City Admin. Code § 8 107 *et seq.,* the use of excessive force in violation of 42 U.S.C. § 1983, and were acting under color of state law pursuant to unlawful policies in violation of *Monell v. Department of Social Services,* 438 U.S. 658 (1978).

1    Plaintiff lists certain "John Doe police officer defendants in the caption of the Amended Complaint and makes certain allegations against them. *(See, e.g.,* Am. Compl. ¶ 14.) However, plaintiff has not identified those officers and there is no indication that

plaintiff has attempted to ascertain their identities from the City. No service has been effectuated on those John Does and thus, they are not properly before this Court. Accordingly, the Court only construes plaintiff s claims against those defendants who were properly served.

The City of New York along with defendants Harrington and Mazzilli have moved to dismiss plaintiff s Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, defendants' motion is granted.

FACTUAL BACKGROUND [2]

2    For purposes of deciding the instant motions, the Court accepts as true all well pleaded allegations in plaintiff's Amended Complaint and draws all reasonable inferences in plaintiff's favor. *See Levy v. Southbrook Int l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001).

In connection with plaintiff's opposition to the motion, plaintiff submitted various documents not referenced in, or integral to, the Amended Complaint. *(See* Decl. of Rocco G. Avallone in Opp'n to Mot. to Dismiss (Dkt. No. 22) Exs. B G.) Consideration of such documents is inappropriate on a motion to dismiss, *see DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010), and the Court has not done so in connection with deciding the instant motion.

On December 17, 2008 at approximately 11:05 p.m., plaintiff, at that time a uniformed member of the NYPD with the rank of Sergeant, was exiting a restaurant and bar near 1490 First Avenue in New York City, while off duty. (Am. Compl.

(Dkt. No. 18) ¶¶ 15, 16, 18.) After plaintiff entered his own car, through his car window he witnessed a separate vehicle strike an individual. *(Id.* ¶ 18.) Plaintiff exited his car to investigate and, in the process of trying to protect an allegedly "dark skinned and possible [*sic* ] Hispanic" cab driver from "being attacked by several [intoxicated] off duty police officers from the 19th Precinct," was struck by a 2 x 4 piece of wood by a John Doe police officer. *(Id.)* Plaintiff then identified himself (presumably to the John Doe police officer) as a police officer. *(Id.* ¶ 18.)

Plaintiff alleges that Captain Pla from the 19th Precinct, [3] one of the NYPD officers at the scene of the incident, failed to take any action to protect either (a) plaintiff, who was attempting to take the 2 x 4 away from one of the John Doe off-duty police officers, or (b) the "dark skinned cab driver." (Am.Compl.¶ 19.) Plaintiff finally wrestled the 2 x 4 into his possession, after which an NYPD vehicle arrived at the scene. (*Id.* ¶ 21.) At that time, plaintiff purportedly identified himself as a police officer, and attempted to inform the "plain clothes" police officers about the car accident and altercation between the cab driver and the off-duty police officers. (*Id.*)

[3]     At all times relevant to the complaint, plaintiff was with the 30th Precinct. (Am.Compl.¶ 10.)

Plaintiff then purportedly approached Officer Mazzilli, identified himself as a police officer, and informed him of the altercation between the off-duty police officers and the cab driver-and pointed out the off-duty officers. (Am Compl. ¶ 23.) In response, defendant Mazzilli allegedly yelled at plaintiff to remove his hands from his pockets, grabbed plaintiff's wrist, pushed plaintiff s hands into his pockets, but then maneuvered plaintiff's elbow to try to remove plaintiff's hands from his pockets. (*Id.* ¶¶ 24 25.) At that time, plaintiff again informed defendant Mazzilli that he was an on-duty police officer, [4] to which Mazzilli responded that he did not care, punched plaintiff in the chest, threw plaintiff to the ground, and handcuffed plaintiff's left wrist. (*Id.* ¶¶ 25 26.)

[4]     Plaintiff alleges that he told defendant Mazzilli, "I'm a Sergeant. I'm on the job. (Am.Compl.¶ 25) despite the fact that plaintiff alleges earlier in the Amended Complaint that he was off duty at the time of the alleged altercation (*id.* ¶ 18).

**\*2** Defendant Mazzilli then attempted to handcuff plaintiff's right arm behind his back but could not due to limited mobility resulting from a prior surgery. (Am.Compl.¶¶ 26 27.) Plaintiff allegedly pleaded with Mazzilli to stop, explained the problem with his right arm, and requested that two sets of handcuffs be used; Mazzilli obliged. (*Id.* ¶ 27.) A "plain clothes" John Doe police officer subsequently inquired if plaintiff was armed, and, upon learning he was not, removed both sets of handcuffs and placed plaintiff in an SUV. (*Id.* ¶ 29.) Thereafter, plaintiff was transported to the 19th Precinct for interrogation. (*Id.* ¶ 30 .)

Plaintiff alleges that defendant Inspector Michael Harrington approached him prior to his interrogation, informed him that he was not a subject of the investigation of the assault against the cab driver, but that he should lie during questioning regarding both what had occurred between the John Doe officers and the cab driver and what had occurred between plaintiff and Officer Mazzilli. Harrington then allegedly provided plaintiff with the version of the story he should tell to protect the off-duty police officers. (Am.Compl.¶¶ 31, 34 35.) According to plaintiff, Harrington provided his directives in front of two Sergeants Mulvey and Cosmo-who allegedly were delegates from the Sergeants Benevolent Association. (*Id.* ¶¶ 32, 34.) Plaintiff informed Sergeants Mulvey and Cosmo of what had occurred, after which Mulvey informed plaintiff that it was inadvisable to go to the hospital for his purported injuries because the investigators "were looking to suspend Plaintiff" and a hospital visit would make plaintiff look "uncooperative and guarantee a suspension." (*Id.* ¶¶ 32, 33.) Based on that information, plaintiff allegedly did not seek medical attention subsequent to his interrogation. (*Id.* ¶ 33.)

Plaintiff, however, purportedly informed defendant Harrington that he would refuse to provide the story that Harrington had requested he give. (Am.Compl.¶ 31.) It is alleged, however, that "defendants" never interviewed the John Doe police officers who had seen the altercation between Mazzilli and plaintiff. (*Id.* ¶ 44.) Mulvey then spoke to Harrington and informed plaintiff that plaintiff was going to be placed on "Modified status;" he was placed on such status shortly thereafter. (*Id.* ¶ 36.) The Amended Complaint does not contain an explanation of the meaning of being placed on modified status.

Plaintiff alleges that he was also "issued Charges and Specifications" on August 18, 2009, and October 29, 2009, for failing to lie during his interrogation "to protect the white police officers" who were involved in the December 17, 2008 altercation with the cab driver. (*Id.* ¶ 38.) Plaintiff does not explain what charges or specifications were issued against him, or what it means to have charges and specifications issued. Then, on January 8, 2010, plaintiff alleges that he was placed in "Level II discipline monitoring" for approximately nine months. (*Id.* ¶ 39.) Again, plaintiff fails to explain what Level II discipline monitoring is or what precisely that meant in the context of plaintiff's job as an NYPD Sergeant.

**\*3** Plaintiff retired on October 2011 over two years later than he allegedly planned to retire. (Am.Compl.¶¶ 40, 41.) Plaintiff allegedly could not retire in March 2009 when planned because he purportedly could not obtain a "Good Guy" letter based on his placement on Level II status. (*Id.* ¶ 41.) Plaintiff also alleges that he had to forfeit a private security job, with a purported $140,000 annual salary, that he "had lined up" without the "Good guy" letter. (*Id.*) Plaintiff also alleges damages associated with failing to obtain overtime or special assignments based upon his modified and Level II statuses. (*Id.* ¶ 43.) It is further alleged that "defendants" continued their retaliation in unspecified ways through October 2011 because plaintiff would not accept a penalty for the charges. (*Id.* ¶ 45.)

PROCEDURAL HISTORY

Plaintiff commenced this action on November 23, 2011. (Dkt. No. 1.) On January 3, 2012, defendants requested a pre-motion conference related to an anticipated motion to dismiss plaintiff's original complaint, in response to which the Court set a briefing schedule. (Dkt. No. 10.) Defendants moved to dismiss the original complaint on January 18, 2012. (Dkt. No. 12.)

The Court held the initial pretrial conference in this matter on January 27, 2012. (*See* Dkt. No. 14.) At that conference, the Court informed plaintiff's counsel that plaintiff could withdraw his original complaint and file an amended complaint, taking into consideration defendants' motion to dismiss, or proceed on its original complaint and, if such complaint was found defective, any dismissal would be with prejudice. (*See id.*) In addition, the Court notified plaintiff's counsel at the conference that, given that plaintiff had been given notice of the defects in the original complaint from defendants' motion to dismiss, plaintiff would be given a single chance to amend the complaint. In other words, the Court stated that if defects remained in any amended complaint, any dismissal would be with prejudice *i.e.,* without leave to amend.

Plaintiff elected to amend his complaint (Dkt. No. 15), and filed the Amended Complaint on February 10, 2012 (*see* Dkt. No. 18). Plaintiff asserts claims under 42 U.S.C. § 1983 against the City and defendants Harrington and Mazzilli for racial discrimination, hostile

work environment, and excessive force (Count One), [5] for violations of Title VII against the City (Count Two), New York State Human Rights Law, N.Y. Exec. Law § 296, *et seq.* against all defendants (Count Three), New York City Human Rights Law, N.Y. City Admin. Code § 8 107 *et seq.* against all defendants (Count Four), 42 U.S.C. § 1983 for violations of constitutional rights under *Monell v. Department of Social Services,* 438 U.S. 658 (1978), against the City (Count Five), and 42 U.S.C. § 1981 for discrimination and retaliation (Count Six).

[5]   Plaintiff's claims are asserted in conclusory fashion, bur defendants and the Court construed them as broadly as possible on this motion to ensure that all potential claims were encapsulated by this decision.

Defendants filed the instant motion to dismiss on March 1, 2012, plaintiff opposed the motion on March 21, 2012, and the motion was fully briefed as of March 28, 2012. (Dkt.Nos.19, 21, 23.)

DISCUSSION

I. LEGAL STANDARD

**\*4** To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010) (quoting *Twombly,* 550 U.S. at 570). *See also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. In applying that standard, the court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Id.* If the court can infer no more than "the mere possibility of misconduct" from the factual averments-in other words, if the well-pleaded allegations of the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate.

*Twombly,* 550 U.S. at 570; *Starr,* 592 F.3d at 321 (quoting *Iqbal,* 129 S.Ct. at 1950).

As an initial matter, plaintiff's claims fail because they do not meet the standard promulgated by *Twombly* and *Iqbal.* In particular, plaintiff's Amended Complaint is, as Judge McMahon recently put it, "a recitation of a false syllogism: (1) I am (insert name of a protected class); (2) something bad happened to me at work; (3) therefore, it happened because I am (insert name of protected class)," *Bermudez v. The City of* New York, 783 F.Supp.2d 560, 581 (S.D.N.Y.2011). But the *sine qua non* of a race-based discrimination or retaliation claim is that discrimination or retaliation was *because of race.* As discussed further below, plaintiff fails to connect the dots between the alleged adverse actions and his membership in a protected class. The Court will address each of plaintiff's claims, including his excessive force and *Monell* claims, *seriatim.*

## II. EMPLOYMENT DISCRIMINATION

### A. CLAIMS UNDER TITLE VII, 42 U.S.C. §§ 1981 & 1983, and NYSHL

Claims of employment discrimination brought pursuant to Title VII are analyzed under the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The same applies to claims of employment discrimination pursuant to 42 U.S.C. § 1983 and the NYSHL. *See Spiegel v. Schulmann,* 604 F.3d 72, 80 (2d Cir.2010) (N.Y.SHRL); *Boykin v. KeyCorp.,* 521 F.3d 202, 213 (2d Cir.2008) ( § 1983). Under that framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination, and must demonstrate (1) membership in a protected class; (2) qualifications for the position; (3) an adverse employment action, and (4) circumstances giving rise to an inference of discrimination. *Collins v.* New York City Transit Auth., 305 F.3d 113, 118 (2d Cir.2002); *Graham v.* Long Island R.R., 230 F.3d 34, 39 (2d Cir.2000) ( § 1983).

**\*5** However, the *McDonnell Douglas* test is "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema, N .A.,* 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). An "employment discrimination plaintiff need not plead a prima facie case of discrimination" on this motion; instead, as long as the complaint gives the defendant "fair notice" of the plaintiff's claim, "the grounds upon which it rests" and

"indicate[s] the possibility of discrimination and thus present[s] a plausible claim for disparate treatment," the complaint satisfies Rule 8 fa) of the Federal Rules of Civil Procedure. *Boykin,* 521 F.3d at 214–16. Of course, "[t]he *Iqbal* plausibility standard applies in conjunction with employment discrimination pleading standards." *Jackson v. New York St. Dep't of Labor,* No. 09 Civ. 6608, 2012 WL 843631, at \*2 (S.D.N.Y. Mar.12, 2012) (quotation marks and citation omitted).

Although plaintiff does allege an "adverse" employment action— *i.e.,* that he was denied overtime and special assignments based on his Level II and modified status (Am.Compl.¶ 43)—he fails to raise a plausible inference that the action was taken on account of his race or national origin. Rather, plaintiff specifically alleges that the adverse employment action—being placed on modified status and Level II discipline monitoring—resulted from him refusing to "lie" when he was interrogated about the incident between the John Doe police officers and the cab driver. (*See* Am. Compl. ¶¶ 31, 35, 36, 38 ("In retaliation for failing to follow Defendant Harrington's unlawful directive regarding testifying falsely during Plaintiff's interrogation, ... Plaintiff was issued Charges and Specifications ...".) Plaintiff does not connect the fact that he is Hispanic to any of the alleged adverse actions taken against him other than alleging that the John Doe officers were white. (*See* Am. Compl. ¶ 38.) That is fatal to his discrimination claims. *See Int'l B'hood of Teamsters v. U.S.,* 431 U.S. 324, 335, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

Plaintiff attempts to show that he was treated differently than the John Doe officers by intimating that "defendants" did not question the John Doe officers about the altercation between plaintiff and Mazzilli. (*Id.* ¶ 44.) Plaintiff does not make any allegations about what the John Doe defendants were or were not told to say about the incident. Nor does plaintiff allege that the officers did *not* face disciplinary charges or changed "status" as a result of the incident between themselves and the cab driver. Indeed, plaintiff specifically alleges that he was told that if he did not lie, "some NYPD officers would get disciplined." (*Id.* ¶ 35.)

The Amended Complaint's allegations provide the distinct impression that plaintiff faced the alleged adverse action due to his purported failure to lie to protect other NYPD officers—not based upon his race. Even assuming the

truth of those allegations, as the Court must on this motion, it does not provide any basis for the Title VII, sections 1983 and 1981, and NYSHRL claims asserted here. *See Iqbal,* 129 S.Ct. at 1949. In other words, the Amended Complaint fails to advance a plausible claim for disparate treatment under those statutes. Accordingly, those claims are dismissed.

### B. NYCHRL

**\*6** Although employment discrimination claims under the NYCHRL are "to be evaluated separately from counterpart claims brought under Title VII," *Kolenovic v. ABM Indus. Inc.,* 361 Fed. Appx. 246, 248 (2d Cir.2010), to effectuate the statute's "uniquely broad and remedial" purpose, *Kaur v. New York City Health & Hosp. Corp.,* 688 F.Supp.2d 317, 339 (S.D.N.Y.2010) (quotation marks omitted); *see also Price v. Cushman & Wakefield, Inc.,* 808 F.Supp.2d 670, 688 (S.D.N.Y.2011) ("Claims under the City HRL must be given an independent liberal construction." (quotation marks, citation, and alterations omitted)), claims of employment discrimination under the NYCHRL likewise are subject to the *McDonnell Douglas* burden-shifting analysis, *see Spiegel,* 604 F.3d at 80; *Pilgram v. McGraw Hill Cos.,* 599 F.Supp.2d 462, 468 (S.D.N.Y.2009) ("[T]he standard for all Title VII, section 1981, [NYSHRL] and [NY]CHRL employment discrimination claims is the same."); *Fowler v. Scores Holding Co., Inc.,* 677 F.Supp.2d 673, 682 (S.D.N.Y.2009). "[A]t a minimum, employment discrimination claims [under NYCHRL] must meet the standard of pleading set forth in *Twombly* and *Iqbal* ...." *Goodman v. Port Auth. of* New York & New Jersey, No. 10 Civ. 8352, 2012 WL 664531, at *16 (S.D.N.Y. Feb.29, 2012).

Plaintiff's NYCHRL employment discrimination claim fails under both *McDonnell Douglas* and *Twombly/Iqbal* for the same reason as its federal and state counterparts-*i.e.,* the absence of allegations connecting the purported adverse employment actions to plaintiff's race. As discussed in connection with the Court's analysis of plaintiff's employment discrimination claims under federal and state law, there is no plausible inference that plaintiff's placement on modified status or Level II disciplinary monitoring resulted from his race. Rather, plaintiff's own allegations state that plaintiff was subjected to adverse actions because he failed to lie to protect other NYPD officers, as instructed by defendant Harrington. (*See, e.g.,* Am. Compl. ¶¶ 31, 35, 36, 38.) Accordingly,

even under the NYCHRL's liberal construction, plaintiff's employment discrimination claim under NYCHRL is dismissed.

### C. RACE DISCRIMINATION UNDER 42 U.S.C. § 1981

Section 1981 of chapter 42 of the United States Code provides,

> All persons ... shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

42 U.S.C. § 1981(a).

Claims of employment discrimination under section 1981 are analyzed under the same framework as discrimination claims under Title VII and section 1983. *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 225 (2d Cir.2004); *see also Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000) (§ 1981); *Jermott v. Coughlin,* 85 F.3d 61, 67 (2d Cir.1996) ( § 1983).

**\*7** Where a defendant is a state actor, claims may only lie under 42 U.S.C. § 1983 for violations of rights under 42 U.S.C. § 1981. *Jett v.* Dallas Indep. Sch. Dist., 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Gladwin v. Possi,* 403 Fed. Appx. 603, 604 05 (2d Cir.2010) (the plaintiff's " § 1981 claims are encompassed by her § 1983 claims, and both are therefore analyzed under § 1983" (citing *Jett,* 491 U.S. at 735)).

Here, to the extent that plaintiff seeks to assert claims against defendants Harrington and Mazzilli in their official capacity or against the City, those claims are analyzed under section 1983 and are dismissed for the reasons set forth in Part II.A., *supra.* To the extent that plaintiff seeks to bring claims against them under section 1981, the claims are dismissed against the City and against Harrington and Mazzilli in their official capacity. *Bermudez,* 783 F.Supp.2d at 576.

## II. HOSTILE WORK ENVIRONMENT

A. UNDER TITLE VII, 42 U.S.C. §§ 1981 & 1981, and NYSHRL

Under federal and New York state law, a hostile work environment claim is sufficiently plead where the complaint alleges that the plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotation marks and citations omitted); *see also Patterson,* 375 F.3d at 227; *Kumaga v.* New York City Sch. Constr. Auth., 27 Misc.3d 1207(a), 2010 WL 1444513, at *8 (N.Y.Sup.Ct. Apr.2, 2010) (N.Y.SHRL). In looking at the totality of the circumsirancers, a court may also consider certain factors, among others, to determine whether a work environment is "hostile"  *e.g.,* the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's "work performance." *Harris,* 510 U.S. at 23.

The question of "hostility" of a work environment is both subjective  *i.e.,* did the plaintiff find it hostile-and objective  *i.e.,* would a reasonable person have found it hostile. *Harris,* 510 U.S. at 21 22. The "hostility," however, must be borne of "animus towards [the plaintiff] as a result of [his] membership in a protected class." *Sullivan v.* Newburgh *Enlarged Sch. Dist. Clarence Cooper,* 281 F.Supp.2d 689, 704 (S.D.N.Y.2003). Severity is a hallmark of a hostile work environment claim. Such claims "are not intended to promote or enforce civility, gentility or even decency." *Ennis v. Sonitrol Mgmt. Corp.,* No. 02  CV  9070, 2006 WL 177173, at *9 (S.D.N.Y. Jan. 25, 2006).

The rubric just described applies similarly to hostile work environment claims under 42 U.S.C. §§ 1981 and 1983, and the NYSHRL. *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 609 § 2d Cir.2006); *Ferraro v. Kellwood Co.,* 440 F.3d 96, 99 (2d Cir.2006).

*8  As with plaintiff's employment discrimination claims, the hostile work environment claims under Title VII, 42 U.S.C. § 1983, and NYSHRL fail because there are no allegations that any animus subjective or objective stemmed from plaintiff's "membership in a protected class." Merely using the words "Hispanic" in reference to himself and "white" in reference to the John Doe police officers in his Amended Complaint does not create a plausible inference of hostility based upon race or national origin. *See Bermudez,* 783 F.Supp.2d at 581. There is simply nothing alleged to demonstrate that race factored into defendants' alleged actions. Thus, the hostile work environment claims under Title VII, 42 U.S.C. §§ 1981 & 1983, and the NYSHRL are dismissed.

B. NYCHRL

The NYCHRL's "liberal construction" lowers the standard for a hostile work environment claim brought under its auspices. *Bermudez,* 783 F.Supp.2d at 579; *see also Farrugia v. N.* Shore Univ. Hosp., 13 Misc.3d 740, 820 N.Y.S.2d 718, 724 (N.Y.Sup.Ct.2006) ("The New York City Human Rights Law was intended to be more protective than the state and federal counterpart."); *Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 278 (2d Cir.2009) ("claims under the [NYCHRL] must be given an independent liberal construction" (quotation marks omitted)). A "hostile work environment" for purposes of the NYCHRL is one where there is "differential treatment" period. *Williams v.* New York City Housing Auth., 61 A.D.3d 62, 77, 872 N.Y.S.2d 27 (1st Dep't 2009). In other words, all that is required to sustain a NYCHRL "hostile work environment claim" is "unequal treatment" based upon membership in a protected class. *Id.* Questions of "severity" or "pervasiveness" go to damages only-not to liability. *Id.* at 76, 872 N.Y.S.2d 27.

As discussed above, plaintiff fails to allege that he was treated differently from the John Doe police officers. There are, as mentioned, no allegations that the John Doe police officers did not face disciplinary charges or were not placed on modified status. The Amended Complaint states in conclusory fashion only that plaintiff believed that the John Doe police officers were not questioned in connection with the altercation. (Am.Compl.¶ 44.) But there are no allegations that any questioning  or lack thereof   was based upon race. Accordingly, the Amended Complaint fails to state a hostile work environment claim under the NYCHRL.

## III. RETALIATION

A. UNDER TITLE VII, 42 U.S.C. §§ 1981 & 1981, and NYSHRL

Plaintiff also asserts that defendants retaliated against him based upon his participation in a protected activity *i.e.,* speaking the truth in violation of Title VII, 42 U.S.C. §§ 1981 & 1983,[6] and the NYSHRL. Claims of retaliation "under those" statutes are generally analyzed in the same way, with the same standards of liability. *See Schiano,* 445 F.3d at 608 (Title VII & NYSHRL); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107 (2d Cir.2004) (§ 1983); *Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38 (2d Cir.1984) (§ 1981).

[6]    Because plaintiff has abandoned his First Amendment claim, the claim for retaliation under section 1983 may not lie concurrently with one under Title VII. *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 143 (2d Cir.1993).

**\*9** A plaintiff adequately states a claim for deprivation of equal protection rights stemming from retaliation for complaining about discrimination pursuant section 1983 where the complaint alleges the plaintiff suffered a "materially adverse employment action," which was "causally connected" to the plaintiff's engaging in a "protected activity." *Patane v. Clark,* 508 F.3d 106, 112 (2d Cir.2007); *Bermudez,* 783 F.Supp.2d at 575. A plaintiff engages in a protected activity when he "oppose [s] any practice made an unlawful employment practice by Title VII, or because [he] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *Bermudez,* 783 F.Supp.2d at 575 (quotation marks and alterations omitted).

An adverse employment action is one that materially and adversely alters the terms and conditions of employment. *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 446 (23 Cir.1999). A "materially adverse change is, for example, "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.*

Here, plaintiff argues in his opposition to the motion to dismiss that the protected activity in which he engaged was "complaining to the uniformed officers at the scene and at 19th Precinct regarding the actions of Harrington,

Mazzilli, and P.O. John Does regarding his unequal and discriminatory treatment on account of his race, national origin...." (Mem. Of Law in Opp'n to Defs.' Mot. To Dismiss the Am. Compl. (Dkt. No. 21) at 18.) However, no such allegation appears in the Amended Complaint. It is axiomatic that a complaint cannot be amended by assertions made in an opposition brief. *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 432 (S.D.N.Y.2001). Thus, plaintiff's assertion in his opposition cannot form the basis for any allegations of protected activity. And without any alleged protected activity, the claims under Title VII, 42 U.S.C §§ 1981 and 1983, and the NYSHRL must fail. *See Patane,* 508 F.3d at 112.

The only protected activity alleged in the complaint is plaintiff's filing of charges with the EEOC. (*See* Am. Compl. ¶ 6.)[7] That filing occurred on January 22, 2010.(*Id.*) The closest in time "adverse action" taken against plaintiff-*i.e.,* the January 8, 2010 placement of plaintiff on Level II discipline monitoring-occurred *prior* to the EEOC filing, though. (*Id.* ¶ 39.)[8] The Level II discipline monitoring thus cannot be "causally connected" to the filing of the EEOC charges such that there is a basis for a retaliation claim. *Cf. Butts v. New York City Dep't of Housing Preservation & Dev.,* 307 Fed. Appx. 596, 599 (2d Cir.2009) ("The plaintiff can establish the causal connection indirectly by showing that the protected activity was closely *followed* by discrimination ..." (emphasis added)).

[7]    Plaintiff's refusal to "lie "to "protect other NYPD officers does not constitute a "protected activity for purposes of a retaliation claim. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) ( "The term 'protected activity' refers to actions taken to protest or oppose statutorily prohibited discrimination. ).

[8]    Plaintiff asserts in wholly conclusory fashion that " d]efendants continued to retaliate against him] up until his retirement in October 2011.... (Am.Compl.¶ 45.) That allegation does not come close to meeting the standard set forth in *Twombly* or *Iqbal* and thus, the Court will not credit it on this motion.

**\*10** Accordingly, without any allegations in the Amended Complaint supporting a protected activity and an adverse employment action, plaintiff's retaliation claims fail under Title VII, 42 U.S.C. §§ 1981 & 1983, and

has been amended once at plaintiff's own election subsequent to that "notice."

## V. *MONELL* CLAIM

To state a claim for municipal liability under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a plaintiff must allege that " 'policies or customs that [were] sanctioned by the municipality led to the alleged constitutional violation.' " *Missel v. Ctny. of Monroe,* 351 Fed. Appx. 543, 545 (2d Cir.2009) (quoting *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006)). A *Monell* claim can survive a motion to dismiss where the plaintiff

> make[s] factual allegations that support a plausible inference that the constitutional violation took place pursuant to either a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policy making authority for the municipality.

*Id.*

Plaintiff has failed to set forth factual allegations that would support a plausible inference that the City's "policies" or "customs" caused Harrington's or even Mazzilli's-alleged violations of plaintiff's rights. The complaint is similarly devoid of allegations regarding any policy promulgated by the City requiring NYPD police officers to "lie" to "protect" other NYPD officers when they commit constitutional or NYPD-regulations violations.

Plaintiff alleges that the "City of New York failed to train its police officers as to display a deliberate indifference to the constitutional rights [of] those within the City of New York." (Am.Compl.¶ 71.) But that allegation standing alone does not create a plausible inference that any of Harrington's and Mazzilli's complained-of-violations-regardless of whether those violations relate to plaintiff's claim for disparate treatment, hostile work environment, or retaliation were made pursuant to any City-mandated policy. That allegation is merely a recitation of the element of the cause of action-something the Court cannot credit

on this motion. *Iqbal,* 129 S.Ct. at 1949. Accordingly, the *Monell* claim must be dismissed.

## CONCLUSION

For the aforementioned reasons, defendants' motion to dismiss is GRANTED.

**\*12** Because plaintiff elected to amend the complaint in response to defendants' motion to dismiss the original complaint where nearly identical arguments to those raised on this motion, having the benefit of the Court's explicit admonition that any pleading deficiencies would be deemed with prejudice on a subsequent motion to dismiss, plaintiff's request for leave to amend is DENIED. Accordingly, the dismissal of the Amended Complaint is with prejudice.

The Clerk of Court is directed to terminate any pending motions and terminate this action. Judgment is to be entered for defendants the City of New York, Michael Harrington, and Michael Mazzilli.

SO ORDERED:

IN RE ADULT FILM COPYRIGHT INFRINGEMENT LITIGATION

This Document Relates to:

11 Civ. 7564(KBF)

11 Civ. 7999(KBF)

11 Civ. 8172(KBF)

11 Civ. 9550(KBF)

11 Civ. 9618(KBF)

11 Civ. 9688(KBF)

11 Civ. 9689(KBF)

11 Civ. 9703(KBF)

11 Civ. 9705(KBF)

11 Civ. 9706(KBF)

11 Civ. 0129(KBF)

11 Civ. 1077(KBF)

11 Civ. 1169(KBF)

Master Case No. 11 Civ. 7564

*MEMORANDUM & ORDER*

On March 13, 2012, this Court issued an order stating, in part, that plaintiffs shall identify Doe defendants, who have requested to proceed anonymously, by IP address and Doe number only *i.e.,* plaintiffs must not reveal the identity of these Doe defendants in public filings. On April 18, 2012, in contravention of this order, plaintiff in Member Case No. 11 Civ. 9706 named a Doe defendant-who had submitted a request to proceed anonymously that was received by plaintiff-in a public filing. This document has been removed by the Court.

1     Counsel shall broadly construe filings by *pro se* plaintiffs and err on the side of interpreting filings as requests to proceed anonymously when there is any indication that they might be such requests.

Should counsel for plaintiffs again disobey a Court order in this consolidated action, plaintiffs may be subject to sanctions including dismissal of their actions pursuant to Federal Rule of Civil Procedure 41(b).

Plaintiff is directed to mail this Order to the Doe defendant named in plaintiff's filing.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1506954

---

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 251781
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Tony JENNINGS, Plaintiff,
v.
Jeremy DECKER, et al., Defendants.

5:17-CV-0054 (LEK/DEP)
|
Signed 01/17/2019

**Synopsis**
**Background:** Arrestee brought action against city and
police officers, asserting § 1983 claims for racial
profiling under the Fourteenth Amendment, excessive
force, false arrest, and illegal search under the Fourth
Amendment, municipal liability, and conspiracy under §
1985. Defendants moved for summary judgment.

**Holdings:** The District Court, Lawrence E. Kahn, J., held
that:

[1] fact issue existed as to whether use of force was
reasonably related to arrestee's actions;

[2] arrestee's de minimis injury did not preclude finding
that officers were liable for excessive force;

[3] arrestee's illegal search claim was barred by *Heck*;

[4] arrestee's false arrest claim was barred by *Heck*; and

[5] officers were not liable for § 1985 conspiracy.

Motion granted in part and denied in part.

West Headnotes (21)

**[1]** **Arrest**
 Use of force

Fourth Amendment claims of excessive force
are governed by an objective reasonableness
standard, such that no claim will lie when

the force used by the officers was objectively
reasonable under the circumstances. U.S.
Const. Amend. 4.

Cases that cite this headnote

**[2]** **Arrest**
 Use of force

In determining whether force used by police
officers was objectively reasonable under
the circumstances, for purposes of § 1983
excessive force claim, courts examine the
severity of the crime at issue, whether
the suspect posed an immediate threat to
the safety of the officers or others, and
whether suspect was actively resisting arrest
or attempting to evade arrest by flight. U.S.
Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[3]** **Arrest**
 Use of force

Not every push or shove, even if it may later
seem unnecessary in the peace of a judge's
chambers, violates the Fourth Amendment,
for purposes of § 1983 excessive force claim.
U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[4]** **Federal Civil Procedure**
 Civil rights cases in general

Genuine issues of material fact as to
whether arrestee fled from police officers
and continued to resist arrest until after
officer punched him, such that officers'
actions of tackling and punching arrestee were
reasonably related to arrestee's actions of
openly engaging in a crime in a public area,
fleeing an officer while being searched, and
concealing his hands when officers tried to
secure him in handcuffs, precluded summary
judgment on arrestee's § 1983 excessive force
claim. U.S. Const. Amend. 4; 42 U.S.C.A. §
1983.

Cases that cite this headnote

**[5]**   **Arrest**
  👉 Use of force

Arrestee's de minimis injury arising from police officers tackling him and punching him in the face did not preclude finding that police officers were liable under § 1983 for use of excessive force; although arrestee suffered no lacerations or bleeding, pictures taken by officer immediately following arrest did not show any obvious injury, arrestee received no medical treatment for any of his claimed injuries, and pain in arrestee's face resulting from arrest lasted no more than one week, arrestee alleged that the arrest aggravated an existing injury to his ribs and caused long-term pain and discomfort in his knee. U.S. Const. Amend. 4.

Cases that cite this headnote

**[6]**   **Arrest**
  👉 Use of force

On a § 1983 excessive force claim a plaintiff must present sufficient evidence to establish that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[7]**   **Arrest**
  👉 Use of force

De minimis use of force will rarely suffice to state a Constitutional claim for excessive force, and de minims injury can serve as conclusive evidence that de minimis force was used. U.S. Const. Amend. 4.

1 Cases that cite this headnote

**[8]**   **Civil Rights**
  👉 Arrest and detention

Arrestee's § 1983 claim that police officers conducted an illegal search in violation of the Fourth Amendment was barred under *Heck* as implicating validity of arrestee's state criminal conviction for criminal possession of a controlled substance, where criminal charges hinged on officer's discovery of drugs through his allegedly unlawful search. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[9]**   **Searches and Seizures**
  👉 What Constitutes Search or Seizure

A "search" in the context of the Fourth Amendment occurs when the police intrude upon a person's reasonable expectation of privacy or if the police otherwise trespass upon one's person, house, papers, or effects for the purpose of acquiring information. U.S. Const. Amend. 4.

Cases that cite this headnote

**[10]**   **Civil Rights**
  👉 Criminal prosecutions

Under *Heck*, in order to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. U.S. Const. Amend. 4.

Cases that cite this headnote

**[11]**   **Civil Rights**
  👉 Arrest and detention

A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[12]** **False Imprisonment**

    👉 Nature and Elements of False Imprisonment

Under New York law, a plaintiff alleging false arrest must show, among other things, that the defendant intentionally confined him without his consent and without justification.

Cases that cite this headnote

**[13]** **Civil Rights**

    👉 Arrest and detention

**False Imprisonment**

    👉 Probable cause

Pursuant to both New York law and § 1983, the existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[14]** **Arrest**

    👉 What constitutes such cause in general

An officer has probable cause to arrest when officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S. Const. Amend. 4.

Cases that cite this headnote

**[15]** **Arrest**

    👉 What Is an Arrest

To quantify the level of intrusiveness used by officers in any given situation, for purposes of determining when a seizure rises to level of arrest, a court must analyze all of the facts surrounding the encounter within the totality of the circumstances. U.S. Const. Amend. 4.

Cases that cite this headnote

**[16]** **Civil Rights**

    👉 Arrest and detention

Arrestee's § 1983 false arrest claim against police officers based on period of detention after discovery of cocaine in arrestee's pocket was barred under *Heck* as implicating validity of arrestee's state criminal conviction for criminal possession of a controlled substance, where state conviction hinged on officer's discovery of cocaine. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[17]** **Civil Rights**

    👉 Criminal prosecutions

*Heck* requires dismissal of any § 1983 claim which would necessarily imply the invalidity of the plaintiff's conviction or sentence. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[18]** **Civil Rights**

    👉 Arrest and detention

Arrestee's § 1983 false arrest claim against police officers based on period of detention prior to discovery of cocaine in arrestee's pocket was barred under *Heck* as implicating validity of arrestee's state criminal conviction for criminal possession of a controlled substance, where finding that officers lacked probable cause to tackle arrestee as he attempted to flee because no drug paraphernalia was present in his car constituted finding that officers lacked probable cause to search arrestee under New York law, and that state court judge erred in denying arrestee's suppression motion. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[19]** **Conspiracy**

    👉 Conspiracy to Interfere with Civil Rights

Conspiracy claim brought pursuant to § 1985 requires a showing of (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws,

or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. U.S. Const. Amend. 14; 42 U.S.C.A. § 1985(3).

Cases that cite this headnote

[20]  **Conspiracy**
 👉 Conspiracy to Interfere with Civil Rights

Section 1985 conspiracy claim requires a plaintiff to allege that he or she is a member of a protected class and that the conspirators acted with racial, or otherwise class-based 'invidiously discriminatory motivation. 42 U.S.C.A. § 1985(3).

Cases that cite this headnote

[21]  **Conspiracy**
 👉 Rights or privileges involved

African-American arrestee failed to establish that police officers' conspiratorial actions in using false reporting to substantiate criminal charges against him were racially motivated, and thus officers were not liable on arrestee's § 1985 conspiracy claim; although arrestee claimed he was targeted on account of his race, arrestee failed to allege that officers used racial slurs or epithets during the course of arrest, or to provide any explicit evidence of racial bias. 42 U.S.C.A. § 1985(3).

Cases that cite this headnote

**Attorneys and Law Firms**

Tony Jennings, Elmira, NY, pro se.

Khalid Bashjawish, H.J. Hubert, Ramona L. Rabeler, City of Syracuse Corporation Counsel, Syracuse, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

## I. INTRODUCTION

 *1  On January 19, 2017, Tony Jennings commenced this 42 U.S.C. § 1983 action against the City of Syracuse and three officers employed by the Syracuse Police Department: Officer Jeremy Decker, Officer Darren Ettinger, and Sergeant Robert Ocker. Dkt. No. 1 ("Complaint"); see also Dkt. No. 1-1 ("Preliminary Statement of Facts"). Plaintiff's claims all arise out of the circumstances surrounding his January 5, 2016 arrest in Syracuse, New York. Prelim. Statement Facts at 1. Now before the Court is Defendants' motion for summary judgment, filed on June 29, 2018 along with a memorandum and statement of material facts ("SMF"). Dkt. Nos. 53 ("Motion"), 53-2 ("Defendants' SMF"), 53-3 ("Memorandum"). Plaintiff opposes the Motion. Dkt. Nos. 59-1 ("Opposition"), 59 ("Response to Defendants' SMF"). For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

1  Plaintiff's initial pleading actually named the Syracuse Police Department as a defendant, not the City of Syracuse. Dkt. No. 1 at 1. However, in a Mary 2017 report recommendation, the Honorable David E. Peebles, U.S. Magistrate Judge, determined that " t]he Syracuse Police Department is an agency of the City of Syracuse and not an independent entity subject to suit. Dkt. No. 7 ("Report Recommendation") at 6. Judge Peebles therefore recommended that the Syracuse Police Department be dismissed as a defendant and replaced with the City of Syracuse, id. at 8, a suggestion later adopted and implemented by the Court, Dkt. No. 15 ("June Order") at 2.

## II. BACKGROUND

### A. Factual Background
The supporting materials submitted in connection with the Motion make clear that Plaintiff and Defendants endorse substantially different versions of the events that occurred on January 5, 2016. Their differing narratives are set out below.

### *1. Defendants' Version of Events*

On January 5, 2016, Officers Decker and Ettinger were on patrol together in Syracuse, New York, near the Pioneer Homes housing complex. Defs.' SMF ¶ 4. Both Decker and Ettinger were members of the Syracuse Police Department's Crime Reduction Team, Dkt. Nos. 53-10 ("Decker Affidavit") ¶ 1,[2] 53-11 ("Ettinger Affidavit") ¶ 1,[3] a "proactive unit" focused on policing related to "guns, drugs[,] and gangs in the City of Syracuse," Dkt. No. 53-6 at 9.[4] Acting on reports of gang activity at Pioneer Homes, the Syracuse Housing Authority had, prior to Plaintiff's arrest, "granted the Syracuse Police Department authorization to arrest persons who were trespassing or had no lawful business at [ ] Pioneer Homes." Defs.' SMF ¶ 3.

[2]    The Decker Affidavit was attached to Defendants' Motion as Exhibit I.

[3]    The Ettinger Affidavit was attached to Defendants' Motion as Exhibit J.

[4]    Exhibits C and D to Defendants' Motion (docket entries 53 6 and 53 7) contain transcripts of the two day suppression hearing held in connection with Plaintiff's criminal trial, on May 17 and May 19, 2016. Those documents will be referred to by the testifying individual. See, e.g., Dkt. Nos. 53 6 at 8:9 32:20 ("Ettinger Suppression Hearing Testimony"), 53 6 at 33:2 57:25 ("Jennings Suppression Hearing Testimony"), 53 7 at 4:4 38:16 ("Decker Suppression Hearing Testimony").

**\*2** At approximately 6:45 PM during Decker's and Ettinger's patrol, they encountered an occupied vehicle parked in a lot near "the 100 block of Radisson Court." Ettinger Supp'n Hr'g Test. at 10, 25. Using the patrol car's spotlight, Decker "illuminated" the vehicle, and the officers "noticed the occupants," two black men, "making furtive movements[,] as if the[y] were trying to conceal items." Defs.' SMF ¶ 4. According to Ettinger, those "furtive movements" consisted of "look[ing] at [the officers] and then immediately turn[ing] away," before making "dramatic movements towards their lap[s and] towards the center of the vehicle as if they were attempting to secrete or hide something." Ettinger Supp'n Hr'g Test. at 11, 29.

Finding the occupants' behavior suspicious, Decker and Ettinger parked their patrol car behind the vehicle "at an angle," but without fully blocking its path. Decker Supp'n Hr'g Test. at 9, 22. The officers then got out and approached the vehicle  Decker on the driver's side and Ettinger on the passenger's side, Defs.' SMF ¶ 5 6  and, looking through the open driver's side window, Decker noticed a digital scale near the center console covered in a "white residue" that he believed to be cocaine, Decker Supp'n Hr'g Test. at 10 11. Decker asked the vehicle's driver, later identified as Plaintiff, and its passenger, later identified as Willy Jones, whether there were any drugs in the vehicle. Id. at 12; Ettinger Supp'n Hr'g Test. at 13. Plaintiff denied having any drugs, but Jones admitted to having just used cocaine. Decker Supp'n Hr'g Test. at 12.

Ettinger asked Jones to step out of the vehicle, then put him in handcuffs and "searched him for contraband." Defs.' SMF ¶ 6; Ettinger Supp'n Hr'g Test. at 13. Simultaneously, Decker asked Plaintiff to get out of the vehicle and began to search him as well. Defs.' SMF ¶ 7. Before Decker's search could get underway, however, Plaintiff "violently pulled away and fled on foot ... eastbound [away] from Officer Decker." Ettinger Supp'n Hr'g Test. at 14. Decker ran after Plaintiff, tackled him from behind, and ordered him to put his hands behind his back. Decker Supp'n Hr'g Test. at 13. But Plaintiff continued to struggle with Decker, "and 'kept his hands under his body rather than putting them behind his back' " while trying to "push up off the ground and keep going." Defs.' SMF ¶ 9 10 (quoting Dkt. No. 53-5 ("Omnibus Order") at 4);[5] Decker Supp'n Hr'g Test. at 13. Ettinger ran over to help Decker, then "struck Plaintiff once with a closed fist" near Plaintiff's right eye, allowing Decker "to pull Plaintiff's hands out from underneath him ... [and] to secure him in handcuffs." Defs.' SMF ¶ 16; Decker Supp'n Hr'g Test. at 13.

[5]    The Order of Hon. Walter W. Harner was attached to Defendant's Motion as Exhibit B. The cited page numbers for that document refer to those generated by the Court's electronic filing system ("ECF").

Once Plaintiff had been handcuffed, Decker resumed his search and Ettinger returned to Jones. Ettinger Supp'n Hr'g Test. at 15. In Plaintiff's front left pants pocket, Decker found "a clear knotted section of plastic containing a beige chunky substance" that he identified as crack cocaine. Decker Supp'n Hr'g Test. at 13 14. A field test later confirmed that identification. Id. at 14 15.

Decker also found two cell phones and a few hundred dollars in cash. Id. at 13 15. Neither Decker nor Ettinger interrogated Plaintiff during the search. Ettinger Supp'n Hr'g Test. at 18; Defs.' SMF ¶ 17. However, Plaintiff voluntarily told the officers that "he was uninjured" and both officers reported that Plaintiff did not "experience any lacerations or bleeding to his right eye." Id. After Plaintiff's arrest, Sergeant Ocker arrived on the scene. Defs.' SMF ¶ 13.

**\*3** Decker and Ettinger took Plaintiff to the Onondaga Justice Center, where he was charged with criminal possession of a controlled substance in the third and fifth degree. Id. ¶¶ 14 15. While there, Plaintiff "refused medical treatment." Id. ¶ 21. To the extent that Plaintiff felt any pain as a result of his arrest, that pain lasted "for no more than one week." Id. ¶ 18.

### 2. Plaintiff's Version of Events

At approximately 5:00 PM on January 5, 2017, Plaintiff was at home when he received a phone call from Jones. Jennings Supp'n Hr'g Test. at 33 34; Dkt. No. 53-4 ("50-h Hearing Testimony") at 21.[6] Jones was staying at his girlfriend's house in Pioneer Homes near Radisson Court and asked Plaintiff for a ride "to the gas station [and] to get his car in shape." Jennings Supp'n Hr'g Test. at 34; 50-h Hr'g Test. at 18 19. Jones's car had broken down and needed, among other things, to be refilled with gas. Jennings Supp'n Hr'g Test. at 34.

[6]  Plaintiff's 50 h Hearing Testimony was attached to Defendants' Motion as Exhibit A.

Plaintiff left his home and picked up Jones, who had with him a gas can, tire inflator, and some other tools. Id. at 35 36. The pair drove to a gas station, where Jones filled up the gas can, then on to Jones's car. Id. at 35; 50-h Hr'g Test. at 19. However, Plaintiff eventually realized that he did not have the proper tools to repair his car, so he packed up and Plaintiff drove him back to his girlfriend's house. Jennings Supp'n Hr'g Test. at 35 36; 50-h Hr'g Test. at 20.

When they arrived back at Pioneer Homes, the Radisson Court parking lot was nearly full. Jennings Supp'n Hr'g Test. at 36. Plaintiff parked in one of the few remaining open parking spots  sandwiched between a truck and another car  then he and Jones remained in Plaintiff's

car for another "five to seven minutes" "making small talk." Id. at 36 37; 50-h Hr'g Test. at 22, 25 26. Finally, bothered by the smell of the full gas can, Plaintiff told Jones to "get [i]t out of [his] car." Jennings Supp'n Hr'g Test. at 37. Jones got out, removed the gas can, placed it on the ground, and continued talking with Plaintiff through the open passenger's side door. Id. at 38. After another "few seconds," Jones noticed that a police cruiser had parked behind Plaintiff's car, "completely block[ing it] off." Id. at 37 38; 50-h Hr'g Test. at 24. The pair had not noticed the cruiser before, both because the truck parked next to Plaintiff's car blocked their view and because the officers "had the[] lights out on ... their police cruiser" and did not use their spotlight. Jennings Supp'n Hr'g Test. at 38; Resp. Defs.' SMF ¶ 4; 50-h Hr'g Test. at 24.

After Jones and Plaintiff noticed the patrol car, Officers Decker and Ettinger got out and "rushed" Jones, instructing him to place his hands on the hood of Plaintiff's car. Jennings Supp'n Hr'g Test. at 39; 50-h Hr'g Test. at 26 27. The officers then searched Jones, looking through his pockets and asking whether he had any drugs or guns. Jennings Supp'n Hr'g Test. at 39; 50-h Hr'g Test. at 26 27. One of the officers also got out his flashlight, using it to look through the windows of Plaintiff's car. Jennings Supp'n Hr'g Test. at 39; 50-h Hr'g Test. at 32. However, Plaintiff claims that such a search would not have revealed any contraband, and specifically denies that there was a digital scale in his car when the officers arrived. Resp. Defs.' SMF ¶ 5; (noting that "[l]aboratory reports confirmed that a digital scale with cocain[e] residue on it[']s surface was never received at the lab ... [and the officers] never charged [ ] Plaintiff ... for the crime of criminal possession of drug paraphernalia in the second degree"); see also 50-h Hr'g Test. at 54.

**\*4** Plaintiff watched Jones and the officers for about a minute, then "opened [his] car door to ... step out of [his] car." Jennings Supp'n Hr'g Test. at 39 40, 50 51; 50-h Hr'g Test. at 32. But before he could do so, Decker "ran around," "jumped inside of [Plaintiff's] doorjamb [to] prevent[ him] from getting out of [his] car[,] ... [and] started asking [him] questions." Jennings Supp'n Hr'g Test. at 40; Resp. Defs.' SMF ¶ 5; 50-h Hr'g Test. at 32 33. Among other things, Decker asked Plaintiff whether he lived in Pioneer Homes and whether he had any contraband. Jennings Supp'n Hr'g Test. at 40 41. Plaintiff denied having any guns or drugs, and explained that he and Jones

had come from the gas station and that Plaintiff was just "dropping [Jones] off." Id.; 50-h Hr'g Test. at 33 34.

Eventually, Decker asked Plaintiff for identification. Jennings Supp'n Hr'g Test. at 41; 50-h Hr'g Test. at 34. Plaintiff handed Decker his driver's license, as well as his registration and insurance information. Jennings Supp'n Hr'g Test. at 41; 50-h Hr'g Test. at 34 35. Decker told Plaintiff to step out and place his hands on the hood of his car, then began to search inside Plaintiff's coat and pants pockets. Jennings Supp'n Hr'g Test. at 42 43; 50-h Hr'g Test. at 35 36. Plaintiff objected to the search, and told Decker that it was "unnecessary" because he "didn't do [any]thing wrong." Jennings Supp'n Hr'g Test. at 43. Decker then "st[u]ck[ ] his hand underneath [Plaintiff's] coat[,] ... down the back of [his] pants," and "in[-]between [his] buttocks," prompting Plaintiff to "turn around, to get [Decker] to stop." Id. at 43; Resp. Defs.' SMF ¶ 8; 50-h Hr'g Test. at 39. At that moment, Decker "grabbed [Plaintiff] and slammed [him] to the ground," causing Plaintiff to "hit [his] head on the ice in the parking lot." Jennings Supp'n Hr'g Test. at 43 44; 50-h Hr'g Test. at 8, 39. "Plaintiff immediately placed his hands behind his back to prevent the [ ] officers from causing [him] any more physical harm." Resp. Defs.' SMF ¶ 9. But before Decker could handcuff Plaintiff, Ettinger "ran around the car, ... reached down on the ground[,] and [ ] punched [Plaintiff] in the face." Jennings Supp'n Hr'g Test. at 44; 50-h Hr'g Test. at 8, 40. Once handcuffed, Plaintiff was again searched by Decker, who "locate[d] a quantity of cocaine ... in [Plaintiff's] pocket." Jennings Supp'n Hr'g Test. at 55; 50-h Hr'g Test. at 41.

After Decker and Ettinger had successfully detained Plaintiff, Sergeant Ocker arrived at the scene. Resp. Defs.' SMF ¶ 13. Ocker spoke to Plaintiff about the severity of his injuries and asked whether he needed medical attention, which Plaintiff declined. 50-h Hr'g Test. at 11 12, 42. Ocker also took photographs of Plaintiff's face, head, and hands, Compl. at 4; see also Dkt. No. 59-2 at 10 15 ("Photographs"), and filed a Use of Force report documenting the incident, Dkt. No. 59-2 at 2 3 ("CRB Disposition"). [7]

[7]     The CRB Disposition was attached to Plaintiff's papers as Exhibit X.

The officers then brought Plaintiff to Onondaga Justice Center, where he was charged with "criminal possession

of a controlled substance in the 3rd, 5th, and 7th degrees and resisting arrest." Resp. Defs.' SMF ¶ 14. While there, Plaintiff "did not receive medical treatment for his eye" which had swollen as a result of Ettinger's punch, Compl. at 4   though Plaintiff denies refusing treatment. Id. ¶¶ 20 21. Plaintiff's account confirms that he "did not experience any lacerations or bleeding to his right eye," and that any pain in his face resulting from the arrest lasted "for no more than one week." Id. ¶¶ 17 18; 50-h Hr'g Test. at 8 9. That said, Plaintiff does claim that "later on down the line [he] started experiencing" pain in both his knee and ribs, which he attributes to the arrest. 50-h Hr'g Test. at 13 14. Those pains did not arise until approximately two weeks after the arrest and Plaintiff never sought medical attention for them, though they bother him "[s]till to this day." Id. at 14, 49 50.

**B. Procedural History**

*1. Criminal Proceedings*

**\*5** Plaintiff was indicted in 2016 in state court for criminal possession of a controlled substance in the third degree and criminal possession of a controlled substance in the fourth degree. Order Hon. Walter W. Harner at 2. That indictment was later superseded, and the second count changed to criminal possession of a controlled substance in the fifth degree. Dkt. No. 53-6 at 2 3. Following the May 17 and May 19, 2016 suppression hearing, the Honorable Walter W. Hafner, Onondaga County Court Judge, denied Plaintiff's omnibus motion to, among other things, "suppress[ ] evidence consisting of tangible property on the grounds that such tangible property was obtained by means of an unlawful search and seizure." Omnibus Order at 2. In so doing, Judge Hafner found that "the cocaine and money recovered from [Plaintiff's] person were obtained during a lawful search ... incident to arrest." Id. at 10. A jury trial was held in February 2017, and Plaintiff was convicted on both charges and sentenced to ten years imprisonment, followed by three years post-release supervision. Dkt. No. 53-9 ("Sentencing Disposition") at 2. [8] Although it appears that Plaintiff intended to appeal his conviction and/or his sentence, Dkt. No. 53-8 ("Sentencing Hearing Transcript") at 6; [9] 50-h Hr'g Test. at 7, the status of any such appeal has not been reported to the Court.

8       The Sentencing Disposition was attached to
        Defendants' Motion as Exhibit F.

9       The Sentencing Hearing Transcript was attached to
        Defendants' Motion as Exhibit E.

### 2. Administrative Proceedings

At some point prior to his criminal trial, Plaintiff filed an administrative complaint before the City of Syracuse's Citizen Review Board ("CRB"), raising allegations of excessive force, illegal search, and racial profiling against Officers Decker and Ettinger, as well as allegations of false reporting against Sergeant Ocker. CRB Disposition at 2. [0] The CRB sustained all of Plaintiff's allegations  finding that (1) Decker and Ettinger "did not follow proper protocol" in searching Plaintiff; (2) Decker and Ettinger need not have used force against Plaintiff, because he was "not resisting arrest and presented no threat;" and (3) Ocker filed an "incomplete and untruthful" use of force report, "because it appears to misrepresent [Plaintiff's] culpability through uncorroborated quoted statements," id. at 3  and recommended that Decker, Ettinger, and Ocker receive letters of reprimand and retraining, id. at 2.

10      The CRB Disposition names the complained against
        officers only as "Officer 1,  "Officer 2,  and "Officer
        3,  but the factual context provided in the CRB's
        decision indicates to the Court that Officers 1 and 2
        are Decker and Ettinger, and that Officer 3 is Sergeant
        Ocker.

### 3. Civil Proceedings

After receiving a favorable decision from the CRB, but before his criminal trial, Plaintiff filed the present Complaint. In it, Plaintiff brings six claims: (1) a Fourteenth Amendment racial profiling claim against Decker and Ettinger; (2) a Monell claim against the City of Syracuse; (3) a Fourth Amendment excessive force claim against Decker and Ettinger; (4) a Fourth Amendment illegal search claim against Decker and Ettinger; (5) a Fourth Amendment false arrest claim against Decker and Ettinger; and (6) a conspiracy claim against Decker, Ettinger, and Ocker, brought pursuant to § 1985(3). Compl. at 3, 5.

11      As explained in more detail below, see infra Part
        IV.E.3, Plaintiff's conspiracy claim could also be
        interpreted as being brought pursuant to § 1983.

Judge Peebles's March 2017 Report-Recommendation conducted a preliminary analysis of the Complaint pursuant to 28 U.S.C. § 1915, and found that it "allege[d] sufficient facts to survive review" and require a response. R. & R. at 7 8. The Court approved and adopted that recommendation in its entirety. June Order at 2.

On June 29, 2018, Defendants filed the instant Motion for summary judgment, which has since been fully briefed. Defendants argue that (1) Plaintiff's Fourth Amendment excessive force claim "should be dismissed because [the] officers used reasonable force ... and the alleged injury sustained is de minimis," Mem. at 2; (2) Plaintiff's Fourth Amendment illegal search and false arrest claims should be dismissed as "barred by [Plaintiff's] criminal conviction," id. at 5; and (3) Plaintiff's § 1985(3) conspiracy claim "should be dismissed because [Plaintiff] has not pleaded any evidence of conspiracy" or provided any evidence of racial animus, and, in the alternative, must be barred "by the intracorporate conspiracy doctrine," id. at 7. Defendants raise no arguments regarding either Plaintiff's Fourteenth Amendment racial profiling claim or his Monell claim against the City of Syracuse.

### III. LEGAL STANDARD

**\*6** Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S.Ct. 2548.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Preliminary Matters—Plaintiff's Fourteenth Amendment and Monell Claims

Although not expressly stated in the Complaint, Plaintiff appears to bring a claim against Decker and Ettinger for racial profiling in violation of the Fourteenth Amendment, [2] and another under a Monell theory against the City of Syracuse. [3] Defendants' Memorandum fails to address either of those two claims, and raises no arguments that would lead the Court to believe that their dismissal is warranted at this time. Accordingly, both Plaintiff's racial profiling claim against Decker and Ettinger and his Monell claim against the City of Syracuse survive the Motion.

[12]  One of the claims listed in Plaintiff's Complaint accuses Decker and Ettinger of "racial profiling, insofar as they "target ed] inner city minorit ies]

and substantiat ed] criminal charges as such sic]. Compl. at 5. Such a claim is "properly subject to equal protection analysis. Marshall v. Town of Middlefield, No. 10 CV 1009, 2012 WL 601783, at *6 (D. Conn. Feb. 23, 2012) (citing Simmons v. Love, No. 09 CV 1218, 2012 WL 113665, at *5 (D. Conn. Jan. 12, 2012) ("Constitutional claims alleging racial profiling are subject to the analysis of the Fourteenth Amendment Equal Protection Clause. ) ).

[13]  When a plaintiff seeks to hold a municipality liable under § 1983, he must plead pursuant to the Supreme Court's decision in Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690 91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) that the alleged deprivation of constitutional rights was "caused by a governmental custom, policy, or usage of the municipality. Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012) (citing Monell, 436 U.S. at 690 91, 98 S.Ct. 2018). Therefore, Plaintiff's inclusion of the City of Syracuse as a defendant, see June Order at 2, must be interpreted as an attempt to bring a Monell claim against that entity.

### B. Fourth Amendment—Excessive Force

*7 [1] [2] [3] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. That language has been interpreted as "protect[ing] persons from the use of excessive force by state police officers incident to an arrest." Messina v. Mazzeo, 854 F.Supp. 116, 128 n.6 (E.D.N.Y. 1994) (citing Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ). Fourth Amendment claims of excessive force are governed by an objective reasonableness standard, such that no claim will lie when "the force used by the officers was objectively reasonable under the circumstances." Id. (citing Roundtree v. City of New York, 778 F.Supp. 614 (E.D.N.Y. 1991) ). In making this determination, courts examine "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [wa]s actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 395 n.10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.' " Brown v. City of New York, 798 F.3d 94, 107 (2d Cir. 2015) (certain internal quotation marks omitted) (quoting Graham v.

[Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)](#) ).

**[4]** Defendants raise two arguments in favor of their motion for summary judgment on Plaintiff's excessive force claim. First, based on the facts as stated in their SMF, they assert that "no reasonable jury could conclude that the [officers'] use of [force] was excessive and not reasonably related to the circumstances" of Plaintiff's arrest. Mem. at 3. In other words, Defendants would ask the Court to find that "Decker and Ettinger's actions of tackling Plaintiff[, as well as] Ettinger's single targeted and purposeful strike[,] w[ere] reasonably related to Plaintiff's actions of openly engaging in a crime in a public area, fleeing an officer while being searched, and concealing his hands when officers tried to secure him in handcuffs." Id. Plaintiff counters by reverting to his version of events, claiming that "the officer[ ]s did not have any evidence of a crime to arrest ... Plaintiff for when removing [him] from his vehicle[,] and subject[ed] him to police brutality when slamming ... [him] to the ground ... [and] when ... str[iking him] in the face with a closed fist." Opp'n at 2.

As the parties' arguments make clear, there are substantial differences between their characterization of the facts material to Plaintiff's excessive force claim. In Defendants' version of events, Plaintiff fled from Decker and continued to resist arrest until after Ettinger punched him. Because "the use of force may be reasonable against a suspect who is fleeing," [Soto v. Gaudett, 862 F.3d 148, 158 (2d Cir. 2017)](#), that account might support the dismissal of Plaintiff's excessive force claim, see also [Sullivan v. Gagnier, 225 F.3d 161, 165 66 (2d Cir. 2000)](#) ("The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force."). But in Plaintiff's version, no flight occurred and the circumstances surrounding Decker and Ettinger's seizure of Jones and Plaintiff call into serious question the reasonableness of the force undisputedly employed by both officers. See [O'Hara v. City of New York, 570 F. App'x 21, 23 (2d Cir. 2014)](#) ("[I]f we assume, as we must, that in effectuating [plaintiff's] arrest for a relatively minor matter, [the defendant-officer] ... punched [plaintiff] in the face *without* provocation and then proceeded to punch him repeatedly after the [plaintiff] fell to the ground, we conclude that a reasonable jury could have found excessive force."). The facts disputed by the parties are therefore material, insofar as they would

affect the outcome of Plaintiff's claim, and the dispute is genuine, because "a reasonable jury could return a verdict for" Plaintiff, were it to believe his story. [Anderson, 477 U.S. at 248, 106 S.Ct. 2505](#). Therefore, the Court rejects Defendants' first argument in favor of dismissing Plaintiff's excessive force claim.

**\*8 [5] [6] [7]** Second, Defendants argue that the Court should grant their motion for summary judgment because "Plaintiff cannot establish that his injury was anything more than *de minimis.*" Mem. at 4. "[O]n an excessive force claim a plaintiff must present sufficient evidence to establish that the alleged use of force is 'objectively sufficiently serious or harmful enough' to be actionable." [Washpon v. Parr, 561 F.Supp.2d 394, 406 (S.D.N.Y. 2008)](#) (certain internal quotation marks omitted) (quoting [United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999)](#) ). "A de minimis use of force will rarely suffice to state a Constitutional claim," [Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993)](#), and " '[d]e minims injury can serve as conclusive evidence that de minimis force was used,' " [Washpon, 561 F.Supp.2d at 407](#) (quoting [Carr v. Deeds, 453 F.3d 593, 606 (4th Cir. 2006)](#) ). Injuries typically considered "de minimis" include those that are "temporary and/or minor in severity." [Smith v. City of New York, No. 04-CV-3286, 2010 WL 3397683, at \*10 (S.D.N.Y. Aug. 27, 2010)](#) (granting defendant's summary judgment motion and dismissing plaintiff's Fourth Amendment claim premised on handcuffing that resulted in "red rings" around his wrists for which he did not request medical attention).

Nonetheless, multiple courts in this Circuit have held at the summary judgment stage "that even minor injuries, including scrapes and bruises, can support an excessive-force claim." [Wang v. Vahldieck, No. 09-CV-3783, 2012 WL 119591, at \*7 (E.D.N.Y. Jan. 9, 2012)](#); see also [id.](#) ("[A] reasonable jury could find that dragging [plaintiff] out of her car by her hair after she had already stopped and pulled over is objectively unreasonable." (citation omitted) ). In [Robison v. Via](#), for example, the Second Circuit allowed the plaintiff's excessive force claim to proceed past summary judgment, based on plaintiff's testimony that police officer defendant "pushed her against the inside of the door of her car, yanked her out, threw her up against the fender, and twisted her arm behind her back." [821 F.2d 913, 923 24 (2d Cir. 1987)](#) (internal quotation marks and alterations omitted). In so doing, the court found that

[w]hile [the plaintiff] did not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure is not fatal to her claim. If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe.

821 F.2d at 924 (citing Norris v. District of Columbia, 737 F.2d 1148, 1150 52 (D.C. Cir. 1984) ).

It is undisputed that Plaintiff suffered no lacerations or bleeding as a result of Ettinger's punch though the Complaint does note that Plaintiff suffered "[s]welling around [his] right eye, Compl. at 4 and the pictures taken by Ocker immediately following the arrest do not show any obvious injury, Resp. Defs.' SMF ¶ 17; Photographs. The parties also agree that Plaintiff received no medical treatment for any of his claimed injuries, and that any pain in Plaintiff's face resulting from the arrest lasted no more than one week. Resp. Defs.' SMF ¶¶ 18, 20 21. However, Plaintiff asserts that the arrest aggravated an existing injury to his ribs and caused long-term pain and discomfort in his knee, 50-h Hr'g Test. at 13 14, 49 50, injuries that a reasonable jury could find to be neither "temporary [n]or minor in severity," Smith, 2010 WL 3397683, at *10. Additionally, other courts in this Circuit have found that "transient pain," such as that suffered by Plaintiff near his right eye, can support an excessive force claim, so long as the force used was objectively unreasonable. See, e.g., Yang Feng Zhao v. City of New York, 656 F.Supp.2d 375, 390 91 (S.D.N.Y. 2009) (finding that plaintiff's claims that an officer "patted" his face and "pressed his head down against [a] table for some unspecified period of time and with some unspecified degree of force" were sufficient to survive summary judgment). As a result, the Court rejects Defendants' second argument and denies Defendants' request for summary judgment as to Plaintiff's excessive force claim against Decker and Ettinger.

## C. Fourth Amendment—Illegal Search

**\*9** **[8]** **[9]** The Fourth Amendment also protects against illegal searches. U.S. Const. amend. IV. "A 'search' in the context of the Fourth Amendment occurs when the police intrude upon a person's reasonable expectation of privacy or if the police otherwise trespass upon one's person, house, papers, or effects for the purpose of acquiring information." Conroy v. Caron, 275 F.Supp.3d 328, 340 (D. Conn. 2017) (citing Florida v. Jardines, 569 U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) ).

**[10]** Defendants contend that "[t]he Court should dismiss Plaintiff's illegal search ... claim because his conviction in a New York State criminal court bars th[at] claim as a matter of law." Mem. at 5. In so arguing, Defendants rely heavily on the Supreme Court's holding in Heck v. Humphrey, that

in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

512 U.S. 477, 486 87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (footnote and citation omitted). Because Plaintiff was validly convicted on two counts of criminal possession of a controlled substance and because there is no indication in the record that his conviction has been overturned Defendants contend that Plaintiff's claim is not cognizable under § 1983. Mem. at 5.

However, Defendants' argument overlooks an essential corollary to the holding in Heck: that "a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction." Heck, 512 U.S. at 487 n.7, 114 S.Ct. 2364. This is because "a federal court's finding of a Fourth Amendment violation would not necessarily imply that a prior state conviction was unlawful if, despite the constitutional violation, the subject evidence was admissible based on such doctrines as independent source, inevitable discovery, and harmless error." Williams v. Ontario Cty. Sheriff's Dep't, 662 F.Supp.2d 321, 329 (W.D.N.Y. 2009); see Heck, 512 U.S. at 487 n.7, 114 S.Ct. 2364 ("Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful."). At this stage of the Court's inquiry, then, the relevant question is whether the illegal search alleged by Plaintiff is the sort of "claim [that] implicate[s] the validity of Plaintiff's conviction." Zarro v. Spitzer, 274 F. App'x 31, 34 (2d Cir. 2008) (citing Heck, 512 U.S. at 487, 114 S.Ct. 2364). That inquiry "is inherently a factual one." Covington v. City of New York, 171 F.3d 117, 122 (2d Cir. 1999).

Plaintiff's illegal search claim can easily be distinguished from the exceptional evidentiary circumstances contemplated in Heck. Plaintiff was convicted on two counts of possessing a controlled substance, charges which hinged on Decker's discovery of drugs through his allegedly unlawful search. Sentencing Disposition at 2. Plaintiff does not argue that any exception to the Heck exclusionary rule applied in his case, nor does it appear to the Court that the doctrines of independent source, inevitable discovery, and/or harmless error would be relevant. Therefore, if the Court found Decker's search to be unconstitutional, it would necessarily imply that Plaintiff's conviction is invalid. See Black v. Blackmun, No. 11-CV-2372, 2011 WL 6019394, at *2 (E.D.N.Y. Dec. 1, 2011) ("Because [plaintiff's] conviction [for weapons possession] hinged directly on the weapons procured during [an] allegedly unlawful search, an award of damages would necessarily imply the invalidity of his state court conviction."); Kaminski v. Hayes, No. 06-CV-1524, 2009 WL 3193621, at *6 (D. Conn. Sept. 30, 2009) (finding that Heck barred plaintiff's illegal search claim because "the entire evidentiary basis for the charged offenses ...

derives from a single search that is now being challenged as part of a section 1983 action"). Thus, the Court finds that Plaintiff is precluded by Heck from pursuing his illegal search claim against Decker and Ettinger, which must therefore be dismissed.

### D. Fourth Amendment—False Arrest

**\*10** **[11]** **[12]** **[13]** **[14]** "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted). And under New York law, a plaintiff alleging false arrest must show, among other things, that "the defendant intentionally confined him without his consent and without justification." Id. (citing Broughton v. State, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 313 14 (1975) ). However, pursuant to both state law and § 1983, "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " Weyant, 101 F.3d at 852 (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994) ). An officer has probable cause to arrest when (s)he "has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006) (quoting Weyant, 101 F.3d at 852).

**[15]** In order to properly evaluate Plaintiff's false arrest claim, the Court must first analyze the Fourth Amendment implications of his interactions with Decker and Ettinger on the evening of January 5, 2016. In Posr v. Doherty, 944 F.2d 91, 97 100 (2d Cir. 1991), the Second Circuit set out guidance for determining when, for Fourth Amendment purposes, a "seizure" rises to the level of an "arrest." It explained that

> when an officer even briefly detains an individual and restrains that person[']s right to walk away, he has effected a seizure and the limitations of the Fourth Amendment become applicable.... [But] not every seizure is an arrest.

Whether an arrest supportable by probable cause occurs, as distinct from a form of Fourth Amendment intrusion supportable by less than probable cause, depends on the seizure's level of intrusiveness, and on the corresponding degree of justification required to effect each level of intrusiveness.

Id. at 97 98 (internal quotation marks and citations omitted). To quantify the "level of intrusiveness" used by officers in any given situation, a court must analyze all of "the facts surrounding the encounter" within "the totality of the circumstances." Id. at 98.

Although the Posr framework does not provide a bright-line rule, the caselaw nonetheless makes clear that, on the night of January 5, 2016, Plaintiff was arrested at least as of the moment that Decker tackled him to the ground. See, e.g., id. at 98 ("An arrest need not be formal; it may occur even if the formal words of arrest have not been spoken provided that the subject is restrained and his freedom of movement is restricted."); Brown v. Dirga, No. 15-CV-1086, 2017 WL 4399190, at *8 (D. Conn. Sept. 29, 2017) (finding that defendant officer  by grabbing plaintiff arrestee's arm, putting it behind his back, and pushing him up against a parked car  "used physical force in an intrusive way to restrain [plaintiff's] liberty and/or to prevent [him] from leaving ... [such that] an arrest had occurred"); United States v. Levy, 731 F.2d 997, 1000 (2d Cir. 1984) (finding that plaintiff was arrested once ordered to "freeze" and forced to stand spread-eagle against a wall). Plaintiff may therefore maintain a false arrest claim for any period of time after he was tackled, but before the officers obtained probable cause. Lust v. Joyce, No. 05-CV-613, 2007 WL 3353214, at *2 (N.D.N.Y. Nov. 9, 2007) (holding that plaintiff could maintain a false arrest claim for the "finite period of time in between [his] initial detention ... and the subsequent discovery of evidence providing probable cause for an arrest," if his detention during that interim period was not supported by probable cause); Gonzalez v. City of Schenectady, No. 00-CV-824, 2001 WL 1217224, at *5 (N.D.N.Y. Sept. 17, 2001) ("Plaintiff does assert cognizable false arrest claims for the period of time between initial contact with the police and the point where the marijuana was discovered.").

**\*11** Thus, summary judgment will not lie as to Plaintiff's false arrest claim if (1) a reasonable jury could find that at any point after Decker's tackle, Plaintiff's continued detention was not supported by probable cause; and (2) such a claim would not constitute "a collateral attack on [his] conviction through the vehicle of a civil suit." Heck, 512 U.S. at 484, 114 S.Ct. 2364 (citation omitted). Defendants argue: (1) that probable cause existed to arrest Plaintiff as a matter of law, because (a) "Officer Decker saw evidence of a crime in plain view when he spotted the digital scale on [Plaintiff's] front console," Mem. at 6 (citing Defs.' SMF ¶¶ 3 5, 23); and (b) "after [Plaintiff] fle[d] Officer Decker to avoid arrest and [was] handcuffed, Officer Decker found cocaine in Plaintiff's possession," id. at 6 7 (citing Defs.' SMF ¶ 12); and (2) that Plaintiff "cannot allege false arrest" because he "did not receive a favorable disposition" on his underlying criminal charge, Mem. at 6 (citing Heck, 512 U.S. at 478 79, 114 S.Ct. 2364).

In order to evaluate Defendants' arguments and determine whether the two relevant conditions have been met in Plaintiff's case, it is useful to divide his arrest into two time periods: (1) the period after Decker's tackle but before his search (the "Initial Arrest Period"); and (2) the period during and after Decker's search that led to the discovery of cocaine (the "Post-Discovery Period"). The Court will begin by analyzing the Post-Discovery Period, since it is the more straightforward of the two.

### 1. The Post-Discovery Period

**[16]**  Plaintiff cannot maintain a false arrest claim for the period of his detention that occurred during and after Decker's search, because such a claim would collaterally attack Plaintiff's conviction in violation of Heck.

**[17]**  As already noted above, the Supreme Court's holding in Heck requires dismissal of any § 1983 claim which would "necessarily imply the invalidity of [the plaintiff's] conviction or sentence." 512 U.S. at 487, 114 S.Ct. 2364. Plaintiff's state court conviction for criminal possession of a controlled substance inevitably hinged on Decker's discovery of the cocaine in Plaintiff's pocket. Thus, awarding Plaintiff damages for any "false" detention occurring after that discovery would necessarily imply the invalidity of his state court conviction. Plaintiff's

false arrest claim will therefore be dismissed insofar as it concerns the Post-Discovery Period.


### 2. The Initial Arrest Period

[18] Plaintiff's false arrest claim for the Initial Arrest Period, however, requires a considerably more nuanced analysis. Of the two events identified in Defendants' Motion as providing Decker and Ettinger probable cause to arrest Plaintiff, Mem. at 6 7, only one occurred prior to Decker's search: Decker's discovery of the digital scale inside Plaintiff's car. But the parties dispute whether any such scale existed. While Decker and Ettinger agree that a scale covered in "a white residue" was visibly resting on Plaintiff's center console, Decker Aff. ¶ 8; Ettinger Aff. ¶ 8, Plaintiff asserts that "there was no digital scale ... in [his] vehicle" at all that night, Resp. Defs.' SMF ¶ 5. In support, Plaintiff also points out that he was never charged with possessing drug paraphernalia, that neither Decker nor Ettinger claimed to have conducted any field tests on the scale, and that no scale was ever "received at the lab for any form of testing as contraband/evidence." Id. This factual dispute cannot be resolved at the summary judgment stage, and precludes the Court from finding as a matter of law that Decker and Ettinger had probable cause, based on the presence of the scale, to arrest Plaintiff by tackling him. [4] See Howard v. Schoberle, 907 F.Supp. 671, 676 77 (S.D.N.Y. 1995) ("In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party."(citing Anderson, 477 U.S. at 255, 106 S.Ct. 2505) ).

[14]   The only other pre search event that could feasibly give rise to probable cause was Plaintiff's alleged flight from Decker. But Plaintiff's version of events contradicts that any such flight occurred, and in any event, though a suspect's flight can, "under certain circumstances, provide reasonable suspicion to warrant a Terry stop, it does not, without more, provide probable cause to arrest." Jenkins v. City of New York, 478 F.3d 76, 89 n.12 (2d Cir. 2007).

*12  However, Plaintiff's false arrest claim for the Initial Arrest Period nonetheless falls afoul of Heck, even though, as noted above, it was Decker's Post-Discovery Period search that was primarily responsible for Plaintiff's conviction. This is true because Plaintiff

was prosecuted under New York law, which provides that "[t]he fruit of an illegal search cannot give rise, in a juristic sense, to probable cause to arrest." Ostrover v. City of New York, 192 A.D.2d 115, 600 N.Y.S.2d 243, 244 45 (1993). [5] Therefore, if Plaintiff's civil claim succeeded as to the Initial Arrest Period   in other words, if a jury found that Defendants lacked probable cause to tackle Plaintiff (because no digital scale was present in his car)   it would necessarily imply that Decker and Ettinger lacked probable cause to search Plaintiff under New York law, [6] and that Judge Hafner erred in denying Plaintiff's suppression motion. See Omnibus Order at 9 ("Decker observed in plain view a digital scale with a white powder substance.... Based upon these observations ... Decker was authorized ... to arrest [Plaintiff] for the crime of Criminally Using Drug Paraphernalia."). Even Decker's later discovery of the cocaine would not have retroactively justified the search, given New York courts' interpretation of the "fruit of the poisonous tree" doctrine. See Ostrover, 600 N.Y.S.2d at 244 45. And without the cocaine recovered from the illegal search, Plaintiff could not have been convicted. See People v. Mason, 69 A.D.2d 769, 415 N.Y.S.2d 31, 31 (1979) (reversing a lower court's decision denying criminal defendant's motion to suppress evidence of drug possession, and, as a result, vacating the defendant's conviction and dismissing the indictment).

[15]   Federal law   which formed the basis for the district courts' decisions in Lust and Gonzalez   takes the contrary stance that the "fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant," Townes v. City of New York, 176 F.3d 138, 149 (2d Cir. 1999). Therefore, under federal law an otherwise illegal search can still provide the probable cause required to implement an arrest. See id. ("The individual defendants here lacked probable cause to stop and search Townes, but they certainly had probable cause to arrest him upon discovery of the handguns in the passenger compartment of the taxicab in which he was riding.").

[16]   According to New York's People v. De Bour paradigm, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976), officers cannot seize drugs without probable cause. See Matter of Andy E., 81 N.Y.2d 948, 597 N.Y.S.2d 665, 613 N.E.2d 571, 571 (1993) (although officer was justified, after detainee placed his hand in his pocket, to conduct a search for weapons, his subsequent warrantless search of a brown bag in detainee's possession containing

"numerous small hard objects later found to be drugs was illegal).

Therefore, Plaintiff's false arrest claim against Decker and Ettinger is precluded in its entirety by Heck and must be dismissed.

**E. Section 1985(3)—Conspiracy Claim**

**[19]    [20]**  A conspiracy claim brought pursuant to § 1985(3) requires a showing of "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999) (citing Traggis v. St. Barbara's Greek Orthodox Church, 851 F.2d 584, 586 87 (2d Cir. 1988) ). Additionally, § 1985(3) "requires a plaintiff to allege that he or she is a member of a protected class and that the conspirators acted with racial, or otherwise class-based 'invidiously discriminatory motivation.' " Ali v. Connick, 136 F.Supp.3d 270, 277 (E.D.N.Y. 2015) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) ).

Although the Complaint does not explicitly allege the existence of a conspiracy between Decker, Ettinger, and/ or Ocker, Plaintiff does accuse those defendants of using "false report[ing]" to "substantiat[e] criminal charges" against him. Compl. at 5. That phrasing mirrors the language used in the CRB Disposition, which faulted Ocker for issuing an "incomplete and untruthful" Use of Force report and for "substantiat[ing] the investigation of an occupied suspicious vehicle without conducting a thorough examination of his own." CRB Disposition at 3 (internal quotation marks omitted). Recalling that "[a] document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however artfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' " the Court interprets those statements as forming the foundation of Plaintiff's § 1985(3) conspiracy claim. Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ).

**\*13**  Defendants appear to have drawn a similar conclusion, and devote two pages in their Memorandum to addressing such a claim. See Mem. at 7 8. Specifically,

Defendants argue that Plaintiff "has not pleaded any evidence of conspiracy," and has therefore failed to show that Defendants entered into an agreement and/or achieved a meeting of the minds. Mem. at 7. In addition, Defendants contend that "Plaintiff has not alleged any facts nor is there any ... evidence in the record that show that the conspiratorial harm flowed from 'some racial or perhaps otherwise class-based, invidious discriminatory animus.' " Id. at 8 (quoting Thomas, 165 F.3d at 146). For the reasons set forth below, the Court disagrees with Defendants' first argument, but nonetheless agrees that Plaintiff's conspiracy claim must be dismissed because the record does not provide adequate evidence of racial animus. [7]

[17]    Defendants also raise a third argument, that " e]ven if Plaintiff had alleged sufficient facts ... his] conspiracy claim is nevertheless barred by the intracorporate conspiracy doctrine, which provides that 'officers, agents, and employees of a single corporate entity are legally incapable of conspiring together. Id. (certain internal quotation marks omitted) (quoting Murphy v. City of Stamford, 634 F. App'x 804, 805 (2d Cir. 2015) ). Having found that Plaintiff's claim must be dismissed on other grounds, however, the Court does not reach this alternative argument.

*1. Existence of a Conspiracy*

The Court disagrees with Defendants' first argument, and instead finds that the current record could persuade a reasonable jury to find that a conspiracy existed in Plaintiff's case. The Second Circuit "has repeatedly held [at the motion to dismiss stage] that complaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed," and that "[d]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir. 1977) (citations omitted). But the Second Circuit has also cautioned that, because "such 'conspiracies are by their very nature secretive operations,' [they] may have to be proven by circumstantial, rather than direct, evidence." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (quoting Rounseville v. Zahl, 13 F.3d 625, 632 (2d Cir. 1994) ).

The Court has already determined that a reasonable jury could accept Plaintiff's version of the events that

occurred on January 5, 2016. See supra Part IV.B. Doing so would inevitably require that jury to reject the version of events described by Decker's and Ettinger's testimony, see generally Ettinger Supp'n Hr'g Test.; Decker Supp'n Hr'g Test., as well as by Ocker's Use of Force report. [8] Both the existence of those statements, as well as the consistencies between them, could then be seen as circumstantial evidence of an agreement, either tacit or explicit, amongst the officers to protect themselves by portraying a false version of Plaintiff's arrest. See In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 113 (2d Cir. 2008) ("A defendant's knowing and willing participation in a conspiracy may be inferred from ... evidence that the defendant ... engaged in acts exhibit[ing] a consciousness of guilt, such as [making] false exculpatory statements." (internal quotation marks and citations omitted) ). Additionally, instead of simply accusing the individual defendants of conspiring with one another in a conclusory or overly generalized fashion, Plaintiff's version of the events surrounding his arrest provides a believable narrative including "specific instances of misconduct" that would explain both how and why such a conspiracy might have come about. Ostrer, 567 F.2d at 553.

[18]     Ocker's Use of Force report has not been made available in the record, so the Court can only speculate as to its exact contents. However, the description of that report provided in the CRB Disposition which Plaintiff submitted with his opposition papers indicates that it generally supports the version of events reported by Decker and Ettinger. CRB Disposition at 2.

*14  The Court therefore rejects Defendants' first argument, and holds that a reasonable jury could find the existence of a conspiracy in the present matter.

### 2. Racial Animus

[21]  In asserting that "Plaintiff has not alleged any facts ... that show that [Plaintiff's] conspiratorial harm flowed from 'some racial or perhaps otherwise class-based, invidious discriminatory animus,' " Mem. at 8, Defendants appear to overlook Plaintiff's "racial profiling/false report[ing]" claim in the Complaint, which forms the basis for his § 1985(3) allegations, Compl. at 5. There, Plaintiff explicitly states that "Jeremy Decker

and Darren Ettinger target[ed] inner city minorit[ies] and substantiat[ed] criminal charges as such [sic]." Id.

That said, the Court nonetheless finds that the record evidence is insufficient to support a finding of racial animus sufficient to support a § 1985(3) conspiracy claim. Although Plaintiff claims he was "target[ed]" on account of his race, the record evidence does not indicate that Defendants used racial slurs or epithets during the course of Plaintiff's arrest, nor does it provide any explicit evidence of racial bias. True, Plaintiff claims that Defendants mistreated and used excessive force against him, but while "mistreatment by defendants is not irrelevant in assessing the strength of plaintiff's circumstantial evidence of race-based animus, it is certainly not sufficient to establish it." Lizardo v. Denny's, Inc., 270 F.3d 94, 102 (2d Cir. 2001); see also Coggins v. County of Nassau, 254 F.Supp.3d 500, 511 15 (E.D.N.Y. 2017) (granting summary judgment and dismissing § 1981 discrimination claim because "the only evidence of racial animus [wa]s plaintiff's belief that [his] arrest was racially motivated").

Therefore, because Plaintiff has failed to offer sufficient evidence suggesting that Defendants' actions were racially motivated, Plaintiff's § 1985(3) claim fails.

### 3. Civil v. Race-Based Conspiracies

As a final point, it is worth noting that the Court could interpret Plaintiff's Complaint as attempting to allege both a "civil" conspiracy pursuant to § 1983 and a "race-based" conspiracy pursuant to § 1985. Biswas v. City of New York, 973 F.Supp.2d 504, 532 33 (S.D.N.Y. 2013). The legal standards applicable to those statutory schemes are slightly different, in particular because (1) a civil conspiracy need not include allegations of racial animus; and (2) "to make out a conspiracy action under section 1983, the plaintiff must allege an underlying deprivation of his constitutional rights." [9] McCloud v. Prack, 55 F.Supp.3d 478, 483 (W.D.N.Y. 2014) (citing Myers v. Bowman, 713 F.3d 1319, 1332 (11th Cir. 2013) ). Thus, in light of the Court's findings above, a § 1983 conspiracy claim would need to be premised on at least one of Plaintiff's surviving constitutional claims namely, his allegations of excessive force and/or racial profiling.

19    The same may also be true in the case of § 1985(3) cases, but in Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 370 n.6, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Supreme Court left open the question "whether § 1985(3) creates a remedy for statutory rights other than those fundamental rights derived from the Constitution.

**\*15** The allegations giving rise to Plaintiff's conspiracy claim that Defendants used "false report[ing]" to "substantiat[e] criminal charges" against him, Compl. at 5 only concern whether Defendants conspired to cover up Decker's and Ettinger's allegedly illegal use of force and arrest. But while police cover-ups can, in certain circumstances, constitute a deprivation of constitutional rights, see, e.g., Barrett v. United States, 689 F.2d 324, 332 (2d Cir. 1982) (finding the existence of a constitutional deprivation when cover-up resulted in a deprivation of due process rights); McGarty v. Town of Carmel, 997 F.Supp. 435, 437 (S.D.N.Y. 1998) (same), "the mere filing of a false police report which causes no ascertainable damage" like Ocker's Use of Force report    "probably does not, by itself, provide grounds for a cover-up claim." Michael Avery *et al.*, Police Misconduct: Law and Litigation § 2:42, 3d ed. 2018 (citing Landrigan v. City of Warwick, 628 F.2d 736, 744 (1st Cir. 1980) ); see also McCloud, 55 F.Supp.3d at 483 (finding that prison officials' intentional failure to preserve evidence in order to cover-up fellow officer's failure to protect inmate plaintiff from physical harm could not "form the predicate violation for a conspiracy claim"). Nor does Plaintiff allege that the cover-up constituted some other form of constitutional violation, such as a deprivation of his due process rights. Therefore, exercising its authority under 28 U.S.C. § 1915(e) to "dismiss the case at any time if ... the action ... fails to state a claim on which relief may be granted," the

Court finds that to the extent Plaintiff attempts to state a § 1983 conspiracy claim against Decker, Ettinger, and Ocker, that attempt also fails.

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 53) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that the following claims are dismissed from this action: (1) Plaintiff's Fourth Amendment illegal search claim against Decker and Ettinger; (2) Plaintiff's Fourth Amendment false arrest claim against Decker and Ettinger; (3) Plaintiff's § 1985(3) conspiracy claim against Decker, Ettinger, and Ocker; and (4) Plaintiff's § 1983 conspiracy claim against Decker, Ettinger, and Ocker; and it is further

**ORDERED**, that the following claims survive Defendants' Motion: (1) Plaintiff's Fourteenth Amendment racial profiling claim against Decker and Ettinger; (2) Plaintiff's Monell claim against the City of Syracuse; and (3) Plaintiff's Fourth Amendment excessive force claim against Decker and Ettinger; and it is further

**ORDERED**, that Sergeant Robert Ocker is **DISMISSED** as a defendant in this action; and it is further

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2019 WL 251781

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 736614
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jasmine L. McGREW et al., Plaintiffs,
v.
James HOLT et al., Defendants.

No. 6:13–cv–792 (GLS/TWD).
|
Signed Feb. 20, 2015.

**Attorneys and Law Firms**

Office of Stephen L. Lockwood, Stephen L. Lockwood, Esq., Daniel N. Cafruny, Esq., of Counsel, Utica, NY, for the Plaintiffs.

Office of Corporation Counsel, City of Utica, John P. Orilio, Esq ., Mark C. Curley, Esq., Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel, Utica, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

*1 Plaintiffs Jasmine L. McGrew, Chianta C. Jenkins, and Fallon M. Bell commenced this action against defendants James Holt, Mark Rahn, Patrick Murphy, and Joshua Harrington, all in their official and individual capacities, as well as the City of Utica, New York and a John Doe defendant, pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1988 alleging violations of the Fourth Amendment for excessive force, and claims pursuant to New York state law for assault, battery, and intentional infliction of emotional distress. (*See generally* Am. Compl., Dkt. No. 29.) Pending before the court is defendants' motion for summary judgment. (Dkt. No. 50.) For the reasons that follow, defendants' motion is granted in part and denied in part.

### II. *Background*

1     Unless otherwise noted, the facts are not in dispute.

On July 14, 2012, at approximately 2:30 A.M., plaintiffs were in the parking lot of the Planet Blue Gentleman's Club in Utica, New York. (Defs.' Statement of Material Facts (SMF) ¶ 15, Dkt. No. 50, Attach. 19; Dkt. No. 51, Attach. 2 at 22.) At the time, the parking lot was "filled with people" and at least two individuals began "arguing." (Defs.' SMF ¶¶ 17 18, 26, 41.) A short time later, Utica police officers, including defendants here, arrived at the scene, and several fights had broken out. (Dkt. No. 51, Attach. 5 at 1011.) The police gave verbal commands for everyone in the parking lot to leave, and subsequently began arresting individuals in the parking lot, including plaintiffs. (*Id.* at 12 13, 21, 50 .) The parties largely dispute what transpired next.

### A. *Bell*

According to Bell, she was simply attempting to explain to police officers that she was looking for a friend so that they could leave the area. (Dkt. No. 51, Attach. 3 at 45, 47 48.) Officers responded by using a racial slur towards her, (*id.* at 50), and then she was slammed to the ground face first by Rahn and Holt, (*id.* at 53 55; Dkt. No. 51, Attach. 2 at 37 38). Rahn grabbed her by the arms while Holt pulled her hands behind her back and slammed her down to the gravel surface. (Dkt. No. 51, Attach. 3 at 50, 5355 .) Murphy contends that he subdued Bell by "us[ing] a soft hand come along in an attempt to restrain Bell," and then "used a takedown to bring [her] down on the ground" after she had refused to follow his instruction to place her hands behind her back. (Dkt. No. 51, Attach. 18 at 6.)

As a result of the incident, Bell reported to the emergency room, indicating "moderate" pain which she rated at eight out of ten. (Pls.' SMF ¶ 85, Dkt. No. 51, Attach. 19; Dkt. No. 50, Attach. 12 at 4, 19.) She was unable to raise her arm above ninety degrees, (Pls.' SMF ¶ 86; Dkt. No. 50, Attach. 12 at 5), so she was issued a sling for her arm, (Pls.' SMF ¶ 87; Dkt. No. 50, Attach. 12 at 3). She also had cuts on her head and forearm. (Pls.' SMF ¶ 88.) Bell felt as though she had a shoulder sprain, (Dkt. No. 51, Attach. 11 at 32), and, because of her shoulder pain, she was referred to a bone specialist, though she never followed up with a specialist, (*id.* at 36). Her shoulder hurt for two months after the incident. (*Id.*)

**\*2** Ultimately, Bell was charged with resisting arrest, *see* N.Y. Penal Law § 205.30, and disorderly conduct, *see* N.Y. Penal Law § 240.20. (Dkt. No. 50, Attach. 7 at 2.) Bell pleaded guilty to the disorderly conduct charge in satisfaction of both charges against her. (*Id.;* Defs.' SMF ¶ 13.)

### B. *McGrew*

McGrew testified that, on the night in question, she heard a "commotion" on the other side of the parking lot while she was "looking for [her] friends," and that when police showed up, they immediately started "getting in people's faces." (Dkt. No. 51, Attach. 2 at 27, 30.) She was told by police to move out of the way, (*id.* at 32 33), and was then, without warning, "slammed" to the ground twice, (*id.* at 34 41). She testified that she was then handcuffed and dragged around the parking lot by the handcuffs to a police car. (*Id.* at 43 45.)

McGrew also sought medical attention, reporting a shoulder injury and "moderate" pain which she rated at a six out of ten. (Pls.' SMF ¶ 80; Dkt. No. 51, Attach. 14 at 4, 6, 16.) An x-ray of her left shoulder revealed "[n]o fracture or dislocation." (Dkt. No. 50, Attach. 14 at 12.) She suffered abrasions to her left shoulder and forearm, and both knees. (Pls.' SMF ¶ 81.) Her right shoulder pain lasted several months. (*Id.* ¶ 83; Dkt. No. 51, Attach. 2 at 50.)

McGrew was ultimately charged with disorderly conduct. (Dkt. No. 50, Attach. 8 at 2.) After a bench trial, she was found guilty of that charge. (*Id.;* Dkt. No. 51, Attach. 5 at 87.)

### C. *Jenkins*

According to Jenkins, she was also looking for her friends so that she could leave the club. (Dkt. No. 51, Attach. 4 at 30 31.) At some point, she observed an officer slam McGrew to the ground, and tried to explain to officers that McGrew had not done anything wrong. (*Id.* at 34 39.) Immediately thereafter, she was "hit in the face" by Rahn, from behind and "out of nowhere," which "knocked [her to] the ground." (*Id.* at 40.) She stated that Rahn hit her in the right cheekbone with his fist, after which several officers jumped on top of her and others "were kicking [her] on [her] sides" and twisting her arms. (*Id.* at 41 42.) She was then "dragg[ed]" across the length

of the parking lot. (*Id.* at 47.) Rahn denied punching or kicking Jenkins, (Dkt. No. 51, Attach. 6 at 58), and, instead, reported that he "delivered one open hand strike to Jenkins ['] chest/face area to push her back," (Dkt. No. 51, Attach. 18 at 5), because she was charging at him with a fist in the air as he was attempting to arrest McGrew, (Dkt. No. 51, Attach. 6 at 51 52).

Shortly thereafter, Jenkins sought medical treatment, (Pls.' SMF ¶ 73), where she reported "mild" pain which she rated a ten out of ten, (*id.* ¶ 74; Dkt. No. 50, Attach. 16 at 6, 18). Jenkins had abrasions on her right shoulder, left arm, and both knees, as well as right shoulder pain. (Pls.' SMF ¶ 75.) Although an x-ray of her shoulder was negative for broken bones or dislocation, she was issued a sling for her shoulder pain. (*Id.* ¶¶ 76 77; Dkt. No. 50, Attach. 16 at 16, 19.)

**\*3** Stemming from the incident, Jenkins was charged with obstructing governmental administration, *see* N.Y. Penal Law § 195.05, disorderly conduct, and resisting arrest. (Dkt. No. 50, Attach. 4 at 2.) After a jury trial, she was found guilty of resisting arrest, acquitted of obstructing governmental administration, and the disorderly conduct charge was dismissed. (*Id.;* Dkt. No. 50, Attach. 6 at 218.)

Plaintiffs then commenced this action, alleging that defendants used excessive force during their July 14, 2012 arrests. (*See generally* Am. Compl.)

### III. *Standard of Review*

The standard of review pursuant to Fed.R.Civ.P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts,* 827 F.Supp.2d 85, 92 (N.D.N.Y.2011), *aff'd sub nom. Wagner v. Sprague,* 489 F. App'x 500 (2d Cir.2012).

### IV. *Discussion* [2]

[2]  At the outset, the court notes that, in their response to defendants' summary judgment motion, plaintiffs have indicated that they concede to the dismissal of the Doe defendant and any municipal liability claim against the City of Utica. (Dkt. No. 51, Attach. 20 at

21 22.) Accordingly, the Doe defendant and the City of Utica are dismissed, and the Clerk is directed to terminate them as parties to this action.

### A. *Excessive Force*

Defendants argue that plaintiffs' excessive force cause of action should be dismissed because it is barred by the *Heck* [3] doctrine. (Dkt. No. 50, Attach. 20 at 3 7.) Specifically, defendants contend that a judgment in plaintiffs' favor on their excessive force claims would necessarily attack the validity of their underlying criminal convictions, and thus such claims are precluded under *Heck*. (*Id.*) Alternatively, defendants argue that they are entitled to summary judgment on the merits of plaintiffs' excessive force claims because plaintiffs suffered only *de minimis* injuries. (*Id.* at 7 19.) In response, plaintiffs argue that their claims are not barred by *Heck* because their excessive force claims do not have the requisite relationship with their underlying criminal convictions for resisting arrest and disorderly conduct to mandate preclusion. (Dkt. No. 51, Attach. 20 at 9 15.) Further, plaintiffs assert that they have "sustained numerous and severe injuries" that are more than merely *de minimis,* and/or that questions of fact prevent the entry of summary judgment here. (*Id.* at 15 18.) For the reasons that follow, the court agrees with plaintiffs, and defendants' motion with respect to these arguments is denied.

[3]    See *Heck v. Humphrey,* 512 U.S. 477 (1994).

### 1. *Heck Doctrine and Collateral Estoppel*

Pursuant to the Supreme Court's decision in *Heck v. Humphrey,* certain § 1983 suits that relate to an underlying criminal conviction or sentence are barred. *See* 512 U.S. 477, 486 87 (1994). Specifically, the Court held that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called

into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

**\*4** *Id.* Heck, however, does not require dismissal of those claims which, if adjudicated in favor of the plaintiff, would not necessarily invalidate her conviction or sentence. *Id.* As pertinent here, it is "well established that an excessive force claim does not usually bear the requisite relationship under *Heck* to mandate its dismissal." *Smith v. Fields,* No. 95 CIV. 8374, 2002 WL 342620, at \*4 (S.D.N.Y. Mar. 4, 2002).

In support of their argument that plaintiffs' excessive force claims [4] are barred here in light of their underlying criminal proceedings, defendants do not cite any Second Circuit decision that would bind this court, instead relying on two district court cases that are inapposite to the facts at issue here. (Dkt. No. 50, Attach. 20 at 3 5.) Defendants also contend that, because a few passing references were made in Jenkins' criminal trial to the use of force against her, excessive force was "put ... at issue," and therefore "a finding of excessive force under § 1983 would imply invalidity of the resisting arrest conviction," mandating dismissal here. (*Id.* at 5 7.) The court disagrees.

[4]    Defendants' argument on this point appears limited to Jenkins and the relationship that her underlying conviction for resisting arrest has with her current excessive force claim. (Dkt. No. 50, Attach. 20 at 5 7.) With respect to McGrew and Bell, defendants merely state, without any analysis or citation to authority, that " p]laintiffs should not be allowed to proffer any facts which call into question the ir] criminal charges,  as they are "precluded under *Heck.* (*Id.* at 7). For the same reasons discussed herein, the court finds that this argument is without merit.

With respect to defendants' *Heck* argument, the court is not persuaded that there is any basis here to divert from the "well established" principle "that an excessive force claim does not usually bear the requisite relationship under *Heck* to mandate its dismissal." *Smith,* 2002 WL 342620, at \*4 (citing *Jackson v. Suffolk Cnty. Homicide Bureau,* 135 F.3d 254, 256 57 (2d Cir.1998)); *see Dawkins*

*v. City of Utica, N.Y.,* No. 91 CV 867, 1994 WL 675047, at \*4 (N.D.N.Y. Nov. 28, 1994) ("[R]ecovery under a theory of excessive force in the arrest does not necessarily impugn plaintiff's convictions for the underlying offenses. Since plaintiff may be both guilty and a victim of excessive force, *Heck* does not mandate dismissal of his ... cause of action [ ] for excessive force."). In fact, the Second Circuit has explicitly stated that "many violations of constitutional rights, even during the criminal process, may be remedied without impugning the validity of a conviction," noting, as particularly relevant here, that "when a suspect sues his arresting officer for excessive force, a § 1983 suit may proceed even if the suspect is ultimately convicted of resisting arrest." *Poventud v. City of N.Y.,* 750 F .3d 121, 132 (2d Cir.2014); *see Hunter v. Town of Shelburne,* No. 5:10 CV 206, 2012 WL 4320673, at \*7 (D.Vt. Sept. 19, 2012) ("The Second Circuit has held, however, that 'a lawful arrest ... may be accompanied by excessive force,' and that 'the jury's return of a guilty verdict in state court for resisting arrest ... does not necessarily preclude a subsequent claim of excessive force in federal court.' " (quoting *Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir.2000))). Accordingly, plaintiffs' claims are not barred by *Heck.*

Similarly, collateral estoppel [5] does not dictate that defendants' motion be granted either. As the Second Circuit has held, "[i]t is clear ... that there is no inherent conflict between a conviction for resisting arrest or harassment of a police officer and a finding that the police officers used excessive force in effectuating the arrest." *Sullivan,* 225 F.3d at 166. "Indeed, a conviction for resisting arrest, which under New York law requires proof that the defendant 'intentionally prevent[ed] or attempt[ed] to prevent a police officer or peace officer from effecting an authorized arrest of h [er]self or another person,' N.Y. Penal Law § 205.30, 'is not incompatible with [a] claim for excessive force.' " *Negron v. Jacobs,* No. 1:11 cv 1385, 2013 WL 5442281, at \*4 (N.D.N.Y. Sept. 27, 2013) (quoting *Sullivan,* 225 F.3d at 166); *see Tracy v. Freshwater,* 623 F.3d 90, 100 (2d Cir.2010) ("[T]he fact that [the plaintiff] was convicted of resisting arrest does not appear to present an 'inherent conflict' with his claim that [the defendant] exerted unreasonable force in effecting that arrest."). [6] Therefore, "[a] claim of excessive force would not be precluded by the plaintiff's prior convictions for resisting arrest ... unless facts actually determined in h[er] criminal conviction that were necessary to the judgment of conviction are incompatible

with the claim of excessive force being raised in the subsequent civil suit." *Sullivan,* 225 F.3d at 166.

[5]    This court must apply the rules of collateral estoppel of the state in which the prior judgment was rendered, here, New York. *See Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir.2000); *see also* 28 U.S.C. § 1738.

[6]    The same can be said of McGrew's conviction and Bell's guilty plea of disorderly conduct pertaining to their "intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof   by "engag[ing] in fighting or in violent, tumultuous or threatening behavior.   N.Y. Penal Law § 240.20(1).

**\*5** Despite defendants' arguments, the criminal jury found only that the elements of the crime of resisting arrest were satisfied   none of which concern the use of force by a police officer   and did not necessarily find that the amount of force used by the officers was reasonable. Briefly, there is no indication in the record that the jury in Jenkins' underlying criminal trial made any explicit factual findings with respect to excessive force, or that any specific factual findings were made in McGrew and Bell's underlying criminal proceedings that would be binding on their excessive force claims here. This is distinguishable from *Hunter,* a case relied on by defendants, where "the jury was plainly instructed [on] excessive force," and the court held that the jury had thus determine the issue of excessive force. 2012 WL 4320673, at \*8. Here, there was no such instruction, nor was there an "assertion of a particular affirmative defense or use of a special verdict form [that] might indeed make clear that a criminal jury necessarily decided factual and legal issues such as those remaining in this case." *Tracy,* 623 F.3d at 100. Defendants' argument is therefore unavailing.

*2. De Minimis Injury*

Turning to the merits of plaintiffs' claims, "[i]n order to establish that the use of force to effect an arrest was unreasonable and therefore a violation of the Fourth Amendment, [a] plaintiff [ ] must establish that the government interests at stake were outweighed by the nature and quality of the intrusion on [the plaintiff's] Fourth Amendment interests." *Barlow v. Male Geneva Police Officer Who Arrested Me on Jan.* 2005, 434 F. App'x 22, 26 (2d Cir.2011) (internal quotation marks and citation omitted). " 'In other words, the factfinder must determine whether, in light of the totality of the circumstances faced

by the arresting officer, the amount of force used was objectively reasonable at the time.' " *Id.* (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 123 (2d Cir.2004)).

"[C]laims of excessive force arising in the context of an arrest under the Fourth Amendment's objective reasonableness test," are analyzed "paying 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Phelan v. Sullivan,* 541 F. App'x 21, 24 (2d Cir.2013) (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). The entirety of the record must be evaluated " 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (quoting *Graham,* 490 U.S. at 396)); *accord Tracy,* 623 F.3d at 96. Indeed, " '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.' " *Tracy,* 623 F.3d at 96 (quoting *Graham,* 490 U.S. at 396).

**\*6** "[T]he Second Circuit and district courts in the Circuit recognize the concept of *de minimis* injury and, when the injury resulting from alleged excessive force falls into that category, the excessive force claim is dismissed." *Jackson v. City of N.Y.,* 939 F.Supp.2d 219, 231 (E.D.N.Y.2013) (internal quotation marks and citation omitted). " '[S]hort-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches from a cut inside the mouth' " have been held to be *de minimis* and, thus, unactionable. *Id.* (quoting *Lemmo v. McKoy,* No. 08 CV4264, 2011 WL 843974, at \*5 (E.D.N.Y. Mar. 8, 2011)). However, "the fact that [the p]laintiff may not have sustained serious long lasting harm is not dispositive." *Graham v. City of N.Y.,* 928 F.Supp.2d 610, 618 (E.D.N.Y.2013).

Defendants argue that they are entitled to summary judgment because any force used was reasonable and because plaintiffs suffered only minor injuries. (Dkt. No. 50, Attach. 20 at 7 19.) The parties have provided conflicting accounts as to whether defendants initiated the use of force, how much force was used by each, whether any force used was necessary, and the extent of plaintiffs' injuries. For example, Murphy [7] indicated that he "used

a soft hand come along in an attempt to restrain Bell," and ultimately "used a takedown to bring Bell down on the ground." (Dkt. No. 51, Attach. 18 at 6.) However, Bell contends that she was lifted off the ground and slammed to the gravel surface face first by Holt and another unknown officer, while her arms were being held behind her back. (Dkt. No. 51, Attach. 3 at 47 48, 50, 53 55.) Similarly, McGrew asserts that she was slammed to the ground twice, handcuffed, and dragged around the parking lot by the handcuffs to a police car, even though she had not been fighting with anyone, (Dkt. No. 51, Attach. 2 at 34 37, 39 41, 43 45), while Rahn maintains that he never threw anyone to the ground, and that McGrew was simply placed in handcuffs because she was fighting with others in the parking lot after he gave verbal commands to disperse, (Dkt. No. 51, Attach. 5 at 17, 21.) Lastly, Jenkins testified that she was hit in the face "out of nowhere" with a fist and dragged on the ground across the parking lot. (Dkt. No. 51, Attach. 4 at 40 41, 47.) Both Rahn and Holt denied punching Jenkins and dragging her across the parking lot, instead indicating that she was escorted, on foot, to a police car because she had charged at an officer in an attempt to interfere with an arrest. (Dkt. No. 51, Attach. 6 at 51 52, 58, 62, 93, 100.)

[7]     In their motion, defendants argue that Murphy is entitled to summary judgment and should be dismissed from the case because plaintiffs' deposition testimony does not identify him as one of the officers who used force on them. (Dkt. No. 50, Attach. 20 at 19 20.) Defendants further note that " t]here is no deposition testimony for ... Murphy because p]laintiffs failed to conduct any depositions in this matter, and therefore it would be "impossible ] to have trial against ... Murphy when the testimony concerning his use of force is his own. (*Id.* at 20 & n. 10.) Defendants are seemingly attempting to argue that Murphy is entitled to summary judgment because there is no record evidence demonstrating his personal involvement in the incident in question. However, plaintiffs have provided Murphy's police report, (Dkt. No. 51, Attach. 18 at 6), which would support a finding that he was, in fact, involved in the allegedly unlawful use of force, (Pls.' SMF ¶¶ 70, 71). Thus, Murphy has not demonstrated that he is entitled to judgment as a matter of law for lack of personal involvement.

Resolution of these conflicting versions of the relevant events, including the severity of plaintiffs' resulting injuries, is a matter for the jury and is not properly

decided by a court on summary judgment. Although defendants characterize plaintiffs' harm as nothing more than "abrasions and contusions," and thus argue that they have suffered no actionable injury, (Dkt. No. 50, Attach. 20 at 12 14, 15 19), plaintiffs have provided evidence of more substantial harm that is enough to survive summary judgment. *See Hayes v. N.Y.C. Police Dep't,* 212 F. App'x. 60, 62 (2d Cir.2007) ("[W]e have permitted claims to survive summary judgment where the only injury alleged is bruising."); *Lemmo,* 2011 WL 4592785, at *8 ("[A] jury may consider the lack of serious injury as evidence that the implemented force was not excessive." (internal quotation marks and citation omitted)). Although defendants further argue that plaintiffs were resisting, and thus the use of force was reasonable, (Dkt. No. 50, Attach. 20 at 11, 14 15, 17), this is ultimately a question for the jury. *See Sullivan,* 225 F.3d at 165 66 ("The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit."). Accordingly, defendants' motion for summary judgment is denied. [8]

[8]    Defendants also contend that they are entitled to qualified immunity. (Dkt. No. 50, Attach. 20 at 20 23.) Because " s]ummary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant 'show s] that no reasonable jury, viewing the evidence in the light most favorable to the p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law, " *O Bert ex rel. Estate of O Bert v. Vargo,* 331 F.3d 29, 37 (2d Cir.2003) (quoting *Ford v. Moore,* 237 F.3d 156, 162 (2d Cir.2001)), that defense is unavailable here in light of the factual disputes highlighted above.

With respect to plaintiffs' state law claims, defendants argue that "if the excessive force claim(s) fail,  then the remainder of the claims should be dismissed as "derivative,  or the court should decline to exercise its supplemental jurisdiction. (Dkt. No. 50, Attach. 20 at 27.) However, given that the excessive force claim survives summary judgment, this argument is of no moment.

## V. *Conclusion*

**\*7 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 50) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to the claims against the John Doe defendant and the City of Utica, and the claims against those defendants are **DISMISSED;** and

**DENIED** in all other respects; and it is further

**ORDERED** that the Clerk terminate the John Doe defendant and the City of Utica as parties to this action; and it is further

**ORDERED** that the case is trial ready and the Clerk shall issue a trial scheduling order in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum  Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 736614

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3368706
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sean SULLIVAN, Plaintiff,

v.

The CITY OF NEW YORK, the Police Department
of the City of New York, Police Officer Thomas
Baserap, Shield No. 10601, Police Officer
Gregory Rittenhouse, Shield No. 16173, Police
Officers John Doe #2, 3, 4, Defendants.

17 Civ. 3779 (KPF)
|
Signed 07/10/2018

**Attorneys and Law Firms**

Sean Sullivan, New York, NY, pro se.

Alison Sue Mitchell, New York City Law Department,
New York, NY, for Defendants.

OPINION AND ORDER

KATHERINE POLK FAILLA, United States District
Judge

 **\*1** Plaintiff Sean Sullivan was arrested on May 16, 2016,
for an assault that Plaintiff maintains he did not commit,
and for which ultimately he was not prosecuted. Now
proceeding *pro se*, Plaintiff asserts that he was wrongfully
detained, without probable cause or reasonable suspicion.
He alleges deprivations of his civil rights under 42 U.S.C.
§ 1983 in the form of false arrest, excessive force, false
imprisonment, failure to intervene, and illegal search
and seizure. Plaintiff also brings a municipal-liability
claim, under *Monell v. Department of Social Services*,
436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978),
against the City of New York. Finally, Plaintiff advances
state-law causes of action, including false arrest; false
imprisonment; fraud and conspiracy; intentional infliction
of emotional distress; negligence/failure to train; and
violations of Sections 11 and 12 of Article I of the New
York Constitution.

Pending before the Court is a Rule 12(b)(6) motion
to dismiss filed by Defendants Police Officer Thomas

Baserap, Police Officer Gregory Rittenhouse (together
with Baserap, the "Individual Defendants"), and the City
of New York (together with the Individual Defendants,
the "Moving Defendants"). For the reasons stated below,
the Court grants in part and denies in part Moving
Defendants' motion.

[1]   Defendants Police Officers John Doe #2, 3, and 4
     have not appeared in the case and have not joined the
     pending motion to dismiss. The remaining defendant
     listed in the Amended Complaint, the New York City
     Police Department ("NYPD"), must be dismissed
     from the case because an agency of the City of New
     York is not an entity that can be sued. *See* N.Y. City
     Charter ch. 17, § 396 ("All actions and proceedings for
     the recovery of penalties for the violation of any law
     shall be brought in the name of the C]ity of New York
     and not in that of any agency, except where otherwise
     provided by law."); *Jenkins v. City of New York*, 478
     F.3d 76, 93 n.19 (2d Cir. 2007); *see also Emerson v.
     City of New York*, 740 F.Supp.2d 385, 395 (S.D.N.Y.
     2010) (" A]plaintiff is generally prohibited from suing
     a municipal agency.").

**BACKGROUND** [2]

[2]   This Opinion draws facts from the Amended
     Complaint. (Dkt. #13 ("Am. Compl.")). For the
     purpose of adjudicating the motion to dismiss, the
     Court accepts as true the well pleaded allegations in
     the Complaint. *See In re Elevator Antitrust Litig.*, 502
     F.3d 47, 50 (2d Cir. 2007) (per curiam). The Court
     has reviewed the parties' briefing and will refer to
     the submissions as follows: to Moving Defendants'
     opening brief as "Def. Br." (Dkt. #34) and reply
     brief as "Def. Reply" (Dkt. #44), and to Plaintiff s
     opposition brief as "Pl. Opp." (Dkt. #43).

     Plaintiff is an attorney proceeding *pro se* in this
     matter. While "a court is ordinarily obligated to
     afford a special solicitude to *pro se* litigants," such
     as by liberally construing their pleadings, "a lawyer
     representing himself ordinarily receives no such
     solicitude at all." *Tracy v. Freshwater*, 623 F.3d 90,
     101 02 (2d Cir. 2010).

**A. Factual Background**
 **\*2** On May 16, 2016, Plaintiff visited a Barnes &
Noble bookstore in the Citicorp Center on Third Avenue
and 54th Street in Manhattan. (Am. Compl. ¶ 21).
As he sat in the bookstore's café, an employee of the

Hillstone restaurant, also located in the Citicorp Center, approached Plaintiff. (*Id.*). The employee asked Plaintiff whether he had left his bag in the Hillstone restaurant. (*Id.*). Plaintiff told the Hillstone employee that he had never been to the Hillstone and asked the employee not to disturb him, a request to which the man acceded. (*Id.*).

Shortly thereafter, a group of NYPD officers, including the Individual Defendants, approached Plaintiff. (Am. Compl. ¶ 22). They first asked Plaintiff to join them so they could "discuss something." (*Id.*). Plaintiff declined to do so. (*Id.*). The officers then insisted that Plaintiff leave with them, and Plaintiff obliged, following the officers into the lobby of the Citicorp Center. (*Id.*). There, the officers told Plaintiff that they were investigating a crime that had taken place at the Hillstone restaurant. (*Id.*). They asked Plaintiff if he knew anything about the crime. (*Id.*). Plaintiff told them he had no relevant information, and that he had never been to the restaurant. (*Id.*).

One of the police officers, whom Plaintiff believes to have been Defendant Thomas Baserap, suggested that Plaintiff was lying. (Am. Compl. ¶ 23). The officer then told Plaintiff that he was a suspect in the crime they were investigating. (*Id.*). The officer further stated "that there were witnesses who identified the Plaintiff, that there was video footage of the Plaintiff committing the crime, and that the Plaintiff needed to confess." (*Id.*). Plaintiff denied any involvement in the crime and told the officers "in no uncertain terms that he ha[d] no idea what they were talking about and that they should leave him alone as he ha[d] committed no crime." (*Id.*). Still, the officers "continued to berate the Plaintiff, proceeded to handcuff [him], and detained him at the entrance of the Barnes [&] Noble[.]" (*Id.*).

At some point, while Plaintiff was still in handcuffs, Baserap instructed Plaintiff to move to a corner of the Barnes & Noble entrance to avoid the crowds. (Am. Compl. ¶ 25). He asked Plaintiff to sit down, but Plaintiff's "hands were handcuffed so tight behind his back that abrasions were forming on his wrists which prevented him from being able to move his body and he thereby could not physically comply with the demand that he sit on the floor." (*Id.*). When Plaintiff tried to explain, "one or more of the Police Officer Defendants tripped [Plaintiff's] legs from under him, all while the Plaintiff was handcuffed, and forced him violently to the floor." (*Id.*).

Plaintiff alleges that he was detained in this "outrageous manner," even though "there was no threat or danger of the Plaintiff leaving ... if the[ officers] had simply asked him to remain where he was earlier[.]" (Am. Compl. ¶ 26). Without any justification, the officers "humiliat[ed] the Plaintiff and creat[ed] a pointless public spectacle of the Plaintiff manacled and held down in a public venue." (*Id.*). This, despite Plaintiff's statements to the officers that "a quick examination of any security camera footage would show that the Plaintiff was nowhere near th[e] Hillstone restaurant when the 'crime' supposedly occurred[.]" (*Id.*).

Plaintiff states, "[u]pon information and belief, [that he] was the only black male sitting in the Barnes [&] Noble café at the time the Police Officer Defendants approached him." (Am Compl. ¶ 26). He further claims that the NYPD has engaged in a pattern and practice of targeting minorities without reasonable suspicion, between at least August 2013 and November 2016. (*Id.* at ¶¶ 31-34). Plaintiff alleges that, while he was detained, officers searched his person and backpack without consent. (*Id.* at ¶ 27). At the time of the incident, Plaintiff was homeless, and substantially all of his belongings were in his backpack. (*Id.*). Yet the police officers "rummaged through the Plaintiff's bags and inspected his belongings for no valid purpose but presumably to embarrass [him.]" (*Id.*).

**\*3** The officers released Plaintiff after approximately one hour. (Am. Compl. ¶ 28). Plaintiff "was never read his Miranda rights, he was never told clearly what 'crime' he was being held for, none of the Police Officer Defendants clearly identified themselves to the Plaintiff, and he was told conflicting stories by the Police Officer Defendants of being both a 'witness' and a 'suspect.' " (*Id.*). Plaintiff believes that he may have been "targeted in retaliation for his past lawsuits against the NYPD." (Am. Compl. ¶ 29).

After the police officers released Plaintiff, he went to the Hillstone restaurant to inquire into the alleged crime. (Am. Compl. ¶ 30). He "asked a hostess at the door whether a crime was committed earlier ... and she told the Plaintiff that she was unaware of any crime." (*Id.*). Determined to investigate further, Plaintiff went to the local precinct and asked a police officer whether the Hillstone restaurant had been the scene of a crime earlier that day. (*Id.*). The officer told Plaintiff that "she was unaware of any criminal activity at the Hillstone restaurant that day." (*Id.*).

**B. Procedural Background**

Plaintiff filed his initial complaint on May 18, 2017. (Dkt. #2). On June 2, 2017, the Court issued an order pursuant to *Valentin v. Dinkins*, 121 F.3d 72, 76 (2d Cir. 1997), requiring the New York City Law Department ("Law Department") to ascertain the identities and badge numbers of various John Doe Defendants whom Plaintiff had named in the Complaint. (Dkt. #5). The Court also ordered Plaintiff to file an amended complaint within 30 days of receiving the information from the Law Department. (*Id.*). On August 1, 2017, the Law Department filed a letter listing service addresses for the two Individual Defendants. (Dkt. #7). That day, the Court issued an Order of Service, directing the U.S. Marshals Service to effect service of Plaintiff's Complaint on these Individual Defendants.

On September 11, 2017, Plaintiff filed an amended complaint. (Dkt. #13). On September 19, 2017, the Court issued another Order of Service, directing the Marshals Service to effect service on the two Individual Defendants. (Dkt. #14). The Court also dismissed with prejudice Plaintiff's claims against then-Defendants Hillstone Restaurant Group, Inc. and John Doe #1. (*Id.*). On January 25, 2018, the Court held a pre-motion conference to discuss the Moving Defendants' anticipated motion to dismiss. (*See* Dkt. #30). Moving Defendants filed said motion on February 23, 2018 (Dkt. #32-34); Plaintiff filed his opposition brief on May 3, 2018 (Dkt. #43); and Moving Defendants filed their reply brief on May 16, 2018 (Dkt. #44).

## DISCUSSION

Plaintiff's claims can be grouped into three categories. The first consists of Plaintiff's § 1983 claims: false arrest, excessive force, false imprisonment, failure to intervene, and illegal search and seizure. The second is Plaintiff's municipal-liability claim under *Monell*. The third includes Plaintiff's state-law causes of action, including false arrest; false imprisonment; fraud and conspiracy; intentional infliction of emotional distress; negligence/failure to train; and violations of Article I, Sections 11 and 12 of the New York Constitution. After a brief discussion of the applicable law, the Court addresses the claims in turn.

**A. Applicable Law**

**1. Motions Under Fed. R. Civ. P. 12(b)(6)**

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) ). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ).

**\*4** "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge[ a plaintiff's] claims across the line from conceivable to plausible[.]' " *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**2. Claims Under 42 U.S.C. § 1983 and Qualified Immunity**

Plaintiff advances various claims under 42 U.S.C. § 1983. Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Okla. City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). "To state a viable claim against an individual under 42 U.S.C. § 1983, the plaintiff must plausibly allege that the defendant, while acting under the color of law, 'deprived the plaintiff of a right guaranteed by the constitution or laws of the United States.' " *Bennett v. City of N.Y.*, 425 F. App'x 79, 80 (2d Cir. 2011) (summary order) (quoting *Bryant v. Maffucci*,

923 F.2d 979, 982 (2d Cir. 1991) ). Where a plaintiff alleges municipal liability under Section 1983 as Plaintiff has done here  he must "plausibly allege that the violation of his constitutional rights was caused by an official policy or custom of the municipality." *Id.* at 81 (citing *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) ).

Individuals sued under Section 1983 may assert that they are protected by qualified immunity. "Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted). Rights are "clearly established" where "existing law ... place[s] the constitutionality of the officer's conduct 'beyond debate.' " *Dist. of Columbia v. Wesby*, ___ U.S. ___, 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ). "In determining whether a right was so clearly established, the Supreme Court has emphasized that the 'dispositive inquiry ... is whether it would be clear to a *reasonable officer* that his conduct was unlawful *in the situation he confronted*,' " *Barboza v. D'Agata*, 676 F. App'x 9, 12 (2d Cir. 2017) (summary order) (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ). Qualified immunity protects officers when "their decision was reasonable, even if mistaken"; that, in turn, "protect[s] all but the plainly incompetent or those who knowingly violate the law." *Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ).

### B. The Motion to Dismiss Is Granted in Part and Denied in Part

#### 1. Plaintiff's Claims for False Arrest and False Imprisonment Survive

##### a. Applicable Law

Section 1983 claims for false arrest "derive[ ] from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). "A [Section] 1983 claim for false arrest, resting on the Fourth Amendment right

of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).

**\*5** To prevail on a false-arrest claim under New York law, a plaintiff must show that "[i] the defendant intended to confine the plaintiff, [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement, and [iv] the confinement was not otherwise privileged [or justified]." *Savino v. City of N.Y.*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ). "Under New York law, false arrest and false imprisonment are one and the same, and the elements for both are the same as for a false arrest claim under [Section] 1983." *Hershey v. Goldstein*, 938 F.Supp.2d 491, 515 (S.D.N.Y. 2013).

Probable cause "is a complete defense to an action for false arrest." *Bernard*, 25 F.3d at 102. It is also a complete defense to a false-imprisonment claim. *See Shaheed v. City of N.Y.*, 287 F.Supp.3d 438, 452 (S.D.N.Y. 2018). Probable cause exists when officers have "reasonably trustworthy information" as to "facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been ... committed by the person to be arrested." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) ). The central inquiry is "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Id.* (quoting *Jaegly*, 439 F.3d at 153).

If a plaintiff adequately pleads a claim for false arrest or false imprisonment, the court may then consider the issue of qualified immunity. "In the context of [Section] 1983 actions predicated on allegations of false arrest, ... an arresting officer is entitled to qualified immunity so long as 'arguable probable cause' was present when the arrest was made." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) ). Arguable probable cause exists when an officer demonstrates that "[i] it was objectively reasonable for the officer to believe that probable cause existed, or [ii] officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks and citations omitted). "[W]hether an

officer's conduct was objectively reasonable" depends on "the information possessed by the officer at the time of the arrest," not "the subjective intent, motives, or beliefs of the officer." *Id.* (quoting *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) ). "[I]n situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002).

### b. The Pleadings Do Not Establish Probable Cause or Arguable Probable Cause

The parties do not dispute that Plaintiff was arrested by individuals acting under color of law. Instead, they disagree on the issue of probable cause: Moving Defendants argue that Baserap and Rittenhouse had probable cause to arrest Plaintiff based on the facts available to them at the time of the arrest. (Def. Br. 4-6). They further contend that the two officers are protected by qualified immunity. (*Id.* at 19-21). Plaintiff disagrees. (Pl. Opp. 11-14, 20-21). For the reasons stated below, the Court cannot find, as a matter of law, that qualified immunity applies or that probable cause existed at the time of Plaintiff's arrest.

### i. The Court Cannot Find, at This Stage of the Litigation, That Probable Cause Existed

**\*6** Plaintiff alleges that, while he sat in a bookstore café, a group of police officers approached him. (Am. Compl. ¶ 22). The officers informed Plaintiff that they were investigating a crime that had occurred at a nearby restaurant. (*Id.*). Defendant Baserap told Plaintiff that he was a suspect. (*Id.* at ¶ 23). Baserap told him that there were witnesses who had identified him. (*Id.*). Baserap asserted that there was video footage of Plaintiff committing the crime. (*Id.*). Plaintiff was urged to confess. (*Id.*). After Plaintiff claimed not to know anything about the alleged crime, the officers handcuffed and detained Plaintiff, before forcing him to the floor. (*Id.* at ¶¶ 23, 25). At some point, Plaintiff overheard some discussion of an assault on a Hillstone customer. (*Id.* at ¶ 24).

Moving Defendants claim that Plaintiff's allegations alone establish, as a matter of law, that Baserap and Rittenhouse had probable cause to arrest him. In their estimation, these allegations, taken as true, establish that (i) an assault had occurred at the Hillstone restaurant; (ii) there was video footage of Plaintiff committing the crime; and (iii) there were witnesses who identified Plaintiff. (Def. Br. 5-6). This, they claim, suffices to establish probable cause, particularly because "Plaintiff set[s] forth no evidence indicating that it was unreasonable for officers to rely on the information provided to them by witnesses." (*Id.* at 6).

Moving Defendants' argument is based on a flawed reading of Plaintiff's factual allegations. They suggest that the pleadings establish that "there *was* video footage of [Plaintiff] committing the crime[.]" (Def. Br. 6 (emphasis added) ). But the pleadings do no such thing. Instead, Plaintiff alleges that Officer Baserap "*claim[ed]* ... that there was video footage of [him] committing the crime[.]" (Am. Compl. ¶ 23 (emphasis added) ). Similarly, the pleadings do not state that "there *were* witnesses who identified [Plaintiff]." (Def. Br. 6 (emphasis added) ). In fact, the allegation is that Baserap "*claim[ed]* ... that there were witnesses who identified [him]." (Am. Compl. ¶ 23 (emphasis added) ). [3] Ditto for Moving Defendants' suggestion that Plaintiff alleged that he *was* a suspect of the crime being investigated. The allegation, taken at face value, is simply that Baserap "*claim[ed]* that the Plaintiff was a 'suspect' of the 'crime' they were investigating." (*Id.* (emphasis added) ). Moving Defendants' interpretation impermissibly assumes facts not pleaded   in particular, that the police officers' statements to Plaintiff were truthful. This Court cannot make similar assumptions.

[3]     In Plaintiff s opposition brief, he variously attacks Moving Defendants' reliance on the witness statements by claiming, first, that they were "fabrications   and, second, that they were unreliable. (Pl. Opp. 10, 12). The Court appreciates that there is some tension between asserting that there were no witness statements at all or, in the alternative, that any statements were unreliable. Yet plaintiffs are allowed to plead and argue in the alternative. *Polanco v. City of New York*, No. 14 Civ. 7986 (NRB), 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 28, 2018). As to the latter argument   that any witness statements were unreliable   Moving Defendants note that " P]laintiff has set forth no factual basis in his pleadings indicating that it was unreasonable for officers to rely on the information provided to them by witnesses .] (Def. Reply 3). Because this Court has found that Plaintiff has not, in fact, alleged that

witnesses provided any information to the arresting officers, and because that finding is dispositive as to the motion to dismiss, the Court will not address the parties' dispute regarding the reliability of any witness statements.

**\*7** The distance between Moving Defendants' interpretation and a fair reading of the pleadings is best illustrated by Plaintiff's allegation that the arresting officers were in fact lying when they stated that there was video footage and witnesses inculpating Plaintiff. Plaintiff states in no uncertain terms that "he had never been in th[e Hillstone] restaurant," and that he had told the arresting officers as much. (Am. Compl. ¶¶ 21-22). He also explained to the officers "that a quick examination of any security camera footage would show that [he] was nowhere near th[e] Hillstone restaurant when the 'crime' supposedly occurred[.]" (*Id.* at ¶ 26). Plaintiff's allegations suggest that the police officers had not seen any video footage of him committing a crime, and that there were no witnesses who had identified him.

Plaintiff goes further still in attacking the veracity of the officers' statements: He suggests that the officers not only lied about supposed evidence connecting Plaintiff to the crime, but also about the existence of the crime itself. He states that the police officers arrested him for a crime "that did not exist in reality and [that] was concocted by them arbitrarily[.]" (Am. Compl. ¶ 28). As proof, Plaintiff recites that upon his release from police custody, he "went to the Hillstone restaurant" and "asked a hostess at the door whether a crime was committed earlier in the restaurant and she told [him] that she was unaware of any crime." (*Id.* at ¶ 30). He then went to the local police station and "asked a police officer at a desk within the precinct whether she was aware of a crime scene at Hillstone restaurant." (*Id.*). The officer "told the Plaintiff that she was unaware of any criminal activity at Hillstone restaurant that day." (*Id.*). These allegations cast doubt over the officers' statements that there was direct evidence tying Plaintiff to the purported crime. As Plaintiff writes in his opposition brief, the "statements by the Defendants were ... fabrications to justify the detention of the Plaintiff in the Citigroup Center's lobby when they pretended to subdue a dangerous situation." (Pl. Opp. 10). For these reasons, the allegations do not establish, as Moving Defendants suggest, that the arresting officers had probable cause to arrest Plaintiff.

The Court notes that Plaintiff advances a second argument, in the alternative, against a finding of probable cause  namely, that in order to establish that probable cause existed at the time of arrest, "the Defendants must present to the Court a particular criminal offense implicated by the Plaintiff's conduct at the time of the arrest and demonstrate how the Plaintiff's conduct satisfied each element of the criminal offense at issue." (Pl. Opp. 12). He asserts that, because the motion to dismiss "fails to state definitively what particular criminal offense the [Individual Defendants] concluded that they had probable cause to arrest ... [,] their motion should be denied on this basis alone." (*Id.* at 11-12).

Plaintiff is incorrect to suggest that Defendants' motion to dismiss fails because it does not specify which crime the officers believed Plaintiff to have committed. In *Jaegly v. Couch*, the Second Circuit held that "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." 439 F.3d 149, 154 (2d Cir. 2006). The Court went on to explain that, "when faced with a claim for false arrest, we focus on the validity of the *arrest*, and not on the validity of each charge." *Id.* Therefore, Defendants' failure to identify a particular crime the arresting officers believed Plaintiff to have committed is not fatal to their motion. What is fatal  as discussed above  is their flawed reading of the pleadings.

### ii. The Court Cannot Find, at This Stage of the Litigation, That Qualified Immunity Applies

**\*8** The Court next turns to the qualified immunity inquiry. The Second Circuit has explained that "the qualified immunity test 'is more favorable to the officers than the one for probable cause.' " *Ackerson*, 702 F.3d at 21 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ). Indeed, qualified immunity protects officers when "their decision was reasonable, even if mistaken"; that, in turn, "protect[s] 'all but the plainly incompetent or those who knowingly violate the law.' " *Johnson*, 859 F.3d at 170 (quoting *Hunter*, 502 U.S. at 229, 112 S.Ct. 534). In deciding whether qualified immunity applies, courts assess "[i] whether plaintiff has shown facts making out [a] violation of a constitutional right; [ii] if so, whether

that right was 'clearly established'; and [iii] even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133-34 (2d Cir. 2010) ).

Here, Moving Defendants do not contest whether Plaintiff has alleged a violation of a clearly established constitutional right. Nor could they. The right to be free from arrest without probable cause is well-settled. *See Jenkins v. City of New York*, 478 F.3d 76, 86-87 (2d Cir. 2007). Instead, Moving Defendants argue that it was objectively reasonable for the officers to believe that the conduct at issue was lawful. They focus almost exclusively on the "facts" that the officers "learned from witnesses" before arresting Plaintiff. (Def. Br. 21-23 (citing Am. Compl. ¶¶ 22-24) ). They state: "Courts have held that there would be arguable probable cause to arrest a plaintiff based on witness statements and here, the facts asserted by plaintiff illustrate that arguable probable cause existed for his arrest." (*Id.* at 21 (citing *Weiner v. McKeefery*, 90 F.Supp.3d 17, 40 (E.D.N.Y. 2015); Am. Compl. ¶¶ 22-24) ).

Moving Defendants' argument fails for the same reason as did their probable cause argument. Plaintiff does not allege that there *were* any witness statements, only that Officer Baserap *claimed* that witnesses had identified Plaintiff as the culprit in the alleged crime. At this stage of the litigation, nothing in the record establishes that Officer Baserap — or any other police officer — had spoken to one or more witnesses, or had heard from them that Plaintiff had committed a crime. In fact, as discussed above, the allegations suggest that the police officers never spoke to any witnesses, and that the officers had fabricated the crime as a pretense to arrest Plaintiff. Though it is true that witness statements may support a finding of arguable probable cause, *see Weiner*, 90 F.Supp.3d at 40, the allegations here do not establish that any such statements were actually made to the police officers. Accordingly, the Court rejects Moving Defendants' argument that arguable probable cause existed or that qualified immunity applies.

For these reasons, Plaintiff's Section 1983 claims for false arrest and false imprisonment survive this motion to dismiss. Because the state-law analogues are substantially identical to the Section 1983 claims for false arrest and false imprisonment, the Court need not address

them separately and instead finds, for the same reasons, that the state-law claims survive. *See Weyant*, 101 F.3d at 852 ("A Section 1983 claim for false arrest ... is substantially the same as a claim for false arrest under New York law[.]" (internal citations omitted) ); *Hershey*, 938 F.Supp.2d at 515 ("Under New York law, false arrest and false imprisonment are one and the same, and the elements for both are the same as for a false arrest claim under Section 1983[.]"); *see also McNeese v. Bd. of Educ.*, 373 U.S. 668, 671, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963) ("The federal Section 1983 remedy is supplementary to the state remedy[.]").

### 2. Plaintiff's Claim for Unreasonable Search and Seizure Survives

#### a. Applicable Law

**\*9** The Fourth Amendment to the Constitution of the United States provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.' " *Riley v. Cal.*, ___ U.S. ___, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ). "It is well established that a warrantless search is '*per se* unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions.' " *United States v. Diaz*, 122 F.Supp.3d 165, 170 (S.D.N.Y. 2015) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ).

One such exception is the "search incident to arrest" doctrine. Under that doctrine, police officers may search a person in connection with a lawful arrest. Put differently, "where police officers have probable cause to effect a[n] arrest, they may search the suspect without a warrant incident to that arrest." *United States v. Herron*, 18 F.Supp.3d 214, 223 (E.D.N.Y. 2014) (citing *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ). The doctrine both "protect[s] arresting officers and safeguard[s] any evidence of the offense of arrest that an arrestee might conceal or destroy." *Ariz.* v. *Gant*, 556 U.S. 332, 339, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

### b. The Court Cannot Conclude, as a Matter of Law, That the Search at Issue Was Lawful

Moving Defendants argue that the officers' search of Plaintiff's person and property was legal because it was "part of a valid search incident to arrest." (Def. Br. 7). They assert that "the officers had probable cause to arrest [P]laintiff at the time of the search, and therefore, could legally search [P]laintiff's person and backpack as part of a valid search incident to arrest." (*Id.*). They cite cases to support the simple proposition that searches incident to an arrest are permissible where there was probable cause for the arrest. (*Id.*) (citing *United States v. Robinson*, 414 U.S. 218, 226, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Hayes*, 553 F.2d 824, 826 (2d Cir. 1977); *United States v. Jenkins*, 496 F.2d 57, 73 (2d Cir. 1974) ). In other words, the sole argument that Moving Defendants advance against Plaintiff's search-and-seizure claim hinges on a finding that the officers had probable cause to arrest Plaintiff.

The Court has already considered and found unpersuasive Moving Defendants' probable cause argument. (*See supra* ). Because Moving Defendants' argument as to the legality of the search depends upon a finding of probable cause, which finding this Court cannot make at this stage of the litigation, Moving Defendants' present argument fails.

### 3. Plaintiff's Claim for Excessive Force Fails

The Court next examines Plaintiff's excessive-force claim. The relevant allegations here are that the officers "handcuff[ed] the Plaintiff" (Am. Compl. ¶ 23); that "Plaintiff['s] hands were handcuffed so tight behind his back that abrasions were forming on his wrists" (*id.* at ¶ 25); and that, when Plaintiff was unable to comply with the officers' instruction that he sit on the floor, "one or more of the [police officers] tripped his legs from under him, all while the Plaintiff was handcuffed, and forced him violently to the floor" (*id.*).

### a. Applicable Law

"Claims that law enforcement officers have used excessive force ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "[A] de minimis use of force will rarely suffice to state a Constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97, 109 S.Ct. 1865. "Whether the force used in connection with the arrest is reasonable depends on a careful weighing of the totality of the circumstances in each particular case, including whether the suspect poses a threat, resists, or attempts to evade arrest, and the severity of the crime at issue." *Felmine v. City of New York*, No. 09 Civ. 3768 (CBA) (JO), 2011 WL 4543268, at *18 (E.D.N.Y. Sept. 29, 2011), *reconsideration denied*, No. 09 Civ. 3768 (CBA) (JO), 2012 WL 1999863 (E.D.N.Y. June 4, 2012).

**\*10** "Courts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell*, No. 10 Civ. 1663 (JPO), 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). The modified standard "reflects the need for a careful balance." *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F.Supp.2d 575, 592 (S.D.N.Y. 2013). "It is well established that the right to make an arrest accompanies with it the right to use some degree of physical coercion[.]" *Esmont v. City of New York*, 371 F.Supp.2d 202, 214 (E.D.N.Y. 2005). And "to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Id.* But "overly tight handcuffing can constitute excessive force." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F.Supp.2d 459, 468 (S.D.N.Y. 2008).

"In analyzing excessive force claims arising out of the use of handcuffs, courts in this circuit frequently consider '[i] whether the handcuffs were unreasonably tight; [ii] whether the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and [iii] the degree of injury to the wrists.' " *Gonzalez v. Bronx Cty. Hall of Justice Ct. Officer Mark Hirschman Shield 7421*, No. 15 Civ. 810 (GHW), 2016 WL 354913, at *4 (S.D.N.Y. Jan. 28, 2016) (quoting *Gonzalez v. City of New York*, No. 14 Civ. 7721 (LGS), 2015 WL 6873451, at *9 (S.D.N.Y. Nov. 9, 2015) ). It is well established in this Circuit that "claim[s] of excessive force [are] not established by allegations that overly tight handcuffs caused minor, temporary injuries."

*Guerrero v. City of New York*, No. 12 Civ. 2916 (RWS), 2013 WL 5913372, at *6 (S.D.N.Y. Nov. 4, 2013).

### b. The Alleged Injuries Are Insufficient as a Matter of Law

The Court discerns two separate acts that, in Plaintiff's view, substantiate his excessive-force claim, *viz.*, handcuffing him so tightly that "abrasions were forming on [Plaintiff's] wrists," and "tripp[ing] [Plaintiff's] legs from under him ... and forc[ing] him violently to the floor." (Am. Compl. ¶ 25). The Court addresses each in turn, beginning with the handcuffing.

### i. The Allegation of Tightly Secured Handcuffs Does Not Support an Excessive-Force Claim

The pleadings do not support a viable claim for excessive force stemming from the officers' decision to handcuff Plaintiff. Plaintiff does not allege that he asked any of the officers to loosen the handcuffs. The only reference in the Amended Complaint to any relevant communication by Plaintiff to the officers is the following: "When he tried to explain this to the Police Officers, one or more of the [officers] tripped his legs from under him[.]" (Am. Compl. ¶ 25). That sentence does not refer to the tight handcuffs, but rather to Plaintiff's inability to sit down in compliance with the officers' directives. The allegations do not suggest that he ever complained about the handcuffs. Necessarily, there is also no allegation that any of the officers ignored any pleas to loosen Plaintiff's handcuffs.

Nor is Plaintiff's allegation that the handcuffs caused "abrasions" sufficient to support a claim for excessive force. Numerous courts in this District have addressed similar claims, and they have consistently held that such allegations do not state a claim for relief. *See, e.g., Kaplan v. City of New York*, No. 14 Civ. 4945 (RJS), 2018 WL 2084955, at *9 (S.D.N.Y. Mar. 22, 2018) (holding that allegation that tight handcuffs caused wrist to bleed failed as a matter of law because plaintiff "offered [no] evidence to suggest that the cut to his wrist was anything more than a superficial abrasion"); *Blue v. City of New York*, No. 14 Civ. 7836 (VSB), 2018 WL 1136613, at *11 (S.D.N.Y. Mar. 1, 2018) (holding that "the evidence, which comprises solely of Plaintiff's deposition testimony, shows only that his wrists were 'bruised up' ... which is

not an injury sufficient to state a claim for use of excessive force"); *Gonzalez*, 2016 WL 354913, at *4 (holding that "allegations of 'bruising and abrasions to [plaintiff's] wrists' as a result of the tight handcuffs are precisely the type of minor injuries routinely held by courts in this circuit to be insufficient to state a claim of excessive force" (collecting cases) ); *Guerrero*, 2013 WL 5913372, at *6 (holding that allegations that tight handcuffs caused "swelling and contusions" failed to state a claim of excessive force). This Court follows the other courts in this District that have found that, without more, an allegation of abrasions caused by tight handcuffs does not support a claim of excessive force.

### ii. The Allegation That Defendants Tripped Plaintiff and Forced Him to the Floor Is Similarly Insufficient as a Matter of Law

**\*11** Plaintiff also alleges that force was used to bring him to the ground. Plaintiff claims that, when he tried to explain to the officers that he was unable to sit down as requested, "one or more of the Police Officer[s] tripped [Plaintiff's] legs from under him, all while the Plaintiff was handcuffed, and forced him violently to the floor." (Am. Compl. ¶ 25). Plaintiff does not allege any physical injury that resulted specifically from having been taken down to the ground. Plaintiff alleges generally that, as a result of his arrest and the force used against him, Plaintiff "suffered injury and damages including, inter alia, physical and mental pain, suffering, humiliation, damage to reputation[,] and emotional anguish." (*Id.* at ¶ 56).

These allegations are insufficient to state a viable claim of excessive force. Though the focus of inquiry in an excessive-force claim is on the force used rather than the injuries sustained, "[t]he extent of injury may also provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (per curiam). "Courts in this district have routinely dismissed excessive force claims where the plaintiff alleged that he was thrown to the ground, but did not allege any physical injuries." *Higginbotham v. City of New York*, 105 F.Supp.3d 369, 376 (S.D.N.Y. 2015) (collecting cases). Indeed, "[s]ome degree of injury is ordinarily required to state a claim of excessive force[.]" *Taylor v. N.Y. Dep't of Corr.*, No. 10 Civ. 3819 (JPO), 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012) (brackets, internal quotation

marks, and citation omitted). To be sure, a plaintiff "need not prove 'significant injury' to make out an excessive force claim[.]" *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir. 1999). But "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano*, 998 F.2d at 105; *see also Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (finding that the allegations that plaintiff was "bumped, grabbed, elbowed, and pushed" did not rise to a level of constitutional significance because the plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact").

Simply put, Plaintiff has not attributed any specific physical injury to having been brought to the ground. The only physical injury asserted arose from the handcuffing, which itself is insufficient to support an excessive-force claim. And the only emotional injuries are garden variety injuries namely, "mental pain, suffering, humiliation, damage to reputation[,] and emotional anguish." (Am. Compl. ¶ 56). Without more, this conclusory assertion of mental and emotional injury is insufficient to sustain a claim of excessive force. *See, e.g., Guerrero v. City of New York*, No. 12 Civ. 2916 (RWS), 2013 WL 673872, at *5 (S.D.N.Y. Feb. 25, 2013) (holding that an allegation that plaintiff " 'suffered mental and emotional harm' ... unaccompanied by allegations of a specific or identifiable mental injury, is an insufficient basis for an excessive force claim").

For these reasons, the Court finds that Plaintiff's claim of excessive force fails as a matter of law. Accordingly, the Court need not analyze whether Officers Baserap and Rittenhouse are entitled to qualified immunity on the excessive-force claim.

### 4. Plaintiff's Claim for Failure to Intervene Survives

#### a. Applicable Law

"[L]aw enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know" of a constitutional violation, provided that she has "a realistic opportunity to intervene to prevent the harm

from occurring." *Id.* "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) ).

**\*12** It is well established that a plaintiff may not state a claim for failure to intervene against an officer who directly participated in the allegedly unlawful conduct. *See Case v. City of New York*, 233 F.Supp.3d 372, 402 (S.D.N.Y. 2017) ("[A] defendant 'cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation.' " (internal quotation marks omitted) (quoting *Marom v. City of New York*, No. 15 Civ. 2017 (PKC), 2016 WL 916424, at *19 (S.D.N.Y. Mar. 7, 2016) ) ); *Sanabria v. Detective Shawn Tezlof*, No. 11 Civ. 6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016).

Yet "[w]here a plaintiff has properly alleged a constitutional violation, he is 'entitled to discovery to determine which officers participated directly in the alleged constitutional violations and which officers were present and failed to intervene.' " *Gersbacher v. City of New York*, 134 F.Supp.3d 711, 725 (S.D.N.Y. 2015) (quoting *Matthews v. City of New York*, 889 F.Supp.2d 418, 444 (E.D.N.Y. 2012) ). That is particularly so where the allegations evince uncertainty as to the officers' specific roles in the alleged constitutional violations. *See Folk v. City of New York*, 243 F.Supp.3d 363, 376 (S.D.N.Y. 2017) (holding that plaintiff was entitled to discovery where she alleged that each of the individual defendants "directly participated in or failed to intervene in the violation of [her] rights"); *Sanabria*, 2016 WL 4371750, at *6 (holding that, though "Plaintiff names a number of officers that participated in the arrest and beating ... [t]he determination of who was specifically involved in the beating will be left to discovery"); *Gersbacher*, 134 F.Supp.3d at 725 (holding that plaintiffs' allegations, suggesting that some officers participated in underlying constitutional violations and others witnessed the violations, permit him to "move forward to discovery").

#### b. Plaintiff Is Entitled to Discovery Regarding the Individual Defendants' Roles, If Any, in the Alleged Constitutional Violations

Moving Defendants seek dismissal of the failure-to-intervene claim on two grounds. *First*, they assert that Plaintiff has failed to state a claim for any constitutional violations. (Def. Br. 14). The Court has already rejected this argument, finding that Plaintiff has stated a viable claim for false arrest; rather than repeat itself here, the Court incorporates by reference its earlier discussion. *Second*, Moving Defendants argue without citing to any particular paragraphs in the Amended Complaint that "both defendant officers Baserap and Rittenhouse are alleged to have participated in plaintiff's false arrest, excessive force, and unlawful search claims," which would preclude liability for failure to intervene. (*Id.*).

The primary question before the Court is whether the Amended Complaint attributes conduct with sufficient specificity to make unavailable a failure-to-intervene claim against either of the Individual Defendants. If indeed the allegations, taken as true, establish that Baserap or Rittenhouse directly participated in the alleged constitutional violations, dismissal of the failure-to-intervene claim would be warranted as to that officer. *See Case*, 233 F.Supp.3d at 402. By contrast, if the allegations fail to establish direct participation, Plaintiff must be afforded an opportunity to engage in discovery in the hopes of clarifying what role, if any, the Individual Defendants played in the alleged violations. *See Gersbacher*, 134 F.Supp.3d at 725.

**\*13** The relevant allegations of constitutional violations are those related to Plaintiff's false-arrest and unreasonable-search-and-seizure claims. The Court begins with the false-arrest claim. The allegations advanced in support of that claim do not ascribe specific roles to particular individuals, but rather refer to the police officers in the collective. For example, Plaintiff claims that while he was sitting in the Barnes & Noble, "a team of employees of the NYPD, including certain of the Police Officer Defendants, approached [him] ... and asked him to go with them as they wanted to discuss something." (Am. Compl. ¶ 22). "[T]hese police officers would not take no for an answer and indicated that the Plaintiff needed to leave with them immediately[.]" (*Id.*). Outside the store, "some of the Police Officer Defendants stated ... that they [we]re investigating a crime ... and that he needed to tell them what [he] knew about it." (*Id.*). "The Police Officer Defendants ... berate[d] the Plaintiff, proceeded to handcuff the Plaintiff, and detained him at the entrance of the Barnes [&] Noble[.]" (*Id.* at ¶ 23). That last allegation

is particularly relevant here: Plaintiff has not identified which of the officers handcuffed and detained him.

The only allegation relevant to the false-arrest claim that refers to a particular officer states:

> One of the police officers, upon information and belief, Police Officer Baserap, then stated that the Plaintiff was lying. As the back and forth with the Police Office[r] Defendants continued, Police Officer Baserap eventually made the claim that the Plaintiff was a "suspect" of the "crime" they were investigating, that there were witnesses who identified the Plaintiff, that there was video footage of the Plaintiff committing the crime, and that the Plaintiff needed to confess.

(Am. Compl. ¶ 23). This allegation, of course, does not reference Officer Rittenhouse by name. And though it does specifically refer to Officer Baserap, it alone is insufficient to establish that he participated in the constitutional violation. Plaintiff alleges that this exchange came *before* he was handcuffed and detained. Plaintiff does not allege that, at the time that Officer Baserap confronted him, he had already been placed under arrest, nor that Baserap participated in the later arrest. When Plaintiff discusses the arrest, he reverts to speaking of the officers as a collective. (*Id.* ("The Police Officer Defendants ... proceeded to handcuff the Plaintiff, and detained him[.]") ). For this reason, the Court cannot find that Plaintiff's allegations establish direct participation by either of the Individual Defendants.

The same is true for Plaintiff's search-and-seizure claim. The Amended Complaint evinces Plaintiff's lack of knowledge as to which officers, if any, conducted the search. Plaintiff states that "certain of the Police Officer Defendants, likely Police Officers Rittenhouse and Baserap, searched the Plaintiff's person and backpack without the Plaintiff's consent[.]" (Am. Compl. ¶ 27). The term "likely" suggests that Plaintiff does not know with any certainty who searched him and his belongings. That

uncertainty is underscored by Plaintiff's allegation that "certain of the Police Officer[s] participated in the search. Though he names Baserap and Rittenhouse as having "likely" been among those involved, the allegations admit the possibility that Baserap and Rittenhouse did not directly participate. Under the circumstances, the Court cannot conclude that Plaintiff has alleged direct participation by the Individual Defendants. Accordingly, Plaintiff is entitled to discovery to determine which officers arrested and conducted the subsequent search, and which officers were present and failed to intervene in the alleged constitutional violations.

### 5. Plaintiff's *Monell* Claim Fails

The Court next turns to Plaintiff's *Monell* claim against the City of New York. For the reasons set forth below, the Court dismisses the claim.

### a. Applicable Law

Under Section 1983, municipalities may not be held "vicariously liable ... for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (citing *Monell*, 436 U.S. at 691, 98 S.Ct. 2018). They may, however, be liable for "their *own* illegal acts." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). To prevail on a municipal-liability claim under Section 1983 based on a public official's acts, "a plaintiff is required to prove: [i] actions taken under color of law; [ii] deprivation of a constitutional or statutory right; [iii] causation; [iv] damages; and [v] that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). "[T]here must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.' " *Tieman v. City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *12 (S.D.N.Y. Mar. 26, 2015) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ). Indeed, "a municipality can be liable under [Section] 1983 only where its policies are the moving force [behind] the constitutional violation." *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (quoting *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197).

*\*14* To satisfy the "policy or custom" requirement, a plaintiff must allege any of the following:

> [i] a formal policy officially endorsed by the municipality; [ii] actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; [iii] a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or [iv] a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F.Supp.2d 261, 276-77 (S.D.N.Y. 2010) (internal citations omitted). "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ).

The last of the four categories — a municipality's deliberate indifference to the rights of members of the public — "is a stringent standard of fault," *Connick*, 563 U.S. at 61, 131 S.Ct. 1350, under which "[a] showing of simple or even heightened negligence will not suffice," *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). As the Second Circuit has stated, "[t]he operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004). "The inference that a [municipal] policy existed may ... be drawn from circumstantial proof, such as ... evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation

into charges that police officers had ... violat[ed] the complainants' civil rights." *Ricciuti*, 941 F.2d at 123.

**b. Plaintiff Has Not Alleged Any Causal Relationship Between a Municipal Policy or Practice and His Injuries**

Plaintiff alleges that the City of New York had a "de facto municipal policy" of targeting minorities for suspicionless stops and frisks. (Am. Compl. ¶ 34). To substantiate that claim, Plaintiff points to *Floyd v. City of New York*, 959 F.Supp.2d 540 (S.D.N.Y. 2013), in which a court in this District held that the NYPD had engaged in a pattern of such behavior and a policy of targeting black and Hispanic New Yorkers. (Am. Compl. ¶¶ 31-34 (citing *Floyd*, 959 F.Supp.2d at 660-67) ). Plaintiff cites the *Floyd* Court's finding that, "in 4.4 million police stops analyzed over an eight[-]year period, over 80% of such stops involved blacks and Hispanics." (*Id.* at ¶ 32 (citing *Floyd*, 959 F.Supp.2d at 556) ). He notes that the *Floyd* Court concluded that the NYPD's stop-and-frisk policy "leads NYPD officers to stop blacks and Hispanics who would not have been stopped if they were white." (*Id.* (quoting *Floyd*, 959 F.Supp.2d at 603) ).

Plaintiff notes that, "[p]ursuant to court orders and implementation agreements between NYC and th[e *Floyd*] plaintiffs, an independent monitor was designated to oversee NYPD reforms to avoid the continuing violation of the constitutional rights of New Yorkers." (Am. Compl. ¶ 31). He observes that, "[e]ven though a monitor has been appointed to ensure that the NYPD reforms its practices ..., this selfsame monitor has told the federal court in as late as November 2016 that the NYPD has been slow to reform its pattern and practices." (*Id.* at ¶ 33). Plaintiff concludes:

>      **\*15** Given the slowness with which NYC has taken action to implement the reforms required of the NYPD by a federal court according to the NYPD's court-appointed monitor, and the NYPD's continual custom and practice of violating the constitutional rights of a vulnerable section of the city's population, this Court can conclude that NYC has a de facto municipal policy

> of trampling on the constitutional rights of certain arrestees detained without reasonable suspicion by officers of the NYPD[.]

(*Id.* at ¶ 34). "At the very least, ... NYC's lack of implementation of court-mandated reforms is evidence ... of its deliberate indifference to the continuing unconstitutional misconduct of the NYPD." (*Id.*).

As an initial matter, the Court addresses whether Plaintiff has sufficiently alleged the existence of a municipal "policy or custom" that existed in May 2016, when the conduct relevant to this case occurred. The factual allegations taken from the *Floyd* Court's decision — which constitute nearly all of the facts that Plaintiff asserts relevant to the municipal-policy question — relate to NYPD practices in the years prior to the decision's issuance in August 2013. By contrast, the events at issue here took place nearly three years after the *Floyd* decision was issued. The factual allegations that relate to the *Floyd* Court's findings of fact are inapposite and will not, on their own, establish a municipal "policy or custom" relevant to this case. *Cf. Bishop v. City of New York*, No. 13 Civ. 9203 (AJN), 2016 WL 4484245, at \*4 (S.D.N.Y. Aug. 18, 2016) (finding, in a case involving a December 2010 stop and frisk, that *pro se* plaintiff's factual allegations, including statistics, reports of whistleblowers, and the *Floyd* Court's findings of fact were sufficient "to plausibly allege a municipal policy").

The only allegations of a municipal policy extant in May 2016 are: (i) in March 2016, the NYPD adopted a revised "stop report form," which "the [court-appointed] monitor submitted and the court approved" (Am. Compl. ¶ 31); and (ii) in November 2016, the court-appointed monitor "told the federal court ... that the NYPD ha[d] been slow to reform its pattern and practices" (*id.* at ¶ 33). These are insufficient to support a *Monell* claim. Plaintiff concedes that, by May 2016, the NYPD had taken some steps to address the *Floyd* Court's concerns. Plaintiff claims that the City's delay in implementing a wider range of reforms illustrates its "deliberate[ ] indifferen[ce] to the Plaintiff's constitutional rights by failing to train and supervise employees of the NYPD in accordance with an implementation agreement of a federal court[.]" (*Id.* at ¶ 54).

The Court disagrees. To be sure, a failure to act might, under certain circumstances, support a deliberate-indifference claim. Yet Plaintiff concedes that, in response to the *Floyd* decision, the City took some measures to protect against further constitutional violations. Plaintiff himself alleges that the City revised its stop report form, which was met with court approval. Plaintiff's theory of indifference rests on his view that the City did not act quickly enough. But under controlling precedent, that is insufficient to support a *Monell* claim. The Supreme Court has explained that deliberate indifference is "a stringent standard of fault[.]" *Connick*, 563 U.S. at 61, 131 S.Ct. 1350. And the Second Circuit has further explained that, "the operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty Am.*, 361 F.3d at 128. Nowhere does Plaintiff allege that the delay in the City's actions was a "conscious choice[.]" *Id.* If anything, the City's decision to implement certain reforms suggests that it was working to ameliorate the problems that the *Floyd* Court identified. Under the circumstances, the Court cannot find that Plaintiff has identified a municipal policy or practice that might support a *Monell* claim against the City.

**\*16** Plaintiff's *Monell* claim fails for a second reason. Put simply, Plaintiff has not adequately alleged that the stop-and-frisk policy was the "moving force" the proximate cause of his arrest or the search attendant to that arrest. To the contrary, Plaintiff has alleged various theories as to why the officers targeted him. He suggests that the police officers colluded with an employee of the Hillstone restaurant to lure Plaintiff out of the Barnes & Noble and to arrest him. (Am. Compl. ¶¶ 21-22, 28). He asserts that the officers may have targeted him in retaliation for lawsuits he had previously filed against the NYPD. (*Id.* at ¶ 29). In the alternative, he suggests that the officers targeted him to "appear ... in control of a dangerous situation that did not exist in reality[.]" (*Id.* at ¶ 28).

What Plaintiff does not allege, in non-conclusory terms, is that he was targeted on account of his race. To be sure, he states that he was "the only black male sitting in the Barnes [&] Noble café at the time the Police Officer Defendants approached him." (Am Compl. ¶ 26). He also suggests that "[t]he unconstitutional acts described herein ... w[ere] a[t] least partially caused by a municipal policy of stopping and detaining citizens of New York City for no other reason than their racial and financial

background[.]" (*Id.* at ¶ 53). Yet Plaintiff does not substantiate that claim with reference to circumstances surrounding his own arrest. The facts alleged therefore do not establish a clear causal connection between the stop-and-frisk policy and Plaintiff's treatment. Simply put, the chain of causation, if any, between the stop-and-frisk policy and Plaintiff's arrest is attenuated; it is interrupted by other reasons offered by Plaintiff, including retaliation. Plaintiff's *Monell* claim therefore fails. *See Graham v. City of New York*, No. 16 Civ. 4613 (NGG) (CLP), 2018 WL 1157818, at \*8 (E.D.N.Y. Mar. 2, 2018); *Outerbridge v. City of New York*, No. 13 Civ. 5459 (AT) (DCF), 2015 WL 5813487, at \*5 (S.D.N.Y. Sept. 30, 2015); *Peterec v. City of New York*, No. 14 Civ. 309 (RJS), 2015 WL 1027367, at \*6-7 (S.D.N.Y. Mar. 6, 2015).

### 6. Plaintiff's Claim for State-Law "Fraud and Conspiracy" Fails

The Court next turns to Plaintiff's state-law claims, beginning with his claim for "fraud and conspiracy." The Court notes that, although Plaintiff refers to the claim as one for "fraud and conspiracy," the pleadings themselves suggest that Plaintiff advances a claim for conspiracy, not fraud. Plaintiff asserts that the Police Officer Defendants and John Doe #1 "conspired to lure the Plaintiff out of the Barnes [&] Noble café under false pretenses and fraudulently bring to bear the resources of the NYPD to create a public spectacle for no legitimate purpose but instead to humiliate the Plaintiff in public." (Am. Compl. ¶ 78). The "fraud" portion of Plaintiff's "fraud and conspiracy" claim repackages Plaintiff's false-arrest, false-imprisonment, and search-and-seizure claims. Indeed, the "fraud" consists of the fact that "Defendants did not possess legitimate charges against the Plaintiff, but still falsely imprisoned the Plaintiff, using excessive force and subject[ing] the Plaintiff to gratuitous and unreasonable searches in the middle of a busy public venue[.]" (*Id.*). Because the Court has already addressed the various causes of action that Plaintiff here terms "fraud," it will not reevaluate them under a different name. Instead, the Court construes the claim consistent with the relevant allegations in the Amended Complaint as one for civil conspiracy.

### a. Applicable Law

New York "does not recognize civil conspiracy to commit a tort ... as an independent cause of action[.]" *Dickinson v. Igoni*, 76 A.D.3d 943, 908 N.Y.S.2d 85, 88 (2d Dep't 2010) (internal citations omitted). However, "a plaintiff may plead the existence of a conspiracy in order to connect the actions of the individual defendants with an actionable, underlying tort and establish that those actions were part of a common scheme[.]" *Litras v. Litras*, 254 A.D.2d 395, 681 N.Y.S.2d 545, 546 (2d Dep't 1998) (citations omitted). Under New York law, a plaintiff "may plead the existence of a conspiracy ... to demonstrate that each defendant's conduct was part of a common scheme." *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F.Supp.2d 514, 532 (S.D.N.Y. 2001) (citations omitted). To establish a claim of civil conspiracy, a plaintiff "must demonstrate the primary tort, plus the following four elements: [i] an agreement between two or more parties; [ii] an overt act in furtherance of the agreement; [iii] the parties' intentional participation in the furtherance of a plan or purpose; and, [iv] resulting damage or injury." *Id.* (citation omitted).

### b. Plaintiff's Conspiracy Claim Fails

**\*17** The Court begins by noting that, although Plaintiff brings a conspiracy claim against, *inter alia*, John Doe #1 and the Hillstone Restaurant, the Court had previously dismissed, with prejudice, all claims against those defendants. Plaintiff's conspiracy claim against those defendants must therefore fail. The claim similarly fails against the Individual Defendants. Plaintiff alleges that they conspired with John Doe #1 to lure Plaintiff out of the Barnes & Noble café in order to effectuate his arrest. Nowhere in the pleadings does Plaintiff plausibly allege an agreement between the Individual Defendants and John Doe #1 nor, for that matter, between the Individual Defendants and the Hillstone restaurant or even among the Individual Defendants and the other officers. Instead, Plaintiff merely asserts that John Doe #1 initially came up to Plaintiff asking if he had left a bag in the Hillstone restaurant, and 15 minutes later, the Police Officer Defendants approached him. (Am. Compl. ¶¶ 21-22). Plaintiff appears to ask this Court to infer from the temporal proximity between John Doe #1's departure and the arrival of the police officers that they had conspired to lure him out of the restaurant.

The Court cannot and will not make this inferential leap. The Amended Complaint is devoid of any allegations of an agreement, explicit or otherwise, between the Defendants. Under controlling precedent, plaintiffs must plead enough facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. Here, the factual allegations do not support a conceivable claim for relief. Accordingly, Plaintiff's conspiracy claim fails.

### 7. Plaintiff's Claim for Intentional Infliction of Emotional Distress Fails

#### a. Applicable Law

Under New York law, a claim for intentional infliction of emotional distress ("IIED") has four elements: "[i] extreme and outrageous conduct; [ii] intent to cause, or disregard of a substantial probability of causing, severe emotional distress; [iii] a causal connection between the conduct and injury; and [iv] severe emotional distress." *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). "In practice, courts have tended to focus on the outrageousness element, the one most susceptible to determination as a matter of law[.]" *Id.* The alleged misconduct "must be ... 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community[.]' " *Dillon v. City of New York*, 261 A.D.2d 34, 704 N.Y.S.2d 1, 7 (1st Dep't 1999). As a sister court in this District has explained, this standard constitutes an "exceedingly high threshold deliberately instituted by the New York [c]ourts[.]" *Gilani v. Nat'l Ass'n of Secs. Dealers*, No. 96 Civ. 8070 (SMS), 1997 WL 473383, at \*14 (S.D.N.Y. Aug. 19, 1997). Indeed, "[t]he New York Court of Appeals has strongly cautioned against allowing emotional distress claims to be brought where other tort remedies are available." *Moore v. City of New York*, 219 F.Supp.2d 335, 339 (E.D.N.Y. 2002) (citing *Fischer v. Maloney*, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978) ). "In New York, '[IIED] is a theory of recovery that is to be invoked only as a last resort,' when traditional tort remedies are unavailable." *Naccarato v. Scarselli*, 124 F.Supp.2d 36, 44 (N.D.N.Y. 2000) (quoting *EEOC v. Die Fliedermaus*, 77 F.Supp.2d 460, 472 (S.D.N.Y. 1999) ).

**b. Plaintiff's Allegations Are Insufficient to Support a Claim for Intentional Infliction of Emotional Distress**

Although "[p]ublic policy bars claims for [IIED] against a governmental entity," *Liranzo v. N.Y.C. Health and Hosp. Corp.*, 300 A.D.2d 548, 752 N.Y.S.2d 568, 568 (2d Dep't 2002), IIED claims may be brought against individual police officers, *see, e.g., Scollar v. City of New York*, 74 N.Y.S.3d 173, 178, 160 A.D.3d 140 (1st Dep't 2018). Here, however, Plaintiff's allegations do not meet the requisite level of outrageous behavior. The most egregious conduct alleged in the Amended Complaint is the police's purported targeting of Plaintiff in retaliation for lawsuits he had previously filed against NYPD personnel. Though this conduct, if true, might rise to the level of outrageousness required for an IIED claim, the Court need not address that question, because the allegation itself is conclusory and couched in uncertainty. Plaintiff writes: "And given that the Plaintiff had sued NYPD personnel in the past for alleged misconduct, the Plaintiff could not rule out that he was being arbitrarily targeted in retaliation for his past lawsuits against the NYPD." (Am. Compl. ¶ 29). Plaintiff provides no grounds on which the Court could assess the plausibility of this claim: No statements by the officers suggestive of retaliatory intent, no connection between the arresting officers and the NYPD personnel against whom Plaintiff previously filed lawsuits, no mention of the gap in time between the prior lawsuits and Plaintiff's arrest in May 2016. And Plaintiff does not affirmatively state that the officers had arrested him in retaliation for those prior lawsuits; he only states that he could not exclude that possibility. That is simply not enough.

**\*18** Even if the other allegations of misconduct could support claims for false arrest, failure to intervene, and unreasonable search and seizure, they do not support an IIED claim. Rather, the well-pleaded IIED allegations are co-extensive with the allegations that give rise to Plaintiff's false-arrest claim. New York courts routinely dismiss IIED claims where they are "duplicative of ... causes of action alleging false arrest and false imprisonment[.]" *Rodgers v. City of New York*, 106 A.D.3d 1068, 966 N.Y.S.2d 466, 469 (2d Dep't 2013) (listing cases); *see also Brewton v. City of New York*, 550 F.Supp.2d 355, 370 (E.D.N.Y. 2008) (concluding that although the plaintiff's false arrest may have qualified as extreme and outrageous, "to the extent that [the plaintiff] contends she suffered

emotional distress as a result of the false arrest, her claim is encompassed entirely within other tort remedies and is thus precluded under New York law"). Because Plaintiff has separately brought claims for false arrest and false imprisonment, and because the only well-pleaded IIED allegations are the same as those that give rise to Plaintiff's other claims, the Court grants Moving Defendants' motion to dismiss the IIED claim.

**8. Plaintiff's Claims for State-Law Negligence and Failure to Train Fail**

Plaintiff asserts a negligence claim against the City of New York and Officers Baserap and Rittenhouse. He claims that the Individual Defendants "carelessly and recklessly performed their duties in that they failed to use such care in the performance of their police duties as a reasonably prudent and careful police officer would have used under similar circumstances[.]" (Am. Compl. ¶ 92). He further asserts that "the false arrest, false imprisonment, excessive force, [and] unlawful search and seizure ... were caused wholly and solely by reason of the negligence of the Defendant[ ] NYC[.]" (*Id.* at ¶ 93). Plaintiff also advances a failure-to-train claim against the City, alleging that it "carelessly and recklessly failed to properly train and supervise [its] employees[.]" (*Id.* at ¶ 91).

For the reasons stated below, the Court dismisses the negligence and failure-to-train claims.

**a. Applicable Law**

**i. Negligence**

To prevail on a claim for negligence under New York law, a plaintiff must establish "[i] the existence of a duty on the defendant's part as to the plaintiff; [ii] a breach of that duty; and [iii] resultant injury to the plaintiff." *Field Day, LLC v. Cty. of Suffolk*, No. 04 Civ. 2202 (DRH) (WDW), 2005 WL 2445794, at \*23 (E.D.N.Y. Sept. 30, 2005). However, "harm predicated on an intentional act may not give rise to a claim of negligence." *Bah v. City of New York*, No. 13 Civ. 6690 (PKC) (KNF), 2014 WL 1760063, at \*13 (S.D.N.Y. May 1, 2014); *see also Dineen v. Stramka*, 228 F.Supp.2d 447, 454 (S.D.N.Y. 2002) ("When a plaintiff asserts excessive force and assault claims which are premised upon a defendant's intentional

conduct, a negligence claim with respect to the same conduct will not lie.").

Under New York law, "a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Dirienzo v. United States*, 690 F.Supp. 1149, 1155 (D. Conn. 1988) (construing New York law); *Boose v. City of Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 743 (4th Dep't 1979) ). New York courts have long held that, where a plaintiff brings false-arrest and false-imprisonment claims, she cannot also recover under broad principles of negligence. *See Secard v. Dep't of Social Servs. of Cty. of Nassau*, 204 A.D.2d 425, 612 N.Y.S.2d 167, 168 (2d Dep't 1994); *Stalteri v. Cty. of Monroe*, 107 A.D.2d 1071, 486 N.Y.S.2d 555, 556 (4th Dep't 1985).

### ii. Failure to Train

Under New York law, a failure-to-train claim generally cannot survive where the alleged injuries are caused by an employee acting within the scope of her employment. As one court explained, "[g]enerally where ... the employee was acting within the scope of his employment, the employer may be held liable for the employee's torts under a theory of respondeat superior, and no claim may proceed against the employer for negligent supervision or training under New York common law[.]" *Holland v. City of Poughkeepsie*, 90 A.D.3d 841, 935 N.Y.S.2d 583, 592-93 (2d Dep't 2011) (citing *Eckardt v. City of White Plains*, 87 A.D.3d 1049, 930 N.Y.S.2d 22, 25 (2d Dep't 2011); *Talavera* v. *Arbit*, 975 N.Y.S.2d 708, 709 (2d Dep't 2005); *Karoon v. N.Y.C. Transit Auth.*, 241 A.D.2d 323, 659 N.Y.S.2d 27, 29 (1st Dep't 1997) ). "An exception to the general rule exists in cases where a plaintiff seeks punitive damages from the employer based on alleged gross negligence[.]" *Bah*, 2014 WL 1760063, at *14.

### b. Plaintiff's Claim of Negligence Fails

 **\*19** Plaintiff's negligence claim fails as to each of the Defendants for at least two reasons. For starters, all of the conduct ascribed to Officers Baserap and Rittenhouse  and indeed to all of the police officers mentioned in the Amended Complaint  was intentional.

The officers "approached [ ] Plaintiff while he sat in [a] café[.]" (Am. Compl. ¶ 22). They told Plaintiff "that [he] needed to leave with them immediately or else." (*Id.*). When Plaintiff denied any involvement in the alleged crime, they insinuated that he was lying. (*Id.* at ¶ 23). They "berate[d] the Plaintiff, proceeded to handcuff the Plaintiff, and detained him at the entrance of the Barnes [&] Noble[.]" (*Id.*). They eventually "insisted that the Plaintiff move to a corner of the entryway ... [and] one or more of the [officers] tripped [Plaintiff's] legs from under him, all while the Plaintiff was handcuffed[.]" (*Id.* at ¶ 25). All of the actions alleged in the Amended Complaint were intentional. Accordingly, the negligence claim against the Individual Defendants fails as a matter of law. *See Stramka*, 228 F.Supp.2d at 454. And because that claim fails, the attendant claim against the City for vicarious liability similarly fails. *See, e.g., Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 546, 435 N.Y.S.2d 556, 416 N.E.2d 557 (1980) (holding that "it is manifest that there can be no vicarious liability on the part of the employer if the employee himself is not liable").

The claim also fails for an independent reason: Plaintiff advances false-arrest and false-imprisonment claims, in addition to his negligence claim. "[A] plaintiff seeking damages for an injury resulting from a wrongful arrest and detention 'may not recover under broad general principles of negligence but must proceed by way of the traditional remedies of false arrest and imprisonment.' " *Secard*, 612 N.Y.S.2d at 168 (quoting *Stalteri*, 486 N.Y.S.2d at 556). This bars the negligence claim as to all Defendants, including the City of New York. *See Burbar v. Inc. Vill. of Garden City*, 961 F.Supp.2d 462, 474 (E.D.N.Y. 2013) (holding that negligence claim against municipality was barred because, under New York law, "a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest" (internal citation omitted) ).

### c. Plaintiff's Claim Based on Allegations of a Failure to Train Fails

The Court easily disposes of Plaintiff's claim against the City of New York for failure to train its employees. As stated above, New York law does not recognize a negligent-training claim where the allegedly negligent employees were acting within the scope of their

employment. *See Eckardt*, 930 N.Y.S.2d at 25. Plaintiff does not contend — nor could he — that the police officers were acting outside the scope of their employment when they approached Plaintiff, questioned him, handcuffed him, and tripped him. And although Plaintiff seeks punitive damages, which in some instances may allow a plaintiff to pursue negligent-training claims even where the employee acted within her scope of employment, when a municipality is the employer, punitive damages are not available as a matter of law. *Sharapata v. Town of Islip*, 56 N.Y.2d 332, 334, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (1982). For these reasons, under New York law, Plaintiff's claim for failure-to-train fails.

### 9. Only One of Plaintiff's Claims Under the New York Constitution Survives

Finally, the Court addresses Plaintiff's claim for violations of Article I, Sections 11 and 12 of the New York Constitution. In particular, Plaintiff asserts that he "was deprived of his right to equal protection under the law and was subjected to discrimination based on his race ... in violation of [Section 11]," and that he "was deprived of his right to be free from unreasonable searches and seizures ... in violation of [Section 12]." (Am. Compl. ¶ 96.) For the following reasons, the Court dismisses Plaintiff's Section 11 claim as to the Moving Defendants and his Section 12 claim as to the Individual Defendants, but denies the motion to dismiss Plaintiff's Section 12 claim as to the City.

### a. Applicable Law

Article I, Section 11 of the New York State Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof." N.Y. Const., art. I, § 11. Like its federal counterpart, it "commands that persons similarly situated should be treated alike[.]" *Walton v. N.Y. State Dep't of Corr.*, 13 N.Y.3d 475, 492, 893 N.Y.S.2d 453, 921 N.E.2d 145 (2009) (internal quotation marks and citation omitted). Section 12, for its part, guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures[.]" N.Y. Const., art. I, § 12.

**\*20** In *Brown* v. *State*, the New York Court of Appeals recognized the viability of a constitutional-tort claim

that is, a cause of action for damages based on official conduct that violated the State's Constitution. 89 N.Y.2d 172, 192, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996). The Court also explained that any such cause of action is a "narrow remedy," *id.*; it is only available when "necessary to effectuate the purposes of the State constitutional protections [that the] plaintiff invokes" or "appropriate to ensure full realization of [the plaintiff's] rights," *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 83, 735 N.Y.S.2d 868, 761 N.E.2d 560 (2001). The private right of action under the State Constitution is available only where the plaintiff "ha[s] no [alternative] remedy[.]" *Wahad v. F.B.I.*, 994 F.Supp. 237, 240 (S.D.N.Y. 1998); *see also Alwan v. City of New York*, No. 14 Civ. 4556 (NGG) (VMS), 2018 WL 2048366, at \*10 (E.D.N.Y. May 2, 2018) ("New York courts have held that a private right of action for violations of the state constitution is unavailable if an alternative remedy is available elsewhere, such as under state tort law[.]").

### b. Plaintiff's Section 11 Claim Fails

The Court begins with Plaintiff's Article I, Section 11 claim. The threshold question here, in determining whether a private right of action may be inferred, is whether an alternative remedy exists elsewhere. The Court notes that Plaintiff has not advanced an Equal Protection Clause claim under Section 1983. His failure to do so is fatal to his claim under Article I, Section 11 of the New York Constitution, given that a Section 1983 claim alleging violation of the Equal Protection Clause would have constituted an adequate alternative remedy. Indeed, Article I, Section 11 of the New York State Constitution "was intended to afford coverage as broad as that provided by the Fourteenth Amendment." *Brown*, 89 N.Y.2d at 190, 652 N.Y.S.2d 223, 674 N.E.2d 1129. Plaintiff therefore had an alternative remedy available to him under federal law, but chose not to pursue it. Because a State constitutional cause of action is a "narrow remedy," available only when a plaintiff lacks any other remedies to protect his rights, Plaintiff's failure to advance a Section 1983 claim bars him from advancing a Section 11 claim.

Even if the Court found otherwise on this threshold matter, Plaintiff's claim still would not survive the motion to dismiss. Plaintiff's claim of discriminatory treatment is supported by a single factual allegation. He writes:

"[u]pon information and belief, the Plaintiff was the only black male sitting in the Barnes [&] Noble café at the time the Police Officer Defendants approached him." (Am Compl. ¶ 26). As mentioned above, Plaintiff provides no other factual allegations to support a claim for racial discrimination: Nothing about the arresting officers' statements or the manner in which the officers conducted their duties that might plausibly suggest a Section 11 violation. And Plaintiff himself has suggested that he was targeted in retaliation for having previously filed lawsuits against NYPD personnel, or simply because the arresting officers wished to appear to be in control of the situation. (*Id.* at ¶¶ 28-29). Because of the paucity of Plaintiff's factual allegations suggestive of racial discrimination, and because Plaintiff failed to pursue alternative remedies available to him, Plaintiff's Section 11 claim cannot survive Defendants' motion to dismiss.

### c. Plaintiff's Section 12 Claim Fails as to Officers Baserap and Rittenhouse

Plaintiff's claim under Article I, Section 12 of the New York Constitution mirrors his claim under Section 1983 for unreasonable search and seizure. In his Section 12 claim, Plaintiff asserts that he "was deprived of his right to be free from unreasonable searches and seizures[.]" (Am. Compl. ¶ 96). In his Section 1983 claim, he states that Officers Baserap and Rittenhouse "took various actions in furtherance of the deliberate and unconstitutional search of the Plaintiff and his property without legal justification." (*Id.* at ¶ 42). Courts have consistently held that where "a plaintiff has asserted a viable Fourth Amendment claim ... under Section 1983 'any [violation] of the plaintiff['s] right to be free of unreasonable searches and seizures can be vindicated through this claim." *Wood v. Town of E. Hampton*, No. 08 Civ. 4197 (DRH), 2010 WL 3924847, at *28 (E.D.N.Y. Sept. 30, 2010) (quoting *Coakley v. Jaffe*, 49 F.Supp.2d 615, 629 (S.D.N.Y. 1999), *abrogated on other grounds by Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268 (2d Cir. 1999) ). Because Plaintiff has asserted a viable Section 1983 claim against Officers Baserap and Rittenhouse, his Section 12 claim against them fails.

### d. Plaintiff's Section 12 Claim Survives as to the City of New York

**\*21** The Court has already found that Plaintiff's municipal-liability claim under Section 1983 fails. The Court now turns to Plaintiff's Section 12 claim against the City. The question before the Court is whether the *Monell* claim provided Plaintiff with an adequate alternative remedy to the Section 12 claim.

The Court begins with a brief review of the requisites for municipal liability under Section 1983. A plaintiff may not assert Section 1983 claims against municipalities under a theory of respondeat superior. *Monell*, 436 U.S. at 691-95, 98 S.Ct. 2018. Instead, a plaintiff can only recover against a municipality for "[its] *own* illegal acts." *Pembaur*, 475 U.S. at 479, 106 S.Ct. 1292. Absent a showing of a "municipal policy or custom" and a " 'direct causal link ... [with] the alleged constitutional deprivation," *Tieman*, 2015 WL 1379652, at *12 (quoting *City of Canton*, 489 U.S. at 385, 109 S.Ct. 1197), a plaintiff cannot assert a claim for municipal liability under Section 1983, *see Brown*, 89 N.Y.2d at 194, 652 N.Y.S.2d 223, 674 N.E.2d 1129 ("A plaintiff seeking to recover on the basis of respondeat superior simply does not come within the terms of [S]ection 1983.").

By contrast, municipal liability under a theory of respondeat superior *is* cognizable under state constitutional-tort law. *See Vilkhu v. City of New York*, No. 06 Civ. 2095 (CPS) (JO), 2008 WL 1991099, at *8 (E.D.N.Y. May 5, 2008) ("In [*Brown*, 89 N.Y.2d at 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129], the New York State Court of Appeals recognized the availability of damages causes of action against the state for equal protection and search and seizure violations[.]"). Because state constitutional-tort claims can proceed under a respondeat superior theory, whereas Section 1983 provides no such remedy, the latter "does not provide an adequate alternative remedy for Plaintiff's state-constitutional claims[.]" *Alwan*, 2018 WL 2048366, at *11; *see also Espinoza v. City of New York*, 194 F.Supp.3d 203, 208 (E.D.N.Y. 2016). Here, because Plaintiff's *Monell* claim fails as a matter of law, he has no alternative remedy to vindicate his State constitutional rights against the City of New York. Though the evidence produced in discovery may ultimately show that Plaintiff's claim fails on the merits, the Court must protect Plaintiff's right to pursue that claim. For this reason, the Court rejects Defendants' argument that Section 1983 provides Plaintiff with "an alternative remedy that ... adequately protect[s] his interest." (Def. Br. 18).

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is DENIED IN PART and GRANTED IN PART. Plaintiff's false-arrest, unreasonable-search-and-seizure, and failure-to-intervene claims survive as to Officers Baserap and Rittenhouse, and his New York State constitutional-tort claim under Article I, Section 12 survives as to the City of New York.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

The Clerk of Court is directed to terminate Docket Entry 32. The parties are hereby ORDERED to submit a joint status letter and a proposed case management plan, on or before **August 10, 2018**, that comply with the Court's Notice of the Initial Pretrial Conference. If in light of Plaintiff's *pro se* status, the parties are unable to confer and file a joint letter and proposed case management plan, Moving Defendants are directed to file the documents separately. Plaintiff may, but is not required, to file his own letter and proposed case management plan. Any submissions must be filed by August 10, 2018.

**\*22** SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 3368706

---

2013 WL 673872
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard GUERRERO, Plaintiff,

v.

CITY OF NEW YORK and Does 1–10, Defendants.

No. 12 Civ. 2916.
|
Feb. 25, 2013.

**Attorneys and Law Firms**

Law Office of John M. Lambros, by: John M. Lambros, Esq., New York, NY, for Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York, by: Uriel Abt, Esq., New York, NY, for Defendant.

*OPINION*

SWEET, District Judge.

**\*1** The defendant City of New York ("City" or "Defendant") has moved to dismiss the Amended Complaint ("AC") of plaintiff Richard Guerrero ("Guerrero" or "Plaintiff") pursuant to Fed.R.Civ.P. 12(b)(6) ("12(b)(6)"). Upon the conclusions set forth below, the City's motion is granted and the AC is dismissed with leave granted to replead within twenty days.

*Prior Proceedings*

On April 4, 2012, Guerrero filed the instant lawsuit against the City of New York alleging various state and federal claims arising out of an arrest that occurred on December 10, 2010. On July 23, 2012, Guerrero filed the AC.

As alleged in the AC, on December 10, 2010, Guerrero was involved in an altercation at a night club. AC ¶ 9. The other individuals involved in the altercation threatened to call the police, and subsequently did so. *Id.* The police arrived and arrested Guerrero (referred to hereinafter as the "First Arrest"). *Id.* After about a year, the criminal

charges against Guerrero stemming from the First Arrest were dismissed. *Id.*

On July 25, 2011, Guerrero was arrested by two plainclothes police officers as he was leaving Queens Court, where he had appeared in an unrelated matter (referred to hereinafter as the "Second Arrest" and, collectively with the First Arrest, the "Arrests"). *Id.* ¶ 11. One of the arresting officers informed Guerrero that his arrest was due to a complaint made by an N.Y.P.D. traffic agent, who accused Guerrero and two other individuals of assaulting him or her at 5:30 A.M. on July 22, 2011. *Id.* Guerrero contends that he was in the hospital at that time. *Id.* The criminal charges against Guerrero stemming from the Second Arrest were eventually dismissed. *Id.*

*The Rule 12(b)(6) Standard*

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *County of Suffolk, New York v. First Am. Real Estate Solutions,* 261 F.3d 179, 187 (2d Cir.2001) (*quoting Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808 (1996)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). This is not intended to be an onerous burden, as plaintiffs need only allege facts sufficient in order to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570.

*Guerrero's § 1983 Claim Is Dismissed*

Guerrero asserts a claim under 42 U.S.C. § 1983 (" § 1983") against the City based upon alleged constitutional violations committed by the police officers who were involved with the Arrests. However, Guerrero has failed to allege a viable basis for the City's liability under § 1983, and has likewise failed to allege any underlying constitutional violations. Accordingly, Guerrero fails to state a § 1983 claim against the City.

*A. Guerrero Fails to Allege Facts Providing a Viable Basis for Monell Liability*

**\*2** A municipality can only be held liable under 42 U.S.C. § 1983 in the manner set forth in *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978), and its progeny, and may not be held liable under § 1983 on a theory of *respondeat superior. Nagle v. Marron,* 663 F.3d 100, 116 (2d Cir.2011).

In order to prevail on a § 1983 claim against a municipality, a plaintiff must show that the municipality itself caused the alleged constitutional deprivation. *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). Guerrero must therefore establish that an identified municipal policy or practice was the "moving force [behind] the constitutional violation." *Monell,* 436 U.S. at 694. Accordingly, in order to state a *Monell* claim, "[t]he plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries .... Second, the plaintiff must establish a casual connection-an 'affirmative link' between the policy and deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985), *cert. denied* 480 U .S. 916 (1987) (*quoting Oklahoma City v. Tuttle,* 471 U.S. 808, 824 n. 8 (1985)).

A municipal policy or custom for purposes of *Monell* liability can be established by alleging:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Bennerson v. City of New York,* No. 03 Civ. 10182, 2004 WL 9021667241, at \*4 (S.D.N.Y. Apr. 28, 2004) (internal citations omitted).

At the pleading stage, the "the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Za hra v. Town of Southold,* 48 F.2d 674, 685 (2d Cir.1995); *see also Brodeur v. City of New York,* No. 99 Civ. 651(WHP), 2002 WL 424688, at \*6 (S.D .N.Y. Mar. 18, 2002) (dismissing complaint against City that "flatly asserts" the existence of a policy but contains no "factual allegations sufficient to establish that a municipal policy or custom cased [plaintiff]'s alleged injury"). Indeed, while "[i]t is questionable whether the boilerplate *Monell* claim often included in many § 1983 cases ... was ever sufficient to state a claim upon which relief could be granted[,][i]n light of [*Iqbal* and *Twombly, supra* ], it is now clear that such boilerplate claims do not rise to the level of plausibility" required to state a viable *Monell* claim. *Santiago v. City of New York,* No. 09 Civ. 0856(BMC), 2009 WL 2734667, at \*3 (E.D.N.Y. Aug. 25, 2009).

**\*3** The AC contains only boilerplate assertions of a municipal policy or custom, *see* AC ¶¶ 14 15, 17 18, alleging that "Plaintiff was injured by defendants because their acts were perpetrated based on custom, usage, patterns, and policies instituted by the municipal policymakers and resulting in violations of Plaintiff's civil rights," *id.* ¶ 15, without offering any accompanying factual support. As set forth above, such conclusory allegations are insufficient to state a claim for *Monell* liability.

Moreover, the two Arrests of which Guerrero complains do not, in and of themselves, suffice to state a municipal policy or custom. *Giaccio, 502 F.Supp.2d at 389.* Each arrest is factually distinct from the other, and Guerrero fails to establish any common causal thread between the two that would support a theory of *Monell* liability. Guerrero has not alleged what municipal policy or custom he believes led to his arrests, and has failed to set forth which of the four theories of *Monell* liability is the basis for the City's liability.

Accordingly, the AC does not allege facts that sufficient to make out *Monell* claim against the City of New York under any theory of liability.

[1]     In an apparent effort to state a *Monell* claim under the failure to train prong set forth in *City of Canton v. Harris,* 489 U.S. 378 (1989), the AC refers to a newspaper article (the "Article ) that suggests that NYPD does not keep statistics on lawsuits in which it is a defendant. AC at ¶ 17. However, no inference can be drawn from the Article with respect NYPD training policies, and the Article certainly does not establish the requisite "affirmative link  between the issues it discusses and the circumstances of Plaintiff's arrests. *See Tuttle,* 471 U.S. at 823 ("At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged. ). Accordingly, to the extent that Guerrero seeks to assert a failure to train *Monell* claim based upon the Article, such a claim is unavailing.

**B. Guerrero Fails to Allege an Underlying Violation**
"*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006). Accordingly, in order for Guerrero to state a viable § 1983 claim, he must allege an underlying violation that "deprived [him] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Pritchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994).

To satisfy this pleading requirement, Guerrero alleges violation of his Fourth Amendment rights due to false arrest and use of excessive force. AC ¶¶ 9 11, 19 20. However, Guerrero fails to adequately plead any type of Fourth Amendment violation.

*(i) Guerrero Fails to State a Claim for False Arrest*
The elements for a § 1983 claim premised on a false arrest claim are substantially similar to the elements necessary to state a claim for false arrest under New York law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (internal citations omitted), Thus, in order to state a § 1983 claim premised upon a false arrest, a plaintiff must allege that; (1) the defendant intended to confine the plaintiff; (2) the plaintiff

was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Weyant,* 101 F.3d at 853 (*quoting Broughton v. State,* 37 N.Y.2d 451, 456 (1975). An arrest pursuant to probable cause is privileged; thus, the existence of probable cause is a complete defense to an action for false arrest under either state law or § 1983. *Covington v. City of New York,* 171 F.3d 117, 122 (2d Cir.1999).

**\*4** In addition, when a victim complains to the police that a crime has been committed, probable cause to arrest an identified perpetrator exists absent a reason to doubt the complaining victim. *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995).

In cases where a plaintiff attempts to plead false arrest despite the existence of a complaining victim or witness, the plaintiff must, at the very least, allege facts tending to show that the victim's veracity should have been questioned. *See, e.g., Khaja Moinuddin v. City of New York,* No. 09 Civ. 646(CBA), 2010 WL 3861003, at \*5  6 (Sept. 28, 2010).

Moreover, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti,* 124 F.3d at 128. This is because, "[i]t is up to the fact finder to determine whether a defendant's story holds water, not the arresting officer." *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir.1989). Thus, "probable cause exists even where it is based upon mistaken information, so long as the arresting officer was reasonable in relying on that information." *Bernard v. United States,* 25 F.3d 98, 103 (2d Cir.1994).

Here, Guerrero has alleged that he was arrested due to the complaints of victims or witnesses. With regard to the First Arrest, Guerrero contends that the police were called by either the individuals with whom he had an altercation or by witnesses to that altercation. *See* AC ¶ 9; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the First Amended Complaint Under Federal Rule of Civil Procedure 12(b)(6) ( "Pl.Mem.Opp.") at 2  3. With regard to the Second Arrest, Guerrero alleged that he was arrested based on the accusations of the traffic agent who was purportedly the victim of the assault. AC ¶ 11. Moreover, Guerrero has made no allegation-with regard to *either* arrest-that

the arresting officers had reason to doubt the complaints leading to the Arrests.[2] Accordingly, even if Guerrero's allegations are accepted as true and all inferences are drawn in his favor, it is evident that the officers responsible for both of the Arrests had probable cause to arrest Guerrero, and therefore Guerrero fails to state a viable claim for false arrest.[3]

[2]    Though Guerrero contends in the AC that he could not have committed the assault that precipitated the Second Arrest because he was in the hospital at the time of the alleged assault, Guerrero does not allege that he made such a contention to the arresting officers. *See* AC ¶ 11. Accordingly, there is no allegation that the officers who were responsible for the Second Arrest had reason to doubt the criminal complaint that had been made against Guerrero. It should be noted that even if Guerrero had included such an allegation in the complaint, it would not necessarily mean that the arresting officers did not have probable cause, but rather the inclusion of such an allegation would have simply necessitated an analysis as to whether it was reasonable for the officers to arrest Guerrero despite his claim of being hospitalized at the time of the complained of assault on the traffic officer. However, since Guerrero made no such allegation in the AC, the existence of probable cause can be assumed without delving into such an analysis.

[3]    In addition, to the extent that Guerrero is basing his § 1983 claim on an allegedly unreasonable search, *see* AC ¶ 9, this claim fails as well, because a search incident to a lawful arrest is *per se* reasonable. *Arizona v. Gant,* 556 U.S. 332, 338 (2009).

*(ii) Guerrero Fails to State a Claim for Excessive Force*
Guerrero has also failed to adequately allege a claim for excessive force. "Not every push or shove amounts to a Fourth Amendment violation. Indeed, a de minimus use of force will rarely suffice to state a Constitutional claim. Further, a plaintiff must allege that he sustained an injury to maintain an excessive force claim." *Acosta v. City of New York,* No. 11 Civ. 856(KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012) (quotations and citations omitted) (dismissing excessive force claim where plaintiff alleged that he was punched in the chest and thrown on the ground but did not allege any injury).

**\*5** With respect to the First Arrest, Guerrero alleged that his handcuffs were too tight. AC ¶ 9. Such an allegation alone does not state a claim for excessive force. *See, e.g., Wims v. New York City Police Dept.,* No. 10 Civ. 6128(PKC), 2011 WL 2946369 at *5 ("Merely placing tight handcuffs on a suspect is not enough for an excessive force claim."); *Wilder v. Village of Amityville,* 288 F.Supp.2d 341, 344 (E.D.N.Y.2003) (allegation of tight handcuffs resulting in twenty-four hours of wrist inflammation and soreness does not rise to the level of excessive force).

With respect to the Second Arrest, Guerrero alleged that he was "physically abused," that the officers "threw him around like a toy," and that he was thrown into the back of a police vehicle. AC ¶ 11. However, Guerrero alleged no injury stemming from these acts other than claiming to have "suffered mental and emotional harm." AC ¶ 32. Such a conclusory assertion, unaccompanied by allegations of a specific or identifiable mental injury, is an insufficient basis for an excessive force claim. Wims, 2011 WL 2943639, at *5.

*Guerrero's State Law Claims Are Dismissed*
New York General Municipal Law 50 i(l) mandates that

> [n]o action or special proceeding shall be prosecuted or maintained against a city ... unless, (a) a notice of claim shall have been made and served upon the city ... in compliance with section fifty-e of this chapter, (b) it shall appear by and as an allegation in the complaint or moving papers that at least thirty days shall have elapsed since the service of such notice and that adjustment or payment thereof has been neglected or refused, and (c) the action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based.

N.Y. Gen. Mun. L. 50 i(1) ("Rule 50 i(1)"). In addition, the required notice of claim must be filed within ninety days afte the claim arises. N.Y. Gen. Mun. L. 50 e(1)(a).

"The burden on the plaintiff to demonstrate compliance with the Notice of Claim requirement." *Horvath v. Daniel,* 423 F.Supp.2d 421, 4 (S.D.N.Y.2006). In addition, "[t]he appropriate remedy for failure by the plaintiff to comply with [the][sic] statutory notice of claim requirement is dismissal of the action, even i the claim is meritorious." *Faruki v. City of New York,* No. 10 Civ. 9614(LAP), 2012 WL 1085533, at *10 (S.D.N.Y. Mar. 30, 2012) (quotation and citation omitted).

Guerrero's state law claims against the City suffer from several fatal procedural defects. First, Guerrero has not alleged that a notice of claim was filed with respect to either Arrest as required by Rule 50 i(1)(a), and moreover has failed to make the allegation required by Rule 50 i(1)(b) that "thirty days have elapsed since the service of [a notice of claim] and that adjustment or payment thereof has been neglected or refused." Indeed, it does not appear that a notice of claim was ever filed with respect to the First Arrest, so Guerrero is barred from asserting state law claims premised upon events that occurred in connection to that event. *Faruki,* 2012 WL 1085533, at *10. In addition, even if a notice of claim had been filed with respect to Guerrero's state law claims arising from the First Arrest, such claims would nonetheless be time-barred since they were first asserted on April 4, 2012, which will over one year and ninety days after the date of the First Arrest, which is December 10, 2010. *See* Rule 50 i(1)(c).

**\*6** With respect to the Second Arrest, Guerrero does appear to have filed a notice of claim with the City, *see* Declaration of Uriel B. Abt in Support of Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6), Ex. B,[4] but the filing, which was made on March 2, 2012, came long after the expiration of the 90 day deadline mandated by N.Y. Gen. Mun. L. 50 e(1)(a). Accordingly, Guerrero's state-law claims arising from the Second Arrest are also time-barred pursuant to N.Y. Gen. Mun. L. 50 e.

[4]   Although Guerrero did not attach this document to his pleading, notice may nonetheless be taken of it because it is a document "either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit. *Gray v. City of New York,*

No. 10 Civ. 3039(SLT)(CLP), 2012 WL 947802, at *10 (E.D.N.Y. Mar. 20, 2012).

Guerrero has contended that the notice of claim filed with respect to the Second Arrest was not untimely because it was filed within 90 days of the dismissal of the criminal action stemming from the Second Arrest. Pl. Mem. Opp. at 10. However, the operative date for calculating the 90 day deadline is not the date upon which the charge was dismissed, but rather the date upon which Guerrero was released from custody. *See Bennett v. City of New York,* 204 A.D.2d 587, 587 (N.Y.App.Div.1994). Guerrero was released from custody on or about July 25, 2011, AC ¶ 11, so the 90 day deadline for submitting a notice of claim premised upon the Second Arrest expired at the end of October 2011, more than four months prior to Guerrero's filing of the notice.[5]

[5]   To the extent that Guerrero attempts to plead an assault and battery claim stemming from the Second Arrest, that claim is **similarly time-barred. An assault and battery claim** arising from the Second Arrest would have accrued on or about July 25, 2011, which was Guerrero's final day in custody, *see Lettis v. U.S. Postal Serv.,* 39 F, Supp.2d 181, 204 05 (E.D.N.Y.1998), meaning that the 90 day period for filing a notice of assault and battery claims stemming from the Second Arrest elapsed in late October 2011.

Since Guerrero's state law claims against the City arising from the First and Second Arrests are procedurally defective and untimely, dismissal of those claims is warranted on that basis alone. *Faruki,* 2012 WL 108553, at *10.

### Conclusion

Based upon the conclusions set forth above, the City's motion to dismiss is granted and the AC is dismissed with leave to replead within twenty days.

It is so ordered.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 673872

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.  5

2018 WL 3850828
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Saeed KAID, Plaintiff,
v.
Joseph RUDNICK, Defendant.

15-CV-548-A
|
Signed 06/26/2018

**Attorneys and Law Firms**

Saeed Kaid, New York, NY, pro se.

Amy Christine Chambers, Jeremy J. Hourihan, Matthew Joseph Rosno, Barclay Damon, LLP, Elmira, NY, for Defendant.

### REPORT AND RECOMMENDATION

H. KENNETH SCHROEDER, JR., United States Magistrate Judge

**\*1** This case was referred to the undersigned by the Hon. Richard J. Arcara, pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. #9.

Plaintiff Saeed Kaid ("Plaintiff") brings this *pro se* action pursuant to 42 U.S.C. § 1983 against Joseph Rudnick ("Defendant"), alleging false arrest, malicious prosecution, and excessive force. Dkt. #1. Plaintiff's claims arise out of a traffic stop and arrest on January 23, 2013. *Id.*

Currently before the Court is Defendant's motion for summary judgment. Dkt. #47. For the following reasons, the Court recommends that Defendant's motion be granted in its entirety.

[1]      In connection with the pending motion, Defendant submits a statement of undisputed facts, memorandum of law, and supporting affidavits and exhibits. Dkt. #47 1 through 47 8.

### FACTUAL BACKGROUND

The following facts are drawn from Defendant's Local Rule 56(a)(1) statement of facts and supporting exhibits. [2] Dkt. #47-2 through 47-7.

[2]      Despite multiple extensions of time (Dkt. ##52 58), Plaintiff has not filed an opposition to Defendant s motion. He has been furnished with the Rule 56 Notice to *Pro Se* Litigants. Dkt. ##58 61. Accordingly, Defendant s assertions of fact in their Local Civil Rule 56(a) Statement are deemed admitted to the extent they are supported by admissible evidence.

On January 23, 2013, Defendant, a uniformed police officer with the Elmira Police Department, along with Officer George Dupay ("Dupay"), initiated a traffic stop of Plaintiff's vehicle for failure to remain right. Defendant called in the traffic stop over his police radio, and Officer Christopher Osiecki ("Osiecki") responded to assist.

During the stop, Defendant observed a strong odor of marijuana emanating from the inside of the vehicle. On this basis, Defendant asked Plaintiff to exit the car, and Plaintiff complied. A search of Plaintiff's person revealed a wallet containing a New York State Benefits card belonging to a Ms. Latoya Green. When questioned about the card, Plaintiff responded that "she is my girl ... but not like that," and that he "gave her some money for it." Dkt. #47-3, ¶ 9. According to Defendant, Dupay, and Osiecki, the traffic stop occurred without incident or altercation, and Plaintiff was cooperative. *Id.*, ¶ 15.

Defendant detained Plaintiff in handcuffs and transported him to the Elmira police station for further investigation into possible misuse of public benefits card. During the investigation, Plaintiff was found to be in possession of two additional state benefit cards belonging to different individuals named David Hildreth and Victoria Seymore; a paper list of names with corresponding pedigree information and personal identifiers; correspondence from the Social Security Administration regarding a social security card application; and internet research on how to obtain birth and death certificate information in New York. Defendant attempted to locate and interview the persons to whom the benefits cards belonged. He was unable to reach Latoya Green and David Hildreth, while

Victoria Seymore claimed that she had lost her benefits card.

**\*2** Plaintiff was charged with Criminal Use of a Public Benefit Card (N.Y. Penal L. § 158.30(1) ), as well as violations of New York State Vehicle and Traffic Law.

On September 3, 2013, The Chemung County District Attorney's Office moved to dismiss Plaintiff's criminal charges in the interest of justice because Defendant (Rudnick) was no longer available to testify at any hearings or at trial and because Plaintiff already had a pending count of Criminal Possession of a Controlled Substance in the same court. The Elmira City Court subsequently dismissed the charges based upon that request.

Plaintiff's complaint alleges that, during his arrest, he was punched, kicked, and thrown to the ground while handcuffed. Dkt. #1, ¶ 7. He did not receive medical treatment and thus has submitted no documents relative thereto. Dkt. #38.

### DISCUSSION AND ANALYSIS

**I. Summary Judgment**
Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material "only if it has some effect on the outcome of the suit." *Eagley v. State Farm Ins. Co.*, No. 13-CV-6653, 2015 WL 5714402, at \*5 (W.D.N.Y. Sept. 29, 2015) (citation and quotation omitted). Moreover, a genuine issue exists as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) ).

Where, as here, a plaintiff proceeds *pro se*, his submissions are read liberally and interpreted "to raise the strongest

arguments that they suggest." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (citation omitted). Nevertheless, proceeding *pro se* does not relieve a litigant from the usual summary judgment requirements. *See Wolfson v. Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011). When a *pro se* plaintiff fails to oppose a summary judgment motion after he has been warned of the consequences of such a failure, "summary judgment may be granted as long as the Court is satisfied that the undisputed facts 'show that the moving party is entitled to judgment as a matter of law.' " *Almonte v. Pub. Storage Inc.*, No. 11 Civ. 1404, 2011 WL 3902997, at \*2 (S.D.N.Y. Sept. 2, 2011) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) ).

**II. Section 1983, Generally**
Plaintiff brings his complaint under 42 U.S.C. § 1983, which provides a civil claim for damages against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (internal citations omitted). To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Id.*

**\*3** In this action Plaintiff claims that Defendant violated his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States when he was subjected to false arrest, malicious prosecution, and excessive force arising out of his January 23, 2013, arrest. Dkt. #1.

Defendant seeks dismissal of Plaintiff's complaint on the grounds that: (1) there was probable cause for his arrest and criminal proceeding; (2) Defendant is entitled to qualified immunity; (3) Plaintiff cannot establish the elements of a malicious prosecution claim; and (4) there is no evidence of excessive force. Dkt. #47-8 at 10-22.

**III. False Arrest and Malicious Prosecution**
"Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are substantially the same as claims for false arrest

or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks and citations omitted). To prevail on a claim of false arrest under New York law, " 'a plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Jocks*, 316 F.3d at 134 35 (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975) ).

Likewise, a plaintiff must prove the following elements to establish a claim of malicious prosecution: "(1) the defendant initiated or continued criminal proceedings against the plaintiff; (2) the criminal proceeding terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (*per curiam* ) (internal quotation marks and citation omitted).

The existence of probable cause is a complete defense to claims for false arrest and malicious prosecution under § 1983. *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 161 62 (2d Cir. 2010). Probable cause exists when an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000). Courts evaluating probable cause for an arrest must consider those facts available to the officer at the time of the arrest and immediately before it. *Warren v. Dwyer*, 906 F.2d 70, 73 (2d Cir. 1990). The probable cause inquiry is an objective one. *Dukes v. City of N.Y.*, 879 F. Supp. 335, 340 (S.D.N.Y. 2005).

Plaintiff was arrested for Criminal Use of a Public Benefit Card in the Second Degree. The relevant section of the New York Penal Law provides that "[a] person is guilty of criminal use of a public benefit card in the second degree when he or she knowingly ... [l]oans money or otherwise provides property or services on credit, and accepts a public benefit card as collateral or security for the repayment of such loan or for the provision of such property or services...." N.Y. Penal L. § 158.30(1). Here, Plaintiff's wallet contained multiple New York benefits cards, including one belonging to Latoya Green, whom Plaintiff stated he gave some money to in

exchange for the card. A total of three benefits cards were ultimately recovered from Plaintiff's person, all belonging to different individuals. Considering the facts available to Defendant at the time of the arrest, there was probable cause for the charge against Plaintiff, making the arrest privileged. *See, e.g., People v. Wilson*, 52 A.D.3d 239, 240 (1st Dep't 2008) (probable cause for arrest for criminal possession of stolen property based on, *inter alia*, the defendant's response to the officer's questions, and his production of an identification card and a credit card that did not belong to him). It is therefore recommended that Plaintiff's false arrest claim be dismissed.

**\*4** It is for the same reason that the Court recommends dismissal of Plaintiff's malicious prosecution claim. *See Walston v. City of N.Y.*, 289 F. Supp. 3d 398, 409 (E.D.N.Y. 2018) ("If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined 'by the discovery of some intervening fact.' ") (quoting *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003) ) (internal quotation omitted). As noted earlier, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003).

In any event, Plaintiff has not alleged, nor is there any evidence in the record, that Defendant was involved in initiating Plaintiff's prosecution. Dkt. #1, ¶¶ 8-10. To the contrary, Defendant's declaration indicates that "[o]ther than standard reports memorializing my observations and investigation on January 23, 2013, I did not generate witness statements and was not regularly in touch with the prosecutor regarding the case." Dkt. #47-3, ¶ 20. The mere fact that Defendant submitted reports to the District Attorney's Office is insufficient to state a claim for malicious prosecution. *See Hewitt v. City of N.Y*, No. 09 CV 214, 2012 WL 4503277, at *7 (E.D.N.Y. Sept. 28, 2012) (noting that individuals who do "no more than disclose to a prosecutor all material information within [their] knowledge [are] not deemed to be the initiator[s] of the proceeding.") (quoting *Rohman v. N.Y.C. Trans. Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) ). Defendant expressly asserts that he "did not encourage or persuade the prosecutor to prosecute the case against Plaintiff." Dkt. #47-3, ¶ 20. Under these circumstances, summary judgment as to Plaintiff's claim of malicious prosecution is appropriate. *See Felmine v. City of N.Y.*, No. 09 CV 3768, 2011 WL 4543268, at *11 (E.D.N.Y. Sept. 29, 2011) ("[A] malicious-prosecution claim cannot stand if

the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by [the] police.") (quotation marks and citation omitted) (second alteration in original). The Court therefore recommends summary judgment in favor of Defendant on Plaintiff's false arrest and malicious prosecution claims.

**IV. Qualified Immunity**

In the alternative, Defendant argues that he is entitled to qualified immunity with respect to Plaintiff's claims of false arrest and malicious prosecution. Dkt. #47-8 at 8-12.

Qualified immunity protects a government official from liability for damages unless his actions violate a "clearly established statutory or constitutional right of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). More specifically, the officers are entitled to qualified immunity if "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir 2007) (internal citations omitted).

"[W]hen a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). "Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach*, 165 F. 3d 137, 143 (2d Cir 1999) (citation omitted).

**\*5** In determining whether an officer is entitled to qualified immunity for a probable cause determination, the court must decide whether the officer had "arguable probable cause." *See Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010). " ' 'Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' " *Id.* (quoting *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007) ). The arguable probable cause standard is "more favorable to the officers" than the ordinary standard used to determine probable cause. *See*

*Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012) (citation omitted).

Here, Defendant's conduct did not violate clearly established constitutional rights. It was objectively reasonable for him to believe probable cause existed for the crime charged in light of the recovery of three benefits cards belonging to other individuals on Plaintiff's person and Plaintiff's admissions that he had given someone "some money" for one of the cards. Dkt. #47-3, ¶ 9. In light of Plaintiff's inability to show that Defendant's actions were unreasonable, the Court finds that the Defendant had at least arguable probable cause to arrest Plaintiff and would therefore be entitled to qualified immunity. Thus, in the alternative, summary judgment should be granted in Defendant's favor on the basis of qualified immunity.

**V. Excessive Force**

Claims that law enforcement officers used excessive force in the course of an arrest or seizure of a citizen are analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Proper application of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The standard is objective and must be assessed from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. *Id.* at 396 97. Furthermore, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments   in circumstances that are tense, uncertain, and rapidly evolving   about the amount of force that is necessary in a particular situation." *Id.*

On the record before the Court, there is no evidence that any force was used at any point during Defendant's interaction with Plaintiff. Defendant, Dupay, and Osiecki confirmed that Plaintiff remained cooperative, did not resist arrest, and that there was no altercation between Plaintiff and Defendant. Dkt. ##47-3, 47-4, 47-5. The contemporaneous reports completed by the police officers do not document any use of force. Dkt. #47-3. Plaintiff has submitted no evidence to controvert the officers' version of events, and the unsubstantiated allegations in

his complaint alone are insufficient to survive summary judgment. *See Adilovic v. Cnty. of Westchester*, No. 08 CIV. 10971, 2011 WL 2893101, at *7 (S.D.N.Y. July 14, 2011)* ("Adilovic's uncorroborated claims that he suffered a forceful beating that caused severe injuries are not supported by any evidence, and cannot alone defeat summary judgment."). The Court recommends that Plaintiff's excessive force claim be dismissed because there is no evidence in the record to support that any use of force was applied during Plaintiff's arrest.

**\*6** Moreover, although Plaintiff's complaint states that, after being handcuffed, he was "punched several times in the stomach, side and back area," and then thrown to the ground and "kicked numerous times in the stomach and finally in the groin area." Dkt. #1, ¶ 7, he describes his injuries as "soreness to my groin, side, back, and ribcage." Dkt. #38. He submits no medical documentation and states that he was not treated. *Id.*

"[I]t is clear that some type of injury is required to prevail on a *§ 1983* excessive force claim." *Castro v. Cnty. of Nassau*, 739 F.Supp.2d 153, 177 n. 16 (E.D.N.Y. 2010). "Injuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth." *Lemmo v. McKoy*, 08 CV 4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011)* (citations omitted). Plaintiff's complaint of "soreness" arising out of the incident alleged cannot defeat Defendant's motion because a "[d]e *minimis* injury can serve as conclusive evidence that *de minimis* force was used." *Washpon v. Parr*, 561 F.Supp.2d 394, 407 (S.D.N.Y. 2008)* (citation omitted); *see also Yang Feng Zhao v. City of N.Y.*, 656 F.Supp.2d 375, 390 (S.D.N.Y. 2009)* (noting that "the extent and nature of the injury, if any, is typically relevant in an arrest context ... because it is probative of the amount and type of force actually used by the arresting officers, and that in turn is likely to reflect on the reasonableness of that force"). He has therefore alleged only a *de minimis* injury insufficient to withstand Defendant's motion. *See, e.g., Acosta v. City of N.Y.*, No. 11 CIV. 856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012)* (on 12(b)(6) motion, dismissing complaint where plaintiff claimed to have been punched, thrown to the ground, and forcibly handcuffed, but alleged no specific or identifiable physical harm beyond conclusory assertions).

To the extent Defendant argues that he is entitled to qualified immunity on the excessive force claim, Dkt. #47-8 at 23, Plaintiff has failed to allege an underlying constitutional violation, rendering the inquiry on the issue of qualified immunity unnecessary. *See Pearson v. Callahan*, 555 U.S. 223, 243 (2009)* (citing *Saucier v. Katz*, 533 U.S. 194, 194 (2001)* ).

For all of the foregoing reasons, it is recommended that Defendant's Motion for Summary Judgment be **GRANTED** in its entirety.

### CONCLUSION

For all of the above reasons, it is recommended that Defendant's motion for summary judgment (Dkt. #47) be **GRANTED in its entirety**.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

With respect to Defendant's motion for summary judgment, **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. Proc. 72(b) and Local Rule 72(b).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**\*7 Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which

objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(b) may result in the District Court's refusal to consider the objection.**

**ALL OF THIS IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 3850828

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 427942
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Arnold BROWN et al., Plaintiffs,
v.
The CITY OF NEW YORK and Jared Fox,
Joseph Gulotta, Ernest Kenner, Evan
Nielson, Patrick Quinlan, Beatrice Shafidiya,
George Tavares, Philip Williams, Frederick
Vanpelt, and Does 12–14, individually and
in their official capacities, Defendants.

No. 14 Civ. 2700(BMC).
|
Signed Feb. 2, 2015.

**Attorneys and Law Firms**

Bryant Cherry-Woode, Matthew Scott Porges, Law Office of Matthew S. Porges, Esq., Brooklyn, NY, for Plaintiffs.

Matthew W. McQueen, Tobias Eli Zimmerman, New York City Law Department, New York, NY, for Defendants.

### *MEMORANDUM OPINION*

COGAN, District Judge.

**\*1** Plaintiffs bring this action, pursuant to 42 U.S.C. § 1983, claiming violations of their constitutional rights resulting from police searches of a house in Brooklyn (the "Premises"). Plaintiffs also allege a *Monell* claim and related state law claims. This opinion sets forth the basis for the Court's Order, dated December 31, 2014, granting defendants' motion for summary judgment and denying plaintiffs' motion for partial summary judgment.

### BACKGROUND

The following facts are not in dispute. On January 30, 2013, a man was shot on Chauncey Street in Brooklyn. After receiving a radio call about the shooting at around 1 p.m., police officers from Brooklyn's 73rd Precinct, a few of whom are defendants, responded to the scene. Upon

their arrival, the officers learned from several witnesses that the shooter ran into the Premises, a three story residential building where all plaintiffs were either residing or visiting that day. Defendant Sergeant Shafidiya relayed this message to defendant Deputy Inspector Gulotta, the commanding officer of the 73rd Precinct, who was not yet on scene. Deputy Inspector Gulotta ordered the establishment of a perimeter around the Premises to ensure that nobody entered or left. An Emergency Services Unit ("ESU") team was brought in to search the Premises for the shooter.

Prior to the ESU's initial search, one precinct member, defendant Officer Van Pelt, was assigned to conduct surveillance on a rooftop near the Premises. Before he went up on the roof, another officer stationed in the park behind the Premises reported to him that an unidentified witness said that someone jumped over the back fence of the Premises. Officer Van Pelt reported this information to defendant Sergeant Tavares.

Once the ESU arrived, they conducted a "perp search", which consisted of a floor-by-floor search of the rooms, to locate and detain the shooter. All occupants (including plaintiffs) were asked to leave the Premises and were detained for a period of time. Plaintiffs Brown and Farrier both resided at the Premises, but were not home at the time of the search.

Defendants temporarily detained all plaintiffs. Although plaintiffs Chambers and Dawkins saw and heard the police escorting people out of the Premises, they returned to Chambers' room and closed the door. When the officers entered Chambers' room, both Chambers and Dawkins were seated. Chambers jumped from his chair, which was within arms' reach of the officer. The officer knocked Chambers down with his shield, hitting Chambers' left wrist. Plaintiff Dawkins also stood from his seat, and was knocked to the floor by an officer's shield. Dawkins suffered a cut to his lip.

While exiting the basement of the Premises, plaintiff Martins was pushed down and bent over in order to be handcuffed. He suffered no physical injuries. Defendants encountered plaintiff Arnon while he was exiting the basement. He informed the police that he was in possession of a phone and a knife. As he was removing an item from his pocket — his phone — police slapped it out of his hand. Plaintiff Arnon suffered no physical injuries.

**\*2** The initial "perp search" did not reveal the shooter. However, ESU officers observed contraband during their search and conveyed this information to Deputy Inspector Gulotta. Once the "perp search" concluded, control of the Premises was given to the 73rd Precinct.

After the ESU departed, and within 30 minutes after the initial sweep, officers from the Precinct conducted a "secondary search" of the Premises to make sure that the shooter was not still inside and to protect the Precinct officers instructed to remain at the Premises while a warrant was being obtained. During this sweep officers observed marijuana in the basement and three rooms on the first floor of the Premises. In addition, they observed a firearm in a basement hall closet accessible to all occupants. Rather than seize the contraband, Deputy Inspector Gulotta instructed the officers to leave it and continue sweeping the Premises for additional occupants.

Once it was determined that nobody remained in the building, defendants Sergeant Tavares and Officer Fox went to the District Attorney's office to secure a search warrant for the Premises based on the presence of the contraband. A warrant was obtained at approximately 11:15 p.m. and was executed at 11:50 p.m. The contraband was collected during this search.

All plaintiffs except Brown, Farrier, and Evony Howard were brought to the Precinct for questioning. Plaintiffs Lespierre, Arnon, Martins, Adam Howard, and Myles were arrested in connection with the seized contraband. Only plaintiffs Lespierre and Arnon were charged, but the charges were eventually dismissed or adjourned in contemplation of dismissal. The remaining plaintiffs were released without charge.

### DISCUSSION

#### I

Summary judgment is appropriate where there are no genuine disputes of material fact, such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). No genuine factual issue exists when the moving party demonstrates, on the basis of the pleadings and admissible evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no reasonable jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 86 (2d Cir.1996). A party may not defeat a motion for summary judgment by relying on unsupported assertions, conjecture, or surmise. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

#### II

The Fourth Amendment generally prohibits warrantless entry into a person's home. *See Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). However, "[i]t is well settled ... that the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay." *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990). More specifically, the Fourth Amendment does not require police officers to delay their investigation if doing so "would gravely endanger the lives or the lives of others." *Warden v. Hayden,* 387 U.S. 294, 298 99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967). Therefore, "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 2459, 153 L.Ed.2d 599 (2002). Where, as here, the facts are undisputed, the presence or absence of exigent circumstances presents a legal issue. *See e.g., Anthony v. City of New York,* 339 F.3d 129, 136 (2d Cir.2003).

**\*3** "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." *MacDonald,* 916 F.2d at 769 (internal quotation marks omitted). This is an "objective test" that "turns on [an] ... examination of the totality of the circumstances confronting law enforcement agents in the particular case." *Id.* Courts in this Circuit generally analyze six factors from *Dorman v. United States,* 435 F.2d 385, 391 (D.C.Cir.1970), to help determine whether exigent circumstances are present:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

See also *Harris v. O'Hare,* 770 F.3d 224, 234 (2d Cir.2014).

With respect to the initial search conducted by the ESU, it is undisputed that police responded to a report of a shooting, an undeniably serious offense by an armed perpetrator still at large. Police then learned that the shooter ran into the Premises. These circumstances are sufficient to constitute probable cause to search the Premises. See *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003).

It was also reasonable for defendants to believe that there was an urgent need to search the Premises for the shooter. The police cannot be expected to take the time to obtain a warrant when a suspect in possession of a gun, who has already shot one person, is believed to be in a house. This was an active shooter incident. The need to protect both the public and the police officers who were giving chase constituted exigent circumstances sufficient to support the ESU's initial sweep of the Premises. See *Maryland v. Buie,* 494 U.S. 325, 334 36, 110 S.Ct. 1093, 1098 99, 108 L.Ed.2d 276 (1990) (upholding the propriety of a "protective sweep" to look for "individuals posing a danger to those on the arrest scene").

Nor did the unsubstantiated statement from a bystander dissipate these exigent circumstances. Again, this was an active shooter situation. Even if the witness was telling the truth, which there was no way for the police to know at that moment, there is no evidence that the "somebody" who allegedly jumped the fence was the shooter. See *United States v. Oguns,* 921 F.2d 442, 446 47 (2d Cir.1990)

(upholding a security sweep of a suspect's apartment incident to his lawful arrest even where police were told that the suspect's brother was not in the apartment because the police "still could have reasonably believed that others were in the apartment"). The police did not have to make that call with the potential of lives at stake.

**\*4** The closer question is whether the exigent circumstances dissipated after the first unsuccessful sweep. Plaintiffs argue that since the ESU team had not found the shooter, there was no basis for performing a subsequent sweep without a warrant.

I think the undisputed facts compel the opposite conclusion. A shooter was still at large and had been seen going into the Premises. This means that the exigency continued for a reasonable time necessary to obtain assurance that the shooter was not in the Premises. See *Bing v. City of Whitehall,* 456 F.3d 555, 565 (6th Cir.2006). The level of assurance required to dissipate the exigent circumstances was high because the police were trying to apprehend a suspect who had just shot someone.

Importantly, the Premises were a three-story building with multiple tenants. This meant there were multiple hiding places, and a risk that the ESU had missed the shooter a risk with significant safety consequences because Precinct officers were instructed to remain at the Premises and guard it while a warrant was being obtained. Moreover, although the record is not precise as to the timing between the ESU sweep and the Precinct sweep, it is fair to conclude that no more than 30 minutes passed between the completion of the ESU sweep and the Precinct sweep. (The first search began at about 2 p.m. and concluded at 3:30 p.m. It is a bit hazy when the second search began, but the Precinct "secured" the building at 3:55 p.m.) See *United States v. Cruz,* No. 11 Cr. 377, 2012 WL 1564667, at \*2 (N.D.Ga. Apr.30, 2012) (upholding a second sweep of a house where exigent circumstances existed because a shooting suspect was not found during the initial sweep, and police had reason to believe the suspect was still in the house and was a safety threat). In practical terms, the Precinct sweep was effectively a continuation of the ESU sweep and was conducted to ensure the safety of the officers. *Cf. United States v. Sinclair,* No. 10 Cr. 6211, 2012 WL 5389729 (W.D.N.Y. Nov.2, 2012) (finding secondary sweep was essentially a continuation of the initial sweep).

The Precinct's final search was also constitutional because it was conducted pursuant to a valid warrant. During the initial two sweeps, conducted during the exigency, defendants observed contraband, which included marijuana and a firearm, in plain view, as it was found on the first floor and in a basement closet, all locations where the shooter might have been hiding. There is no evidence that these initial searches were anything other than "protective sweeps". Once defendants saw the contraband in commonly accessible locations, they had probable cause to request a search warrant. *See United States v. Klump,* 536 F.3d 113, 118 (2d Cir.2008). The evidence seized during this search was pursuant to a valid warrant, and therefore reasonable.

### III

To state a claim for false arrest/false imprisonment under either New York or federal law, a plaintiff must show "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino,* 331 F.3d at 75; *see also Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (a § 1983 claim for false arrest premised on the Fourth Amendment is "substantially the same as a claim for false arrest under New York law"). The existence of probable cause is a complete defense to an action for false arrest. *See Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994).

**\*5** Based upon my conclusion that both the ESU sweep and the Precinct sweep were permissible under the exigent circumstances exception, it follows necessarily that plaintiffs' temporary detentions during these sweeps were not unreasonable because they were incident to a lawful search. *See Muehler v. Mena,* 544 U.S. 93, 98, 125 S.Ct. 1465, 1470, 161 L.Ed.2d 299 (2005). In fact, plaintiffs do not dispute that their detentions were justified. Instead, they appear to take issue with the fact that they were detained even after the ESU's initial search. However, the exigent circumstances presented here gave defendants the authority to detain plaintiffs for a longer period in order to prevent further violence. *Id.* at 100, 1471 (ruling that an occupant's detention for two to three hours while a search was in progress was not unreasonable).

1    All plaintiffs bring this claim except Brown and Farrier.

Probable cause existed to arrest all occupants inside the Premises, including plaintiffs, because defendants found contraband in plain view during the first and second sweeps and in areas accessible to all occupants. Under the doctrine of constructive possession, probable cause existed to arrest all plaintiffs because each of them had access to the basement closet that housed the rifle. *See United States v. Zaleski,* 686 F.3d 90, 93 (2d Cir.2012). In addition, separate bases for probable cause existed for plaintiffs Lespierre, Arnon, Martins, Adam Howard, and Myles, because contraband was found in their living quarters during the searches.

### IV

Excessive force claims are governed by an objective "reasonableness inquiry that asks "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 396 97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Moreover, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396, 1872 (internal citations omitted). Because defendants were trying to locate a fleeing shooter in a three-story residential building, the force they applied to plaintiffs in this case was reasonable and *de minimis.* [2] *See United States v. Walsh,* 194 F.3d 37, 49 50 (2d Cir.1999) (explaining that *de minimis* use of force will typically not amount to a constitutional violation).

2    Defendants' use of force in knocking plaintiff Arnon's cell phone out of his hand was also reasonable, particularly because he told defendants that he was in possession of a knife.

Plaintiffs have offered no evidence of any injuries that they suffered. Plaintiffs Martins and Arnon concede that they suffered no physical injuries, and the injuries alleged in the complaint, Chambers' bruised wrist and Dawkins' cut lip, qualify as *de minimis. See Lemmo v. McKoy,* No. 08 Civ. 4264, 2011 WL 843974, at \*5 (E.D.N.Y. Mar.8, 2011) ("Injuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing,

claims of minor discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth.") (internal citations omitted). The excessive force claims brought by plaintiffs Chambers, Dawkins, Martins, and Arnon fail because no reasonable jury could find that the amount of force used was excessive and because any injuries they suffered were *de minimis.*

 **\*6** Some of the plaintiffs raise an additional point concerning their treatment by the police during this detention. Specifically, they claim that they were not allowed to obtain proper clothing during their detention. For example, plaintiff Chambers alleges that he was forced to wait outside without shoes. These claims do not rise to the level of constitutional violations. *See, e.g., Dawson v. City of Seattle,* 435 F.3d 1054, 1069 70 (9th Cir.2006) (finding plaintiffs' detentions incident to a lawful search to be constitutionally permissible even where a plaintiff was forced to wait without shoes on a patio containing broken glass).

### V

Qualified immunity "shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Bradway v. Gonzales,* 26 F.3d 313, 317 18 (2d Cir.1994) (internal citations omitted). This standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

As suggested above, the only close issue as to the violation of plaintiffs' constitutional rights is whether the completion of the first sweep by the ESU made a second sweep, conducted shortly thereafter, constitutionally impermissible. There is no authority in this Circuit as to when a secondary sweep is permissible. The continuation of exigent circumstances is, by its nature, a judgment call. Here, where the shooter had not been located, the invocation of qualified immunity is appropriate to avoid second guessing the police officers on the scene who had the responsibility of ensuring that no one else got shot.

### VI

Since there were no unconstitutional actions by the City's employees, plaintiffs' *Monell* claim must be dismissed. *See Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006). For the same reason, plaintiffs' state law claims must be dismissed. *See Shapiro v. Kronfeld,* No. 00 Civ. 6286, 2004 WL 2698889, at \*24 (S.D.N.Y. Nov.24, 2004) (holding that there can be "no imposition of vicarious liability in the absence of underlying liability").

### CONCLUSION

Based on the Court's Order of December 31, 2014 and this Memorandum Opinion, the Clerk is directed to enter judgment in favor of defendants, dismissing the complaint.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 427942

---

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3357171
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Shawn D. THOMAS, Plaintiff,

v.

WESTCHESTER COUNTY, Correct Care
Solutions LLC, Westchester County Correctional
Officer VAL # 1439, Individually and in his
Official Capacity, Dr. Paul Adler, Individually
and in his Official Capacity, and New York
Correct Care Solutions P.C., Defendants.

No. 12–CV–6718 (CS).
|
July 3, 2013.

**Attorneys and Law Firms**

Shawn D. Thomas, pro se.

James C. Freeman, Kent Hazzard, LLP, White Plains,
NY, for Defendants Correct Care Solutions LLC, New
York Correct Care Solutions P.C., and Dr. Paul Adler.

***OPINION AND ORDER***

SEIBEL, District Judge.

**\*1** Before the Court is the Motion to Dismiss of
Defendants Correct Care Solutions LLC ("CCS"), New
York Correct Care Solutions P.C. ("NYCCS"), and
Dr. Paul Adler pursuant to Federal Rule of Civil
Procedure 12(b)(6). (Doc. 16.) For the following reasons,
Defendants' Motion is GRANTED.

**I. Background**
For the purposes of the present Motion, the Court accepts
as true the facts (but not the conclusions) stated in
Plaintiff's Amended Complaint ("AC"), (Doc. 8).

Plaintiff was incarcerated at the Westchester County Jail
("WCJ") in Valhalla, New York on August 9, 2011, (AC
3.1), at which time he had an open wound in his ankle
from a shooting at close range in April 2010,[2] which
required daily bandage changing to prevent infection, (*id.*

Exs. 4, 20). Prior to his incarceration, Plaintiff had twelve
surgeries on his ankle, faced "life threatening" infections
in his wound, and developed a chronic need for pain
medication. (*Id.* Ex. 20.)

[1]     Page 3.1 refers to the first of the three pages of the
        AC's "Facts section.

[2]     Plaintiff alleges that he told the nurse at his medical
        screening on August 10, 2011, that he had been shot
        in the heel two months previously, (AC 3.1), but the
        exhibits he attaches to the AC including medical
        records from North Bronx Healthcare Network, (*id.*
        Exs. 5, 6), and Plaintiff's own statement, (*id.* Ex. 20)
        make clear that the shooting occurred approximately
        fifteen months before his incarceration.

At his initial medical screening, Plaintiff informed the
nurse that he was taking ten milligrams of Percocet
three times daily, which was effective for his "severe
pain." (*Id.* at 3.1.) The nurse responded that "we only give
[M]otrin or [T]ylenol," and put Plaintiff on the list to see
a doctor. (*Id.*) Plaintiff subsequently met with Dr. Paul
Adler,[3] who refused to prescribe him stronger medication
despite Plaintiff's assertion that Motrin was ineffective
in alleviating his pain; Dr. Adler allegedly stated that,
"[T]his department is cheap they'LL [*sic* ] just prolong
so it becomes someone else's problem sorry." (*Id.* at 3.1
3.2.) In response to Plaintiff's concern about the effect
of taking extended doses of Motrin, Dr. Adler explained
that switching between Tylenol and Motrin would avoid
any liver damage. (*Id.* at 3.2.) Plaintiff further informed
Dr. Adler that his injury required at least daily cleaning,
and he alleges that CCS failed to clean the wound on
"numerous occasions," "causing ... an infection which
is now a[n] ulcer on [his] right ankle heel injury." (*Id.*)
Plaintiff also specifically alleges that two nurses refused to
change his bandages on January 3, 2012. (*Id.* Ex. 4.)

[3]     Plaintiff states in his reply brief that Dr. Adler was
        removed as medical director at WCJ for drinking
        alcohol on the job and bringing contraband into
        the facility. (*See* Plaintiff 'Js Memorandum of Law
        in Opposition to Defendant s'] Motion to Dismiss,
        (Doc. 21), 8.) This allegation is not contained in the
        AC, but even if it were, it is unsupported by facts and,
        in any event, irrelevant.

On August 21, 2011, Plaintiff alleges that he suffered
further injury to his ankle when a corrections officer closed
a door on him. (*Id.* at 3.2.) He immediately requested

medical attention but did not receive it until thirty minutes later, whereupon he was given Motrin and was scheduled for an X-ray with an outside provider. (*Id.; see id.* Exs. 3, 15.) On August 23, 26, and 29, 2011, Plaintiff received X-rays of his foot, which revealed a previous fracture of the heel bone in the process of healing. (*Id.* Exs. 10, 12, 13.) Plaintiff alleges that he did not receive the X-rays of his chest, lower back, and lower neck that he requested following the door incident. (*Id.* Ex. 18.) Plaintiff also received two orthotic shoes on August 23, 2011, (*id.* Ex. 2), but he alleges that he has not yet received the physical therapy that he requires for his injury, (*id.* at 3.3.)

**\*2** Plaintiff brings a claim against CCS, NYCCS, and Dr. Adler under 42 U.S.C. § 1983 for deliberate indifference to his medical needs, as well as a *Monell* claim against CCS and NYCCS for engaging in a pattern or practice of constitutional violations. (*See id.* at 3.3.)

## II. *Legal Standard*

### A. *Motion to Dismiss*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929).[4] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 678–79.

---

[4]    Defendants erroneously cite to a case that relies on the antiquated "no set of facts" pleading standard articulated in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *overruled by Twombly,* 550 U.S. at 563. (Defendant's *sic* ] Memorandum

of Law in Support of Motion to Dismiss Plaintiff's Amended Complaint ("Ds' Mem. ), (Doc. 18), 4.) As the Supreme Court stated in *Twombly,* the "no set of facts standard "has earned its retirement .... and] is best forgotten as an incomplete, negative gloss on an accepted pleading standard.... In the future, Defendants should cite the current legal standard for evaluating Rule 12(b)(6) motions set forth in *Twombly* and *Iqbal.* Indeed, given that the correct standard is more favorable to Defendants than the *Conley* standard, defense counsel's reference to the old standard is baffling.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'shown' 'that the pleader is entitled to relief.' " *Id.* (alteration omitted) (quoting Fed.R.Civ.P. 8(a)(2)).

*Pro se* complaints are held to less stringent standards than those drafted by lawyers, even following *Twombly* and *Iqbal. See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). But while pleadings of a *pro se* party should be read " 'to raise the strongest arguments that they suggest,' " *Kevilly v. New York,* 410 F. App'x 371, 374 (2d Cir.2010) (summary order) (quoting *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006)), dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements, *see Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997); *accord Honig v. Bloomberg,* No. 08 CV 541, 2008 WL 8181103, at \*4 (S.D.N.Y. Dec.8, 2008), *aff'd,* 334 F. App'x 452 (2d Cir.2009).[5]

---

[5]    Copies of all unpublished decisions cited herein will be sent to the *pro se* Plaintiff, along with a copy of this Opinion and Order.

### B. *Documents Considered on a Motion to Dismiss*

**\*3** When deciding a motion to dismiss, the Court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007); *see Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). There are limited circumstances, however, when it is appropriate for a court to consider documents outside of the complaint on a motion to dismiss. *See Weiss v. Inc. Vill. of Sag Harbor,* 762 F.Supp.2d 560, 567 (E.D.N.Y.2011) (court may properly consider documents "integral" to complaint, documents relied upon in drafting complaint, public documents, and facts of which judicial notice may be taken). When matters outside the pleadings that do not fall into these limited categories are included in a response to a 12(b)(6) motion, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material." *Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d Cir.2000) (internal quotation marks omitted).

Here, Defendants submitted the Affidavit of Paul Adler, D.O., (Freeman Decl. Ex. C),[6] with their motion papers, stating only that extrinsic documents that are integral to Plaintiff's claims may be considered on a Rule 12(b)(6) motion. (Ds' Mem. 5 (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 48 (2d Cir.1991).) This is a correct statement of the law, but it has no application to the Adler Affidavit a factual affidavit based on Adler's personal knowledge which is not integral to Plaintiff's claims. *See Bill Diodato Photography LLC v. Avon Prods., Inc.,* No. 12 CV 847, 2012 WL 4335164, at \*3 (S.D.N.Y. Sept. 21, 2012) (document considered "integral" where plaintiff has "(1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint.") (internal quotation marks omitted). I thus cannot consider the facts contained in the Adler Affidavit without converting the instant Motion to one for summary judgment,[7] *see Friedl,* 210 F.3d at 83, which I decline to do .[8] Accordingly, I will consider only the factual allegations in Plaintiff's AC and the exhibits attached thereto in assessing the plausibility of his claims.

[6] "Freeman Decl. refers to the Declaration of James C. Freeman. (Doc. 17.)

[7] Local Rule 12.1 requires that a represented party moving to dismiss a *pro se* complaint under Rules 12(b) or 12(c) provide notice to the *pro se* litigant if the represented party refers to matters outside of the pleadings in its motion, thus making it possible that the Court could convert the motion to one for summary judgment. As far as the Court can tell, defense counsel did not comply with this rule and failed to provide Plaintiff with the required notice set forth in the text of Local Rule 12.1.

[8] Defendants also include in the statement of facts in their Memorandum of Law, (*see* Ds' Mem. 2 4), numerous "facts for which they provide no citation but which apparently come from medical records not provided to the Court (or, presumably, to Plaintiff). Even if I could consider facts outside the AC on a motion to dismiss, which I cannot, I would have to disregard sourceless "facts provided only in a memorandum of law. *See Kulhawik v. Holder,* 571 F.3d 296, 298 (2d Cir.2009) ("An attorney's unsworn statements in a brief are not evidence. ).

## III. *Discussion*

### A. *Deliberate Indifference*

"A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care ... arises from the Eighth Amendment's prohibition of cruel and unusual punishment." *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (internal quotation marks omitted). While prison officials must ensure that prisoners[9] receive adequate medical care, *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), "not every lapse in medical care is a constitutional wrong," *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "Rather, a prison official violates the Eighth Amendment only when two requirements one objective and one subjective "are met." *Id.* (internal quotation marks omitted).

[9] The AC does not state whether Plaintiff is a pre trial detainee or a convicted prisoner. I may take judicial notice, however, of the fact that Plaintiff was a federal pre trial detainee at the relevant times. (Indeed, his criminal case is assigned to me. *See United States v. Hardy,* No. 11 CR 629 (CS) (S.D.N.Y. filed Aug. 2, 2011).) Although a deliberate indifference claim must be brought under different constitutional provisions depending on the Plaintiff's status the Eighth Amendment for convicted prisoners and

the Fourteenth Amendment for pre trial detainees the standard for evaluating claims of deliberate indifference is the same under both amendments. *See Caiozzo,* 581 F.3d at 69.

### 1. Objective Prong

**\*4** To satisfy the objective requirement, Plaintiff must allege that he was "actually deprived of adequate medical care," *id.* ("[T]he prison official's duty is only to provide reasonable care."), and "that the alleged deprivation of medical treatment [wa]s ... sufficiently serious   that is, the prisoner must prove that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain," *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks omitted); *see Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) ("The standard for Eighth Amendment violations contemplates a condition of urgency that may result in degeneration or extreme pain .") (internal quotation marks omitted). The inquiry is "fact-specific" and "must be tailored to the specific circumstances of each case." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003). Relevant factors include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (quoting *Chance,* 143 F.3d at 702).

Where the inadequacy alleged is the medical treatment given, "the seriousness inquiry is narrower.... [I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Goris v. Breslin,* 402 F. App'x 582, 584 85 (2d Cir.2010) (summary order) (internal quotation marks omitted); *see Smith,* 316 F.3d at 186 87 (among other things, court must look at reasons for and effect of delay in treatment); *Ferguson v. Cai,* No. 11 CV 6181, 2012 WL 2865474, at \*4 (S.D.N.Y. July 12, 2012) ("Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness.").

Plaintiff does not allege that Defendants failed to provide any medical treatment. Indeed, Plaintiff's AC details the ongoing medical treatment that he received at WCJ, including over-the-counter medication for his chronic pain, (AC 3.1 3.2), orthotic shoes, (*id.* Ex. 2), and visits to outside providers for X-rays, (*id.* Exs. 10, 12, 13). Plaintiff alleges that interruptions in his treatment   specifically, Defendants' failure to consistently change his bandages   exacerbated his condition and resulted in an infection and ulcer in the open wound on his foot. "[T]he failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment." *Smith,* 316 F.3d at 186; *accord Chance,* 143 F.3d at 702 ("[I]f prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment."); *Odom v. Kerns,* No. 99 CV 10668, 2008 WL 2463890, at \*7 (S.D.N.Y. June 18, 2008) (cuts and open wounds that eventually became infected could be serious medical needs, even absent allegations that plaintiff had chronic pain or inhibition of daily activities); *cf. Brock,* 315 F.3d at 163 64 (failure to properly treat a painful scar, which "d[id] not present a risk of serious harm as would an infected wound," was sufficiently serious). Moreover, Plaintiff alleges that the chronic pain resulting from his ankle injury and open wound also constitutes a serious medical condition, and courts have held that injuries causing chronic and extreme pain can be sufficiently serious. *See Johnson,* 412 F.3d at 403; *Chance,* 143 F.3d at 702. Accordingly, Plaintiff's assertions of an infection in his open wound and chronic pain from his ankle injury plausibly allege sufficiently serious medical conditions. [10]

[10]   To the extent that Plaintiff asserts that he experienced pain from the door incident affecting his chest, lower back, and neck, (*see* AC Ex. 18 " [O]fficer Val # 1439 closed me up between the sliding doors which causes severe pain to my foot, chest, lower back, and lower neck. And I only receive the x ray for my foot. )), Plaintiff appears only to allege pain in these areas resulting from this specific incident particularly as the AC and its numerous attachments contain no other allegations of chest, back, or neck pain   and not the kind of chronic pain courts have found sufficient to allege a serious medical condition. *See Walker v. Dep t of Corr. Serv.,* No. 11 CV 993, 2012 WL 527210, at \*1 (S.D.N.Y. Feb.14, 2012) ("A

determination of whether an incident is sufficiently serious to invoke the Eighth Amendment requires the Court to assess the duration of the condition and the potential for serious physical harm. Where a medical need is at issue, an Eighth Amendment violation may be sustained only where plaintiff proves that it was a condition of urgency, one that may produce death, degeneration, or extreme pain. ) (citation and internal quotation marks omitted).

2. *Subjective Prong*

**\*5** The subjective component requires that the prison official acted with a "sufficiently culpable state of mind." *Salahuddin,* 467 F.3d at 280. Specifically,

> [a] prison official cannot be found liable ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837. "This 'deliberate indifference' element is equivalent to the familiar standard of 'recklessness' as used in criminal law." *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002) (citing and quoting *Farmer,* 511 U.S. at 839 40).

Although Plaintiff's infection may be a sufficiently serious medical condition, he also "must demonstrate that the defendants acted or failed to act while actually aware of a substantial risk that serious inmate harm would result." *Farid v. Ellen,* 593 F.3d 233, 248 (2d Cir.2010) (alterations and internal quotation marks omitted). Plaintiff has not set forth any facts plausibly showing that any Defendant's occasional failure to change his bandages was accompanied by the requisite state of mind. Indeed, his sole allegations are that he spoke with prison officials and nurses who refused to change his bandages on January 3, 2012, (AC Ex. 4), and that CCS failed to change his bandages on "numerous occasions," (*id.* at 3.2). Even affording Plaintiff the special solicitude due *pro se* litigants, there are simply no facts rendering it plausible that Defendants acted with a

state of mind akin to criminal recklessness. *See Phelps,* 308 F.3d at 186. While not changing Plaintiff's bandages daily may potentially amount to negligence, nothing alleged in the AC makes it plausible that Defendants knew of and consciously disregarded an excessive risk to Plaintiff's health and safety particularly as Plaintiff received ongoing dressing changes and treatment, and admitted to missing clinic visits that may account for some instances when his bandages went unchanged. Accordingly, Plaintiff's allegations are insufficient to state a plausible claim for deliberate indifference. *See Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ( "[A] complaint that a physician has been negligent in ... treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness an act or a failure to act by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm.") (alteration and internal quotation marks omitted).

11    The AC further admits that while " Plaintiff] ha s] a n] order to go to the clinic every day, he missed going to the clinic for several days prior to and on August 27, 2011. (*Id.* Ex. 18.) Nurse's notes dated August 22, 2011 indicate that he was receiving daily bandage changes. (*Id.* Ex. 15.)

Further, Plaintiff's allegation that Motrin and Tylenol were insufficient to alleviate his chronic pain also does not state a plausible claim for deliberate indifference. The law is clear that a "mere disagreement over the proper treatment" is not actionable, *Chance,* 143 F.3d at 703, and courts have found that treating pain with over-the-counter, as opposed to prescription, medication is a disagreement over treatment that does not rise to the level of deliberate indifference, *see, e.g., Hill,* 657 F.3d at 123 (2d Cir.2011) (prescribing Motrin rather than stronger pain medication to treat broken wrist, with no concomitant allegation of "a culpable state of mind," falls short of claim for deliberate indifference); *Reyes v. Gardener,* 93 F. App'x 283, 284 (2d Cir.2004) (holding that alternative medical plan incorporating weaker pain medication to treat inmate was "mere disagreement over the proper treatment") (internal quotation marks omitted); *Rush v. Fischer,* No. 09 CV 9918, 2011 WL

6747392, at *3 (S.D.N.Y. Dec.23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs."). [2]

[12]     Even if Plaintiff had plausibly alleged chronic chest, lower back, and lower neck pain, the failure to X ray these areas at his request is not actionable as it is also a mere disagreement over proper treatment. See *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (allegation of failure to X ray finger "does not rise to the level of a constitutional violation because "disagreements over medications and] diagnostic techniques (*e.g.,* the need for X rays) ... implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment. ). The same is true of Plaintiff's allegation that he has not received the necessary physical therapy for his ankle injury. See *O Diah v. Mawhir,* No. 08 CV 332, 2012 WL 4482579, at *9 (N.D.N.Y. Sept. 5, 2012) (prisoner's allegation that he required physical therapy was disagreement over proper treatment).

**\*6** Dr. Adler's alleged response to Plaintiff's request for stronger pain medication and provision of his outside doctor's contact information "[T]his department is cheap they'LL [*sic* ] just prolong so it becomes someone else's problem sorry," (AC 3.2) does not plausibly indicate that *Dr. Adler* knew of and disregarded an excessive risk to Plaintiff's health or safety, *see Farmer,* 511 U.S. at 837 particularly in light of Plaintiff's receipt of non-prescription pain medication and ongoing medical attention. Although the Second Circuit has held that allegations of personal financial incentive are sufficient to state a claim for deliberate indifference, *see Chance,* 143 F.3d at 704 (claim survived motion to dismiss where two defendants recommended a treatment option "not on the basis of their medical views, but because of monetary incentives," which, if true "would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment"), *Chance* can be distinguished from the case at bar. First, the claim survived under the previous, more lenient standard for evaluating a motion to dismiss whether the plaintiff could prove "no set of facts" that would entitle him to relief, *see Conley,* 355 U.S. at 45 46 and the *Chance* court noted that dismissal of the plaintiff's claim would be inappropriate there even if "[it] [thought] it highly unlikely that [plaintiff] [would] be able to prove his

allegations" of the defendants' ulterior financial motives, *Chance,* 143 F.3d at 704. Further, the allegation that the treating physician personally had a financial incentive in recommending a particular course of treatment and thus was potentially reckless in treating the plaintiff differs substantially from Plaintiff's allegation here that his treating physician stated only that the Department of Corrections (apparently as opposed to himself) was cheap and would rather have Plaintiff be someone else's problem. Finally, the *Chance* plaintiff alleged that there was legitimate disagreement among physicians about how to treat his condition, whereas Plaintiff has failed to allege that any other medical professional questioned Dr. Adler's decision to treat Plaintiff's pain with over-the-counter medication.

For the reasons stated above, Defendants' Motion is granted with respect to Plaintiff's deliberate indifference claim.

*B. Monell Claim*

Absent an underlying constitutional violation, a *Monell* claim cannot lie. *See Bolden v. Cnty. of Sullivan,* No. 11 CV 4337, 2013 WL 1859231, at *2 (2d Cir. May 6, 2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the County defendants' liability under *Monell* was correct."); *Segal v. City of N. Y.,* 459 F.3d 207, 219 (2d Cir.2006) ("*Monell* does not provide a separate cause of action ... it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original). Even if the underlying claims had survived, however, Plaintiff has not plausibly alleged a *Monell* claim against CCS and NYCCS. [3] Plaintiff alleges that CCS failed to change his bandages, but there are no allegations that this failure was the result of a formal policy, a widespread practice, or a failure to properly train or supervise employees. Rather, Plaintiff relies exclusively on an investigation report dated November 19, 2009 [4] issued by the Department of Justice ("Investigation Report") detailing in part "Medical Care Deficiencies" found at WCJ specifically in infection control, dental care, mental health care, and the medical grievance process, [5] (AC Ex. 17, at 19 27), without alleging that CCS, NYCCS, or any of its policymakers were the subject of or privy to the results of the Investigation Report. Neither

CCS nor NYCCS is mentioned in the Investigation Report, (*see id.* Ex. 17); Plaintiff's allegations occurred nearly two years after the Investigation Report was issued; and the medical care policies found deficient at WCJ including inadequate treatment of infectious diseases and lack of dental care, (*id.* Ex. 17, at 19 22) are unlike the deprivation of medical care Plaintiff alleges here. [6] Plaintiff's *Monell* claim is accordingly dismissed.

[13]    I assume without deciding for the purposes of this Motion that *Monell* would apply to private entities providing care to state inmates, such as CCS or NYCCS. *See Bektic Marrero v. Goldberg,* 850 F.Supp.2d 418, 432 33 (S.D.N.Y.2012) (accepting plaintiff's argument that defendant New York Medical College acted under color of state law by virtue of its agreement to administer medical services to inmates at WCJ).

[14]    Defendants argue in their brief that CCS/NYCCS did not become responsible for inmate healthcare until July 26, 2010. (Ds' Mem. 10 .) I must ignore this allegation because it is not in or integral to the AC, and because it appears only in Defendants' Memorandum of Law.

[15]    Although Plaintiff alleges that he was unable to file a grievance at WCJ, (*see* AC Exs. 18 19), the grievance in question relates to his claims against Defendant Officer Val # 1439 arising from the incident in which he was caught in a door and does not implicate NYCCS or CCS, (*see id.* Ex. 3).

[16]    The Investigation Report notes that a medical intake was performed in an open area within the sight and sound of other inmates and WCJ staff. (AC Ex. 17, at 19 n. 22.) Although Plaintiff alleges that his intake was also performed in an open area where anyone could overhear what was said, (*id.* at 3.1), the Investigation Report found that this "appeared to be an isolated incident," and thus does not constitute a custom or practice sufficient to allege a plausible *Monell* claim. Further, while the Court does not condone such a breach of Plaintiff's privacy and the medical staff's professional obligations, it would not meet either the objective or subjective prongs of the deliberate indifference test.

*C. Leave to Amend*

**\*7** Although *pro se* plaintiffs are generally given leave to amend a deficient complaint, *see Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 96 (2d Cir.1999) (per

curiam), a district court may deny leave to amend when amendment would be futile because the problem with the claim "is substantive ... [and] better pleading will not cure it," *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000). While courts should be more lenient when considering a *pro se* party's motion to amend than when considering that of a represented party, *see In re Sims,* 534 F.3d 117, 133 (2d Cir.2008), leave to amend is properly denied where all indications are that the *pro se* plaintiff will be unable to state a valid claim, *see Valle v. Police Dep't Cnty. of Suffolk Cent. Records,* No. 10 CV 2847, 2010 WL 3958432, at \*2 (E.D .N.Y. Oct. 7, 2010). I find that to be the case here, where Plaintiff's AC and its many attachments contain no factual allegations rendering either of his claims plausible. Further, Plaintiff has neither asked to amend again nor otherwise indicated that he is in possession of facts that could cure the deficiencies identified in this Opinion. Thus, because Plaintiff has already had the opportunity to amend his Complaint, and because it appears to the Court that amendment would be futile, I decline to *sua sponte* grant leave to amend again. *See Coleman v. brokersXpress, LLC,* 375 F. App'x 136, 137 (2d Cir.2010) (summary order) (denial of leave to amend affirmed where *pro se* plaintiff had already had opportunity to amend once and made no specific showing as to how he would remedy defects in complaint); *cf. Ariel (UK) Ltd. v. Reuters Grp., PLC,* 277 F. App'x 43, 45 46 (2d Cir.2008) (summary order) (district court did not exceed its discretion in not *sua sponte* granting leave to amend where Plaintiff had already amended complaint once and amendment would have been futile).

\* \* \*

Although I am granting Defendants' Motion to Dismiss, defense counsel should take no pride in his professional performance in this case. He: (1) cited an outdated legal standard that is less favorable to his clients than the applicable standard; (2) submitted an affidavit that cannot be considered on a motion to dismiss; (3) apparently violated Local Rule 12.1 by not providing (as far as the Court can tell) the notice required to be provided to a *pro se* plaintiff when the moving party refers to matters outside of the pleadings on a Rule 12 motion; (4) referred in his Memorandum of Law to "facts" that cannot be found in the record; and (5) apparently violated Local Rule 7.2 by not providing to Plaintiff (as far as the Court can tell) printed copies of cases cited in his

Memorandum of Law that are unreported or reported only on computerized databases.

#### IV. *Conclusion*

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. The Clerk is respectfully directed to terminate the pending Motion, (Doc. 16), and terminate CCS, NYCCS, and Dr. Adler from the case.

**\*8 SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3357171

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Jeffreys v. Ross , S.D.N.Y., July 8, 2003

2002 WL 342620
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Steven SMITH Plaintiff,

v.

Michael FIELDS and Miles Anthony Defendants.

No. 95 CIV. 8374(DAB).
|
March 4, 2002.

**Attorneys and Law Firms**

Steven Smith, Clinton Correctional Facility, Dannemora,
Pro se Plaintiff.

Eliot Spitzer, Attorney General of the State of New York,
New York, Rebecca Ann Durden, Caryn A. Rosencrantz,
Assistant Attorneys General, of Counsel, for Defendants.

MEMORANDUM & ORDER

BATTS, District J.

**\*1** Steven Smith ("Plaintiff"), proceeding *pro se,* brings
this action pursuant to 42 U.S.C. § 1983. Plaintiff
alleges that Michael Fields ("Fields") and Miles Anthony
("Anthony"), (collectively "Defendants"), used excessive
force to effectuate his arrest, in violation of his rights
under the Fourth Amendment of the United States
Constitution. Defendants move for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth herein Defendants'
Motion for Summary Judgment is DENIED in part and
GRANTED in part.

I. BACKGROUND

A. Procedural History
On July 28, 1995, Plaintiff filed a Complaint alleging
violations of his constitutional and civil rights in
connection with his October 17, 1993 arrest. Pursuant
to this Court's Order dated April 30, 1997, this case
was placed on Suspense pending the determination of

Plaintiff's appeal of his criminal conviction to the New
York State Supreme Court, Appellate Division, Second
Department. This appeal was denied, *see People v. Smith,*
665 N.Y.S.2d 675 (N.Y.App.Div.1997), and this Court
restored the above-captioned action to the active calendar
on February 9, 1998.

After the case was restored to the active calendar,
Defendants Michael Fields, Miles Anthony and James
Schepperly filed a motion for judgment on the pleadings
pursuant to Fed.R.Civ.P. 12(c). By order dated October 9,
1998, the Court dismissed all but one of Plaintiff's claims.
*See Smith v. Fields,* No. 95 Civ. 8374, 1998 WL 709815
(S.D.N.Y. Oct. 9, 1998). The sole remaining issue before
the Court in this summary judgment motion is whether
or not the Defendants, through the use of excessive force,
violated the Plaintiff's Fourth Amendment rights.

1
    After the Court's October 9, 1998 Memorandum
    & Order, this Court granted the Defendants'
    request for permission to obtain non Department
    of Correctional Services Medical records from the
    hospital that cared for the Plaintiff immediately
    following his arrest. The Defendants had 30 days
    from the receipt of the records to move for summary
    judgment.

B. Facts
On October 17, 1993, the Defendants, both New York
State Troopers with the Division of State Police, (Pl.'s
56.1 Stmt. ¶ 1; Defs.' 56.1 Stmt. ¶¶ 3-4), received a radio
transmission that an armed robbery had occurred at the
Burger King in Goshen, New York (Defs.' 56.1 ¶ 7). The
suspects, according to the transmission, were two white
males brandishing automatic weapons. (Defs.' 56.1 Stmt.
¶ 8.) One of the suspects bore facial hair. (*Id.*) As the
troopers headed toward the Burger King, they received
another transmission regarding an earlier robbery by two
or three white males that had taken place at a McDonald's
in Liberty, New York, just two exits from the Burger King
mentioned in the first transmission. (Defs.' 56 .1 Stmt. ¶
10).

Plaintiff, his brother, Thomas Smith, and Plaintiff's
brother-in-law, Kevin Vorhes, were pulled over by the
Defendants. The troopers believed that these individuals
were the wanted suspects. (Pl.'s 56.1 Stmt. ¶¶ 5-6; Defs.'
56.1 Stmt. ¶¶ 13, 14). [2] Both troopers approached the
car, Anthony to the passenger's side and Fields to the

driver's side. (Pl.'s 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. ¶ 16). Thomas Smith rolled down the passenger side window. (Pl.'s 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. ¶ ¶ 17). When asked where they were traveling from, Thomas Smith responded "Liberty." (Pl.'s 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. ¶ ¶ 17-8). Trooper Anthony noticed the pistol grip of a shotgun lying along Thomas Smith's leg, took a few steps away from the car and yelled "Gun." (Pl.'s 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. ¶ 19). Trooper Fields ran back towards the rear of the car. (Pl.'s 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. ¶ 20). According to the Defendants, Thomas Smith brandished the shotgun and pointed it out the window at Trooper Anthony. (Pl.'s 56.1 Stmt. ¶ 8; Defs.' 56.1 Stmt. ¶ 21). [3] With the gun brandished and the car rolling forward, Thomas Smith screamed at the driver "Go, Go, Go". (Defs.' 56.1 Stmt. ¶ 22). Defendants then discharged their weapons, aiming at Thomas Smith. (Pl.'s 56.1 Stmt. ¶ 8; Defs.' 56.1 Stmt. ¶ 22). Bullets shattered the rear window of the car, (Second Am. Compl. ¶ ¶ 19, 20; Def.'s 56.1 Stmt. ¶ 30), striking both Thomas Smith and Kevin Vorhes. (Defs.' 56.1 Stmt. ¶ ¶ 26-7). Thomas Smith died from the gunshot wounds he sustained in the incident. (Pl.'s 56.1 Stmt. ¶ 13; Defs.' 56.1 Stmt. ¶ 27). Plaintiff, who was lying on the back seat of the car the whole time, sustained multiple abrasions and puncture wounds to his back from the shattered glass. (Pl.'s 56.1 Stmt. ¶ ¶ 9, 13-14; Defs.' 56.1 Stmt. ¶ ¶ 23, 30).

[2]    Although Judge Thomas J. Byrne in a pre trial suppression hearing acknowledged that the officers lacked probable cause for the initial stop, the court found that whatever taint resulted from the lack of probable cause was removed by subsequent actions taken by Thomas Smith. (Pl.'s 56.1 Stmt. Ex. A, Decision and Order of Judge Byrne dated July 12, 1994 at 3 4). Specifically, the court's findings of fact included the finding that " t]he troopers observed Thomas Smith, the front seat passenger ,] grab the weapon, bring it upward and point it out the passenger window,  and that " Thomas Smith] was ordered to drop the weapon.  (*Id.* Ex. A at 3 4). Based upon these findings, the state court denied the Plaintiff's suppression motion. On Appeal, the Appellate Division affirmed and found that the brandishing of the gun coupled with the imperative to "go, go, go  established the probable cause necessary for the arrest of the car's occupants thereby removing any possible taint of the prior police conduct. *Smith,* 665 N.Y.S.2d at 676.

[3]    Plaintiff disputes the Defendants' assertion that Thomas Smith brandished the gun. (Pl.'s 56.1 Stmt.

¶ 7). Plaintiff, however, is estopped from contesting this issue of fact. The doctrine of collateral estoppel prevents a party from relitigating an issue of fact or law that has been decided in an earlier action. *Metromedia Co. v. Fugazy,* 983 F.2d 350 (2d Cir.1992); *see also Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir.2000) (stating that the doctrine applies whether or not the tribunals or causes of action are the same). Under New York law two requirements must first be satisfied before the doctrine may be applied (1) there must be an identity of issues which were necessarily decided in the prior action and (2) the party precluded from litigating the issue must have had a full and fair opportunity to contest the prior determination. *See Schwartz v. Pub. Adm r of Bronx,* 298 N.Y.S.2d 955, 960 (1969). In this case, the requirements for the application of collateral estoppel have been satisfied. In Plaintiff's own suppression hearing and on appeal from his conviction, both the trial court and the Appellate Division found that Thomas Smith brandished the gun and this finding was necessary to each court's decision on the suppression issue.

 **\*2** The parties dispute what happened after the shooting ceased. The Defendants claim that Plaintiff leapt from the car and landed at Trooper Anthony's feet where Anthony then dropped a knee on the Plaintiff's back and placed the Plaintiff in handcuffs. (Defs.' 56.1 Stmt. ¶ ¶ 24-5). Plaintiff, however, alleges that Trooper Anthony dragged the Plaintiff out of the car, threw him to the ground, placed a knee on his back, put a gun to his head and told Plaintiff "I should F cking kill you right here." (Pl.'s 56.1 Stmt. ¶ 10). After Plaintiff was handcuffed Plaintiff asserts that Trooper Anthony repeatedly slapped and kicked him about the face and head. (Pl.'s 56.1 Stmt. ¶ 10.)

Later that morning, Plaintiff was admitted to Arden Hill Hospital where he was diagnosed and treated for abrasions and where small pieces of glass were removed from his back. (Defs.' 56.1 Stmt. ¶ 28). Plaintiff states that he suffered trauma and pain from a gun shot wound [4] and that after his initial hospital visit on October 17, 1993, he was treated for emotional and psychological trauma. (Pl .'s 56.1 Stmt. ¶ 14, Ex. C (indicating that Plaintiff was treated for depression)).

[4]    There is no evidence in the record nor even an assertion in the Plaintiff's Second Amended Complaint that he was hit by a bullet from a trooper's gun. (Second Am. Compl. ¶ 19). Any such assertion

at this stage of the litigation is so incredible and implausible that it shall not be credited by this Court.

Orange County and Sullivan County successfully prosecuted Plaintiff for robbery and other offenses related to the events of October 17, 1993. On January 9, 1997, the New York State Supreme Court, Appellate Division, Third Department affirmed the Plaintiff's Sullivan County judgment of conviction. *See People v. Smith,* 652 N.Y.S.2d 343 (N.Y.App.Div.1997). The New York State Supreme Court, Appellate Division, Second Department denied Plaintiff's appeal with respect to his Orange County criminal conviction on November 24, 1997. *People v. Smith,* 665 N.Y.S.2d 675, 676 (N.Y.App.Div.1997).

## II. DISCUSSION

A. Summary Judgment Standard

The principles applicable to summary judgment are familiar and well-settled. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *Corselli v. Coughlin,* 842 F.2d 23 (2d Cir.1988). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

As a general rule, ambiguities and inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party. *See Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9,11 (2d Cir.1986); *see also LaFond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991); *see also Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir2001).

**\*3** Further, in a *pro se* case, the Court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see also Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest.") Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *See Showers v. Eastmond,* No. 00 Civ. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001).

B. Section 1983 Claims

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ...." 42 U.S.C. § 1983. Section 1983 however, does not grant substantive rights. *Albright v. Oliver,* 510 U.S. 266, 271 (1994). Rather, Section 1983 works as a vehicle to enforce federal rights conferred elsewhere. *Id.*

1. Excessive Force

The Fourth Amendment's prohibition against the use of excessive force in the course of an arrest was established by the Supreme Court in *Graham v. Connor,* 490 U.S. 386, 394-95 (1989). To comport with the Fourth Amendment when effectuating an arrest, an officer's use of force must be objectively reasonable in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation. *Id.* at 397. In determining whether the force used during an arrest is reasonable, the court should consider how a reasonable officer facing the same circumstance would have acted in response. *Id.* at 396. In addition, the court must recognize that "[n]ot every push or shove ... violates the Fourth Amendment." *Id.* at 396 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)) (internal quotation omitted). This objective reasonableness standard is applied using a totality of the circumstances approach that includes an examination of the severity of the crime at issue, the immediate threat the suspect poses to the officer and others, and

whether the suspect is resisting arrest or attempting to flee. *Graham,* 490 U .S. at 396; *see also Sullivan,* 225 F.3d 161, 165 (excessive force "subject to an objective test of reasonableness under the totality of the circumstances"). Courts must consider the specific facts in each case and balance these facts against the suspect's Fourth Amendment rights. *Graham,* 490 U.S. at 396. Thus, to prevail on a motion for summary judgment in an excessive force case, the evidence must show that "no rational jury could [find] that the force used was so excessive that no reasonable officer would have made the same choice." *Lennon v. Miller,* 66 F.3d 416, 426 (2d Cir.1995).

**\*4** As an initial matter, the Court notes that *Heck v. Humphrey,* 512 U.S. 477 (1994), does not require the dismissal of Plaintiff's excessive force claim. The Supreme Court's decision in *Heck* bars certain § 1983 suits. In particular, *Heck* bars those suits or claims where a plaintiff seeks "to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless the § 1983 plaintiff can demonstrate that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus ...." *Heck,* 512 U.S. at 486-87. *Heck,* however, does not require dismissal of any claim whose adjudication in favor of the plaintiff would not necessarily invalidate his conviction or sentence. It is well established that an excessive force claim does not usually bear the requisite relationship under *Heck* to mandate its dismissal. *See Jackson v. Suffolk County Homicide Bureau,* 135 F.3d 254, 256-57 (2d Cir.1998) (reversing dismissal of excessive force claim pursuant to *Heck* because a finding that excessive force had in fact been used would not necessarily require the invalidation of the conviction); *see also Jeffreys v. City of New York,* No. 99 Civ. 4602, 2000 WL 1459845, at \*5 (S.D.N.Y. Sept. 29, 2000) (excessive force claim need not implicate the validity of a conviction); *Dawkins v. City of Utica,* No. 91 Civ. 867, 1994 WL 675047, at \*4 (N.D.N.Y. Nov. 28, 1994) (excessive force claim does not necessarily impugn plaintiff's convictions for the underlying offense). While the possibility exists that in certain cases *Heck* may nevertheless bar an excessive force claim, *see Covington v. City of New York,* 171 F.3d 117, 122 (2d Cir.1999) (stating the determination of whether *Heck* applies is "inherently a factual one"), this is not such a case.

i. Deadly Force

Plaintiff argues that the troopers' decision to open fire on all of the passengers in the car violated his constitutional rights under the Fourth Amendment. However, this Court has already determined that the Plaintiff "lacks standing to bring a § 1983 claim for deadly force on behalf of himself and on behalf of his brother." *See Smith v. Fields,* 1998 WL 709815, at \*4-5. Accordingly, this Court need not evaluate the "objective reasonableness" of the troopers' decision to shoot Thomas Smith. [5]

[5]   Any such examination, however, would compel the conclusion that the troopers acted in an objectively reasonable manner. *See Tennessee v. Garner,* 471 U.S. 1, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. ); *see also Green v. Montgomery,* 43 F.Supp.2d 239, 242 (E.D.N.Y.1999) (stating that "officers may use deadly force when confronted with a grave risk of death ); *Javid v. Scott,* 913 F.Supp. 223, 227 (S.D.N.Y.1996) (stating that where the officer reasonably believes deadly force is necessary to protect himself or others from death or serious harm, such force may be used to effect the arrest of a fleeing felon).

As Plaintiff's excessive force allegations with respect to Defendant Fields are limited to his participation in the shooting, and since this Court has already found that the Plaintiff lacks standing to assert a § 1983 deadly force claim resulting from the troopers' decision to use deadly force, Defendant Field's motion for summary judgment is hereby GRANTED.

ii. Post-Shooting Use of Force

**\*5** As for Plaintiff's other allegations of excessive force, this Court finds that even accepting the allegations as true many of the proffered examples do not, as a matter of law, amount to a cognizable Fourth Amendment excessive force claim. Plaintiff's allegation that he was dragged out of the car, thrown to the ground, and threatened at gunpoint, (Pl.'s 56.1 Stmt. ¶ 10), does not constitute the use of excessive force. Although there is a dispute concerning the manner in which the Plaintiff got out of the car, this dispute is not material. Once the shooting concluded the troopers unquestionably had an interest in

apprehending and handcuffing the other individuals in the car as expeditiously as possible. Further, when the troopers first approached the car they saw the Plaintiff lying down in the back and trying to cover himself with a blanket or a coat. (Pl.'s 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. ¶ 15). It is not an unreasonable assumption that Plaintiff may have offered further resistance if the officers did not act swiftly. Under the circumstances facing the officers after the shooting, pulling the Plaintiff out of a car and taking him to the ground to be handcuffed cannot be considered objectively unreasonable. *See Graham,* 490 U.S. at 397 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."); *see also Smith v. City of New Haven,* 166 F.Supp.2d 636, (D.Conn.2001) (force used to pull defendant out of car not objectively unreasonable). Further, Trooper Anthony's threat of force likewise does not support an excessive force claim. *See Aderonmu v. Heavey,* No. 00 Civ. 9232, 2001 WL 77099, at *3 (S.D.N.Y. Jan 26, 2001) (interrogation at gun point does not amount to use of excessive force); *Murphy v. Pizarro,* No. 94 Civ. 0471, 1995 WL 565990, at *3 (S.D.N.Y. Sept. 22, 1995) (stating that "mere verbal abuse is not a § 1983 violation insofar as the mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations" (citations and alterations omitted)).

Of considerably more concern to this Court, however, are the Plaintiff's allegations that he was slapped and kicked in the head after he was handcuffed. [6] (Pl.'s 56.1 Stmt. ¶ 10). Anthony disputes the Plaintiff's account and denies ever punching or kicking the Plaintiff. (Anthony Aff. ¶ 10). In arguing that Plaintiff's slapping and kicking allegations are not supported by the evidence, Anthony points out that the Plaintiff's Emergency Room Record as well as his Discharge Instructions fail to demonstrate that Plaintiff suffered any injuries other than the abrasions caused by the shattered glass from the rear window. (Selwin Aff. Ex. A). Indeed, these Arden Hill Hospital records, do not appear to indicate that the Plaintiff complained of or was treated for slaps or kicks to the head. Further, Plaintiff's Prehospital Care Report does not contain any notations to support Plaintiff's kicking and slapping allegations. [7] (Pl.'s 56.1 Stmt. Ex. B).

[6] The Court notes that in the Plaintiff's sworn Complaint he makes slightly different allegations. According to the Complaint, Defendant Anthony "handcuffed the plaintiff excessively tight then repeatedly slapped and punched plaintiff about the face and head and then "angrily kicked plaintiff twice around the right arm and rib cage area and once in the leg. (Second Am. Compl. ¶ 21.) Plaintiff claims that while at the hospital he was treated for pain on the right side of his body. (*Id.*)

[7] Prehospital Care Report, Objective Physical Assessment/Comments reads: Patient] riding in back of car hit by gunfire. Multiple wounds to back, patient] was covered with glass ... unreadable] ... Patient] stated he was lying on seat in back of car. Patient] transported in prone position due to handcuffs. Patient] c/o complains of] pain in arms and hands from cuffs. Patient] had swelling a little at hand].

**\*6** Defendants, citing *Shabazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y.1998), argue that in the absence of any corroboration from the medical records that Plaintiff was slapped or kicked in the head, Plaintiff's excessive force claim should be dismissed in its entirety. [8] The court in *Shabazz,* noted that at summary judgment it was authorized to " 'pierce the veil of the complaint's factual allegations,' dispose of '[s]ome improbable allegations', and dismiss the claim" where the facts alleged "are so contradictory that doubt is cast upon their plausibility." *See id .* at 470 (quoting *Denton v. Hernandez,* 504 U.S. 25, 32-3 (1992). While none of the medical reports indicate that Plaintiff complained of injuries resulting from Anthony's alleged slaps and kicks, Plaintiff's claim and the factual allegations that support it which are contained in the Plaintiff's sworn Verification that accompanies his Opposition may not be properly disregarded by this Court. Plaintiff's allegations are not "so contradictory" as to cast doubt upon their plausibility. Further, the fact that the Emergency Room Report and the Prehospital Care Report do not appear to indicate that Plaintiff complained of kicks and slaps to the head may not be dispositive. In deciding a summary judgment motion, this Court must make all inferences in favor of the nonmoving party. Although the apparent lack of any indication in the medical records suggesting that Plaintiff was in fact slapped and kicked about the head casts some doubt on his claim, it is for the fact finder to determine the veracity of the Plaintiff's account and whether his allegations, even if standing alone, amount to excessive force. Finally, it is

possible the cryptic handwriting on the medical records conceals the actual information that Plaintiff provided to the hospital staff. Although Defendants have submitted an affidavit from a Green Haven Correctional Facility doctor that attempts to explain the information contained in the records from Arden Hill Hospital, it is clear to this Court that not every piece of information from the records has been included in the doctor's summary. Thus, the possibility exists that some of the unexplained notations could support Plaintiff's post-shooting excessive force claim. Accordingly, summary judgment on the Plaintiff's excessive force claim is DENIED with respect Defendant Anthony.

8    The Court notes that the Defendants do not argue that the Plaintiff's post handcuff allegations do not amount to excessive force under the standard that governs such claims.

C. Qualified Immunity

Despite the existence of material facts, the Court must nevertheless determine whether Officer Anthony is entitled to qualified immunity. [9] Qualified immunity is " 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' " *See Saucier v. Katz,* 121 S.Ct. 2151, 2156 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). The existence of disputed material facts does not necessarily render the applicability of qualified immunity a jury question. As the Supreme Court has recently stated, the first inquiry is whether "a constitutional right would have been violated on the facts alleged." *Saucier,* 121 S.Ct. at 2155-56 (stating that the threshold question is "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").

9    Although the Defendants argue that they are entitled to qualified immunity, their Memorandum of Law largely ignores Plaintiff's allegation that he was slapped and kicked about the face and head once he was placed in handcuffs. Instead, as discussed *supra* at 16, Defendants argue that they need not address Plaintiff's factual allegations since the medical records do not support his claim.

**\*7** If a constitutional violation is established, the next question is whether "the right was clearly established." *Saucier,* 121 S .Ct. at 2155; *see also Poe v. Leonard,* No.

00-9024, 2002 WL 237411, at \*7 (2d Cir. Feb. 19, 2002) (stating that in the Second Circuit qualified immunity is also established where "it was objectively reasonable for the defendant to believe that his action did not violate such [clearly established] law"). This determination "must be undertaken in light if the specific context of the case, not as a general broad proposition," *Saucier,* 121 S.Ct at 2156, and must be made in light of the law as it existed at the time of the alleged constitutional violation, *see Kerman v. City of New York,* 261 F.3d 229, 237 (2d Cir.2001) (noting that a "reasonable police officer cannot be expected to anticipate developments in the law"). While it must be "clear to a reasonable officer that his conduct was unlawful in the situation confronted," the controlling standard, need not be embodied consistently in one verbal formulation as long as "courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand ...." *Saucier,* 121 S.Ct. at 2156-57. In sum, "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.* at 2158; *see also Poe,* 2002 WL 237411, at \*7 (stating that if rational jury could only conclude that reasonable officers would disagree about the legality of the defendant's conduct under the circumstances qualified immunity applies).

As discussed *supra,* claims of excessive force are evaluated under the framework established in *Graham v. Conner,* 490 U.S. 386 (1989). Applying the *Graham* factors to the use of force that Plaintiff alleges to have endured post-shooting, it cannot be said that this use of force was objectively reasonable. Although it is necessary to consider the totality of the circumstances confronting the officers at the time while recognizing that not every shove or push violates the Fourth Amendment, the facts alleged by the Plaintiff in this case force the Court to conclude that he has stated an excessive force claim under the Fourth Amendment. Here, the Plaintiff was allegedly handcuffed, on the ground, and offering no resistance to Officer Anthony at the time he claims excessive force was exercised. Even though the Officers' use of deadly force was reasonable given the facts and circumstances with which they were initially confronted, once the Plaintiff was pulled out of the car, taken to the ground, and handcuffed, the kicks and slaps that

Officer Anthony allegedly delivered to the Plaintiff's head and body, absent any contemporaneous resistence, was objectively unreasonable. Further, it is beyond dispute that the right to be free from excessive force has long been clearly established. *Green v. Montgomery,* 219 F.3d 52, 59 (2d Cir.2000); *see, e.g., Messina v. Mazzeo,* 854 F.Supp. 116, 143 (E.D.N.Y.1994) ("[t]aking the allegations in the [complaint] to be true ... if the Defendants, without provocation, stuck and beat Plaintiff while arresting him ... then Defendants have used excessive force unwarranted by the circumstances [and thus] Defendants have violated the clearly established law of the Fourth Amendment and are not entitled to qualified immunity." (quoting *Ramirez v. Barrett,* No. 93-C-2706, 1994 WL 8254 (N.D.Ill. Jan. 7, 1994))); *Cox v. County of Suffolk,* 780 F.Supp. 103, 109 (E.D.N.Y.1991) ("When there was no provocation, police officers have been held liable under § 1983 for the use of relatively minor physical force against a person in their custody."); *Pastre v. Weber,* 717 F.Supp. 992, 995 (S.D.N.Y.1989) ("To the extent that [defendant] went beyond the force necessary to arrest plaintiff, he rendered his 'seizure' of plaintiff 'unreasonable' and actionable under 42 U.S.C. § 1983 under the standard recently enunciated in *Graham v. Connor.* (citation omitted)).

**\*8** Thus, the only remaining question is whether it was objectively reasonable for Officer Anthony to believe that his actions comported with the Fourth Amendment's prohibition of excessive force. *Poe,* 2002 WL 237411, at \*7. However, this determination is not possible at this time. *See Kerman,* 261 F.3d 229, 240 (stating that " '[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are

material to a determination of reasonableness' " (quoting *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999))); *Breen v. Garrison,* 169 F.3d 152, 153 (2d Cir.1999) (stating that "parties' versions of the material facts differ markedly ... [thus] preclud[ing] summary judgment on the defense of qualified immunity").

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is hereby GRANTED with respect to Defendant Fields and DENIED with respect to Defendant Anthony. Having found the existence of genuine issues of material fact, the Court hereby establishes the following schedule for pretrial submissions: (1) Proposed Requests to Charge and Proposed *Voir Dire* shall be submitted by May 3, 2002.

(2) Joint Pre-trial Order ("JPTO"): A JPTO shall be submitted by July 1, 2002. The JPTO shall conform to the Court's Individual Rules.

(3) Memoranda of Law addressing those issues raised in the JPTO shall be submitted by July 1, 2002. Responses to the Memoranda shall be submitted by July 29, 2002. There shall be no replies.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 342620

---

2013 WL 1310554
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Tyrone HOUSTON a/k/a Tyrone Black, Plaintiff,
v.
The CITY OF NEW YORK, Individually and as
Municipal Agency for the State of New York; M.
Toussaint, Shield # 30127, Individually And as
Police Officer for the City of New York; Steve
Alcaraz, Transit Kings Task Force; Seargent
Richard Brea, Tax # 903476, Transit Kings Task
Force; Detective Robert Funes, Shield # 2392,
Brooklyn Transit Robbery Squad, Defendants.

No. 06 CV 2094(RJD)(LB).
|
March 28, 2013.

**Attorneys and Law Firms**

Tyrone Houston, Romulus, NY, pro se.

Brian G. Maxey, Donald Sanford, Nyc Law Department,
New York, NY, Leticia Joy Santiago, Corporation
Counsel of the City of NY, New York, NY, Lisa Marie
Richardson, New York Law Dept., New York, NY, for
Defendants.

## MEMORANDUM OF DECISION

DEARIE, District Judge.

**\*1** *Pro se* plaintiff Tyrone Houston brings this action
against various city defendants alleging violations of
his federal and state constitutional rights and state tort
claims stemming from his arrests in January and April
of 2006 and the ensuing prosecutions. The gravamen of
plaintiff's claims is that New York police officers and
detectives arrested him without probable cause, conspired
to falsely charge and convict him, and retaliated against
him for a previous lawsuit against New York City Police
Department officers. However, these claims are belied by
plaintiff's guilty pleas to disorderly conduct and grand
larceny.

Defendants moved to dismiss the complaint for failure to
state a claim under Federal Rule of Civil Procedure 12(b)
(6). For the following reasons, the motion is granted.

## I. BACKGROUND

### A. The January 2006 Arrest and Plea

On January 27, 2006 at approximately 7 P.M., plaintiff
was arrested by Police Officer Toussaint ("Toussaint")
and his partner. ECF Docket # 11, Plaintiff's [Second]
Amended Complaint ("Compl."), at 3.   Plaintiff alleges
that the arrest was made "without probable cause" and
suggests that it was a pretext for a robbery investigation by
Toussaint and Detective Robert Funes ("Funes") of the
Brooklyn Transit Robbery Squad. According to plaintiff,
Toussaint told him that he fit the description of a black
male who was wanted in connection with numerous
subway robberies, and then Toussaint and Funes took
pictures of him to show robbery victims. Compl. at 3  4.

1      The Complaint paragraphs are inaccurately
       numbered. We refer to page numbers.

Plaintiff claims that when the victims did not identify
him as the perpetrator, Funes instructed Toussaint to
charge plaintiff with various crimes in retaliation for
past lawsuits he had brought against N.Y.P.D. officers.
Compl. at 4. Plaintiff was then transferred to Brooklyn
Central Booking, where he claims he received no medical
treatment, shower, hot food, or sleep for approximately
two days, "despite noted medical conditions," including
"Iacomo [sic], high blood pressure and water in the knees."
*Id.* He met with a Legal Aid attorney at 10:40 a.m. on
January 29, 2006, and was arraigned within the hour.
Compl. at 5.

According to official records, plaintiff was arrested after
officers observed him urinating on a subway platform.
ECF Docket # 112, Exhibit C, 2006 Arrest Report.
Plaintiff does not directly dispute this sequence of events;
he merely states he was arrested "without probable cause."
Compl. at 3. The arresting officers recovered two knives
from his person, one from the right jacket pocket and
the other from an inside pocket. ECF Docket # 112, Exhibit
C, 2006 Arrest Report. The next day, he was charged with
two violations of New York City Administrative Code 10
133(G), Possession of Knives or Instruments in Excess of
Four Inches, and one violation of New York City Health

Code 153.09, Urinating in Public. ECF Docket # 112, Exhibit D, Criminal Court Complaint dated January 28, 2006.

On February 2, 2006, plaintiff pled guilty to one count of Disorderly Conduct, N.Y.P.L. § 240.20, in satisfaction of the charge, and was sentenced to time served. ECF Docket # 112, Exhibit E, Certificate of Disposition.

**B. The April 2006 Arrest and Plea**

**\*2** On March 9, 2006, the District Attorney served plaintiff with an Order to Compel him to stand in two more lineups related to robberies that took place on January 14 and January 16, 2006. ECF Docket # 11, Compl., Exhibit D, Order and Affirmation in Support of the People's Motion for a Lineup Order. He believes this is evidence that Funes and the Brooklyn Transit Robbery Squad were involved in a conspiracy to detain him on false charges. Compl. at 5–6. Plaintiff argues that on March 16, 2006, Funes falsely arrested and charged him with the January 14, 2006 robbery, despite the fact that the robbery victims failed to identify him in the line-up. Compl. at 6. Plaintiff also alleges that in a court proceeding on April 11, 2006, "two new Black victims" informed the court that he was not the robber, and that defendants told them to pick him out of the line-up anyway. Compl. at 7.

According to official records, plaintiff was arrested on April 5, 2006 in connection with the January 14, 2006 robbery. The arrest was made pursuant to Kings County Grand Jury Indictment 2006–02546, charging him with one count of N.Y.P.L. § 160.15, Robbery in the 1st Degree, and one count of N.Y.P.L. § 265.02, Criminal Possession of a Weapon in the 3rd Degree. ECF Docket # 112, Exhibit G, April 5, 2006 Arrest Report.

On January 23, 2012, plaintiff pled guilty to one count of N.Y.P.L. § 155.30, Grand Larceny in the 4th Degree, in full satisfaction of Indictment 2006–02546. ECF Docket # 112, Exhibit H, Certificate of Disposition, Case No.2006–02546. Plaintiff sought to withdraw his guilty plea when he was informed that "as a third time violent felon, he would be subject to consecutive sentences by operation of law" pursuant to New York Penal Law § 70.25(2 a). ECF Docket # 116, Letter to Judge Dearie, at 1; *see also* ECF Docket # 107, Plaintiff's Memorandum of Law at 3. Plaintiff filed an application seeking to withdraw his guilty plea on July 2, 2012, and the motion was denied. ECF Docket # 109, Letter Regarding the Status of Plaintiff's

Motion to Withdraw His Guilty Plea, August 3, 2012; *see also* ECF Docket # 116, Exhibit A, Denial of Plaintiff's Motion to Set Aside Sentence.

**C. Procedural History**

Plaintiff filed a *pro se* complaint under 42 U.S.C. §§ 1983, 1985 and 1988 alleging violations of his state and federal constitutional rights and state tort law claims. We address his claims against the City of New York, Police Officer Toussaint, Steve Alcaraz and Sergeant Richard Brea of the Transit Kings Task Force, and Detective Robert Funes of the Brooklyn Transit Robbery Squad. [2] Defendants move to dismiss under Rule 12(b)(6).

[2]    Plaintiff's claims against Sergeant and Chief John Doe(s), Police Commissioner Raymond Kelly, and the Brooklyn Transit Robbery Squad have been dismissed. *See* ECF Docket # 7, Memorandum and Order by Judge Dearie (07/27/2006).

## II. DISCUSSION

**A. Standard of Review**

To avoid dismissal under 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Kitchen v. Phipps Houses Group of Cos.,* 380 Fed. Appx. 99, 100 (2d Cir.2010) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (affirming dismissal of *pro se* plaintiff's complaint). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). In assessing a motion to dismiss under 12(b)(6), this Court relies on the facts and allegations in the complaint, including any documents incorporated by reference or attached as exhibits. *Blue Tree Hotels Inv. (Canada), Ltd. et al. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004). It may also consider public records. *Id.* The Court reads all facts in the light most favorable to the plaintiff. *Id.*

**\*3** Courts hold *pro se* complaints to "less stringent standards" than those drafted by lawyers. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Although liberally construed, *pro se* complaints must still meet procedural requirements. *See Estelle v.*

*Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (applying more general pleading standard under *Conley v. Gibson,* 355 U.S. 41, 45 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) and still dismissing *pro se* claims); *see also Harris v. Mills,* 572 F.3d 66, 71 72 (2d Cir.2009) (applying *Twombly* standard to *pro se* complaint and affirming 12(b)(6) dismissal).

**B. *Heck v. Humphrey***
Plaintiff's claims arising out of his April 2006 arrest and guilty plea to grand larceny are subject to review pursuant to the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In *Heck,* the Court addressed the overlap between § 1983 and the federal habeas corpus statute. 512 U.S. at 489 90. The Court held that when a state prisoner seeks damages pursuant to § 1983, the district court must consider whether a judgment in favor of plaintiff "would necessarily imply the invalidity of his conviction or sentence." *Id.* at 486 87. If it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has been invalidated. *Id.* Because plaintiff has not alleged that his conviction for grand larceny has been reversed, expunged, declared invalid, or called into question by a writ of habeas corpus, it is subject to review under the *Heck* doctrine.

On the other hand, plaintiff is not in custody for the disorderly conduct charge. Because nothing in the record supports the conclusion that federal habeas corpus review of that conviction is available, we need not address whether plaintiff's claims arising out of that conviction are barred by *Heck. See* 28 U.S.C. §§ 2241(c)(1) (requiring prisoner to be "in custody" to challenge his conviction); *U.S. ex rel. Myers v. Smith,* 444 F.2d 75, 76 (2d Cir.1971) (holding that a state prisoner in custody for an unrelated felony is not entitled to habeas corpus relief to challenge a conviction for which he had served the sentence and was unconditionally released); *Huang v. Johnson,* 251 F.3d 65, 75 (2d Cir.2001) (concluding that plaintiff with no remedy in habeas corpus is not barred by *Heck* ); *Leather v. Eyck,* 180 F.3d 420, 424 25 (2d Cir.1999) (plaintiff's claims not barred by collateral estoppel or res judicata because he could not have sought damages for his alleged constitutional injuries while defending himself in the underlying charges). We dismiss these claims on other grounds.

**C. Specific Claims**
*1. False Arrest*
A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). To prevail on his claim for false arrest, plaintiff must show that defendants "intentionally confined him without his consent and without justification." *Id.* "Probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Faruki v. City of New York,* 2013 WL 452536, at *1 (2d Cir.2013) (quoting *Weyant,* 101 F.3d at 852); *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 315 (N.Y.1975). Moreover, in this Circuit, "[a] valid prosecution resulting in conviction is conclusive evidence that probable cause existed for an arrest, *Cameron v. Fogarty,* 806 F.2d 380, 387 (2d Cir.1986), even if the conviction is the result of a guilty plea to a lesser charge than that for which plaintiff was arrested." *Hope v. City of New York,* 2010 WL 331678, at *2 (E.D.N.Y.2010) (Cogan, J); *see also Desir v. Desena,* 2013 WL 678186 (E.D.N.Y.2013) (Mauskopf, J.); *Roundtree v. City of New York,* 778 F.Supp. 614, 619 (E.D.N.Y.1991) (Glasser, J.) (plaintiff who plead guilty to disorderly conduct after being arrested for possession of cocaine is precluded from bringing a section 1983 action for false arrest).

**\*4** Accordingly, plaintiff's false arrest claims stemming from the January and April 2006 arrests fail on the basis of his guilty pleas to disorderly conduct and grand larceny. Defendants' motion to dismiss plaintiff's false arrest claims is granted.

*2. Malicious Prosecution Claims*
The elements of a malicious prosecution claim under New York law and § 1983 are the same because the elements of a § 1983 claim are borrowed from State law. *Cook v. Sheldon,* 41 F.3d 73, 78 (2d Cir.1994). To succeed on a claim for malicious prosecution, plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir.2003) (citations omitted).

Since plaintiff is still incarcerated following his guilty plea to grand larceny, and was sentenced to time served for disorderly conduct, he cannot demonstrate the requisite favorable termination. *See Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). Even if plaintiff could demonstrate favorable termination, his guilty plea establishes probable cause. See *Husbands v. City of New York,* 335 Fed. Appx. 124 (2d Cir.2009) (existence of probable cause defeated plaintiff's claim for false arrest and malicious prosecution); *Jovanovic v. City of New York,* 486 Fed. Appx. 149, 152 (2d Cir.2012) ("An element of any malicious prosecution claim is the absence of probable cause").

Plaintiff's malicious prosecution claim with respect to his April 2006 conviction is also *Heck*-barred because his recovery on this claim would imply that his conviction for grand larceny was invalid. *See Duamutef v. Morris,* 956 F.Supp. 1112, 1116 (S.D.N.Y.1997) (barring malicious prosecution claim); *see also Channer v. Mitchell,* 43 F.3d 786, 787 (2d Cir.1994) (allegations that two police officers committed "numerous acts of perjury and coerced witness to wrongfully identify [plaintiff]" in state court criminal proceedings were properly dismissed where plaintiff "offered no proof that his conviction had been independently invalidated.").

Defendants' motion to dismiss plaintiff's malicious prosecution claims is granted.

### 3. First Amendment Retaliation

Plaintiff includes the First Amendment on his list of violated rights. Compl. at 8. We construe the claim liberally to suggest that defendants prosecuted him with false testimony in order to retaliate against him for (1) his prior law suit against the City or (2) his unwillingness to answer defendants' questions pertaining to the robbery violations. Nevertheless, defendants' motion to dismiss these claims is granted.

A claim for retaliation cannot be sustained "when the criminal prosecution was supported by probable cause." *Mozzochi v. Borden,* 959 F.2d 1174, 1179 80 (2d Cir.1992) ("An individual does not have the right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government."); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 120 (2d Cir.1995) (upholding dismissal of First Amendment retaliation claim "if the officer ... had probable cause ... then we will not examine the officer's underlying motive in arresting and charging the plaintiff."), *cert denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996).

**\*5** Furthermore, plaintiff's retaliation claim with respect to the April 2006 arrest is *Heck* barred because it requires him to demonstrate an absence of probable cause supporting the charges against him, thus calling into question the validity of his conviction.

### 4. Malicious Abuse of Process

To state a claim for malicious abuse of process under § 1983 and New York law, a plaintiff must show that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside legitimate ends of process." *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003) (quoting *Cook,* 41 F.3d at 80; *Curiano v. Suozzi,* 63 N.Y.2d 113, 116, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984) (malicious motive in issuing a summons does not establish abuse of process). "[I]t is not sufficient for a plaintiff to allege that defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *See Savino,* 331 F.3d at 76.

Plaintiff's conclusory allegation that defendants were seeking to retaliate against him for a prior law suit is not sufficient; such retaliation is an improper *motive,* but not an improper *purpose* beyond or in addition to his criminal prosecution. "The mere act of issuing process does not give rise to a claim." *Lopez v. City of New York,* 901 F.Supp. 684, 691 (S.D.N.Y.1995) (citing *PSI Metals v. Firemen's Insurance Co. of Newark, N.J.,* 830 F.2d 42 (2d Cir.1988)).

Plaintiff's malicious abuse of process claim with respect to his April 2006 arrest and conviction is also *Heck-barred* because it would implicate the validity of his conviction. *See Zarro v. Spitzer,* 274 Fed. Appx. 31, 34 (2d Cir.2008) (applying *Heck* to bar malicious abuse of process claim).

Accordingly, defendants' motion to dismiss plaintiff's malicious abuse of process claim is granted.

*5. Eighth Amendment / Unconstitutional Conditions of Confinement*

Plaintiff's argument that defendants were deliberately indifferent to his "serious medical needs" is frivolous. "An inmate attempting to show deliberate indifference must demonstrate that defendants "act[ed] or fail[ed] to act with actually aware of a substantial risk that serious inmate harm w[ould] result." *Salahuddin v. Goord,* 467 F.3d 264, 280 (2d Cir.2006). Plaintiff's "medical conditions," including "Iacomo [sic], high blood pressure and water in the knees," would not be apparent to a Central Booking officer, and plaintiff does not plead that he brought them to anyone's attention or that he required certain medication he was refused. Furthermore, it is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (internal quotation marks omitted). Plaintiff does not identify an official personally involved in the alleged deprivations.

**\*6** Plaintiff's allegations fare no better when construed as a claim for unconstitutional conditions of confinement. To sustain a claim, plaintiff must show "(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (internal quotations omitted). Again, plaintiff does not identify a defendant official. His accusations regarding indifference to his health are vague and insufficient for the reasons stated above. And, his allegation regarding the temperature of his food or the amount of sleep he was afforded are frivolous and/or contradicted by the record.

Defendants' motion to dismiss these claims is granted.

*6. Municipal Liability*

Lastly, plaintiff seeks to hold the City of New York liable for the conduct of Toussaint and Funes, suggesting that the City has a policy or custom of "negligently hiring and supervis[ing] police officers." Compl. at 2,7. However, because plaintiff has not stated a claim against any of the defendant officers or detectives, his claims against the City also fail. *See Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *see also Curley v. Village of Suffern,* 268 F.3d 65, 71 (2d Cir.2001) ("[A] municipality cannot be liable for inadequate training or supervision when the officers involved in the arrest did not violate the plaintiff's constitutional rights.").

Even if he had stated a claim against one of the individual officers, his claim again the city would fail nonetheless. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 663 n. 7, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1998). Respondeat superior does not provide a basis for the City's liability, *Id.,* and the complaint is "devoid of factual support for [any] references to a municipal policy," *Gordon v. City of New York,* 2012 WL 1068023, at *3 4 (E.D.N.Y.2012); *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998); *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991) (isolated incidents involving actors below the policy-making level do not suffice to show a municipal policy).

Accordingly, we dismiss plaintiff's claims against the City of New York.

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint isGRANTED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1310554

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

© 2019 Thomson Reuters. No claim to original U.S. Government Works.